**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK and ERIC GONZALEZ, *in his official capacity as the District Attorney of Kings County (Brooklyn)*,<br><br>          Plaintiffs,<br><br>    v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT; MATTHEW T. ALBENCE, *in his official capacity as Acting Director of United States Immigration and Customs Enforcement*; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and KEVIN K. MCALEENAN, *in his official capacity as Acting Secretary of Homeland Security*,<br><br>          Defendants. | CIVIL ACTION NO.<br><br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

**INTRODUCTION**

1.      This lawsuit challenges the federal government's recent unlawful and unconstitutional policy authorizing civil immigration arrests in and around New York State courthouses—a policy that disrupts the effective functioning of our courts, deters victims and witnesses from assisting law enforcement and vindicating their rights, hinders criminal prosecution, and undermines public safety.

2.      New York has a compelling interest in the proper functioning of its court system—one of the oldest and busiest in the Nation.  The unrestricted participation of parties, witnesses, and complainants is essential to the fair administration of justice.  When those

individuals fail to appear in court, justice is sometimes delayed and sometimes left undone.
Cases are not adjudicated or prosecuted and decisions are not rendered, or are rendered without
complete facts.  State resources are also squandered: judges and court staff must prepare for
proceedings that are canceled or adjourned, and must rearrange ever-more-crowded dockets to
accommodate these disruptions.  When the court system fails, that failure not only prejudices the
parties but also interferes with the administration of justice and undermines public confidence in
the courts.

3.      As a reflection of these important interests, the common law has for centuries
recognized a privilege against civil arrests in or around courthouses and court-related
proceedings.  That privilege, which remains a bedrock of New York common law, has long been
"deemed necessary for the maintenance of [the courts'] authority and dignity and in order to
promote the due and efficient administration of justice."  *Parker v. Marco*, 136 N.Y. 585, 589
(1893).

4.      Nothing in federal law, including in the Immigration and Nationality Act
("INA"), purports to abrogate this common-law privilege.  And until recently, federal
immigration authorities followed a longstanding practice of avoiding civil immigration arrests in
and around state courthouses, in recognition of the severe disruption that such arrests would have
on court proceedings and the resulting interference with the administration of justice by the
States.

5.      In January 2018, U.S. Immigration and Customs Enforcement ("ICE") formally
reversed this longstanding practice by issuing a directive addressing "Civil Immigration
Enforcement Actions Inside Courthouses" (the "Courthouse Civil Arrest Directive" or
"Directive").  The Courthouse Civil Arrest Directive generally allows civil immigration arrests

2

in or near state courthouses, subject only to vague, ill-defined, and poorly enforced cautions against undue interference that the Directive leaves individual agents and officers to follow or not on a case-by-case basis.

6.      ICE enforcement actions at courthouses in New York State have skyrocketed since the Directive was issued.  The regularity of ICE's public and aggressive enforcement activities in and around courthouses has significantly chilled participation in New York State courts: victims fear that ICE will apprehend them if they report crimes; defendants are afraid to exercise their constitutional right to defend their cases; plaintiffs and petitioners worry that bringing a civil action will lead to their arrest; and witnesses refuse to appear in court or assist state and local law enforcement officials, scared that doing so will result in their detention by federal authorities.  Without these actors, courts cannot accomplish their fundamental and historical role.  Nor can prosecutors effectively administer justice or protect the rule of law, thus endangering the safety of residents throughout New York State.

7.      To counteract these direct harms on the state court system, New York's Office of Court Administration ("OCA") and the Unified Court System ("UCS"), which OCA oversees, have taken measures to protect the integrity of state judicial functions while allowing ICE immigration arrests under more tailored circumstances.  The most recent UCS policy permits ICE agents and officers to conduct criminal arrests authorized by judicial warrants.  This policy has not, however, stopped ICE's practice of arresting parties and witnesses without a judicial warrant near New York State courthouses—including arrests on the courthouse steps.

8.      The State of New York and Eric Gonzalez, in his official capacity as the District Attorney of Kings County (Brooklyn), now bring this suit to vacate and enjoin implementation of the Courthouse Civil Arrest Directive, which suffers from numerous legal defects.

9.      First, ICE lacked statutory authority to issue the Directive.  Congress's authorization for the U.S. Department of Homeland Security ("DHS"), of which ICE is a part, to conduct civil arrests under the INA must be interpreted against the centuries-old common-law privilege against civil arrests in and around courthouses—a privilege that has been recognized since fifteenth-century England as essential to protecting courts' ability to function properly. Since the Founding era, American courts have likewise recognized the importance of the privilege in helping ensure that courts function properly.  Because Congress is presumed to retain long-established common-law principles, and because the INA did not expressly displace the common-law privilege against civil arrests in and around courthouses, ICE's statutory arrest authority does not extend to the areas protected by the privilege.  By authorizing civil arrests in violation of the privilege, the Directive exceeded ICE's statutory authority in violation of the Administrative Procedure Act ("APA").

10.      Second, the Directive also violates the APA because it is arbitrary and capricious. In issuing the Directive, ICE failed to account for its harm to state judicial proceedings or to justify the marginal benefits of the Directive against such harm—important factors that any rational decision-maker should have considered.

11.      Third, the Directive violates the Tenth Amendment to the U.S. Constitution.  That amendment preserves the States' historic sovereign autonomy to control the operation of their judiciaries and to pursue criminal prosecutions and other law enforcement actions, without interference by the federal government.  The Directive directly infringes on that autonomy.

12.      Plaintiffs the State of New York and District Attorney Eric Gonzalez therefore bring this action to vacate the Courthouse Civil Arrest Directive and enjoin its implementation in or around state courthouses.

**JURISDICTION AND VENUE**

13.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

2201(a).  Jurisdiction is also proper under the judicial review provisions of the APA, 5 U.S.C.

§ 702.

14.     Declaratory and injunctive relief is sought consistent with 5 U.S.C. § 706 and as

authorized in 28 U.S.C. §§ 2201 and 2202.

15.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1).

Defendants are United States agencies or officers sued in their official capacities.  Plaintiff the

State of New York is a resident of this judicial district, and a substantial part of the events or

omissions giving rise to this Complaint occurred and are continuing to occur within the Southern

District of New York.

**PARTIES**

16.     Plaintiff the State of New York, represented by and through its Attorney General,

is a sovereign state of the United States of America.  The Attorney General is New York State's

chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this

action.

17.     Plaintiff Eric Gonzalez is the District Attorney of Kings County (Brooklyn), and

brings this suit in his official capacity.  The Kings County District Attorney's Office (the

"Brooklyn DA") is responsible for protecting the public safety of residents and protecting the

integrity of the justice system in its jurisdiction.  The Office discharges those duties by, among

other things, investigating and prosecuting crime, assisting victims, and implementing various

crime prevention strategies.  The Brooklyn DA is one of the largest and busiest law enforcement

agencies in the country; Kings County is the most populous county in New York, and has a

population larger than that of fifteen States.

5

18.     Plaintiffs are aggrieved by Defendants' actions and have standing to bring this action because the Courthouse Civil Arrest Directive and its implementation harm Plaintiffs' sovereign, quasi-sovereign, economic, and proprietary interests and will continue to cause injury unless and until the Courthouse Civil Arrest Directive is vacated and Defendants' practices are permanently enjoined.

