UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK and ERIC GONZALEZ,

          Plaintiffs,

   v.

UNITED STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT; MATTHEW T. ALBENCE, in his
official capacity as Acting Director of United States
Immigration and Customs Enforcement; UNITED STATES
DEPARTMENT OF HOMELAND SECURITY; and
KEVIN K. MCALEENAN, in his official capacity as
Acting Secretary of Homeland Security,

          Defendants.

19 Civ. 8876 (JSR)

 

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2614/2721
Fax: (212) 637-2686
Email: rebecca.friedman@usdoj.gov
       tomoko.onozawa@usdoj.gov

REBECCA R. FRIEDMAN
TOMOKO ONOZAWA
Assistant United States Attorneys, *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ...................................................................................................................3

    A.    Federal Statutory Removal and Arrest Authority ...................................................3

    B.    The Directive ........................................................................................................4

ARGUMENT .......................................................................................................................6

    A.    Standard of Review ...............................................................................................6

    B.    Plaintiffs' APA Claims Should be Dismissed .......................................................7

            1.    Plaintiffs Are Not Within the Zone of Interests of Sections 1226 or 1357 of the INA ...............................................................................7

            2.    This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' APA Claims Because the Directive Concerns Enforcement Actions That Are Committed to Agency Discretion by Law ...........................................9

            3.    This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' APA Claims Because the Directive Is Not a Final Agency Decision.................11

            4.    This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' APA Claims Because the Directive Addresses Only ICE Arrests Inside Courthouses...........................................................................................13

    C.    Plaintiffs' APA Claims Fail As a Matter of Law Because the Directive Is Not in Excess of ICE's Authority .......................................................................14

            1.    There Is No Common Law Privilege Against Federal Immigration Enforcement in Courthouses....................................................................14

            2.    Congress Established a Comprehensive Immigration Detention Scheme That Displaced any Prior Common Law on Civil Immigration Enforcement Arrests ...........................................................19

    D.    Plaintiffs' Tenth Amendment Claim Must be Dismissed......................................24

CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

PAGE(S)

Cases

*Am. Elec. Power Co. Inc. v. Connecticut*,
    564 U.S. 410 (2011) ........................................................................................ 19, 20, 24

*Arizona v. United States*,
    567 U.S. 387 (2012) ................................................................................................ passim

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ....................................................................................................... 6

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
    501 U.S. 104 (1991) ..................................................................................................... 20

*Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*,
    968 F.2d 196 (2d Cir. 1992) .......................................................................................... 6

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................................. 6, 7

*Bennett v. Spear*,
    520 U.S. 154 (1997) ..................................................................................................... 11

*Block v. Cmty. Nutrition Inst.*,
    467 U.S. 340 (1984) ....................................................................................................... 9

*Bowen v. Mich. Acad. of Family Physicians*,
    476 U.S. 667 (1986) ....................................................................................................... 9

*Brass v. Am. Film Techs., Inc.*,
    987 F.2d 142 (2d Cir. 1993) .......................................................................................... 7

*Broadgate Inc. v. U.S. Citizenship & Imm. Servs.*,
    730 F. Supp. 2d 240 (D.D.C. 2010) ............................................................................ 12

*Bronsztejn v. INS*,
    526 F.2d 1290 (2d Cir. 1975) ........................................................................................ 1

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001) ..................................................................................................... 21

*Chrysler Corp. v. Brown*,
 441 U.S. 281 (1979)................................................................................................. 12

*City of Milwaukee v. Illinois & Michigan*,
 451 U.S. 304 (1981)................................................................................ 18, 19, 20

*City of New York v. Beretta U.S.A. Corp.*,
 524 F.3d 384 (2d Cir. 2008)................................................................................. 24

*City of New York v. BP P.L.C.*,
 325 F. Supp. 3d 466 (S.D.N.Y. 2018)................................................................... 24

*Clarke v. Sec. Indus. Ass'n*,
 479 U.S. 388 (1987)................................................................................................ 7, 9

*Connecticut v. Physicians Health Servs. of Connecticut, Inc.*,
 287 F.3d 110 (2d Cir. 2002)................................................................................. 25

*Cont'l Indus. Grp., Inc. v. Altunkilic*,
 633 F. App'x 61 (2d Cir. 2016) ............................................................................. 16

*E. Bay Sanctuary Covenant v. Trump*,
 932 F.3d 742 (9th Cir. 2018) ............................................................................... 18

*Erie R. Co. v. Tompkins*,
 304 U.S. 64 (1938)................................................................................................. 15

*Ex Parte Lamar*,
 274 F. 160 (2d Cir. 1921)...................................................................................... 17

*F.D.I.C. v. Meyer*,
 510 U.S. 471 (1994)................................................................................................. 6

*Gardner v. United States*,
 246 F. Supp. 1014 (S.D.N.Y. 1965)..................................................................... 16

*Heckler v. Chaney*,
 470 U.S. 821 (1985)............................................................................................ 9, 10

*Herrera-Inirio v. I.N.S.*,
 208 F.3d 299 (1st Cir. 2000)........................................................................... 21, 25

*Hodel v. Virginia Surface Mining & Reclamation Ass'n*,
 452 U.S. 264 (1981)............................................................................................... 21

*In re Arthur Treacher's Franchise Litig.,*
  92 F.R.D. 398 (E.D. Pa. 1981) ................................................................. 16

*In re Kimball,*
  14 F. Cas. 474 (S.D.N.Y. 1867) ............................................................... 15

*INS v. Legalization Assistance Project,*
  510 U.S. 1301 (1993) .................................................................................. 8

*Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement,*
  326 U.S. 310 (1945) ................................................................................... 18

*Jennings v. Rodriguez,*
  138 S. Ct. 830 (2018) .................................................................................. 8

*Kappa Printing Group, LLC v. Archie Comic Publ'ns, Inc.,*
  No. 17 CV 7511, 2018 WL 2561032 (S.D.N.Y. June 4, 2018) .................. 6

*Lamb v. Schmitt,*
  285 U.S. 222 (1932) ............................................................................. 14, 19

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State,*
  104 F.3d 1349 (D.C. Cir. 1997) ............................................................... 10

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014) .................................................................................... 7

*Light Tech., Inc. v. N. Lights Club,*
  236 F.3d 57 (1st Cir. 2001) ................................................................... 16, 19

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) ............................................................................... 9, 12

*Lunney v. United States,*
  319 F.3d 550 (2d Cir. 2003) ....................................................................... 9

*Match-E-Be-Nash v. Patchak,*
  567 U.S. 209 (2012) .................................................................................... 7

*Milardo v. Kerilikowske,*
  No. CV316MC00099 (VLB), 2016 WL 1305120 (D. Conn. Apr. 1, 2016) ............ 21

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
  138 S. Ct. 1461 (2018) ........................................................................ 24, 25

iv

*Nat'l Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ............................................................................. 12