19.     Defendant U.S. Immigration and Customs Enforcement is a sub-agency of DHS. ICE is responsible for the administration of the interior enforcement provisions of the country's immigration laws.  ICE issued the Courthouse Civil Arrest Directive, and ICE agents and officers execute civil arrests in and around the courts of New York State pursuant to that Directive.

20.     Defendant Matthew T. Albence is the Acting Director of U.S. Immigration and Customs Enforcement.  He is sued in his official capacity.

21.     Defendant the U.S. Department of Homeland Security is a cabinet agency within the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f).  Its mandate includes the administration of the interior enforcement provisions of the country's immigration laws.  Agents of DHS execute civil arrests in and around the courts of New York State pursuant to the Courthouse Civil Arrest Directive.

22.     Defendant Kevin K. McAleenan is the Acting Secretary of Homeland Security. He is sued in his official capacity.

## ALLEGATIONS

## I.    The New York State court system.

23.     The judiciary of New York is established by the New York Constitution, which provides for a unified court system for the State.  *See* N.Y. Const. art. VI.  The New York State court system is one of the oldest in the country.  It plays the vital and fundamental role of

promoting the rule of law and serving the public.

24.    Each year, approximately 1,300 state judges and 1,800 local judges, along with 15,000 non-judicial employees, are responsible for administering over three million cases in courthouses across the State.  The New York Constitution grants New York's judiciary the powers required to perform its judicial functions and to protect its dignity, independence, and integrity.

25.    In addition to intermediate appellate courts (the Appellate Division) and a court of last resort (the Court of Appeals), New York has trial-level courts of general jurisdiction (the Supreme Court) and specialized trial-level courts, such as Family Court, Housing Court, and Surrogate's Court.  N.Y. Const. art. VI, § 1.

26.    Family Court, for instance, "is given a wide range of powers for dealing with the complexities of life so that its action may fit the particular needs of those before it," and has jurisdiction over abuse and neglect proceedings, custody and visitation, petitions for orders of protection from family members, child and spousal support, and adoption proceedings.  N.Y. Family Ct. Act § 141; N.Y. Const. art. VI, § 13.  Surrogate's Court is assigned jurisdiction over actions relating to the affairs of decedents, probate of wills, administration of estates, and guardianship of the property of minors.  N.Y. Const. art. VI, § 12.

27.    In addition to the courts established by the State Constitution, New York State has established courts designed to meet the evolving needs of access to justice.  Since 2000, UCS has created "problem-solving courts," which use innovative, non-traditional approaches to serve litigants and the community at large.  These courts provide holistic remedies tailored to the specific needs of the litigants before them.

28.    These courts include the Queens Human Trafficking Intervention Court, which

works with government agencies and non-profit organizations to provide comprehensive services to rehabilitate survivors of human trafficking; Harlem Community Justice Court; Midtown Community Court; Red Hook Community Justice Court; Brooklyn Young Adult Court; and Brooklyn Mental Health Treatment Court.

29.     UCS's Office of Policy and Planning works together with the Center for Court Innovation to administer these courts by engaging in judicial monitoring, coordination with outside services, treatment where appropriate, the removal of barriers between courts, and increased communication with stakeholders to address the root causes that bring litigants to court.  Like the rest of New York State courts, the problem-solving courts are committed to administering justice while enhancing public safety.

## II.     ICE policies regarding immigration enforcement activity in state courthouses.

### A.     ICE enforcement policies regarding courthouses before 2017.

30.     In 1952, Congress enacted the INA, which governs, among other things, the presence of noncitizens in the United States and the associated procedures for enforcing immigration law and removing those present in the United States without federal authorization. *See* Pub. L. No. 82-414, 66 Stat. 163 (1952) (codified at 8 U.S.C. § 1101 et seq.).

31.     Because "[r]emoval is a civil, not criminal, matter," *Arizona v. United States*, 567 U.S. 387, 396 (2012), arrests of immigrants who are subject to removal are generally civil arrests.  The INA authorizes civil arrests with and without warrants.  INA § 242(a), 8 U.S.C. § 1226(a).  Such warrants are issued not by judges but instead by DHS officials.  *See* 8 C.F.R. §§ 236.1, 241.2.

32.     ICE officers and agents may also execute judicial arrest warrants for federal crimes, *see id.* § 287.5(e)(4), but these warrants must be supported by probable cause to believe that the subject of the warrant has committed a crime.

33.    Before 2017, it was generally ICE's practice to instruct its agents and employees to enforce immigration law, and arrest and detain noncitizens, in a tailored manner with defined enforcement priorities through publicly released memoranda from its Director.

34.    For example, in March 2011, the then-Director issued a memorandum identifying the agency's civil immigration enforcement priorities.  *See* ICE Policy Number 10072.1, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (Mar. 2, 2011).  The memorandum explained that ICE has the resources to remove only about four percent of the estimated removable population each year.  *Id.*  ICE thus directed agents to prioritize the removal of the most dangerous (i.e., "Priority 1") noncitizens, defined as those who pose a danger to national security or a risk to public safety because, for example, they have "engaged in or are suspected of terrorism or espionage," or have been convicted of violent crimes.  *Id.* at 1.  Policy Number 10072.1 then prioritized the apprehension and removal of "[r]ecent illegal entrants" and "[a]liens who are fugitives or otherwise obstruct immigration controls."  *Id.* at 2.

35.    ICE has also issued policies to protect witnesses, crime victims, and other litigating parties.  In June 2011, the agency directed all ICE officers, agents, and attorneys to "exercise all appropriate prosecutorial discretion" in removal cases in order "to minimize any effect that immigration enforcement may have on the willingness and ability of victims, witnesses, and plaintiffs to call police and pursue justice."  ICE Policy No. 10076.1, *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs*, at 1 (June 17, 2011).

36.    Policy Number 10076.1 provided that "it is against ICE policy to initiate removal proceedings against an individual known to be the immediate victim or witness to a crime," and that "it is similarly against ICE policy to remove individuals in the midst of a legitimate effort to

protect their civil rights or civil liberties."  *Id.* at 1-2; *see also id.* ("To avoid deterring individuals from reporting crimes and from pursuing actions to protect their civil rights, ICE officers, special agents, and attorneys are reminded to exercise all appropriate discretion on a case-by-case basis when making detention and enforcement decisions in the cases of victims of crime, witnesses to crime, and individuals pursuing legitimate civil rights complaints.").  ICE has made clear, in 2014 and 2015 guidance memos, that any exceptions to this policy for arrests in courthouses should be applied narrowly only to a subset of "Priority 1" aliens (for example, aliens engaged in terrorism or espionage, or who present a national security risk).[1]

37.    Similarly, for more than 25 years, ICE has maintained a "sensitive locations" policy that generally prohibits ICE enforcement actions or investigative activities in sensitive community locations such as schools, hospitals, places of worship, funerals or other public religious ceremonies, and public demonstrations.[2]

**B.    The implementation of new ICE policies regarding courthouse enforcement activity since January 2017.**

38.    On January 25, 2017, President Trump issued an Executive Order that sought, among other goals, to dramatically increase immigration enforcement activity by ICE and other federal agencies, including expanded enforcement efforts against removable aliens.  Exec. Order

---

[1] Memorandum from Philip T. Miller, Assistant Director for Field Operations, to Field Office Directors & Deputy Field Office Directors, *Guidance Update: Enforcement Actions at or Near Courthouses* (Jan. 26, 2015); Memorandum from Philip T. Miller, Assistant Director for Field Operations, to Field Office Directors & Deputy Field Office Directors, *Enforcement Actions at or Near Courthouses* (Mar. 19, 2014).