*Netograph Mfg. Co. v. Scrugham*,
   197 N.Y. 377 (1910) ............................................................................................. 15

*New England Industries v. Margiotti*,
   270 A.D. 488 (N.Y. App. Div. 1st Dep't 1946) .................................................... 15

*Noel v. Chapman*,
   508 F.2d 1023 (2d Cir. 1975) ............................................................................... 12

*Norris v. Beach*,
   2 Johns 294 (N.Y. Sup. Ct. 1807) ........................................................................ 15

*Page Co. v. MacDonald*,
   261 U.S. 446 (1923) ............................................................................................. 14

*Parker v. Marco*,
   136 N.Y. 585 (1893) ....................................................................................... 15, 17

*Pavlo v. James*,
   437 F. Supp. 125 (S.D.N.Y. 1977) ...................................................................... 16

*Perez v. Mortg. Bankers Ass'n*,
   135 S. Ct. 1199 (2015) ......................................................................................... 12

*Person v. Grier*,
   66 N.Y. 124 (1876) ............................................................................................... 15

*Phifer v. City of New York*,
   289 F.3d 49 (2d Cir. 2002) ..................................................................................... 6

*Printz v. United States*,
   521 U.S. 898 (1997) ............................................................................................. 24

*Rajah v. Mukasey*,
   544 F.3d 427 (2d Cir. 2008) ................................................................................... 8

*Reno v. Flores*,
   507 U.S. 292 (1993) ............................................................................................. 20

*Sanford v. Chase*,
   3 Cow. 381 (N.Y. 1824) ....................................................................................... 15

*Secretary of Labor v. Twentymile Coal Co.*,
   456 F.3d 151 (D.C. Cir. 2006) .......................................................... 11

*Shakhnes v. Berlin*,
   689 F.3d 244 (2d Cir. 2012) ........................................................... 11

*Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*,
   528 F.3d 310 (4th Cir. 2008) .......................................................... 11

*States of New York v. Dep't of Justice*,
   343 F. Supp. 3d 213 (S.D.N.Y. 2018) ............................................. 25

*Stewart v. Ramsay*,
   242 U.S. 128 (1916) ....................................................................... 14

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*,
   752 F.3d 239 (2d Cir. 2014) ............................................................. 6

*Truax v. Raich*,
   239 U.S. 33 (1915) ......................................................................... 20

*United States v. Alabama*,
   691 F.3d 1269 (11th Cir. 2012) ..................................................... 20

*United States v. Conley*,
   80 F. Supp. 700 (D. Mass. 1948) ................................................... 17

*United States v. Green*,
   305 F. Supp. 125 (S.D.N.Y. 1969) ........................................... 16, 17

*United States v. Vasquez-Benitez*,
   919 F.3d 546 (D.C. Cir. 2019) ....................................................... 21

*Wayte v. United States*,
   470 U.S. 598 (1985) ....................................................................... 11

**Statutes**

5 U.S.C. § 701 .................................................................................... 9

5 U.S.C. § 702 .................................................................................. 11

5 U.S.C. § 704 .................................................................................. 11

5 U.S.C. § 706(2)(C) ........................................................................... 2

8 U.S.C. § 1226(a) ..................................................................................................... passim

8 U.S.C. § 1229(e) ................................................................................................. 1, 8, 23

8 U.S.C. § 1182 .................................................................................................................. 1

8 U.S.C. § 1231 ............................................................................................... 1, 18, 22

8 U.S.C. § 1252 .................................................................................................................. 8

8 U.S.C. § 1326 .................................................................................................................. 4

8 U.S.C. § 1357 ............................................................................................................. 1, 8

8 U.S.C. § 1367 ....................................................................................................... 5, 8, 23

## Rules

Fed. R. Civ. P. 12(b)(1) .................................................................................................. 1, 6

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 1, 6, 7

N.Y. C.P.L.R. § 302(a) .................................................................................................... 17

Defendants respectfully submit this memorandum of law in support of their motion to dismiss Plaintiffs' complaint ("Compl.") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Pursuant to Congress's "plenary power over the admission of aliens and their right to remain in the United States," *Bronsztejn v. INS*, 526 F.2d 1290, 1291 (2d Cir. 1975), Congress has codified the Executive Branch's constitutional and inherent authority to investigate, arrest, and detain aliens who are suspected of being, or found to be, unlawfully present in the United States. *See* 8 U.S.C. §§ 1182, 1225, 1226, 1229, 1231, 1357. The Executive Branch may, among other things, arrest aliens with or without a warrant pending a decision on whether they are to be removed from the United States. *Id.* §§ 1226(a), 1357(a)(2).

Defendant United States Immigration and Customs Enfocement ("ICE") has long exercised its arrest authority at and around courthouses. ICE has a strong interest in removing aliens who engage in criminal activity, often pursuant to a detainer issued to another law enforcement agency with custody of an alien to obtain a direct transfer of the alien once state or federal criminal proceedings and detention has concluded. On January 10, 2018, ICE promulgated Directive 11072.1, "Civil Immigration Enforcement Actions Inside Courthouses" (the "Directive"), which set forth a revised policy guidance for the exercise of ICE's discretionary arrest authority *inside* federal, state, and local courthouses against specific, targeted aliens with criminal convictions, gang members, national security or public safety threats, aliens who have failed to depart from the United States despite a final order of removal, and aliens who have re-entered the country illegally after being removed.

Notwithstanding the Executive Branch's "broad" and "undoubted power" to implement its statutory arrest authority, *Arizona v. United States*, 567 U.S. 387, 394 (2012), the State of

New York and Eric Gonzalez, in his official capacity as the District Attorney of Kings County (collectively, "Plaintiffs"), assert that the Directive violates the Administrative Procedure Act ("APA"), because a so-called "common-law privilege against civil arrests in and around courthouses," Compl. ¶ 9, precludes ICE from exercising its arrest authority under provisions of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1226 and 1357, and because the Directive is arbitrary and capricious.  5 U.S.C. § 706(2)(C).  Plaintiffs also assert that the Directive violates the Tenth Amendment, because it purportedly intrudes on New York State's "historic sovereign autonomy to control the operation of their judiciaries and to pursue criminal prosecutions and other law enforcement actions."  Compl. ¶ 11.

Plaintiffs' complaint should be dismissed.  As a general matter, the Directive is unreviewable under the APA because: (1) Plaintiffs lack a cognizable cause of action under zone-of-interests principles; (2) the circumstances and location of an arrest is a matter fully committed to agency discretion by law and for which there are no judicially manageable standards; and (3) it is a general statement of agency policy and not a final agency decision within the meaning of the APA.  Additionally, because the Directive addresses ICE civil enforcement actions *inside* federal, state, and local courthouses and is silent with regard to arrests outside or near courthouses, the Directive is unreviewable under the APA because it is not a final agency decision which addresses ICE enforcement activities outside courthouses.  To the extent that Plaintiffs contend that the Directive can be read to regulate ICE enforcement activities outside state courthouses—which it does not—the Directive is not reviewable under the APA because there are no justiciable standards by which this Court can determine how far or near the perimeter of a courthouse ICE agents may lawfully effectuate an arrest.