[2] ICE Policy No. 10029.2, *Enforcement Actions at or Focused on Sensitive Locations* (Oct. 24, 2011); Memorandum from Julie L. Myers, Assistant Secretary, to All Field Office Directors & All Special Agents in Charge, *Field Guidance on Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations* (July 3, 2008); INS Policy HQ 807-P, *Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies* (May 17, 1993).

No. 13,768, *Enhancing Public Safety in the Interior of the United States*, 82 Fed. Reg. 8799 (Jan. 30, 2017).  According to the President's Press Secretary, the President's goal through this Executive Order was to "take the shackles off" ICE agents and other immigration officers.[3]

39.     Rather than prioritizing the removal of only the most dangerous noncitizens, Executive Order 13,768 abandoned previous priorities and directed the Secretary of Homeland Security to prioritize the removal of noncitizens who, among other classes, "[h]ave been charged with any criminal offense, where such charge has not been resolved."  Exec. Order No. 13,768, § 5(b), 82 Fed. Reg. at 8800.  In a memorandum implementing the Executive Order, the Secretary of Homeland Security announced that the "Department no longer will exempt classes or categories of removable aliens from potential enforcement."[4]

40.     ICE also specifically empowered ICE officers and agents to conduct civil immigration arrests in or near courthouses.  In March 2017, in response to concerns raised by the Chief Justice of the California Supreme Court regarding the increased presence of ICE agents and officers in state courthouses to make civil immigration arrests, the Secretary of Homeland Security and United States Attorney General jointly issued a public letter defending the practice of conducting immigration arrests in state courthouses and confirming that ICE has been conducting such arrests.[5]

---

[3] The White House, Press Briefing by Press Secretary Sean Spicer (Feb. 21, 2017), https://www.whitehouse.gov/briefings-statements/press-briefing-press-secretary-sean-spicer-022117.

[4] U.S. Dep't of Homeland Sec., Memorandum from Secretary John Kelly, *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf.

[5] Letter from Attorney General Jefferson B. Sessions III & Secretary of Homeland Security John F. Kelly to the Hon. Tani G. Cantil-Sakauye, Chief Justice, Supreme Court of California (Mar. 29, 2017).

41.     The Department publicly affirmed this practice throughout 2017.  In April 2017, a DHS spokesman confirmed that anyone attending court—including victims and witnesses—would be subject to civil immigration arrest: "Just because they're a victim in a certain case does not mean there's not something in their background that could cause them to be a removable alien.  Just because they're a witness doesn't mean they might not pose a security threat for other reasons."[6]  And in September 2017, an ICE spokesperson affirmed that "ICE plans to continue arresting individuals in courthouse environments."[7]

42.     On January 10, 2018, ICE formalized its enhanced enforcement initiative in Directive Number 11072.1, *Civil Immigration Enforcement Actions Inside Courthouses* (Jan. 10, 2018) (appended as Ex. 1).

43.     The Courthouse Civil Arrest Directive purports to generally authorize ICE officials to make civil arrests in any courthouse location.  The Directive explains that "law enforcement officials routinely engage in enforcement activity in courthouses throughout the country because many individuals appearing in courthouses for one matter are wanted for unrelated criminal or civil violations."  *Id.* at 1.  As a result, the Directive reasons, "ICE's enforcement activities in these same courthouses are wholly consistent with longstanding law enforcement practices, nationwide."

44.     The Directive acknowledges that civil immigration arrests in or near courthouses can cause substantial harms, but the Directive imposes little to no meaningful controls to prevent

---

[6] Devlin Barrett, *DHS: Immigration Agents May Arrest Crime Victims, Witnesses at Courthouses*, Wash. Post (Apr. 4, 2017), https://www.washingtonpost.com/world/national-security/dhs-immigration-agents-may-arrest-crime-victims-witnesses-at-courthouses/2017/04/04/3956e6d8-196d-11e7-9887-1a5314b56a08_story.html.

[7] Linley Sanders, *Federal Immigration Officials Will Continue Nabbing Suspects at New York Courthouses to Subvert Sanctuary City Status*, Newsweek (Sept. 15, 2017), https://www.newsweek.com/new-york-immigration-courthouse-arrests-continue-sanctuary-city-665797.

those harms.  For example, the Directive recognizes that ICE officers and agents should "conduct enforcement actions discreetly to minimize their impact on court proceedings," but says that they must do so only "[w]hen practicable"—a judgment that the Directive leaves to individual officers and agents.  *Id.* at 1.

45.     And although the Directive provides that "[a]liens encountered during a civil immigration enforcement action inside a courthouse" who are not "targeted alien[s] . . . will not be subject to . . . enforcement action, absent special circumstances," the Directive further provides that "ICE officers and agents will make enforcement determinations on a case-by-case basis in accordance with federal law and consistent with [DHS] policy" (with reference to two 2017 memos from the then-Secretary of Homeland Security that say nothing about courthouse arrests).  *Id.* at 1 & n.1.

46.     In issuing and enforcing the Courthouse Civil Arrest Directive, ICE did not fully consider the costs of its policy, adequately train its agents or officers, or explain why any marginal benefit of targeting civil arrests in or near courthouses outweighed the significant harms that previous policies identified as arising from such arrests.

47.     ICE also failed to consider how the Directive contravened Congress's vigorous provision of affirmative immigration relief to parties, including witnesses and victims of crime, that are often conditioned on state court access.

48.     For example, under 8 U.S.C. § 1101(a)(15)(U), noncitizen crime victims who have cooperated with law enforcement are eligible for immigration relief through the issuance of U-nonimmigrant visas.  The U-visa program, designed to encourage noncitizen participation in criminal investigations and prosecutions, and to protect public safety more broadly, often requires noncitizens to appear in state court as a prerequisite to immigration relief.

49.     In addition, Congress has provided for immigration relief for Special Immigrant

Juvenile Status ("SIJS") for certain vulnerable young people under 8 U.S.C. § 1101(a)(27)(J),

which is conditioned upon having a state court order that makes findings about juveniles' family

and custodial situations and their inability to return to their countries of origin.  8 U.S.C.

§ 1101(a)(27)(J)(i)-(ii).  The threat of civil arrest at state courthouses directly undermines

Congress's intent in authorizing these programs.

50.     Similarly, ICE also failed to consider how the Directive frustrates the

administration of New York State's problem-solving courts, which depend on the robust

participation of noncitizen litigants.  Because problem-solving courts routinely sentence

defendants to non-incarceration alternatives that require continued court monitoring—such as

drug treatment programs, mental health counseling, and job training—these courts cannot

perform their designated roles if noncitizen defendants are detained on their way to or from court

or are too afraid to return to court for fear of ICE apprehension.

51.     ICE similarly failed to consider the effect of the Courthouse Civil Arrest Directive

on noncitizen claimants, many of whom are especially vulnerable, such as tenants living with

hazardous conditions in their apartments, workers employed at unsafe worksites, and survivors

of intimate-partner violence.