In addition, Plaintiffs' reliance on a "common-law privilege against civil arrests in or near courthouses," Compl. ¶ 126, fails for two reasons: (1) there is no federal common law immunity from immigration enforcement for those who are subject to ICE arrest; and (2), even if there were such an expansive common law privilege, Congress established a comprehensive system of immigration laws which dictates when and where immigration arrests are lawful, including at courthouses, thereby displacing any purported common-law privilege.

Finally, the Directive does not implicate the Tenth Amendment because it does not command or compel state actors to take any action at all.  Accordingly, the Court should grant the Government's motion.

## BACKGROUND

### A.    Federal Statutory Removal and Arrest Authority

It has long been settled that the federal government "has broad, undoubted power over the subject of immigration and the status of aliens."  *Arizona*, 567 U.S. at 394; *see* U.S. Const. art. I § 8, cl. 4 (granting Congress the power to "establish an uniform Rule of Naturalization"). Pursuant to that authority, Congress has provided that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."  8 U.S.C. § 1226(a).  Congress has also provided that "without [a] warrant," a federal officer may "arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any [] law or regulation [regulating the admission, exclusion, expulsion, or removal of aliens] and is likely to escape before a warrant can be obtained for his arrest."  *Id.* § 1357(a)(2).  These statutes confer arrest authority that is generally plenary and unqualified.

Since at least 2014, ICE policy has permitted courthouse arrests in limited circumstances. In a March 19, 2014 memorandum (the "2014 Policy"), ICE advised its personnel that

"[e]nforcement actions at or near courthouses will only be undertaken against" aliens convicted of crimes, who were gang members aged 16 years or older, and/or were considered national security or public safety risks.  *See* Mem. from Philip T. Miller, Assistant Director for Field Operations, to Field Office Directors & Deputy Field Office Directors, *Enforcement Actions at or Near Courthouses* (Mar. 19, 2014), annexed as Ex. B to the Declaration of Tomoko Onozawa, dated October 23, 2019 ("Onozawa Decl.").  The 2014 Policy restricted enforcement actions against "collaterally" present aliens, "such as family members and friends" of the "target alien," and directed that such actions should, "whenever practicable," "take place outside public areas of the courthouse," "be conducted in collaboration with court security and staff," and "utilize the court building's non-public entrances and exits."  *Id.*

## B.     The Directive

In January 2018, ICE promulgated Directive 11072.1, *see* Onozawa Decl. Ex. A, which revised ICE's policy "regarding civil immigration enforcement actions *inside* federal, state, and local courthouses."  *Id.* at 1 (emphasis added).  The Directive indicates that "civil immigration enforcement actions taken inside courthouses can reduce safety risks to the public, targeted alien(s) and ICE officers and agents," because "[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband."  *Id.*  The Directive differs from the 2014 Policy in three main respects: (1) it focuses solely on civil immigration enforcement actions "inside" courthouses; (2) it adds two categories of targeted aliens: "aliens who have re-entered the country illegally after being removed" (a federal felony under 8 U.S.C. § 1326) and "aliens who have been ordered removed from the United States but have failed to depart"; and (3) it articulates "special circumstances" in which ICE may arrest non-target aliens, such as "when the individual poses a threat to public safety or interferes with ICE's enforcement actions."  *Id.*  As to witnesses and victims of crimes, including domestic

violence, existing ICE policy and 8 U.S.C. § 1367 set additional limitations on ICE's civil immigration enforcement actions against aliens who are victims of or witnesses to a crime, or victims of abuse.[1]

The Directive instructs ICE officers "generally [to] avoid enforcement actions in courthouses, or areas within courthouses that are dedicated to non-criminal (*e.g.,* family court, small claims court) proceedings."  Directive at 2.  Under the Directive, when an ICE officer determines that an enforcement action inside a courthouse is "operationally necessary," the arresting officer must first obtain the approval of a higher-level officer to proceed.  *Id.*[2]  The Directive advises that, "when practicable," ICE officers should "conduct enforcement actions discreetly to minimize their impact on court proceedings."  *Id.* at 1.  The Directive further states that enforcement actions inside courthouses "should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits."  *Id.* at 2.  ICE officers and agents are also advised to "exercise sound judgment" and "make substantial efforts to avoid unnecessarily alarming the public," and are required to "make every effort to limit their time at courthouses while conducting civil immigration enforcement actions."  *Id.*  Finally, the Directive addresses only "civil immigration enforcement actions inside courthouses," *id.* at 2, and, contrary

---

[1] *See* Mem. from John Morton, Director for Field Operations, to Field Office Directors, All Special Agents in Charge and All Chief Counsel, Directors, *Prosecutorial Discretion: Certain Victims, Witnesses and Plaintiffs* (Mar. 19, 2014), Onozawa Decl. Ex. C.  This memorandum provides that "[a]bsent special circumstances or aggravating factors, it is against ICE policy to initiate removal proceedings against an individual known to be the immediate victim or witness to a crime," or "to remove individuals in the midst of a legitimate effort to protect their civil rights or civil liberties."  *Id.* at 1–2.

[2] The Directive emphasizes that "ICE officers and agents will make enforcement determinations on a case-by-case basis in accordance with federal law and consistent with [DHS] policy."  *Id.* at 1 n.1.

to Plaintiffs' assertions, does not address, in any way, enforcement actions "around," "near" and "outside" courthouses.  *See, e.g.,* Compl. ¶¶ 1, 7, 9, 19, 70, 73.

# ARGUMENT

## A.      Standard of Review

On a Rule 12(b)(1) motion to dismiss, the party asserting subject matter jurisdiction bears "the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citation omitted).  In considering challenges to subject matter jurisdiction under Rule 12(b)(1) at the pleading stage, the court "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Id.*  The Court may also consider evidence extrinsic to the pleadings. *See Phifer v. City of New York*, 289 F.3d 49, 55 (2d Cir. 2002).  "'However, argumentative inferences favorable to the party asserting jurisdiction should not be drawn.'" *Kappa Printing Group, LLC v. Archie Comic Publ'ns, Inc.*, No. 17 CV 7511, 2018 WL 2561032, at *2 (S.D.N.Y. June 4, 2018) (quoting *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992)).  "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit," and "[s]overeign immunity is jurisdictional in nature." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (citations omitted).

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   The court should begin by "identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679.  If well-pleaded factual allegations exist, the court must then determine whether "they plausibly give rise to an

entitlement to relief." *Id.* When determining the sufficiency of a plaintiff's claim under Rule

12(b)(6),

> consideration is limited to the factual allegations in [plaintiff's] . . . complaint,
> which are accepted as true, to documents attached to the complaint as an exhibit
> or incorporated in it by reference, to matters of which judicial notice may be
> taken, or to documents either in plaintiff['s] possession or of which plaintiff[] had
> knowledge and relied on in bringing suit.

*Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

**B.      Plaintiffs' APA Claims Should be Dismissed**

**1.      Plaintiffs Are Not Within the Zone of Interests of Sections 1226 or 1357 of
the INA**

Plaintiffs lack a cause of action under the APA because the interests they seek to

vindicate do not "fall within the zone of interests protected by the law invoked." *Lexmark Int'l,*

*Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). The zone-of-interests test is

"a gloss on the meaning of [5 U.S.C.] § 702," which provides a right of review to "[a] person . . .

adversely affected or aggrieved by agency action within the meaning of a relevant statute."

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987). When a court applies the zone-of-

interests test, it must determine whether the interest asserted by a plaintiff suing under the APA

is "'arguably within the zone of interests to be protected or regulated by the statute' that he says

was violated." *Match-E-Be-Nash v. Patchak*, 567 U.S. 209, 224 (2012) (citations omitted).

Plaintiffs acknowledge, as they must, that the "INA authorizes civil arrests with and

without warrants," *see* Compl. ¶ 31 (citing 8 U.S.C. § 1226(a)), and that "ICE arrests based on

civil immigration infractions are civil arrests authorized by the Immigration and Nationality

Act." Compl. ¶ 125. Sections 1226 and 1357 of the INA, by their plain terms, govern the

Department of Homeland Security's ("DHS") arrest authorities with respect to *aliens*. Section

1226 generally authorizes arrests of aliens "on a warrant," but also precludes judicial review of

the "discretionary judgment regarding the application of this section."  8 U.S.C. § 1226(a), (e).

Section 1357(a) grants immigration officers broad authority "to arrest any alien in the United

States" without a warrant, 8 U.S.C. § 1357(a), and provides for only limited restrictions on that

authority with respect to "dwellings" within twenty-five miles of the border, but not at other

locations.  *Id.* § 1357(a)(3).  Relatedly, section 1229(e) specifically contemplates arrests at

"courthouses," but requires ICE to comply with certain confidentiality provisions found at 8

U.S.C. § 1367 in particular contexts.  8 U.S.C. § 1229(e).

Importantly, the INA provides a process, led by immigration courts, for addressing arrest

and detention issues, and also provides individual aliens with a means to challenge their arrest

and the initiation of removal proceedings, *see* 8 U.S.C. § 1252, including a means to challenge

the propriety of their arrest under the statute, *see, e.g., Rajah v. Mukasey*, 544 F.3d 427, 441 (2d

Cir. 2008) (recognizing that aliens may challenge the initiation of removal proceedings based on

fourth and fifth amendment violations and statutory or regulatory violations occurring before or

in initiating those proceedings), and to obtain review exclusively in the courts of appeals.  8

U.S.C.  § 1252(a)(5), (b)(9).  But the INA does not provide Plaintiffs—the State of New York

and the District Attorney of Kings County—with any right of action.  *See, e.g.*, *Jennings v.

Rodriguez*, 138 S. Ct. 830, 841 (2018) (plurality) (construing 8 U.S.C. § 1252 as barring district

court "challeng[es to ICE's] decision to detain [aliens] in the first place or to seek removal" of

aliens, and permitting such claims in removal proceedings).  Indeed, nothing in these provisions

governs Plaintiffs' conduct or actions in any way, is targeted towards Plaintiffs, or creates any

entitlement or interest that Plaintiffs may invoke.  *See INS v. Legalization Assistance Project*,

510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in chambers) (in similar challenge brought by

"organizations that provide legal help to immigrants," concluding that the relevant INA

8

provisions were "clearly meant to protect the interests of undocumented aliens, not the interests of [such] organizations," and that the fact that a "regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect"). Accordingly, "it cannot reasonably be assumed that Congress intended to permit" Plaintiffs' APA claim. *Clarke*, 479 U.S. at 399.

## 2. This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' APA Claims Because the Directive Concerns Enforcement Actions That Are Committed to Agency Discretion by Law

Before review may be had under the APA, "a party must first clear the hurdle of [5 U.S.C.] § 701(a)," which governs when courts may review the actions or inactions of agencies. *Heckler v. Chaney*, 470 U.S. 821, 828 (1985). While the APA embodies a presumption of judicial review, *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986), "[t]his is 'just' a presumption, . . . and under § 701(a)(2) agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law.'" *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)). In *Heckler*, the Supreme Court articulated the fundamental inquiry for the application of section 701(a)(2):

> [E]ven where Congress has not affirmatively precluded review, review is not to be had if *the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion*. In such a case, the statute ("law") can be taken to have "committed" the decisionmaking to the agency's judgment absolutely.

470 U.S. at 830 (emphasis added). Accordingly, under *Heckler*, the starting point of any analysis under section 701(a)(2) must be whether there is a "meaningful standard" provided in the governing statute. *Lunney v. United States*, 319 F.3d 550, 558 (2d Cir. 2003). No review is possible where the relevant statute is so vague and broad that it does not provide a reviewing court criteria for evaluating the agency's exercise of its discretion. *See Heckler*, 470 U.S. at 830.

ICE's civil arrest enforcement authority derives from the INA, which provides no "meaningful standard" by which this Court can evaluate the appropriateness of ICE's exercise of discretion under the Directive to arrest an alien who may be located in a federal, state, or local courthouse. *See* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States"); *id.* § 1357(a)(2) ("Any officer or employee . . . authorized under regulations prescribed by the Attorney General shall have the power without warrant . . . (2) . . . to arrest any alien in the United States"). The INA's broad language thus grants ICE the discretion to determine the location of a civil enforcement action against an alien present in the United States. *See Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997) (State Department policy relating to location of processing overseas immigrant visa applications was not reviewable under the APA, because the "broad language" of the INA "grants to the Secretary discretion to prescribe the place at which aliens apply for immigrant visas without providing substantive standards against which the Secretary's determination could be measured").

The INA provides no standards for this Court to apply with respect to the location of a civil enforcement action. The choice of where to effectuate an arrest "involves a complicated balancing of a number of factors which are peculiarly within" ICE's expertise, *Heckler*, 470 U.S. at 831, including an assessment of safety risks to the public, the individual alien, and ICE officers. Directive at 1. Indeed, the Supreme Court "has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler*, 470 U.S. at 831 (citing cases). Courts have also held that agency decisions to take—as opposed

to refrain from taking—enforcement actions are unreviewable under the APA when there are no judicially manageable standards for reviewing the agency's exercise of discretion. *See, e.g., Speed Mining, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*, 528 F.3d 310, 316–19 (4th Cir. 2008) (Secretary of Labor's charging decision for violations of federal statute was a "discretionary decision" that was not reviewable under the APA because it "rest[ed] on a 'complicated balancing of a number of factors which are peculiarly within' the Secretary's expertise") (citation omitted); *Secretary of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 157–58 (D.C. Cir. 2006) (administrative charging decisions of the Secretary of Labor not reviewable under the APA). *Cf. Wayte v. United States*, 470 U.S. 598, 607 (1985) ("[T]he government retains 'broad discretion' as to whom to prosecute . . . This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review . . . .").