**C.     New York's response to ICE's civil courthouse arrest policy.**

52.     ICE enforcement activities in New York State courthouses increased significantly

after the Courthouse Civil Arrest Directive was promulgated.  According to OCA's records, ICE

has conducted law enforcement activities in New York State courthouses on a *weekly* basis since

2017.  ICE agents and officers have arrested parties in courthouses, as well as on their way into

and out of New York State courts.

53.     In response to these disruptive activities, OCA's Chief Administrative Judge, who

14

oversees UCS, has twice updated UCS's policy for arrests in New York State courthouses to protect the integrity of judicial proceedings.

54.     First, in April 2017, UCS issued a policy mandating that all law enforcement officers who entered state courthouses to make an arrest identify themselves to security personnel, who must then inform a judge if the entering officers were "present in the courthouse with the intent of arresting or otherwise taking into custody a party or other participant in a case before th[at] judge."  Office of the Chief Admin. Judge, N.Y. State Unified Court Sys., *Policy and Protocol Governing Activities in Courthouses by Law Enforcement Agencies* (Apr. 26, 2017) (the "2017 UCS Policy") (appended as Ex. 2).

55.     The 2017 UCS Policy also provided that "[a]bsent leave of the court under extraordinary circumstances (e.g., extradition orders), no law enforcement action may be taken by a law enforcement agency in a courtroom."  Finally, the 2017 UCS Policy required that court security personnel file an "Unusual Occurrence Report" for each covered arrest.

56.     In April 2018, Governor Cuomo issued Executive Order No. 170.1, limiting federal immigration arrests in state facilities within executive control.  The Order provides that "[c]ivil arrests by federal immigration authorities may only be executed within state facilities when accompanied by a judicial warrant or judicial order authorizing them to take into custody the person who is the subject of such warrant, unless the civil arrest is related to a proceeding within such facility."  State of N.Y. Exec. Order No. 170.1, *Amendment to Executive Order 170—State Policy Concerning Immigrant Access to State Services and Buildings* (Apr. 25, 2018).

57.     Governor Cuomo's Order stated that "federal immigration authorities have increasingly conducted immigration enforcement activity in sensitive spaces crucial to

immigrants' full participation in the economic, civil, and cultural life of the State," which

"creates a chilling effect, preventing immigrants from fully participating in the State."[8]  *Id.*

58.     Despite these efforts from OCA and the Governor, ICE arrests in and around New

York State courthouses continued at an alarming rate.  By one calculation, ICE courthouse

operations in and around New York State courthouses increased by 1700% in 2018 compared to

2016.[9]  State and local prosecutors held a press conference in February 2018, imploring ICE to

halt its courthouse arrests of immigrants.[10]

59.     In response to continued ICE enforcement activities in 2018 and 2019, UCS

issued an updated policy regarding ICE activity in April 2019.  Office of the Chief Admin.

Judge, N.Y. State Unified Court Sys., *Protocol Governing Activities in Courthouses by Law

Enforcement Agencies* (Apr. 17, 2019) (the "2019 UCS Policy") (appended as Ex. 3).

60.     In relevant part, the 2019 UCS Policy updated the 2017 UCS Policy by providing

that ICE arrests inside a courthouse "may be executed . . . only pursuant to a judicial warrant or

judicial order authorizing the arrest," with judicial warrant and judicial order defined to mean "a

warrant or order issued by a federal judge or federal magistrate judge."  *Id.*

61.     The 2019 UCS Policy further requires that a UCS judge or court attorney "review

the warrant or order to confirm compliance with this requirement prior to any such arrest."  *Id.*

---

[8] Because the state court system is not under the Governor's control, Governor Cuomo's order does not apply to state courthouses.

[9] Immigrant Def. Project, *The Courthouse Trap: How ICE Operations Impacted New York's Courts in 2018*, at 6 (Jan. 2019), www.immigrantdefenseproject.org/wp-content/uploads/TheCourthouseTrap.pdf.

[10] Erin Durkin, *City DAs Plead with ICE to Stop Arresting Immigrants at NYC Courthouses: "It Jeopardizes Public Safety"*, N.Y. Daily News (Feb. 14, 2018), https://www.nydailynews.com/new-york/city-das-press-ice-stop-arresting-immigrants-courthouses-article-1.3820798.

III.   **ICE's enforcement activity in and near New York courthouses and court proceedings interferes with court functions, undermines public safety, and disrupts the administration of justice in the state.**

62.     Despite UCS's efforts to curb ICE arrests in New York State courthouses, ICE's ongoing enforcement practices—which include conducting civil arrests of parties and witnesses in the immediate vicinity of state courthouses, while they are going to or coming from judicial proceedings—have continued to deter noncitizens from participating in the judicial process. These arrests have significantly interfered with New York State courts' functioning and have hindered criminal prosecutions, in turn jeopardizing public safety.

A.     **ICE's immigration enforcement activity has significantly interfered with state court functions since 2017.**

63.     Since 2017, ICE has conducted enforcement activities in and around New York State courthouses, on average, more often than once a week—including after implementation of the 2019 UCS Policy.

64.     This law enforcement activity is not limited to the insides of courthouses: ICE has arrested parties on their way to court and as they leave the courthouse and court-related proceedings, regardless of whether they have subsequent court dates.

65.     ICE has also failed to produce people that they previously arrested for their criminal court dates, preventing courts from resolving open cases.

66.     These disruptions significantly impair the ability of New York courts to perform routine functions.  New York courts, like all courts, rely on parties and witnesses to attend proceedings.  When those parties and witnesses fail to do so, courts often must adjourn proceedings, thereby wasting judicial resources.  Such adjournments also delay the resolution of cases, causing uncertainty and delaying justice for litigants, victims, witnesses, and family members.  Indeed, the indefinite adjournment of proceedings when ICE deports individuals

against whom criminal charges are pending deprives victims of their day in court. And in all events, adjournments only add to the backlog of cases that UCS seeks to combat.

67.     Moreover, New York courts, like all courts, rely on public access to court proceedings to serve as a check on "arbitrary judicial behavior," promoting "confidence in the conscientiousness, reasonableness, [and] honesty of judicial proceedings" and serving as "an essential feature of democratic control." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006); *see Mosallem v. Berenson*, 76 A.D.3d 345, 348 (1st Dep't 2010). This "essential feature of democratic control" is undermined when members of the public are deterred from attending court proceedings.

68.     Numerous examples illustrate the deep disruptions often caused by ICE's civil arrests in and around New York courthouses and court-related proceedings. As the examples below show and as OCA's records confirm, this disruption has not abated following adoption of UCS's April 2019 Policy designed to limit ICE arrests in New York courthouses to those authorized by judicial warrant; to the contrary, court records show a spike in ICE enforcement activity around courthouses in May 2019, immediately following implementation of the 2019 UCS Policy.

69.     For example, in July 2019, ICE agents created a significant disturbance when they arrested a defendant who was entering Yonkers City Court to attend his court hearing. A team of ICE agents approached the man as he walked up to the front door of the courthouse building. When the man began opening the courthouse door, one of the agents stopped the door with his foot, breaking the glass on the door. The agents arrested the man. To ensure public safety, New York State Court Officers had to temporarily restrict entry into the courthouse.

70.     In June 2019, an ICE agent entered the New York County Criminal Courthouse

and informed the court officer that he was there to observe a defendant he intended to arrest. The ICE agent did not produce a judicial warrant, and a court officer stated that he could not arrest the defendant in the building.  The ICE agent said he intended to arrest the defendant outside the courthouse.  The court accordingly postponed the proceeding for nearly two months.