**3.     This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' APA Claims Because the Directive Is Not a Final Agency Decision**

Plaintiffs' APA claims also fail a second requirement of the APA's waiver of sovereign immunity, that the action being challenged constitute a "final agency action." 5 U.S.C. § 704. An agency action is "final" only if two conditions are met: "'(1) the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature,' and (2) 'the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Shakhnes v. Berlin*, 689 F.3d 244, 260 (2d Cir. 2012) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

The Directive is not a final agency action because it fails the second prong of this test. On its face, the Directive does not compel any action, determine any rights or obligations, or create legal consequences for Plaintiffs or the aliens who may be the subject of civil enforcement actions. Instead, the Directive is a general statement of policy for APA purposes. General

statements of policy are "'statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'" *Lincoln*, 508 U.S. at 196-97 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)). *See also Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975) ("'general statements of policy' are rules directed primarily at the staff of an agency describing how it will conduct agency discretionar[y] functions") (citation omitted); *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (a "general statement of policy" is an "agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule"). "Legislative or substantive rules are, by definition, final agency action, while interpretive rules and general policy statements are not." *Broadgate Inc. v. U.S. Citizenship & Imm. Servs.*, 730 F. Supp. 2d 240, 243 (D.D.C. 2010).

The Directive merely explains certain considerations that will guide ICE officers in the exercise of their discretion in deciding whether and when to conduct civil immigration enforcement actions inside federal, state, and local courthouses, and is therefore a general statement of policy for APA purposes. Directive at 1. Further, the Directive expressly "provides only internal ICE policy guidance," "is not intended to, does not, and may not be relief upon to create any right or benefit, substantive or procedural," and places "no limitations . . . on the otherwise lawful enforcement or litigative prerogatives of ICE." *Id.* at 3. Because the Directive is a general statement of policy that does not create substantive rules or rights, *see Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1205 (2015), or "bind" ICE officers, *Broadgate*, 730 F. Supp. 2d at 246, it is unreviewable under the APA.

**4.      This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' APA Claims Because the Directive Addresses Only ICE Arrests Inside Courthouses**

Plaintiffs' APA claims also fail because the Directive's plain language contradicts their assertion that it "generally allows civil immigration arrests in *or near* state courthouses . . . ." Compl. ¶ 5 (emphasis added).  The Directive is entitled "Civil Immigration Enforcement Actions Inside Courthouses," and "sets forth [ICE] policy regarding civil immigration enforcement actions inside . . . courthouses." Directive at 1.  It refers to enforcement activities exclusively "inside courthouses" and "in courthouses" at least 13 times.  *Id.* at 1–2.  Nothing in the text of the Directive provides any guidance to ICE officers about civil immigration enforcement arrests outside, around, or near a courthouse.

This distinction is fatal to Plaintiffs' APA claims because, to the extent Plaintiffs seek APA review of ICE civil immigration enforcement actions *outside* state courthouses, the Directive fails both prongs of section 704 of the APA: (1) it does not "mark the consummation of the agency's decisionmaking process" with respect to enforcement activities outside courthouses; and (2) as noted above, *see supra* at 11–12, it is not an action "by which rights or obligations have been determined, or from which legal consequences will flow."  Moreover, to the extent that Plaintiffs contend that the Directive can be read to regulate ICE enforcement activities outside state courthouses—which it does not—the Directive is still unreviewable under the APA because there are no justiciable standards by which this Court can determine how far or near the perimeter of a state courthouse ICE agents may lawfully effectuate an arrest.  *See supra* at 9–11.[3]

---

[3] For this reason, the injunctive relief sought by Plaintiffs is overly broad ("Enjoin Defendants . . . from civilly arresting parties, witnesses, and any other individual coming to . . . or returning from courthouses or court-related proceedings," *see* Compl., Prayer for Relief) and improper because it exceeds the scope of the Directive, which is limited to civil enforcement actions inside courthouses.

**C.      Plaintiffs' APA Claims Fail As a Matter of Law Because the Directive Is Not in Excess of ICE's Authority**

Plaintiffs' assertion that the Directive contravenes a privilege against civil arrests in or around courthouses and court-related proceedings that has been recognized for centuries, Compl. ¶¶ 3, 106–12, is also mistaken.  As a threshold matter, Plaintiffs' broad contention regarding privilege is incorrect—there is no federal common law immunity from immigration enforcement for those subject to ICE arrest.  And even if there were such an expansive common law privilege, Congress established a comprehensive system of immigration laws which dictate when and where immigration arrests are lawful, including at courthouses, thereby displacing any privilege.

**1.      There Is No Common Law Privilege Against Federal Immigration Enforcement in Courthouses**

The Supreme Court cases cited in Plaintiffs' complaint recognize a significantly narrower privilege: the immunity from service of process in a civil suit based on transient jurisdiction, when the only reason that a person is in the jurisdiction is to attend a court proceeding as a witness or a party.  *See Lamb v. Schmitt*, 285 U.S. 222, 224 (1932) (service of process on an Illinois resident while "he was in the Northern District of Mississippi in attendance on the court as an attorney in the principal suit"); *Page Co. v. MacDonald*, 261 U.S. 446, 447 (1923) (service on a Canadian resident who was in Massachusetts "in attendance before a special master appointed by the superior court"); *Stewart v. Ramsay*, 242 U.S. 128, 128 (1916) (service on a Colorado resident when in the Northern District of Illinois "while in attendance upon the district court as a witness in a case").  As the Supreme Court explained in *Stewart*, "[t]he true rule, well founded in reason and sustained by the greater weight of authority, is that suitors, . . . as well as witnesses, *coming from another state or jurisdiction*, are exempt from the *service of civil process* while in attendance upon court, and during a reasonable time in coming and going."  *Stewart*, 242 U.S. at 129 (emphasis added).

14

The New York state[4] and federal cases that Plaintiffs cite address the same limited privilege.  *See*, *e.g.*, *Parker v. Marco*, 136 N.Y. 585, 588 (1893) (service of process on South Carolina resident at the ferry terminal in New York when he came to New York "at the instance of the plaintiff to attend an examination of the plaintiff and his witnesses before a notary public"); *Person v. Grier*, 66 N.Y. 124, 124 (1876) (service of summons on Pennsylvania resident while in "attendance . . . as a witness in an action in the Supreme Court").[5]  Courts have explained that the privilege is one exists while the party is "without the jurisdiction of his residence for the purpose of attending court . . . ."  *Parker*, 136 N.Y. at 589.