71.     In June 2019, two plainclothes ICE officers followed a criminal defendant and his wife out of the Queens County Criminal Courthouse.  Having identified him in the court room, ICE officers pushed him against a fence and arrested him.  They told his wife that "they had all entrances covered" and "watched him in the courtroom and followed him out."  His wife asked whether they had a warrant, and the agents said, "[O]h you will see one alright," but they never produced a warrant before arresting him.

72.     In May 2019, ICE agents arrested a noncitizen defendant as he was leaving the Kings County Courthouse.  During the arrest, the ICE agents pushed him against a wall and grabbed his phone.

73.     In August 2019, an ICE officer was waiting in the next room of Manhattan Criminal Court to arrest a noncitizen who was being offered a disorderly conduct plea to resolve her case.  Before her case was called, the attorney was informed that the ICE officer was waiting to arrest the noncitizen.  The ICE officer did not have a judicial warrant.  The attorney spoke to the ICE officer and informed him of the 2019 UCS Policy.  The ICE officer stated that he would wait until the noncitizen was outside and make the arrest outside the courthouse.

74.     In August 2019, an ICE agent informed a court officer in Kings County Criminal Court of his intention to arrest a noncitizen who had a court appearance.  The ICE agent did not have a judicial warrant.  The court officer informed him that he would have to make the arrest outside the courthouse.  The noncitizen's case was subsequently dismissed.

75.     In April 2019, two ICE officers informed a court officer that they were waiting outside the building to take an individual into custody outside of the Westchester County Courthouse.  The noncitizen had a 9:30 a.m. court hearing with a judge.  The court officer asked the ICE officers whether they were going to let the individual conduct his court business before arresting him, and the ICE officers said no.  They arrested him at 9:25 a.m. outside the courthouse.

76.     In April 2019, ICE officials arrested a pregnant mother attending a child custody hearing in Family Court in Queens.  She had just completed a preliminary custody hearing for her two U.S. citizen children, ages three and eleven, when ICE officials arrested her outside the courthouse, in front of her family members.[11]  ICE later transferred her to the ICE Bergen County Detention Center, where she received and reported no health care treatment for her pregnancy, despite acute symptoms.  Two months after her detention, her lawyers secured her release, alleging that ICE violated her First Amendment rights by placing her in expedited deportation proceedings in retaliation for complaining about poor health conditions and due process violations.[12]

77.     In March 2019, ICE officers in Westchester County Supreme Court informed court officers that they intended to arrest a defendant scheduled to appear in court.  In response to the court officers' question about whether they were going to let the individual attend his

---

[11] Molly Crane-Newman, Stephen Rex Brown, & Cathy Burke, *Queens Mom Ensnared in Immigration Quagmire in Race against Deportation Order*, N.Y. Daily News (June 24, 2019), https://www.nydailynews.com/new-york/ny-crime/ny-immigration-deportation-queens-guatamala-20190625-plghlwjxy5fqdaivxih43iy5t4-story.html.

[12] Dan M. Clark, *Attorneys Use First Amendment Argument to Halt Deportation of Pregnant Immigrant*, N.Y. Law Journal (July 1, 2019), https://www.law.com/newyorklawjournal/2019/07/01/attorneys-use-first-amendment-argument-to-halt-deportation-of-pregnant-immigrant; Molly Crane-Newman & Larry McShane, *Pregnant Queens Mom Released from ICE Custody, Reunited Saturday with Two Kids in Emotional Airport Scene*, N.Y. Daily News (July 6, 2019), https://www.nydailynews.com/new-york/nyc-crime/ny-ice-mother-released-20190707-4vafggkau5cwrcuc62d5o7fize-story.html.

proceedings, the ICE officers said they would not.  They then arrested the individual outside the courthouse before he could enter.

78.      In March 2019, an ICE agent arrested a noncitizen defendant outside the courtroom in Bronx County Criminal Court before his case was called.  The judge was informed and adjourned the defendant's case.

79.      In April 2018, ICE officers arrested a defendant at Queens County Criminal Court, just minutes after the court dismissed the charges against him.  The man had a green card application pending and is married to a U.S. citizen, with whom he has three children.  He had no prior criminal record.[13]

80.      In June 2018, several ICE officers approached a litigant as he was waiting for his case inside Westchester County Family Court.  The man asked the officers whether he could talk to the Family Court judge, his lawyer, or his partner.  The ICE officers would not let him, and instead took him into custody and began a proceeding to remove him from the country, thus impairing his ability to defend his case in Family Court.

81.      In September 2018, a criminal defendant was leaving Kings County Supreme Court with his attorney and family when he was surrounded by plainclothes ICE agents.  Two agents threw him against a wall and put his hands behind his back.  Two other plainclothes agents and a court officer blocked him from his attorney.  The ICE officers pulled the man into an unmarked car with no plates.  Several bystanders witnessed the commotion and one woman, believing that the man was being kidnapped, called 911.

82.      In June 2017, ICE officers sought to detain a noncitizen criminal defendant who

---

[13] Nicole Brown & Lauren Cook, *ICE Detains Immigrant at Queens Courthouse, Attorneys Say*, AM New York (Apr. 10, 2018), https://www.amny.com/news/ice-court-arrest-nyc-1.17942936.

had been charged with working illegally as a masseuse and identified as a possible survivor of human trafficking at the Queens County Human Trafficking Intervention Court.  The defendant had been on track to have the charges against her dismissed after completing her mandated counseling services.  The court set bail and later released the defendant on her own recognizance; ICE arrested three other people outside the courthouse, including one as she left the court and was walking toward the subway.  The presence of ICE officers inside the Human Trafficking Intervention Court prompted expressions of serious concern from state and local officials.[14]

83.     In November 2018, a defendant was on his way into the Queens County Criminal Court when he was violently arrested by three ICE officers.  Although his case was on track to be resolved by a noncriminal disposition, the man never got to resolve his case.[15]  ICE officers initially detained him in a New Jersey immigration jail, leaving him without access to free immigration counsel that is available in New York, despite facing removal with an open criminal case.  He was subsequently transferred to an ICE facility in Oklahoma and was quickly deported.  His criminal case remains open.

84.     In April 2018, a young woman was leaving the Midtown Community Court, a problem-solving court in Manhattan that imposes alternatives to incarceration for low-level offenses.  She had just received an adjournment in contemplation of dismissal when two ICE agents arrested her outside of the courthouse.

85.     In March 2018, a young man decided to accompany his brother to Queens County

---

[14] Beth Fertig, *Outcry After Immigration Agents Seen at Queens Human Trafficking Court*, WNYC (June 16, 2017), https://www.wnyc.org/story/outcry-after-immigration-agents-come-trafficking-victim-queens-courthouse; Liz Robbins, *A Game of Cat and Mouse with High Stakes: Deportation*, N.Y. Times (Aug. 3, 2017), https://www.nytimes.com/2017/08/03/nyregion/a-game-of-cat-and-mouse-with-high-stakes-deportation.html.

[15] Ryan Devereaux, *ICE Arrests at New York City Courthouses are Increasing—This Video Captures One*, The Intercept (Nov. 2, 2018), https://theintercept.com/2018/11/02/ice-arrests-video-nyc-courts.