Contrary to Plaintiffs' broad statement of the privilege, the privilege thus applies when a jurisdiction would otherwise lack authority over the person but for his or her appearance in the jurisdiction to attend a court proceeding.  As the Court explained in *United States v. Green*:

---

[4] State common law is not the same as federal common law, so looking to state common law and state court decisions is inappropriate when determining federal common law.  *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("There is no federal general common law.").  In addition, New York law makes clear that the dispositive factor is whether a person "had come within [the] jurisdiction voluntarily, or whether service was permissible because he had come here by compulsion."  *New England Industries v. Margiotti*, 270 A.D. 488, 489 (N.Y. App. Div. 1st Dep't 1946).  As the Court of Appeals held, "[t]he privilege should . . . not be extended beyond the reason of the rule upon which it is founded," which "rests" upon the fact that the "person claiming the privilege is a free moral agent who may come into or depart from the jurisdiction or not as he pleases."  *Netograph Mfg. Co. v. Scrugham*, 197 N.Y. 377, 380, 382 (1910).

[5] Some of the New York cases that Plaintiffs cite specifically discuss arrests, but those cases are from an era when arrests initiated civil suits between private parties, a practice that was replaced by process service.  *See In re Kimball*, 14 F. Cas. 474, 474 (S.D.N.Y. 1867) (bankrupt debtor on his way to the register's office for the purpose of being examined under an order previously served on him was "arrested by the sheriff, upon an order of arrest issued as mesne process in a civil suit in the supreme court of the state of New York"); *Sanford v. Chase*, 3 Cow. 381 (N.Y. 1824) (witness residing in Massachusetts who was subpoenaed to attend as a witness before arbitrators in Columbia, New York was then "arrested and holden to bail"); *Norris v. Beach*, 2 Johns 294, 294 (N.Y. Sup. Ct. 1807) (Connecticut resident who attended court in New York as a witness to prove a will "was proceeding from court on his way home, when he was arrested at the suit of the plaintiff, on a writ issued out of the Mayor's Court").

> The rule of immunity was seen as generally applicable to persons ordinarily
> without the jurisdiction of a court, and, therefore, necessarily not amenable to its
> service of process, who appeared within that jurisdiction solely with respect to the
> cause there already underway.  Such persons were viewed as giving up the
> 'safety' of one jurisdiction to serve the interests of justice, and their natural state
> of immunity was held to be generally respected.

*United States v. Green*, 305 F. Supp. 125, 128 (S.D.N.Y. 1969); *see also N. Light Tech., Inc. v. N. Lights Club*, 236 F.3d 57, 63 (1st Cir. 2001) (the privilege "fills the gap only where it needs to be filled that is, in cases where a district court wishes to shield an individual from service of process to encourage his or her travel to the forum state, but would be unable to do so absent the power to grant immunity").

In no case has the Supreme Court or any other court suggested that this privilege would be applicable to immigration enforcement, where the federal government has the authority to initiate process against the alien.  In other contexts, courts have held that the immunity privilege does not apply to parties that were personally served while in different jurisdictions if they could have been served through other means.  *See, e.g., In re Arthur Treacher's Franchise Litig.,* 92 F.R.D. 398, 405–06 (E.D. Pa. 1981) (non-resident defendant not entitled to dismissal for insufficient service when service of process was made on him while he was present in state solely for purpose of giving testimony where he could have been served pursuant to state's long-arm statute); *Gardner v. United States*, 246 F. Supp. 1014, 1015 (S.D.N.Y. 1965) ("A nondomiciliary who could be served outside the state cannot claim immunity from service if he is served in New York, even if he is here voluntarily and in the aid of justice.").[6]  In *Green*, for

---

[6] The Second Circuit and this Court have recognized this same immunity privilege, and either remanded for a determination on whether the party was subject to jurisdiction or held that there were not sufficient contacts to justify service.  *See, e.g., Cont'l Indus. Grp., Inc. v. Altunkilic*, 633 F. App'x 61, 62–63 (2d Cir. 2016) (holding that "New York law does not permit a nondomiciliary to claim immunity from personal service—even if he is in New York only to testify in legal proceedings—if he could be served outside the state," and remanding to

example, defendants argued that they were immune to service of the subpoeanas under the privilege laid out in *Lamb*, stating they "might not voluntarily attend the examination armed with the knowledge of possible liability to service of the subpoenas." *Green*, 305 F. Supp. at 127–28. The court noted, however, that "there is no jurisdiction in which petitioners could have avoided service of process as an original matter, because their conditions of bail restricted their travel to the continental United States." *Id.* at 128.  Given that "defendants were not lured into jurisdictional quicksands that imperiled their rights or privileges," the service of process at the examination was not the "type of activity meant to be prevented in *Lamb*." *Id.* at 129.

Plaintiffs note that the privilege is "deemed necessary for the maintenance of [the courts'] authority and dignity and in order to promote the due and efficient administration of justice." Compl. ¶¶ 3, 111 (citing *Parker*, 136 N.Y. at 589).  However, courts have recognized limitations on the privilege, noting that this doctrine "has not been customarily extended to protecting a litigant or witness in a civil suit from service of process in a criminal suit."  *United States v. Conley*, 80 F. Supp. 700, 702 (D. Mass. 1948); *see Ex Parte Lamar*, 274 F. 160, 169 (2d Cir. 1921) ("[I]n criminal cases, the interests of the public override that which is, after all, a mere privilege from arrest.") (internal quotation marks and citation omitted).  "The public interest in apprehending" a person for violating immigration law, like the public interest in prosecuting a person for violating criminal laws, "outweighs the public interests in the dignity of the courts . . . in encouraging vindication of private rights and in preventing the interruption of judicial proceedings." *Conley,* 80 F. Supp. at 702.

---

determine whether defendant was subject to personal jurisdiction); *Pavlo v. James,* 437 F. Supp. 125, 127, 129 (S.D.N.Y. 1977) (the "reason for the immunity—encouraging voluntary appearances—disappears if a defendant is otherwise subject to the extra-territorial reach of [N.Y. C.P.L.R. § 302(a)]," and noting there was not sufficient contacts to exercise jurisdiction).

Here, aliens are subject to federal law enforcement jurisdiction anywhere in the United States.  *See* 8 U.S.C. § 1226(a) (providing for arrests "[o]n a warrant" without jurisdictional limitation), *id.* § 1357 (providing for warrantless arrests without jurisdictional limitation). Plaintiffs also cannot argue that aliens have a right to evade immigration enforcement.  *See E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 764 (9th Cir. 2018) (no legally protected right to violate immigration law); 8 U.S.C. § 1226 (dictating when detention is required or optional); 8 U.S.C. § 1231 (mandating detention of aliens with final removal orders).  Like the defendants in *Green* who could be served with process in any location whether they appeared for an examination or not, aliens can be subjected to immigration custody in any jurisdiction, and thus the rationale behind the common law privilege does not apply.