Criminal Court.  The man and his brother were leaving the Queens courthouse when plainclothes ICE officers approached them and asked them for identification.  When they failed to produce U.S. identification, both men were handcuffed and taken into custody.

86.     In January 2019, an ICE agent informed a court officer at Bronx County Criminal Court that he intended to arrest a criminal defendant who had a court appearance that day.  The ICE agent did not produce a judicial warrant.  Before the defendant's case was called, the ICE agent arrested him inside the courthouse.

87.     In July 2017, ICE officers arrested a noncitizen inside a courtroom in Watervliet City Court, after he had been arraigned on traffic violations.

**B.     The Courthouse Civil Arrest Directive interferes with the prosecution of crimes in New York State.**

88.     The inability of state prosecutors to prosecute perpetrators and other dangerous individuals jeopardizes public safety throughout New York State.

89.     Plaintiff the Brooklyn DA's ability to prosecute cases has been deeply affected by ICE's civil courthouse enforcement activities, because those activities instill fear in immigrant communities, make victims and witnesses afraid to come forward to report crimes, and impair prosecutors' ability to obtain justice.

90.     In one case in the Brooklyn DA's office, a victim robbed at gunpoint refused to testify because he feared an ICE arrest in court.  In another case, a man robbed at knifepoint refused to testify because he was not a U.S. citizen.  Without his testimony, the assistant district attorney was forced to reduce the charges in that case to a misdemeanor.

91.     From the Brooklyn DA's experience, the Courthouse Civil Arrest Directive has also caused undocumented workers to fear coming forward with evidence and participate in an ongoing large-scale investigation of construction violations in New York City, thereby hindering

23

the overall investigation and prosecution of this matter.

92.     In another recent case involving the Brooklyn DA's office, an ICE arrest prevented a criminal defendant—a native and citizen of Uruguay—from being held to account for felony sexual and domestic violence.  The defendant was due in Kings County Criminal Court in May 2019 for a hearing on a proposed guilty plea that would have required the defendant to spend more than three years in prison.  Minutes before the hearing, ICE arrested him for a civil immigration violation.  The defendant was removed to Uruguay soon after. Having never answered for his alleged crimes in New York State court, the defendant, since his removal, has continued to harass the victim on social media, where he boasts about getting away with his past crimes.

93.     Because of ICE's premature removal of this defendant, he has evaded not only the criminal consequences of his alleged actions, but the immigration consequences as well.  He is not currently inadmissible: he could apply for a visa and would not face any bars to his legal re-entry.  And if he re-entered illegally, he would not be subject to any of the heightened penalties applicable had he been removed after conviction.  Although the defendant's victim still has an order of protection against him, the defendant's future harassment of the victim would likely not constitute criminal contempt, because ICE prevented the defendant from receiving notice of the order against him.  And although the criminal case remains pending, if the defendant were to re-enter and be apprehended, the victim, now traumatized by these developments, would be unlikely to cooperate in the prosecution.

94.     Numerous other prosecutors and law enforcement officials across the State have publicly reported that ICE's enforcement activities impede their prosecutions and crime-fighting efforts.

95.     Bronx County District Attorney Darcel D. Clark has explained that ICE apprehensions of crime witnesses have resulted in dismissals of Bronx DA prosecutions and in "dangerous individuals being released back into the community."[16]  DA Clark has also stressed the chilling effect on witnesses and survivors: "Witnesses and survivors already deal with enough trauma and are brave enough to show up to court and testify during a case.  They should not have to worry about being arrested at our courthouses."[17]

96.     New York County District Attorney Cyrus R. Vance, Jr., stated that ICE's policy of conducting civil arrests in and around Manhattan courthouses reduces cooperation with his office from crime victims and witnesses, and makes criminal defendants less likely to appear: "Deporting New Yorkers who show up to court is antithetical to our values and detrimental to our public safety.  The fear of unjust deportation stops crime victims from coming forward, and stops defendants from responsibly attending their court dates.  These policies threaten to marginalize immigrant New Yorkers to the point where they no longer report crimes or terror plots.  And so, local prosecutors like me now have to work twice as hard to assure immigrants that our office is a safe place to report crime without fear of getting deported."[18]

---

[16] Press Release, Office of the Bronx Borough President, *Elected Officials, Advocates, & Public Defenders Gather to Introduce Groundbreaking New Bill to Protect Immigrants from Unlawful ICE Arrests at Courthouses* (June 5, 2018), http://bronxboropres.nyc.gov/2018/06/05/elected-officials-advocates-and-public-defenders-gather-to-introduce-groundbreaking-new-bill-to-protect-immigrants-from-unlawful-ice-arrests-at-courthouses.

[17] Press Release, N.Y. State Senator Brad Hoylman, *Hoylman, Solages Intro ICE Out of Courts Bill with Support from DAs, Defenders, & Community Advocates* (Jan. 31, 2019), https://www.nysenate.gov/sites/default/files/press-release/attachment/protect_our_courts.pdf.

[18] *Oversight—ICE Out of New York Courts: Joint Hearing Before the N.Y. City Council Comms. on Immigration & the Justice System* (Apr. 10, 2019) (written statement of Cyrus R. Vance, Jr., Manhattan District Attorney), https://www.manhattanda.org/testimony-for-city-council-committees-on-immigration-and-the-justice-system-oversight-hearing-on-ice-out-of-new-york-courts.

97.     Albany County District Attorney David Soares stated, "The activities of Immigration and Customs Enforcement [are] compromising our ability to hold accountable perpetrators who prey upon victims from vulnerable immigrant communities."[19]

98.     Albany County Sheriff Craig D. Apple, Sr., expressed similar concerns: "If you're afraid to come forward out of fear of being swept up and deported, how many heinous crimes will go unreported?  If people are afraid to come to me and speak with me, then we have a problem."[20]

99.     Westchester County District Attorney Anthony A. Scarpino, Jr., reported that "[w]hen ICE uses our local courthouses to make civil immigration arrests, both immigrants who are victims of or witnesses to domestic violence, scams, wage theft or violent crimes are now fearful that coming to court may lead to arrest by ICE."[21]  DA Scarpino recently noted: "I have cases with witnesses who are scared to death about coming forward and participating in these trials now." [22]

100.     Nassau County District Attorney Madeline Singas also expressed concern that ICE's courthouse arrest practices were impacting crime reporting by noncitizens: "New York's justice system works best when everyone has access.  Immigrants who are victims of domestic

---

[19] Immigrant Def. Project, *Protect Our Courts Act: Prosecutor Statements* (Feb. 20, 2019), https://www.immigrantdefenseproject.org/wp-content/uploads/Prosecutor-Statements-Updated-02202019.pdf.

[20] Christina Goldbaum, *When Paying a Traffic Ticket Can End in Deportation*, N.Y. Times (June 30, 2019), https://www.nytimes.com/2019/06/30/nyregion/ice-courthouse-arrests.html.

[21] Immigrant Def. Project, *Protect Our Courts Act: Prosecutor Statements* (Feb. 20, 2019), https://www.immigrantdefenseproject.org/wp-content/uploads/Prosecutor-Statements-Updated-02202019.pdf.