In addition, the privilege against civil arrest while being physically present within a jurisdiction eventually gave way to personal service of summons or other form of notice such that parties could be served if they had certain minimum contacts.  *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).  By the time Congress codified the current civil immigration arrest statute, 8 U.S.C. § 1231, in the INA in 1952,[7] the privilege referenced in the Plaintiffs' cited cases had been superseded by the process immunity privilege against transient jurisdiction.  Given that the civil arrest privilege was (1) only applied to bar serving process while people were out of their jurisdiction of residence; (2) has never been applied in an immigration enforcement context; and (3) has been replaced by a privilege against service of process, the immigration arrest statutes under the INA could not have codified Plaintiffs' broad privilege, and this Court cannot create the new rule now.

---

[7] 8 U.S.C. § 1231 (enacted June 27, 1952).

"Federal courts, unlike state courts, are not general common-law courts and do not possess a general power to develop and apply their own rules of decision." *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 312 (1981). "The enactment of a federal rule in an area of national concern, and the decision whether to displace state law in doing so, is generally made not by the federal judiciary, purposefully insulated from democratic pressures, but by the people through their elected representatives in Congress." *Id.* at 312–13. Numerous courts have specifically acknowledged the "limitations" of the process immunity privilege, noting that it "'should not be enlarged beyond the reason upon which it is founded.'" *N. Light Tech.*, 236 F.3d at 62–63 (quoting *Lamb*, 285 U.S. at 225). The purpose of the privilege was to fill the gap "in cases where a district court wishes to shield an individual from service of process to encourage his or her travel to the forum state, but would be unable to do so absent the power to grant immunity." *Id.* at 63. As Plaintiffs are asking the Court to adopt a policy measure under the guise of federal common law, this Court lacks the ability to engage in such lawmaking. *Milwaukee*, 451 U.S. at 312. Therefore, the Court should dismiss Plaintiffs' APA claims because there is no federal common law right to evade immigration arrests.

### 2.   Congress Established a Comprehensive Immigration Detention Scheme That Displaced any Prior Common Law on Civil Immigration Enforcement Arrests

Even if a federal common law privilege did exist in the form that Plaintiffs claim, the federal statutory immigration scheme comprehensively addresses immigration arrests, thus supplanting any prior federal common law on the issue. To the extent that any federal common law exists, it only applies until that "field has been made the subject of comprehensive legislation or authorized administrative standards." *Milwaukee*, 451 U.S. at 313–14 (internal quotation marks and citation omitted). Once Congress addresses the issue, courts rely on the new federal laws and federal regulations instead of continuing to rely on federal common law. *Id.* at 315. In

determining whether a statutory scheme displaces federal common law, courts consider the entire

statutory scheme. *Am. Elec. Power Co. Inc. v. Connecticut,* 564 U.S. 410, 424 (2011). "The test

for whether congressional legislation excludes the declaration of federal common law is simply

whether the statute 'speak[s] directly to [the] question' at issue." *Id.* at 424; *see also Milwaukee*,

451 U.S. at 315 (the "question" in determining whether a statutory scheme displaces federal

common law is "whether the legislative scheme spoke directly to a question") (internal quotation

marks omitted). While there is a presumption that well-established common law principles apply

except where a "statutory purpose to the contrary is evident," this "presumption is not, however,

one that entails a requirement of clear statement, to the effect that Congress must state precisely

any intention to overcome the presumption's application to a given statutory scheme." *Astoria*

*Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991).

Here, the congressional scheme shows that Congress spoke to the issue of immigration

arrests, thus displacing any federal common law. "The Government of the United States has

broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567

U.S. at 394; *see also Reno v. Flores,* 507 U.S. 292, 305 (1993) ("Over no conceivable subject is

the legislative power of Congress more complete.") (internal quotation marks and citation

omitted). Morever, the "comprehensive and unified system to keep track of aliens within the

Nation's borders," specifically "instructs when it is appropriate to arrest an alien during the

removal process." *Arizona*, 567 U.S. at 401, 407. "'The authority to control immigration—to

admit or exclude aliens—is vested solely in the Federal Government.'" *Arizona*, 567 U.S. at

409–10 (quoting *Truax v. Raich*, 239 U.S. 33, 42 (1915)).

The "removal process is entrusted to the discretion of the Federal Government," and any

attempt to allow states to alter the comprehensive removal scheme, "creates an obstacle to the

full purposes and objectives of Congress" and thus is "preempted by federal law." *Id.* at 409,

410. *See also United States v. Alabama*, 691 F.3d 1269, 1294, 1296 (11th Cir. 2012) (statute,

which was a "thinly veiled attempt to regulate immigration" and an attempt to "impinge on an

area of core federal concern," was "preempted by the inherent power of the federal government

to regulate immigration" because the power to expel aliens "is retained only by the federal

government"); *Milardo v. Kerilikowske*, No. CV316MC00099 (VLB), 2016 WL 1305120, at *8

(D. Conn. Apr. 1, 2016) (enforcing a subpoena over ICE's decision "would conflict with th[e]

constitutionally derived federal power to regulate immigration" because "protection of the

nation's borders, including those who may pass through them," is an area "which the federal

government has fully occupied to the exclusion of the states") (internal quotation marks omitted).

Because the federal government has exclusive authority over immigration, it has

regulatory authority over all aliens within the United States. *Cf. Buckman Co. v. Plaintiffs'*

*Legal Comm.,* 531 U.S. 341, 347 (2001) ("[T]he relationship between a federal agency and the

entity it regulates is inherently federal in character because the relationship originates from, is

governed by, and terminates according to federal law.").  Congress thus has the power to create a

system that permits arrests of aliens notwithstanding the status of federal or state court

proceedings.  *See Herrera-Inirio v. I.N.S.*, 208 F.3d 299, 307 (1st Cir. 2000) ("Because Congress

possesses plenary authority over immigration-related matters, it may freely displace or preempt

state laws in respect to such matters."); *id.* at 307–08 ("After all, in areas in which plenary

federal power exists, 'the Supremacy Clause permits no other result,' notwithstanding that

Congress may enact laws that 'curtail or prohibit the States' prerogatives to make legislative

choices respecting subjects the States may consider important.'") (quoting *Hodel v. Virginia*

*Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 290 (1981)); *United States v. Vasquez-*

*Benitez*, 919 F.3d 546, 548–50 (D.C. Cir. 2019) (ICE can civilly detain an alien pending removal while criminal proceedings are pending where judge has released the alien and found there is no need to criminally detain the alien pending trial).

Through the INA, Congress has used its power to create a comprehensive scheme governing arrests of removable aliens.  "On a warrant issued" by DHS attesting to an alien's removability, "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."  8 U.S.C. § 1226(a).  The Secretary's "discretionary judgment regarding the application of this section shall not be subject to review."  *Id.* § 1226(e).  Under 8 U.S.C. § 1231(a)(2), DHS shall "detain the alien," during the removal period, and certain aliens deemed at "risk to the community or unlikely to comply with the order of removal," may be detained beyond the removal period," *id.* § 1231(a)(2), (a)(6).