[22] Christina Goldbaum, *When Paying a Traffic Ticket Can End in Deportation*, N.Y. Times (June 30, 2019), https://www.nytimes.com/2019/06/30/nyregion/ice-courthouse-arrests.html.

violence, wage theft, fraud, or violent crime should be able to seek justice regardless of their

status, and they should be able to come to court for that purpose without fear that their

appearance will lead to civil arrest by ICE."[23]

101.   Data from state prosecutors' offices also confirm the impact of the chilling effect

of ICE arrests in state courthouses.  For example, calls to the Brooklyn DA's Immigrant Affairs

Unit ("IAU") decreased by 67% in 2018 compared to 2016.[24]  Similarly, calls to the Nassau

County District Attorney's IAU fell from 51 calls in 2016 to only three calls in 2017, and eight

calls in 2018.[25]

102.   District Attorney "Clean Slate" events (warrant amnesty programs that allow

people to resolve any criminal summonses on site without risk of criminal arrest by state or local

police) have also seen a sharp decline.  The New York County District Attorney's office reported

that the number of people participating in Clean Slate events has declined significantly since

2017—from 460 people at an event in April 2016, to 380 people at an event in June 2017; to

approximately 200 people at an event in April 2018—and that this decrease in participation is

due in part to a fear that ICE may appear, stemming from ICE's increased presence in and

around courthouses.[26]  The New York County and Bronx County District Attorneys also

---

[23] Immigrant Def. Project, *Protect Our Courts Act: Prosecutor Statements* (Feb. 20, 2019), https://www.immigrantdefenseproject.org/wp-content/uploads/Prosecutor-Statements-Updated-02202019.pdf.

[24] Immigrant Def. Project, *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations on New York State*, at 13-14 & fig. 2 (2019), https://www.immigrantdefenseproject.org/wp-content/uploads/Safeguarding-the-Integrity-of-Our-Courts-Final-Report.pdf.

[25] *Id.* at 14-15 & fig.3.

[26] *Id.* at 17.

experienced a decline in requests for victim-related assistance in their Family Justice Centers.[27]

103.    The Domestic Violence Bureau of the Bronx County District Attorney's office has publicly reported that numerous complaining witnesses expressed fear of testifying or otherwise participating in criminal proceedings due to ICE presence in the courthouse, including at least one instance in which a previously cooperative complaining witness became extremely reluctant to testify following several news reports regarding ICE arrests occurring in courthouses.[28]

104.    Despite encouragement by state prosecutors, many noncitizens who are survivors of intimate partner violence and would qualify for a protective order are now not willing to seek such an order because it requires going to court, where the victims fear ICE arrest for themselves and their families.

105.    ICE enforcement activities directed at witnesses, victims, and defendants who are attending, or traveling to or from, court proceedings greatly impede Plaintiffs' ability to fairly and effectively prosecute crimes, and thereby threaten public safety and undermine the integrity of the justice system.

## IV.    Common law and federal statutory background.

### A.    The fundamental common-law privilege against civil arrests in and around courthouses.

106.    The common law recognizes a historical privilege against civil arrests in or around courthouses and court-related proceedings, dating back to fifteenth-century England. *Parker*, 136 N.Y. at 589; *see also Meekins v. Smith* (1791) 126 Eng. Rep. 363, 364; *Orchard's Case* (1828) 38 Eng. Rep. 987, 987; *Ex parte Byne* (1813) 35 Eng. Rep. 123, 123.

---

[27] *Id.*

[28] *Id.* at 11-12.

107.     This privilege extends not only to parties and witnesses, but also to all people "necessarily attending" the courts on business.  3 William Blackstone, *Commentaries on the Laws of England* 289 (1769) ("Suitors, witnesses, and other persons, necessarily attending any courts of record upon business are not to be arrested during their actual attendance, which includes their necessary coming and returning."); *accord Meekins*, 126 Eng. Rep. at 364; *Spence v. Stuart* (1802) 102 Eng. Rep. 530, 530.

108.     This rule avoids a significant problem posed by civil arrests in courthouses: if courthouses became a convenient forum for effectuating arrests, many parties would not attend, thus undermining the judicial system as a whole.  *See, e.g.*, *The King v. Holy Trinity in Wareham* (1782) 99 Eng. Rep. 530, 531 (holding that "for the purpose of justice," and "to encourage witnesses to come forward voluntarily," they are privileged from arrest "in coming, in staying, and in returning" from court); *Meekins*, 126 Eng. Rep. at 363.

109.     This privilege was repeatedly upheld by English courts and remains a bedrock principle of American common law.  *See, e.g.*, *Lamb v. Schmitt*, 285 U.S. 222, 225 (1932) ("[T]he due administration of justice requires that a court shall not permit interference with the progress of a case pending before it, by the service of process in other suits, which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation."); *Page Co. v. MacDonald*, 261 U.S. 446, 448 (1923); *Ryan v. U.S. Immigration & Customs Enf't*, 382 F. Supp. 3d 142, 156 (D. Mass. 2019); *Person v. Grier*, 66 N.Y. 124, 125 (1876); *In re Kimball*, 14 F. Cas. 474, 474 (S.D.N.Y. 1867).  Like their English counterparts, American courts interpreted the privilege broadly, encompassing "all cases" and "any matter pending before a lawful tribunal" (including arbitrations and examinations).  Simon Greenleaf, *A Treatise on the*

*Law of Evidence* § 317, at 475 (16th ed. 1899).

110.   New York courts, in particular, have recognized and vigorously enforced the common law privilege of immunity from civil arrest in and around courthouses.  *Norris v. Beach*, 2 Johns. 294, 294 (Sup. Ct. 1807) ("We have power to compel the attendance of witnesses, and when they do attend, we are bound to protect them redeundo."); *see generally Sanford v. Chase*, 3 Cow. 381 (N.Y. 1824).

111.   Moreover, like the U.S. Supreme Court, the New York Court of Appeals has recognized that the privilege protected "parties and witnesses from all forms of civil process" not only during their attendance at court" but also "for a reasonable time in going and returning." *Parker*, 136 N.Y. at 589; *Person*, 66 N.Y. at 125.  And like the U.S. Supreme Court, the Court of Appeals observed that the privilege belongs to the court "and is deemed necessary for the maintenance of its authority and dignity and in order to promote the due and efficient administration of justice."  *Parker*, 136 N.Y. at 589.

112.   Based on this historic principle, it is the duty of "[c]ourts of justice . . . everywhere to be open, accessible, free from interruption, and to cast a perfect protection around every man who necessarily approaches them."  *Stewart v. Ramsay*, 242 U.S. 128, 130 (1916) (quotation marks omitted).

**B.**   **Congress has not abrogated the fundamental common-law right against arrests in and around courthouses and court proceedings.**

113.   The Supreme Court has long recognized the "presumption favoring the retention of long-established and familiar principles" under the common law, which can be overcome only when "a statutory purpose to the contrary is evident."  *United States v. Texas*, 507 U.S. 529, 534 (1993) (quotation marks omitted).  To demonstrate a contrary statutory purpose, the statute must "speak[] directly to the question addressed by the common law."  *Pasquantino v. United States*,

544 U.S. 349, 359 (2005) (quotation marks omitted).

114.    The statute in question, the INA, allows the federal government to make civil

arrests for the violation of federal immigration laws.  But the INA does not speak directly to the

common law privilege against civil courthouse arrests.

115.    Because the INA is silent on courthouse arrests, Congress presumably intended to

retain rather than displace that "long-established and familiar principle[]," *Texas*, 507 U.S. at

534, when it authorized civil arrests.