The relevant statutes set only one limitation on DHS's broad detention powers – DHS cannot take an alien in to custody who is currently serving a criminal sentence; instead, DHS must wait until the completion of the alien's criminal imprisonment.  *Id.* §§ 1226(c), 1231.  The statute does not provide an additional limitation on arrest authority for aliens in or around courthouses.  Instead, Congress has authorized DHS to detain removable aliens whenever they are released from state imprisonment "without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense."  *Id.* § 1226(c).

Congress was also explicit in developing the comprehensive scheme related to DHS's warrantless arrest authority.  Congress gave immigration officers broad authority "to arrest any alien in the United States" without a warrant if they have "reason to believe that the alien so arrested is in the United States in violation" of "any law or regulation made in pursuance of law

regulating the admission, exclusion, expulsion, or removal of aliens" and "is likely to escape

before a warrant can be obtained for his arrest."  *Id.* § 1357(a)(2).  Congress also provided

immigration officers with a broad ability to arrest without a warrant "within a reasonable

distance from any external boundary of the United States" and to "board and search for aliens

[in] any vessel within the territorial waters of the United States and any railway car, aircraft,

conveyance or vehicle."  *Id.* § 1357(a)(3).  Congress explicitly limited powers in specific

circumstances, authorizing "access to private lands" within "twenty-five miles" of the border, but

limiting access to "dwellings" and restricting warrantless entry to "the premises of a farm or

other outdoor agricultural operation."  *Id.* § 1357(a)(3)), (6).

Another section of the INA specifically discusses courthouse arrests.  "In cases where an

enforcement action leading to a removal proceeding was taken against an alien at any of the

locations specified in paragraph (2), the Notice to Appear shall include a statement that the

provisions of section 1367 of this title have been complied with."  8 U.S.C. § 1229(e)(1).  One of

those specified locations in paragraph (2) is "a courthouse . . . if the alien is appearing in

connection with a protection order case, child custody case, or other civil or criminal case

relating to domestic violence, sexual assault, trafficking, or stalking in which the alien has been

battered or subject to extreme cruelty or if the alien is described in subparagraph (T) or (U) of

section 1101(a)(15) of this title."  8 U.S.C. § 1229(e)(2)(B).  Under these circumstances, the

arresting officer has to certify that he or she did not rely on confidential information that was part

of that case in determining the alien's admissibility or deportability.  *See* 8 U.S.C. § 1367 (ICE

and other enforcement employees cannot "make an adverse determination of admissibility or

deportability of an alien . . . using information furnished solely by . . . a spouse or parent who has

battered the alien or subjected the alien to extreme cruelty" or others potentially complicit in the

abuse of the alien or their family).  If Congress knew that ICE was not allowed to make arrests at courthouses under federal common law, then Congress presumably would have had no reason to include Section 1229(e), which acknowledges the authority to make courthouse arrest in immigration matters and requires certifications of compliance in specific circumstances.

These provisions show that Congress knew how to limit DHS's arrest authority and made choices about when to do so.  Therefore, given that Congress comprehensively laid out DHS's immigration arrest authority both under warrant and without a warrant, any federal common law privilege from arrest, even if it existed, would have been displaced by the congressional scheme. *See, e.g., Am. Elec. Power Co*, 564 U.S. at 424 ("We hold that the Clean Air Act and the EPA actions it authorizes displace any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired powerplants."); *City of New York v. BP P.L.C.*, 325 F. Supp. 3d 466, 473–74 (S.D.N.Y. 2018) (City's claims under federal common law are displaced because the relevant statute spoke "<u>directly</u> to the <u>particular</u> issue.") (emphasis in original).

## D.    Plaintiffs' Tenth Amendment Claim Must be Dismissed

Plaintiffs' additional cause of action asserts that the Directive "impermissibly interferes with New York's right to form its own government by interfering with state court operations and impeding criminal prosecutions in violation of the Tenth Amendment."  Compl. ¶ 139.  Under the Tenth Amendment, the "Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs."  *Printz v. United States*, 521 U.S. 898, 925 (1997); *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018) (Tenth Amendment embodies an "anticommandeering doctrine" which "withhold[s] from Congress the power to issue orders directly to the States.").  The Directive does not violate this command.

Courts have routinely held that directives and statutes, like the one at issue here, do not violate the Tenth Amendment if they do not commandeer the states.  *See, e.g.*, *City of New York*

*v. Beretta U.S.A. Corp.*, 524 F.3d 384, 396–97 (2d Cir. 2008) (the "critical inquiry with respect to the Tenth Amendment is whether the PLCAA commandeers the states," and holding that "[t]he PLCAA does not violate the Tenth Amendment" as it "'does not commandeer any branch of state government because it imposes no affirmative duty of any kind on any of them'") (quoting *Connecticut v. Physicians Health Servs. of Connecticut, Inc.*, 287 F.3d 110, 122 (2d Cir. 2002)).  Under anti-commandeering principles, the federal government also cannot prohibit state actors from taking action.  *See States of New York v. Dep't of Justice*, 343 F. Supp. 3d 213, 234 (S.D.N.Y. 2018) ("Whether Congress attempts to command affirmative action or impose a prohibition, '[t]he basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event.'") (quoting *Murphy*, 138 S. Ct. at 1478).

Here, the Directive does not implicate the Tenth Amendment—it does not order state courts or District Attorneys to identify witnesses that will be appearing, much less make them available for arrest.  The complaint does not allege that state actors were compelled to take or refrain from taking a specific action as a result of the Directive.  Therefore, the Directive raises no commandeering issues, and the Court should dismiss Plaintiffs' third claim.

To the extent that Plaintiffs allege that the Directive offends the Tenth Amendment because it disregards New York's ability to regulate its court system, that argument ignores that "immigration is uniquely a matter of federal, not local, concern."  *Herrera-Inirio*, 208 F.3d at 307.  Accordingly, given that Congress possesses plenary authority over immigration-related powers, it can freely displace state laws in that area as well as a state's desire to pursue criminal prosecutions before aliens are removed from the country.  *See supra* at 19–21.

## CONCLUSION

Defendants respectfully request that the Court dismiss Plaintiffs' complaint in its entirety.

Dated:  October 23, 2019
        New York, New York

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By:     */s/ Tomoko Onozawa*
        REBECCA R. FRIEDMAN
        TOMOKO ONOZAWA
        Assistant United States Attorney
        86 Chambers Street, 3rd Floor
        New York, New York 10007
        Tel.:   (212) 637-2614/2721
        Fax:    (212) 637-2686
        Email: rebecca.friedman@usdoj.gov
               tomoko.onozawa@usdoj.gov