116.    As a result, the INA's grant of civil arrest authority incorporates and is limited by

the common law privilege against courthouse arrests.

### C.    State sovereignty under the Tenth Amendment.

117.    The Tenth Amendment provides that "[t]he powers not delegated to the United

States by the Constitution, nor prohibited by it to the States, are reserved to the States

respectively, or to the people."  U.S. Const. amend. X.

118.    The power to administer state court proceedings is a power decidedly reserved to

the States.  Since our nation's founding, our federal system of government has recognized the

right of States to try cases free from federal interference.  *See, e.g.*, *Younger v. Harris*, 401 U.S.

37, 43 (1971).  Indeed, States have the prerogative to control "the internal workings" of state

court proceedings, *Kaufman v. Kaye*, 466 F.3d 83, 86 (2d Cir. 2006)—a prerogative grounded in

States' "fundamental constitutional independence," *Chick Kam Choo v. Exxon Corp.*, 486 U.S.

140, 146 (1988).  Likewise, "each State's power to prosecute is derived from its own 'inherent

sovereignty,' not from the Federal Government."  *Heath v. Alabama*, 474 U.S. 82, 89 (1985).

119.    Underlying these firmly recognized rights is the principle that the federal

government generally may not entrench on a State's power, "sometimes termed its police power,

to prescribe regulations to promote the health, peace, morals, education and good order of the

people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity." *Barbier v. Connolly*, 113 U.S. 27, 31 (1884).

120.    And States' "reserved powers" under the Tenth Amendment include the power to regulate their court systems. *Atlantic Coast Line R.R. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 285 (1970).

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Administrative Procedure Act—Exceeds Statutory Authority)

121.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

122.    Under the APA, courts must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

123.    Defendants may only exercise authority conferred by statute. *City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013).

124.    New York recognizes a common-law privilege against civil arrests in, or while traveling to or from, courthouses.

125.    ICE arrests based on alleged civil immigration infractions are civil arrests authorized by the Immigration and Nationality Act. *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984).

126.    A long-established common-law privilege forbids civil arrests in or near courthouses.  Congress is presumed to retain such long-established common-law principles unless it expressly provides otherwise.  Congress did not displace the common-law privilege when it enacted the INA.  To do so, Congress would have had to "speak[] directly to the question

addressed by the common law." *Pasquantino*, 544 U.S. at 359 (quotation marks omitted). But the civil-arrest provisions in the INA do not speak directly to the common-law privilege against civil arrests in or near courthouses: although the INA contains two provisions that authorize arrests, *see* 8 U.S.C. § 1226(a) (arrests with warrant); § 1357(a)(2) (arrests without a warrant), neither of them mentions courthouses at all.

127.    The Courthouse Civil Arrest Directive authorizing civil arrests of people in, or traveling to or from, courthouses, and ICE's practice of carrying out civil arrests against parties, witnesses, and others attending New York courts on official business, thus exceed ICE's statutory authority.

128.    The Courthouse Civil Arrest Directive is therefore "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of the APA. 5 U.S.C. § 706(2)(C).

129.    Defendants' violation causes ongoing harm to Plaintiffs and their residents.

### SECOND CLAIM FOR RELIEF

### (Administrative Procedure Act—Arbitrary and Capricious)

130.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

131.    The APA provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

132.    The Courthouse Civil Arrest Directive is arbitrary and capricious because Defendants did not fully consider the foreseeable harms of their policy, did not adequately explain prioritizing civil arrests in or near courthouses over those harms, and did not adequately justify the change from Defendants' prior policies on courthouse arrests.

133.    The Courthouse Civil Arrest Directive is therefore "arbitrary, capricious, [or] an

abuse of discretion" in violation of the APA.  5 U.S.C. § 706(2)(A).

134.    Defendants' violation causes ongoing harm to Plaintiffs and their residents.

**THIRD CLAIM FOR RELIEF**

**(U.S. Constitution amend. X)**

135.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

136.    The Tenth Amendment preserves the states' historic, sovereign, and fundamental autonomy to control the operation of their judiciaries and to pursue criminal prosecutions.

137.    The states' judicial, prosecutorial, and police powers are among the most important powers that the Constitution reserves to the states.  *United States v. Morrison*, 529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

138.    The INA does not contain an "unmistakably clear" authorization for Defendants to intrude on these core sovereign interests.  *See Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

139.    The Courthouse Civil Arrest Directive impermissibly interferes with New York's right to form its own government by interfering with state court operations and impeding criminal prosecutions in violation of the Tenth Amendment.  ICE's Directive, and ICE's practice under the Directive of carrying out civil arrests against parties, witnesses, and others attending New York courts on official business, unduly interfere with New York's right and ability to operate its own court system and pursue criminal prosecutions because it interferes with the administration of justice in New York State courts.

140.    ICE's unprecedented civil enforcement activities in and around state courthouses create a documented chilling effect that deters defendants, would-be litigants, claimants, and

witnesses from bringing violations of state law to law enforcement authorities, and from participating in state court proceedings.

141.    The Courthouse Civil Arrest Directive, and ICE's implementation of the Directive, significantly interfere with core sovereign functions in violation of the Tenth Amendment.

142.    Defendants' violation causes ongoing harm to Plaintiffs and their residents.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

1.    Issue an order holding unlawful, vacating, and setting aside the Courthouse Civil Arrest Directive (ICE Directive No. 11072.1 (Jan. 10, 2018)).

2.    Declare that the Courthouse Civil Arrest Directive is in excess of Defendants' statutory jurisdiction, authority, or limitations, or short of statutory right within the meaning of 5 U.S.C. § 706(2)(C);

3.    Declare that the Courthouse Civil Arrest Directive is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

4.    Declare that the Courthouse Civil Arrest Directive is unconstitutional;

5.    Enjoin Defendants and all their officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under the Courthouse Civil Arrest Directive, and from civilly arresting parties, witnesses, and any other individual coming to, attending, or returning from courthouses or court-related proceedings;

6.    Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees.

7.    Grant such other and further relief as the Court deems just and proper.

35

DATED:  September 25, 2019                Respectfully submitted,

                                          LETITIA JAMES
                                          *Attorney General of the State of New York*

                                          By: */s/ Matthew Colangelo*
Steven C. Wu                              Matthew Colangelo
   *Deputy Solicitor General*                *Chief Counsel for Federal Initiatives*
Scott A. Eisman                           Anjana Malhotra, *Assistant Attorney General*
   *Assistant Solicitor General*          Morenike Fajana, *Special Counsel*
                                          Office of the New York State Attorney General
*Of Counsel*                              28 Liberty Street
                                          New York, NY 10005
                                          Phone: (212) 416-6057
                                          Matthew.Colangelo@ag.ny.gov

                                          *Attorneys for the State of New York*

                                          ERIC GONZALEZ
                                          *District Attorney of Kings County (Brooklyn)*

                                          By: */s/ Jill Harris*
                                          Jill Harris, *Chief of Policy and Strategy*
                                          Kings County District Attorney's Office
                                          350 Jay Street
                                          Brooklyn, New York 11201
                                          Phone: (718) 250-3156
                                          harrisj1@BrooklynDA.org

                                          *Attorney for the District Attorney of Kings
                                          County (Brooklyn)*