**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK, et al.,

              Plaintiffs,

      v.

UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT,
et al.,

              Defendants.

19 Civ. 8876 (JSR)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

STANDARD OF REVIEW ..................................................................................................... 2

ARGUMENT .......................................................................................................................... 2

    I.    Defendants' motion to dismiss Plaintiffs' APA claims should be denied. ............. 2

        A. Plaintiffs' APA claims are within the relevant zone of interests regulated
           by the Immigration and Nationality Act ....................................................... 2

        B. The Courthouse Civil Arrest Directive is reviewable. ...................................... 5

        C. The Courthouse Civil Arrest Directive is final agency action. ......................... 8

        D. The complaint challenges ICE's policy of arresting people traveling to
           and from court. ............................................................................................... 10

    II.    The complaint states a claim that the Courthouse Civil Arrest Directive
        exceeds ICE's statutory authority. ......................................................................... 11

        A. Congress did not authorize ICE to conduct civil arrests in or near state
           courthouses. ................................................................................................... 12

        B. Defendants mischaracterize the common-law privilege against civil arrests
           in or around courthouses. ............................................................................... 16

    III.    The complaint states a Tenth Amendment claim. .................................................. 23

CONCLUSION ....................................................................................................................... 25

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**                                                                                             **Page(s)**

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967)...........................................................................................8, 9

*Al Otro Lado, Inc. v. Nielsen*,
    327 F. Supp. 3d 1284 (S.D. Cal. 2018)....................................................................5

*Amadei v. Nielsen*,
    348 F. Supp. 3d 145 (E.D.N.Y. 2018) ...........................................................10, 11

*Aquavella v. Richardson*,
    437 F.2d 397 (2d Cir. 1971)...................................................................................10

*Arizona v. United States*,
    567 U.S. 387 (2012)..........................................................................................15, 22

*Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*,
    398 U.S. 281 (1970)...............................................................................................13

*Batalla Vidal v. Nielsen*,
    291 F. Supp. 3d 260 (E.D.N.Y. 2018) ....................................................................4

*Baumgartner v. Baumgartner*,
    273 A.D. 411 (1st Dep't 1948) .........................................................................19, 21

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................................2

*Bennett v. Spear*,
    520 U.S. 154 (1997)................................................................................................8

*Bond v. United States*,
    564 U.S. 211 (2011)..............................................................................................25

*Bond v. United States*,
    572 U.S. 844 (2014)..........................................................................................23, 24

*Broadgate Inc. v. U.S. Citizenship & Immigration Services*,
    730 F. Supp. 2d 240 (D.D.C. 2010) ........................................................................8

*Chick Kam Choo v. Exxon Corp.*,
    486 U.S. 140 (1988)..............................................................................................24

*Citizens for Responsibility & Ethics in Wash. v. Trump*,
    939 F.3d 131 (2d Cir. 2019)........................................................................2, 3, 4, 5

**Cases**                                                        **Page(s)**

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)............................................................................5, 7

*City of Arlington v. FCC*,
    569 U.S. 290 (2013)..............................................................................12

*City of Milwaukee v. Illinois*,
    451 U.S. 304 (1981)........................................................................12, 13

*City of New York v. Beretta U.S.A. Corp.*,
    524 F.3d 384 (2d Cir. 2008)...............................................................23

*City of New York v. United States*,
    179 F.3d 29 (2d Cir. 1999).................................................................23

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987).............................................................................5

*Cole v. Hawkins*,*
    (1738) 95 Eng. Rep. 396....................................................................21

*DeCanas v. Bica*,
    424 U.S. 351 (1976)...........................................................................16

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019)......................................................................5, 6

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ...............................................................5

*Evello Invs., N.V. v. Printed Media Servs., Inc.*,
    158 F.R.D. 172 (D. Kan. 1994)..........................................................25

*Ex parte Lamar*,
    274 F. 160 (2d Cir. 1921)..................................................................22

*First Nat'l Bank v. Ames*,
    39 Minn. 179 (1888).........................................................................18

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*,
    857 F. Supp. 1137 (M.D.N.C. 1994) .................................................25

_____

*Authorities marked with an * appear in the addendum to this memorandum of law.*

**Cases**                                                                                  **Page(s)**

*Frisbie v. Young*,\*
    11 Hun. 474 (1st Dep't 1877) ...................................................................19, 21

*Grand Canyon Tr. v. Pub. Serv. Co. of N.M.*,
    283 F. Supp. 2d 1249 (D.N.M. 2003) ..........................................................10

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ...................................................................13, 14, 15, 24

*Hale v. Wharton*,
    73 F. 739 (W.D. Mo. 1896) ...................................................................18, 19, 21

*Halsey v. Stewart*,
    4 N.J.L. 366 (N.J. 1817) ...............................................................................18

*Hayes v. Shields*,
    2 Yeates 222 (Pa. 1797) ...............................................................................18

*Heath v. Alabama*,
    474 U.S. 82 (1985)...................................................................................13, 25

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ...................................................................................7, 8

*Hopkins v. Coburn*,
    1 Wend. 292 (N.Y. Sup. Ct. 1828)...............................................................20

*Hurst's Case*,
    4 U.S. (4 Dall.) 387 (Washington, Circuit Justice, C.C.D. Pa. 1804)....................18

*In re Healey*,
    53 Vt. 694 (1881) ...........................................................................................19

*In re Thompson*,
    122 Mass. 428 (1877) ...............................................................................17, 20

*INS v. Legalization Assistance Project*,
    510 U.S. 1301 (1993)......................................................................................4

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945) ......................................................................................18

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018).......................................................................................7

*Kaufman v. Garner*,
    173 F. 550 (W.D. Ky. 1909) ........................................................................18

**Cases**                                                                                   **Page(s)**

*Kaufman v. Kaye*,
    466 F.3d 83 (2d Cir. 2006)..................................................................................24

*L.V.M. v. Lloyd*,
    318 F. Supp. 3d 601 (S.D.N.Y. 2018)..................................................................10

*Lexmark Int'l v. Static Control Components*,
    572 U.S. 118 (2014)........................................................................................2, 4

*Lincoln v. Vigil*,
    508 U.S. 182 (1993).............................................................................................7

*Long's Case*,*
    (1676-77) 86 Eng. Rep. 1012.............................................................................17

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).............................................................................................2

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012).............................................................................................3

*Mitchell v. Wixon*,
    53 Mich. 541 (1884)..........................................................................................18

*Murphy Bros. v. Michetti Pipe Stringing, Inc.*,
    526 U.S. 344 (1999).....................................................................................16, 22

*New York v. U.S. Dep't of Homeland Sec.*,
    No. 19-cv-7777, 2019 WL 5100372 (S.D.N.Y. Oct. 11, 2019)............................4

*New York v. United States*,
    505 U.S. 144 (1992)..........................................................................................23

*O'Shea v. Littleton*,
    414 U.S. 488 (1974).....................................................................................13, 24

*Oneok, Inc. v. Learjet, Inc.*,
    135 S. Ct. 1591 (2015)......................................................................................16

*Orchard's Case*,*
    (1828) 38 Eng. Rep. 987...............................................................................17, 21

*Parker v. Marco*,
    136 N.Y. 585 (1893).....................................................................................16, 18

*Perez v. Mortg. Bankers Ass'n*,
    135 S. Ct. 1199 (2015).........................................................................................8

**Cases**                                                                    **Page(s)**

*Person v. Grier*,
    66 N.Y. 124 (1876) ...................................................................................18, 20, 21

*Printz v. United States*,
    521 U.S. 898 (1997) ....................................................................................23

*Resolution Trust Corp. v. Miramon*,
    22 F.3d 1357 (5th Cir. 1994) .......................................................................12

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947)......................................................................................13

*Robinson v. Overseas Military Sales Corp.*,
    21 F.3d 502 (2d Cir. 1994)............................................................................2

*Ryan v. U.S. Immigration & Customs Enf't*,
    382 F. Supp. 3d 142 (D. Mass. 2019) ................................................. passim

*Sec'y of Labor v. Twentymile Coal Co.*,
    456 F.3d 151 (D.C. Cir. 2006)......................................................................7

*Speed Mining, Inc. v. Fed. Mine Safety & Health Review Comm'n*,
    528 F.3d 310 (4th Cir. 2008) .......................................................................7

*Stewart v. Ramsay*,
    242 U.S. 128 (1916).....................................................................................19

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) .......................................................................4

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    136 S. Ct. 1807 (2016)..................................................................................9

*U.S. Gypsum Co. v. Muszynski*,
    161 F. Supp. 2d 289 (S.D.N.Y. 2001)........................................................10

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ..................................................................15

*United States v. Conley*,
    80 F. Supp. 700 (D. Mass. 1948) ...............................................................22

*United States v. Lopez*,
    514 U.S. 549 (1995)......................................................................................24

*United States v. Moffitt, Zwerling & Kemler, P.C.*,
    83 F.3d 660 (4th Cir. 1996) ........................................................................12

**Cases**                                                                    **Page(s)**

*United States v. Morrison,*
   529 US. 598 (2000)..................................................................................24

*United States v. Texas,*
   507 U.S. 529 (1993)..................................................................................12

*Venetian Casino Resort, LLC v. EEOC,*
   530 F.3d 925 (D.C. Cir. 2008) .................................................................10

*Vincent v. Watson,*
   30 S.C.L. (1 Rich.) 194 (S.C. 1845) ........................................................18

*Walpole v. Alexander,**
   (1782) 99 Eng. Rep. 530 ....................................................................17, 20

*Webster v. Doe,*
   486 U.S. 592 (1988)....................................................................................5

*Younger v. Harris,*
   401 U.S. 37 (1971).....................................................................................24

**Constitutions**

U.S. Const. amend. X...........................................................................................23

N.Y. Const. art. XXXV (1777)............................................................................17

**Federal Statutes**

5 U.S.C. § 701.......................................................................................................5

8 U.S.C.
   § 1226................................................................................7, 12, 13, 22
   § 1229...............................................................................................14
   § 1357....................................................................................6, 12, 13

**Rules**

Fed. R. Civ. P. 12 ...............................................................................................25

**Miscellaneous Authorities**                                                           **Page(s)**

David Graham, *Treatise on the Practice of the Supreme Court of the State of New-York* (2d ed. 1836)* ................................................................................18, 20

6 Matthew Bacon, *A New Abridgement of the Law* (7th ed. 1832)* ...........................................21

3 William Blackstone, *Commentaries on the Laws of England* (1768)*.........................17, 20, 21

## INTRODUCTION

An effective court system is a critical aspect of state sovereignty—one that is essential to ensuring that crimes are prosecuted, victims receive relief, and justice is done on behalf of the State's residents.  In 2017, Defendants—the U.S. Department of Homeland Security (DHS), its sub-agency U.S. Immigration and Customs Enforcement (ICE), and the heads of DHS and ICE—implemented a policy that threatens New York's sovereign interests by disrupting the effective functioning of New York's courts and hindering both criminal and civil proceedings. That policy, reflected in ICE Directive Number 11072.1 (the Courthouse Civil Arrest Directive, Dkt. 1-1), authorizes ICE agents and officers to conduct civil immigration arrests in and around New York courthouses.  Since ICE issued the Directive, the number of arrests at or near New York's courthouses has soared, causing witnesses and parties to miss court appearances, deterring victims from seeking judicial relief or cooperating with prosecutors and police, and impairing prosecutors' ability to obtain justice for the New Yorkers they serve.

Plaintiffs the State of New York and the Kings County District Attorney brought this lawsuit to halt this serious intrusion into the State's sovereign prerogative to maintain its judiciary and prosecute crimes.  Plaintiffs claim (1) that the Directive exceeds ICE's statutory authority, in violation of the Administrative Procedure Act (APA), because Congress never intended to authorize ICE to interfere with state judicial proceedings or to disregard the well-settled common-law privilege against civil arrests in or near courthouses; (2) that the Directive is arbitrary and capricious because Defendants issued it without considering the severe impact that arrests in or near courthouses would have on state judiciaries and prosecutors; and (3) that the Directive's interference with core sovereign functions violates the Tenth Amendment.

Defendants seek to dismiss Plaintiffs' claims based on sweeping theories about their immunity from any judicial review and their unfettered authority to seize noncitizens wherever

they may be.  Defendants' arguments make no allowance for New York's sovereign interest in the effective functioning of its courts, except for whatever limits Defendants may voluntarily choose to follow.  Neither federal law nor the Constitution permits Defendants to so disregard the core state interests at issue here.  This Court should deny the motion to dismiss.

## STANDARD OF REVIEW

While Plaintiffs bear the burden of establishing subject-matter jurisdiction, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), they "need only make a *prima facie* showing," *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994).  The Court should "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations."  *Id.*

Under Rule 12(b)(6), Plaintiffs need allege only "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads "enough factual matter (taken as true)" to allow the court to draw the reasonable inference that the defendant is liable. *Id.* at 556.

## ARGUMENT

**I.   Defendants' motion to dismiss Plaintiffs' APA claims should be denied.**

**A.   Plaintiffs' APA claims are within the relevant zone of interests regulated by the Immigration and Nationality Act.**

Defendants' contention that Plaintiffs are outside the "zone of interests" regulated by the Immigration and Nationality Act (INA) is without merit.  The zone-of-interests test is not "especially demanding," particularly where, as here, Plaintiffs sue "under the generous review provisions of the APA."  *Lexmark Int'l v. Static Control Components*, 572 U.S. 118, 130 (2014) (quotation marks and citation omitted).  The test "does not require the plaintiff to be an intended beneficiary of the law in question," but rather allows entities "who are injured" by an alleged violation of law to seek redress.  *Citizens for Responsibility & Ethics in Wash. (CREW) v.*

2

*Trump*, 939 F.3d 131, 158 (2d Cir. 2019).  "[T]he benefit of any doubt goes to the plaintiff."

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

Here, Defendants do not contest Plaintiffs' allegations—which must be taken as true on this motion to dismiss—that they have been injured by Defendants' unlawful authorization of ICE civil arrests in and near New York courthouses.  *See* Compl. ¶¶ 46-51, 106-16, 121-34.  The Courthouse Civil Arrest Directive injures New York's sovereign interests because it "disrupts the effective functioning of our courts, deters victims and witnesses from assisting law enforcement and vindicating their rights, hinders criminal prosecution, and undermines public safety."  *Id.* ¶ 1. And the Directive causes economic harm by squandering state resources, *id.* ¶¶ 2, 18, 66—the precise type of "secondary economic injuries due to conduct that violates a limiting law" that "can satisfy the zone of interests test, notwithstanding that the statute violated was not intended to protect against the type of injury suffered by the plaintiffs," *CREW*, 939 F.3d at 154.  While Defendants assert that the INA authorizes such arrests (Defs.' Mem. (Mem.) 7-8), that argument goes to the merits of Plaintiffs' claims (*see infra* at 12-16), not to the threshold question whether Plaintiffs can seek redress for their injuries.  *See CREW*, 939 F.3d at 153 (distinguishing between merits and jurisdictional questions).

On similar allegations about the effects of the Courthouse Civil Arrest Directive, a federal district court in Massachusetts has recognized that prosecutors and other "participants in the state civil and criminal justice systems" are within the INA's zone of interests—and so could challenge the Directive—because the INA reflects Congress's "preference that federal immigration enforcement not impede state criminal law enforcement."  *Ryan v. U.S. Immigration & Customs Enf't*, 382 F. Supp. 3d 142, 156 (D. Mass. 2019), *appeal filed*, No. 19-1838 (1st Cir. Sept. 5, 2019).  Similarly, a judge of this Court held just a few weeks ago that the State of New

York and other governmental plaintiffs "plainly fall within the INA's zone of interests" because "[t]he interests of immigrants and state and local governments are inextricably intertwined. Among a state government's many obligations are representing and protecting the rights and welfare of its residents." *New York v. U.S. Dep't of Homeland Sec.*, No. 19-cv-7777, 2019 WL 5100372, at *5 (S.D.N.Y. Oct. 11, 2019), *appeals filed*, Nos. 19-3591, 19-3595 (2d Cir. Oct. 31, 2019).

So too here: the State of New York and the Kings County District Attorney seek to protect the rights and welfare of their residents by invalidating a federal government policy that is alleged to exceed Defendants' authority under the INA.  Plaintiffs' interests in effective law enforcement and the proper functioning of their court system are not so "marginally related" as to bring Plaintiffs outside of the "lenient" zone-of-interests test.  *Lexmark*, 572 U.S. at 130; *see also Texas v. United States*, 809 F.3d 134, 163 (5th Cir. 2015) (States' role in administering public benefits put them in INA's zone of interests), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 269 n.3 (E.D.N.Y. 2018) (States' proprietary interests put them in INA's zone of interests), *cert. before judgment granted sub nom. McAleenan v. Vidal*, 139 S. Ct. 2773 (2019).

Defendants' sole authority for the proposition that Plaintiffs are outside the zone of interests is a non-precedential in-chambers stay order by a single Justice that involved the Immigration Reform and Control Act of 1986.  *See* Mem. 8-9 (quoting *INS v. Legalization Assistance Project*, 510 U.S. 1301 (1993) (O'Connor, J., in chambers)).  But the stay in *Legalization Assistance* was based on Justice O'Connor's conclusion that the plaintiffs there lacked standing, 510 U.S. at 1305, under an approach that the Supreme Court later "unambiguously rejected," *CREW*, 939 F.3d at 153-54 (citing *Lexmark*, 572 U.S. at 126-28 &

n.4); *see E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 769 n.10 (9th Cir. 2018) (rejecting government's reliance on *Legalization Assistance*); *Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1298-1302 (S.D. Cal. 2018) (same).

Defendants also err in arguing (Mem. 7-8) that Plaintiffs are outside the INA's zone of interests because individual arrestees may challenge the conditions of their arrest. The zone-of-interests test requires neither an indication that Congress specifically intended "to benefit the would-be plaintiff" nor that "the plaintiff itself [be] the subject of the contested regulatory action." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987); *see CREW*, 939 F.3d at 158 (same). That Congress provided a remedy for arrestees to challenge the lawfulness of their arrests thus does not foreclose other parties injured by Defendants' policy from seeking relief.

### B.     The Courthouse Civil Arrest Directive is reviewable.

This Court should reject Defendants' argument (Mem. 9-11) that Congress has vested ICE with wholly unreviewable discretion to conduct civil immigration arrests in and near state courthouses. The APA's narrow exception to judicial review for decisions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), applies only in the "rare instances" where Congress has provided "clear and convincing evidence" that it vested an agency with unfettered discretion, *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (quotation marks omitted). The Supreme Court recently reaffirmed that this exception to the presumption of reviewability should be applied "quite narrowly." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019) (quotation marks omitted). Defendants fail to meet the stringent standard for establishing non-reviewability here.

Defendants have identified no provision of the INA that expressly shields their arrest policies from judicial review. *Cf. Webster v. Doe*, 486 U.S. 592, 601 (1988). Instead, Defendants argue (Mem. 9-10) that the INA provides no "meaningful standard" to evaluate the

validity of ICE's Courthouse Civil Arrest Directive because the statute imposes no constraints on their arrest authority.  This argument simply begs the question on the merits.  Plaintiffs' complaint alleges that the INA's civil-arrest provisions *do* constrain ICE because Congress (a) necessarily incorporated the preexisting common-law privilege forbidding civil arrests in or near courthouses, and (b) more generally preserved respect for the States' sovereign right to operate their judicial systems free from federal interference.  *See* Compl. ¶¶ 121-29; *see also infra* at 11-25.  Although Defendants disagree with that interpretation of Congress's intent, that dispute goes to the merits.  As for reviewability, however, Defendants' argument fails because, at a minimum, Plaintiffs allege APA claims that the Court can assess "according to the general requirements of reasoned agency decisionmaking."  *Dep't of Commerce*, 139 S. Ct. at 2568-69. Defendants improperly assume the validity of their own statutory interpretation in arguing for wholly unreviewable discretion to conduct civil immigration arrests as they see fit.

More generally, nothing in the INA shows that Congress intended to allow ICE to conduct civil immigration arrests without the critical protections that judicial review provides— particularly when state sovereign interests are paramount.  *See infra* at 23-25.  Although the INA may "leave much to the [agency's] discretion," it does "not leave [this] discretion unbounded," *Dep't of Commerce*, 139 S. Ct. at 2568.  In authorizing civil immigration arrests, Congress included in the INA a number of restrictions that are judicially enforceable, including the requirement that the alien be present in violation of a law or regulation regarding the admission or removal of aliens, and the requirement that the alien be "likely to escape before a warrant can be obtained."  8 U.S.C. § 1357(a)(2).  In fact, Defendants effectively concede that there are judicially enforceable limits to ICE's civil-arrest authority by acknowledging (Mem. 7-8) that individual arrestees may challenge the lawfulness of their arrests in removal proceedings.  Thus,

far from providing "clear and convincing evidence" of Congress's intent to preclude judicial review, *Overton Park*, 401 U.S. at 410, the INA shows that Congress anticipated such review.

Contrary to Defendants' argument (Mem. 8), Congress's recognition of Defendants' "discretionary judgment" to decide whom to detain, release, or grant or deny bond or parole, 8 U.S.C. § 1226(e), is irrelevant here because Plaintiffs do not challenge any such judgment. As the Supreme Court recently held, § 1226(e) precludes an alien from challenging an *individual* detention or release decision, but it does not preclude broader challenges to "the extent of the Government's . . . authority under the 'statutory framework' as a whole." *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018). Here, too, Plaintiffs "mount that second type of challenge," *id.*—that is, Plaintiffs contend that Defendants lack general statutory authority to conduct civil arrests in or near state courthouses, *see* Compl. ¶¶ 106-34. Section 1226(e) is no barrier to such a claim.[1]

Defendants also misplace reliance (Mem. 9-10) on *Heckler v. Chaney*, 470 U.S. 821 (1985), which involved a decision by the Food and Drug Administration not to institute an enforcement proceeding. There, the Supreme Court held that the *refusal* to take enforcement action was presumptively unreviewable because reviewing *inaction* would require judging whether the agency had wisely chosen to conserve its resources against a potentially infinite array of opportunity costs. *Id.* at 831-32. That holding undermines Defendants' argument because *Heckler* expressly distinguished an agency's refusal to take enforcement action from an

---

[1] Defendants thus misplace reliance (Mem. 10-11) on cases holding that specific enforcement or charging decisions are unreviewable under the APA. Those cases involved challenges to particular citations issued by the Secretary of Labor. *See Speed Mining, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 528 F.3d 310, 316-19 (4th Cir. 2008); *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 157-58 (D.C. Cir. 2006). The Supreme Court has made clear that such specific enforcement or charging decisions fall within a distinct "categor[y] of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). But the Court has not treated as unreviewable the question whether a general agency policy has altogether exceeded the agency's statutory authority.

agency's affirmative act, which "provides a focus for judicial review" and "at least can be reviewed to determine whether the agency exceeded its statutory powers," *id.* at 832—precisely what Plaintiffs allege here.

### C.    The Courthouse Civil Arrest Directive is final agency action.

Applying a "pragmatic" and "flexible" approach, *Abbott Labs. v. Gardner*, 387 U.S. 136, 149-50 (1967), this Court should conclude that the Courthouse Civil Arrest Directive is a final agency action subject to APA review.  Agency action is final under 5 U.S.C. § 704 if it (1) "mark[s] the consummation of the agency's decisionmaking process," and (2) is one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation marks and citations omitted).

Here, Defendants concede the first prong of the *Bennett* test and argue only that the Courthouse Civil Arrest Directive fails the second prong, on the ground that the Directive is merely a general statement of policy that "does not compel any action" or "create legal consequences."  Mem. 11-12.[2]  But the Supreme Court has long held that agency action that "give[s] notice of how the [agency] interpreted" the relevant statute can be final and reviewable under the APA, even if that notice "would have effect only if and when a particular action was brought" based on that interpretation.  *Abbott Labs.*, 387 U.S. at 150 (citing cases).  Thus, the Court recently held that jurisdictional determinations issued by the Army Corps of Engineers (advising whether a particular property contains "waters of the United States" under the Clean

---

[2] Defendants cite *Broadgate Inc. v. U.S. Citizenship & Immigration Services*, 730 F. Supp. 2d 240, 243 (D.D.C. 2010), for the proposition that "[l]egislative or substantive rules are, by definition, final agency action, while interpretive rules and general policy statements are not." Mem. 12 (quotation marks omitted).  To the extent that *Broadgate* held that *only* legislative and substantive rules meet the APA's final-agency-action requirement, it has been overruled.  As the Supreme Court has since made plain, interpretive rules, like legislative rules, are subject to "a variety of constraints on agency decisionmaking—the [APA's] arbitrary and capricious standard being among the most notable."  *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015).

Water Act) constitute final agency action because they warn regulated entities of conduct that risks serious civil penalties, even though they do not dictate whether the agency would grant a permit under the Act. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016).

The Courthouse Civil Arrest Directive is no different: it constitutes ICE's determination—which the agency concedes (Mem. 11) is neither tentative nor interlocutory— that ICE officers and agents should conduct civil arrests against parties, witnesses, or victims attending New York court proceedings. *See* Courthouse Civil Arrest Directive § 2. As Plaintiffs allege, the Directive, as implemented by ICE, has had the effect of deterring noncitizens from attending court by warning them that certain conduct (attendance at court-related proceedings and cooperation with law enforcement) risks serious consequences (civil immigration arrests by ICE). Compl. ¶¶ 38-45, 52, 58, 62-87, 89-91. The Directive thus carries "legal consequences" that suffice to constitute final agency action under the APA, especially given the Supreme Court's longstanding "pragmatic" approach to finality. *Abbott Labs.*, 387 U.S. at 149-50.

In arguing otherwise, Defendants mischaracterize the Directive (Mem. 12) as a mere explanatory document, designed solely to "guide ICE officers in the exercise of their discretion in deciding whether and when to conduct civil immigration enforcement actions" in courthouses. This assertion simply ignores the fact, conceded elsewhere by Defendants (Mem. 4), that the Directive was intended to make a sharp change in ICE's arrest policy from its past practice—one that has caused "ICE enforcement actions at courthouses in New York State [to] skyrocket[]."[3] Compl. ¶ 6. Because "the impact of the challenged action on the parties," rather than

---

[3] Indeed, the Directive is part of a broader policy change of expanded immigration enforcement reflected in the Secretary of Homeland Security's 2017 directions, *see* Courthouse Civil Arrest Directive § 2 n.1, which were issued to implement the President's 2017 Executive Order that sought to "take the shackles off" ICE officers and agents, Compl. ¶¶ 38-39.

Defendants' "semantic characterizations," guides the finality inquiry, *Aquavella v. Richardson*, 437 F.2d 397, 404-05 (2d Cir. 1971), this Court should reject Defendants' attempt to treat the Directive merely as nonbinding guidance. *See also L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 612 (S.D.N.Y. 2018) (internal guide governing treatment of "unaccompanied alien children" was final agency action); *U.S. Gypsum Co. v. Muszynski*, 161 F. Supp. 2d 289, 290-91 (S.D.N.Y. 2001) (Rakoff, J.) (an agency's "own behavior may belie the claim that its interpretation is not final" (alterations and quotation marks omitted)).

### D. The complaint challenges ICE's policy of arresting people traveling to and from court.

Defendants are wrong that because the Courthouse Civil Arrest Directive expressly refers only to arrests inside courthouses, any policy of conducting arrests near courthouses is not a final agency action. *See* Mem. 13. Courts, including this one, have held that APA review is available even without "a formal or official statement regarding the agency's position," *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 165 (E.D.N.Y. 2018), if the agency's position is reasonably discernible and sufficiently definitive. *See, e.g.*, *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 929, 931 (D.C. Cir. 2008); *U.S. Gypsum*, 161 F. Supp. 2d at 291. Otherwise, agencies could "shield [their] decisions from judicial review simply by refusing to put [them] in writing." *Grand Canyon Tr. v. Pub. Serv. Co. of N.M.*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003).

Here, the complaint alleges that Defendants have adopted a policy authorizing ICE officers and agents to conduct arrests not only in, but also around, courthouses. Compl. ¶ 1 (describing "the federal government's recent unlawful and unconstitutional *policy* authorizing civil immigration arrests *in and around* New York State courthouses" (emphases added)). Although that policy is reflected in part in the Directive, Defendants' "own behavior," *U.S. Gypsum*, 161 F. Supp. 2d at 291 (quotation marks omitted), confirms that their policy also

10

includes arrests of people "on their way into and out of New York State courts," Compl. ¶ 52; *see id.* ¶¶ 69-77, 81-85 (detailing arrests outside courthouses).  Indeed, Defendants have described their policy as one that authorizes arrests near courthouses and "in courthouse environments."  *Id.* ¶¶ 40-41.  At best, Defendants' disagreement about the scope of its policy raises a dispute of fact that cannot be resolved now.  *See Amadei*, 348 F. Supp. 3d at 165.

## II.      The complaint states a claim that the Courthouse Civil Arrest Directive exceeds ICE's statutory authority.

On the merits, Defendants make no arguments about Plaintiffs' claim that the Courthouse Civil Arrest Directive is arbitrary and capricious.  For Plaintiffs' statutory-authority claim under the APA, Defendants contend (Mem. 14, 19) that the claim fails as a matter of law because "there is no federal common law right to evade immigration arrests" and, even if there were, Congress displaced federal common law by authorizing ICE arrests in the INA.

This argument fundamentally misconceives Plaintiffs' claim.  Plaintiffs' claim does not turn on the scope of federal common law, but rather on the scope of ICE's statutory authority to conduct arrests in or near state courthouses.  Plaintiffs argue that the INA's generic grant of arrest authority—which says nothing about state courts—cannot be read to implicitly authorize courthouse arrests in light of the presumption that Congress sought both to respect state sovereignty over judicial proceedings and to preserve the well-settled common-law privilege against civil arrests in or near courthouses.  Moreover, contrary to Defendants' assumption, this privilege derives not from *federal* common law, which Congress can displace by legislating, but rather from *state* common law, which is preempted only when Congress clearly and manifestly intends to do so—intent that is absent from the INA's civil-arrest provisions.  Finally, Defendants are wrong to characterize (Mem. 15) the centuries-old common-law privilege against civil arrests as a "limited privilege" pertaining only to service of process on out-of-state litigants.

Properly understood, Plaintiffs' APA claim satisfies the minimal standard for pleading that the Directive exceeds ICE's statutory authority.

> ### A.     Congress did not authorize ICE to conduct civil arrests in or near state courthouses.

Like any agency, ICE can exercise only the powers Congress has given it.  *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).  Defendants claim (Mem. 20, 22-23) that they are authorized to conduct civil immigration arrests in and near state courthouses under the INA's generic grants of arrest authority, 8 U.S.C. §§ 1226(a), 1357(a)(2)—even though these provisions say nothing about state courts—simply because "Congress spoke to the issue of immigration arrests" in these provisions.  That argument ignores two critical presumptions that defeat Defendants' arguments and support Plaintiffs' APA claim.

First, Congress presumptively intends to leave "long-established and familiar" common-law principles—including state common law—intact unless a statute "speak[s] directly to the question addressed by the common law."  *United States v. Texas*, 507 U.S. 529, 534 (1993) (quotation marks omitted); *see United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 667-68 (4th Cir. 1996) (holding that Congress left state common-law remedies intact); *Resolution Trust Corp. v. Miramon*, 22 F.3d 1357, 1360 (5th Cir. 1994) (presumption favoring common law "applies to . . . state common law").  Here, as explained in more detail below (at 16-20), both state and federal courts recognized a common-law privilege against civil arrests in and around courthouses when Congress enacted the INA's civil-arrest provisions.

Second, Congress also presumptively preserves "the historic police powers of the States" when it legislates.  *City of Milwaukee v. Illinois*, 451 U.S. 304, 316 (1981) (quotation marks omitted).  That presumption can be overcome only when a statute reflects Congress's "clear and manifest purpose" to preempt the State's police powers.  *Id.* (quotation marks omitted); *see also*

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (requiring clear statement before presuming that Congress sought to preempt a "field which the States have traditionally occupied").  Here, the Constitution reserves to the States "the maintenance of state judicial systems for the decision of legal controversies," *Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 285 (1970), and the Supreme Court has long recognized the importance of avoiding federal interference with state judicial proceedings and preserving the States' "inherent sovereign[]" power to prosecute crimes, *Heath v. Alabama*, 474 U.S. 82, 89 (1985) (quotation marks omitted); *see also O'Shea v. Littleton*, 414 U.S. 488, 500 (1974).

Nothing in the INA's generic grant of arrest authority evidences any congressional intent—let alone a clear and manifest one—to preempt the common-law privilege against civil arrests in or near courthouses, or to interfere with state judicial proceedings and prosecutions. Neither of the INA's provisions authorizing arrests, *see* 8 U.S.C. §§ 1226(a), 1357(a)(2), refers to courthouses.  Nor do these provisions include any "clear statement" of Congress's intent to displace the States' historic police powers in this area.  *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (quotation marks omitted).  Given Congress's silence on both these fronts, the INA's grant of arrest authority cannot be read to override the longstanding and familiar common-law privilege or to endorse ICE agents' interference with state courts and prosecutions.  *See Ryan*, 382 F. Supp. 3d at 157-59.

Defendants thus err in asserting (Mem. 20) that Congress merely needed to "sp[eak] to the issue of immigration arrests" to "displac[e]" the common-law privilege.  That more lenient standard applies when Congress legislates in an area where *federal* common law applies, since "it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law."  *City of Milwaukee*, 451 U.S. at 317.  But a stricter test applies when, as

here, a federal statute touches on *state* common law or the States' police powers: courts simply do not presume that Congress intended to "alter the usual constitutional balance between the States and the Federal Government" unless it "make[s] its intention to do so unmistakably clear in the language of the statute." *Gregory*, 501 U.S. at 461 (quotation marks omitted). The INA includes no such "unmistakably clear" language.

Defendants also misplace reliance (Mem. 23-24) on a reference to courthouses in a different subsection of the INA—passed decades after Congress enacted INA's civil-arrest provisions—to support their argument that Congress did intend to authorize ICE arrests in state courthouses. That subsection, 8 U.S.C. § 1229(e), requires federal immigration officers who conduct "an enforcement action leading to a removal proceeding" in certain court proceedings (including cases "relating to domestic violence, sexual assault, trafficking, or stalking") to certify that they did not decide to remove an arrestee based solely on information provided by an abuser. Defendants assert that this language contemplates civil arrests in state courthouses.

They are incorrect. In addition to civil immigration arrests, ICE officers and agents have statutory authority to conduct *criminal* arrests (subject to stricter procedural and substantive requirements), and the common-law privilege at issue here does not apply to such arrests. Thus, § 1229(e) may reflect only that Congress contemplated criminal arrests that would not implicate the common-law privilege—and at any rate does not contain clear and manifest language showing that Congress intended the statute to apply to civil, rather than criminal, arrests. More broadly, § 1229(e) was intended to *protect* noncitizens by assuring them that federal immigration authorities would not misuse information from their abusers to support their removal—thus encouraging noncitizens to participate in state-court proceedings seeking to obtain justice against those who "battered or subject[ed] [them] to extreme cruelty." *Id.* It would be perverse to rely

14

on § 1229(e) to support a Directive that undermines those very objectives—for example, by leading to arrests of domestic-violence victims and arrests at the courts specializing in protecting abused adults and minors, *see* Compl. ¶¶ 76, 82, 99-100, 103.  At the very least, § 1229(e)'s goal of making courthouses *safer* for noncitizens precludes reading the statute as an "unmistakably clear" expression of Congress's intent to make courthouses *less safe* by affirmatively authorizing ICE civil courthouse arrests.  *See Gregory*, 501 U.S. at 461 (quotation marks omitted); *see also Ryan*, 382 F. Supp. 3d at 159 (Section 1229(e) "has little bearing on the . . . interpretation of Congressional intent regarding courthouse arrests" in the INA).

Finally, Defendants appear to argue that the federal government's "exclusive authority over immigration" (Mem. 21) requires this Court to interpret the INA's arrest provisions as implicitly authorizing interference with state courts.  But there is no support for Defendants' extraordinary proposition that the federal government's "regulatory authority over all aliens within the United States" (*id.*) allows it to disregard *any* state laws that might apply to such aliens.  Instead, courts have relied on the federal government's primacy over immigration only to override state laws that effectively seek to regulate immigration itself.  *See Arizona v. United States*, 567 U.S. 387, 402 (2012).  For example, in the Eleventh Circuit case Defendants cite (Mem. 21), the court found preempted a state statute that was a "thinly veiled attempt to regulate immigration" by barring undocumented immigrants "from enforcing contracts for basic necessities."  *United States v. Alabama*, 691 F.3d 1269, 1293, 1296 (11th Cir. 2012).

Here, by contrast, neither the common-law privilege against civil courthouse arrests nor the States' administration of their judicial systems represents any attempt by the State to regulate immigration specifically—as shown by the fact that these principles would prohibit *any* civil arrests in or near New York courthouses, not simply arrests by ICE officers or agents.  *See*

15

*Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 1601 (2015) (federal Natural Gas Act did not preempt generally applicable state laws "not aimed at natural-gas companies in particular, but rather all businesses in the marketplace"); *DeCanas v. Bica*, 424 U.S. 351, 355 (1976) ("the fact that aliens are the subject of a state statute does not render it a regulation of immigration"). Plaintiffs here are not seeking to alter whom the federal government may remove, or on what grounds, but instead seek only to protect a core feature of their sovereignty from a federal policy that directly and significantly harms a compelling sovereign interest. *See Ryan*, 382 F. Supp. 3d at 158. That the INA authorizes arrests in the immigration context does not provide an automatic override of state common law or state sovereign interests.

## B.   Defendants mischaracterize the common-law privilege against civil arrests in or around courthouses.

Defendants' arguments rely on a fundamental misunderstanding of the common-law privilege against civil arrests in and around courthouses. Contrary to Defendants' assertions (Mem. 15 n.4), that privilege is part of state common law, not just federal common law, *see, e.g.*, *Parker v. Marco*, 136 N.Y. 585, 589 (1893). The privilege protects against arrests, not just service of summons (*see* Mem. 18). And the privilege applies to residents of a State, not just to nonresidents who enter a foreign jurisdiction (*see* Mem. 14-15). Properly understood, the common-law privilege against civil arrests in or near courthouses thus provides precisely the type of well-settled protection that Congress presumptively incorporated into the INA, and that the Courthouse Civil Arrest Directive improperly disregards.

*1.* The civil-arrest privilege dates back to fifteenth-century England. *See Parker*, 136 N.Y. at 589. At the time, plaintiffs could serve process in lawsuits by obtaining a "writ of *capias ad respondendum*," which "directed the sheriff to secure the defendant's appearance by taking him into custody." *Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999).

Clever litigants began using courthouses to trap their opponents by having them arrested while they were attending court on other business, or while they were on their way to or from the courthouse.  *See, e.g.*, *Walpole v. Alexander* (1782) 99 Eng. Rep. 530, 531.

The privilege developed to counter that practice.  It served two important ends: It encouraged court attendees "to come forward voluntarily," *id.*, by shielding from civil arrest "[s]uitors, witnesses, and other persons, necessarily attending *any* courts of record upon business . . . during their actual attendance, which includes their necessary coming and returning," 3 William Blackstone, *Commentaries on the Laws of England* 289 (1768).  And it kept peace in the courthouse by preventing "perpetual tumults" that would debase "the decorum which ought to prevail in a high tribunal."  *Orchard's Case* (1828) 38 Eng. Rep. 987, 987; *see also Long's Case* (1676-77) 86 Eng. Rep. 1012, 1012 (arrest "in the Palace yard, not far distant from the hall gate, the Court being then sitting," was "a contempt").  The privilege thus belonged not only to the attendees, but also to the courts.  *See Orchard's Case*, 38 Eng. Rep. at 987.  And when invoked to preserve courts' "decorum," the privilege protected even those people who had no official business in court, for it barred *all* arrests "made in [the judges'] presence or within the local limits of the place where they were administering justice."  *Id.*

"The United States imported" into its judicial system England's "procedure of civil arrest and [its] common law privilege against civil arrest at courthouses."  *Ryan*, 382 F. Supp. 3d at 156; *see also, e.g.*, N.Y. Const. art. XXXV (1777) (adopting English common law).  Courts across the country consistently held that parties and witnesses "are privileged from arrest on civil process during their attendance, and for a reasonable time in going and returning."  *E.g.*, *In re Thompson*, 122 Mass. 428, 429 (1877).  By the end of the nineteenth century, "no rule of practice [was] more firmly rooted in the jurisprudence of United States courts than that of the exemption

of persons from the writ of arrest and of summons while attending upon courts of justice, either as witnesses or suitors."  *Hale v. Wharton*, 73 F. 739, 740 (W.D. Mo. 1896).[4]

New York, like the vast majority of American jurisdictions, has also long recognized a privilege protecting parties and witnesses from "all forms of civil process," including arrest, "during their attendance at court and for a reasonable time in going and returning."  *Parker*, 136 N.Y. at 589; *accord* David Graham, *Treatise on the Practice of the Supreme Court of the State of New-York* 129-31 (2d ed. 1836).  Like the English privilege, the New York privilege against civil arrests is both a privilege of attendees, who "might be deterred" by the prospect of courthouse arrests, *Person v. Grier*, 66 N.Y. 124, 126 (1876), and "a privilege of the court," vital to "the due and efficient administration of justice," *Parker*, 136 N.Y. at 589.

*2.*  Defendants claim (Mem. 18) that the privilege against civil arrests had "been replaced by a privilege against service of process" by 1952, when Congress codified the INA's civil-arrest provisions, but they are incorrect.  As arrests began to "give[] way to personal service of summons" as the preferred method of securing defendants' appearance in civil suits, *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), the privilege "was extended" to protect people from being served with a summons while in, or on the way to or from, court, *Hale*, 73 F. at 741.  But while the privilege against civil arrest and the privilege against the service of a summons rest on the same common-law principles, courts recognized that they did not have to be applied identically.  *See, e.g.*, *Person*, 66 N.Y. at 125.  Some courts held, for instance, that residents were privileged only against civil arrest, while nonresidents were privileged against all forms of

---

[4] *See, e.g.*, *Hurst's Case*, 4 U.S. (4 Dall.) 387, 389 (Washington, Circuit Justice, C.C.D. Pa. 1804); *Kaufman v. Garner*, 173 F. 550, 554 (W.D. Ky. 1909); *First Nat'l Bank v. Ames*, 39 Minn. 179, 179 (1888); *Mitchell v. Wixon*, 53 Mich. 541, 542 (1884); *Vincent v. Watson*, 30 S.C.L. (1 Rich.) 194, 198 (S.C. 1845); *Halsey v. Stewart*, 4 N.J.L. 366, 369 (N.J. 1817); *Hayes v. Shields*, 2 Yeates 222, 222 (Pa. 1797) (per curiam).

service of process.  *See, e.g.*, *Frisbie v. Young*, 11 Hun. 474, 475 (1st Dep't 1877).  But the core

rationale for the privilege, whatever its application, remained to protect courts against any form

of service that would cause a disturbance or otherwise interfere with court proceedings.  *See*

*Baumgartner v. Baumgartner*, 273 A.D. 411, 412-13 (1st Dep't 1948).

These principles underlay *Stewart v. Ramsay*, 242 U.S. 128 (1916), the Supreme Court's

foundational case on the privilege.  While that case concerned service of a summons, the Court

made clear that the privilege rested on the broader principle that "[c]ourts of justice ought

everywhere to be open, accessible, free from interruption, and to cast a perfect protection around

every man who necessarily approaches them," leaving litigants and witnesses "free from the fear

of molestation or hindrance."  *Id.* at 129 (quotation marks omitted).  There is no basis for reading

this broad protection as applying only to service of summons and not to the more disruptive

effect of civil arrests.

Defendants are also incorrect that any common-law privilege is limited to nonresidents

entering into a foreign jurisdiction.  *See* Mem. 14-15.  Courts that discussed such a limitation did

so only in the context of service of summonses, which they deemed to pose a unique risk:

dissuading parties and witnesses from crossing state lines, for fear that they would be served in

another State, and thus subject to personal jurisdiction there.  *See, e.g.*, *Hale*, 73 F. at 741.

Arrests, by contrast, posed a risk equally applicable to residents and nonresidents: that the

prospect of a looming arrest would "disturb and divert" court attendees, causing them to lose the

"repose and equipoise essential to a full and true deliverance of [their] testimony."  *Id.*  Courts

thus recognized that the common-law privilege against civil arrests applied to "*all persons* who

have any relation to a cause."  *In re Healey*, 53 Vt. 694, 695 (1881) (emphasis added).

Although some New York courts, like courts in other jurisdictions, applied the privilege

against the service of a summons only to nonresidents, they consistently held that the privilege against civil arrests applied to residents as well.  In *Hopkins v. Coburn*, for instance, New York's highest court expressly held that resident parties are "undoubtedly privileged from [civil] arrest" in and around courthouses.  1 Wend. 292, 293 (N.Y. Sup. Ct. 1828).  And in *Person*, the New York Court of Appeals explained that resident parties and witnesses were privileged from civil arrest in court, and would therefore be ordered "discharged from arrest upon" signing a formal appearance (sometimes called "filing common bail").  66 N.Y. at 125.  Consistent with these cases, a leading nineteenth-century treatise on New York law explained that, "[a]s a general rule, *every person* who has any relation to a suit . . . is exempt from arrest" while going to, remaining in, and returning from court.  Graham, *supra*, at 129 (emphasis added).

In short, Defendants are simply wrong in claiming that the law distinguishes between residents and nonresidents when applying the privilege against civil arrest.  While it is "doubtful" that "any distinction [between residents and nonresidents] should or does in fact exist," the distinction, at most, applies in the context of service of summonses.  *Person*, 66 N.Y. at 126.  But that distinction has no bearing on this case, which involves only civil arrests.

*3.*  Defendants' attempts to narrow the common-law privilege also cannot be squared with the well-recognized policies that animate the privilege.

One of the main purposes of the privilege against civil arrest is to encourage parties and witnesses "to come forward voluntarily."  *Walpole*, 99 Eng. Rep. at 531.  To that end, the privilege has for centuries protected *all* "[s]uitors, witnesses, and other persons . . . attending any courts of record upon business," 3 Blackstone, *supra*, at 289, whether they live in the jurisdiction or come "from abroad," *Walpole*, 99 Eng. Rep. at 531; *accord Thompson*, 122 Mass. at 429.  The privilege thus recognizes that the specter of civil arrest causes parties and witnesses to "be

deterred . . . from attending" court, resulting in "delays" and "injustice." *Person*, 66 N.Y. at 126. Potential arrestees experience that threat regardless of whether they reside in New York, and regardless of whether their arrestors are federal immigration officials or local sheriffs.

ICE's Directive and its implementation have caused the very delays and injustice that the privilege seeks to prevent. ICE's civil arrests under the Directive have forced New York courts to dismiss and postpone cases in which parties or witnesses were apprehended, Compl. ¶¶ 70, 74, 77-78, 80, 83, 86; caused the temporary closure of a courthouse after an arrest caused property damage, *id.* ¶ 69; and hampered prosecutors' ability to prosecute crimes, in part because witnesses fear that ICE will apprehend them if they appear in court, *id.* ¶¶ 90-91.

The privilege's other well-established purpose is to enable courts to function properly. Because arrests on courthouse grounds threaten the judiciary's ability to dispense justice, English courts forbade all such arrests—even of people not in court on official business. *See Orchard's Case*, 38 Eng. Rep. at 987; *see also* 3 Blackstone, *supra*, at 289 ("[N]o arrest can be made . . . in any place where the king's justices are actually sitting."). Unlike mere service of a summons, civil arrests "interfere with [the arrestees'] liberty," *Frisbie*, 11 Hun. at 475; "produce much terror" in the potential arrestees, *Cole v. Hawkins* (1738) 95 Eng. Rep. 396, 396; and may result in "violence" that "disturb[s]" the court, 6 Matthew Bacon, *A New Abridgement of the Law* 530 (7th ed. 1832); *accord, e.g.*, *Hale*, 73 F. at 741.

New York courts have also recognized this important purpose. Because "the administration of justice" is thwarted when parties and witnesses are "molested with process" while on courthouse grounds, *Person*, 66 N.Y. at 126, the privilege prevents service on residents and nonresidents alike if service would cause a "disturbance directly tending to interrupt the proceedings of the court or to impair the respect due to its authority," *Baumgartner*, 273 A.D. at

412-13.  And ICE arrests have caused precisely such disturbances—such as when a violent arrest shatters courthouse doors, Compl. ¶ 69, or causes so much commotion that it leads bystanders to believe they were witnessing a kidnapping, *id.* ¶ 81.

*4.*  Defendants argue (Mem. 17) that the public interest in immigration arrests requires overriding the common-law privilege, but they offer no genuine support for this position.  The only cases they cite say that the public interest "in *criminal* cases" may overcome the privilege. *Ex parte Lamar*, 274 F. 160, 169 (2d Cir. 1921) (emphasis added; quotation marks omitted).  But "[r]emoval is a civil, not criminal, matter."  *Arizona*, 567 U.S. at 396.  Indeed, the Directive disclaims any application "to criminal immigration enforcement actions."  Directive § 2.  So the arrests Plaintiffs challenge do not vindicate the "overriding public policy" requiring defendants "to answer and stand trial" for crimes of which they are accused.  *See United States v. Conley*, 80 F. Supp. 700, 703 (D. Mass. 1948).  Instead, they serve the same purpose as civil arrests at common law—to "secure the [arrestee's] appearance" at a civil proceeding, *Murphy Bros.*, 526 U.S. at 350; *see* 8 U.S.C. § 1226(a)—and should be subject to the same privilege.

Although Defendants claim that no case has applied the privilege in the federal immigration context (Mem. 16), a recent federal decision in fact did so, concluding that the common-law privilege was sufficiently well established and on point to provide a background principle of law that Congress presumptively incorporated into the INA.  *See Ryan*, 382 F. Supp. 3d at 155-57.  The lack of other cases on this precise issue is unsurprising.  As Defendants acknowledge (Mem. 4-5), ICE's policy of arresting people in courthouses is new, and the recently announced Directive is a stark departure from past practice that has caused arrests in or around state courthouses to "skyrocket[]."  Compl. ¶ 6; *see also id.* ¶¶ 30-45.  The absence of prior decisions thus underscores the radical nature of Defendants' new policy, rather than

suggesting any uncertainty about the relevance of the common-law privilege here.

## III.    The complaint states a Tenth Amendment claim.

The complaint plausibly pleads that the Courthouse Civil Arrest Directive violates the Tenth Amendment by unduly interfering with New York's operation of its courts and its ability to prosecute criminal cases.  The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  Because "the National Government possesses only limited powers," *Bond v. United States* (*Bond II*), 572 U.S. 844, 854 (2014), the States "retain a significant measure of sovereign authority," *New York v. United States*, 505 U.S. 144, 156 (1992) (alteration and quotation marks omitted).

Defendants' sole argument in response (Mem. 24-25) is that the Tenth Amendment bars only federal commandeering of States and their officials.  But the Tenth Amendment has never been construed so narrowly.  The federal government violates the Tenth Amendment whenever it exceeds its "discrete, enumerated" powers by invading the States' "residuary and inviolable sovereignty."  *Printz v. United States*, 521 U.S. 898, 919 (1997) (quotation marks omitted).  The anti-commandeering doctrine is thus but one "example" of the Tenth Amendment's broader protection of state sovereignty.  *City of New York v. United States*, 179 F.3d 29, 33 (2d Cir. 1999), *abrogated on other grounds by Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018).[5]  For instance, the Tenth Amendment also bars Congress from criminalizing "act[s]

---

[5] Contrary to Defendants' assertion (Mem. 25), *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384 (2d Cir. 2008), accords with this principle.  There, the Second Circuit held that "federal statutes *validly enacted under one of Congress's enumerated powers* . . . cannot violate the Tenth Amendment unless they commandeer the states' executive officials or legislative process."  524 F.3d at 396 (emphasis added; quotation marks, alteration, and citation omitted).  Here, the question under dispute is whether Congress's enumerated powers—assuming they were delegated to Defendants—include authorizing arrests that seriously disrupt the States' operation of their judiciaries and hinder state criminal prosecutions.  *See* Compl. ¶¶ 117-20, 137-41.

committed wholly within a State" unless those acts "have some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United States." *Bond II*, 572 U.S. at 854 (quotation marks omitted); *see United States v. Morrison*, 529 US. 598, 613-27 (2000); *United States v. Lopez*, 514 U.S. 549, 561-68 (1995).

Moreover, as relevant here, both the Supreme Court and the Second Circuit have recognized that the federalism principles embodied by the Tenth Amendment broadly forbid federal interference in state judiciaries—whether by enjoining state-court proceedings, *Younger v. Harris*, 401 U.S. 37, 53-54 (1971); by second-guessing States' procedures for administering cases, *see Kaufman v. Kaye*, 466 F.3d 83, 87 (2d Cir. 2006); or by conducting "ongoing federal audit[s] of state criminal proceedings" to ensure compliance with the U.S. Constitution, *O'Shea*, 414 U.S. at 500. These protections of the States' prerogative to control "the internal workings" of their own courts, *Kaufman*, 466 F.3d at 86, stem directly from the Tenth Amendment's preservation of "the fundamental constitutional independence of the States," *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 146 (1988).

Here, the Courthouse Civil Arrest Directive threatens New York's "compelling" interest in a "fully capable" judiciary. *Gregory*, 501 U.S. at 472; *see supra* at 21-22. The Directive has resulted in the arrests of parties, witnesses, and family members, thereby preventing witnesses from testifying and parties from appearing, and forcing courts to adjourn or cancel hearings, trials, and other judicial proceedings. Compl. ¶¶ 64-87. Those delays harm not only the people that the court system serves, but also the court system itself, which "must rearrange ever-more-crowded dockets" and will suffer from a growing backlog. *Id.* ¶ 2. ICE's arrests have also caused public disturbances threatening the safety of persons attending court, and undermining the State's interest in maintaining security and decorum in court proceedings. *Id.* ¶¶ 69, 81. And

despite New York's efforts to curb these arrests, arrests of people on their way to or from court—including on courthouse steps, *id.* ¶ 7—continue to "impair the ability of New York courts to perform routine functions," *id.* ¶ 66.

ICE's practice of arresting people in and around courthouses has also intruded on New York's sovereign prerogative to prosecute local crimes. *See Heath*, 474 U.S. at 89. Those arrests have made prosecutors' jobs "twice as hard" by "instill[ing] fear in immigrant communities" and "mak[ing] victims and witnesses afraid to come forward and report crimes." Compl. ¶¶ 89, 96; *see id.* ¶¶ 95-100. Prosecutors throughout the State have reported declines in immigrant participation in the criminal-justice system, *see id.* ¶¶ 101-03, and have resorted to imploring ICE to stop making courthouses arrests—to little effect, *see id.* ¶¶ 62-63, 104-05.

These allegations state a Tenth Amendment claim. They show the federal government's "[i]mpermissible interference with state sovereignty," *Bond v. United States*, 564 U.S. 211, 225 (2011), by issuing a directive that squarely targets state courthouses as convenient locations for ICE to conduct civil immigration arrests. Defendants' commandeering argument is thus beside the point: the Courthouse Civil Arrest Directive's meaningful interference with state judicial proceedings and criminal prosecutions is enough to trigger the Tenth Amendment's protections.[6]

## CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

---

[6] The Court should deny in full Defendants' motion to dismiss. But if the Court believes there is any question about the legal sufficiency of the challenged claims, it may exercise its discretion to defer determination until after the parties have developed the factual record, because the extent of interference with state sovereignty may be informed by factual questions, and the parties will necessarily develop a factual record in any event because Defendants do not contest that Plaintiffs state an arbitrary-and-capricious claim. *See* Fed. R. Civ. P. 12(d), (i); *Evello Invs., N.V. v. Printed Media Servs., Inc.*, 158 F.R.D. 172, 173 (D. Kan. 1994) (citing *Gulbenkian v. Gulbenkian*, 33 F. Supp. 19, 20 (S.D.N.Y. 1940)); *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 857 F. Supp. 1137, 1145 (M.D.N.C. 1994).

DATED:  November 5, 2019

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Matthew Colangelo*

Steven C. Wu
  *Deputy Solicitor General*
Scott A. Eisman
  *Assistant Solicitor General*

*Of Counsel*

Matthew Colangelo
   *Chief Counsel for Federal Initiatives*
Anjana Malhotra, *Assistant Attorney General*
Morenike Fajana, *Special Counsel*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
Matthew.Colangelo@ag.ny.gov

*Attorneys for the State of New York*

ERIC GONZALEZ
*District Attorney of Kings County (Brooklyn)*

By: */s/ Jill Harris*
Jill Harris, *Chief of Policy and Strategy*
Kings County District Attorney's Office
350 Jay Street
Brooklyn, New York 11201
Phone: (718) 250-3156
harrisj1@BrooklynDA.org

*Attorney for the District Attorney of Kings
County (Brooklyn)*

# Addendum

# TABLE OF CONTENTS

**Page**

*Cole v. Hawkins*,
   (1738) 95 Eng. Rep. 396 ...................................................................................ADD1

*Frisbie v. Young*,
   11 Hun. 474 (1st Dep't 1877) ..........................................................................ADD3

*Long's Case*,
   (1676-77) 86 Eng. Rep. 1012 ...........................................................................ADD5

*Orchard's Case*,
   (1828) 38 Eng. Rep. 987 ...................................................................................ADD7

*Walpole v. Alexander*,
   (1782) 99 Eng. Rep. 530 ...................................................................................ADD9

David Graham, *Treatise on the Practice of the Supreme Court of the State of
   New-York* (2d ed. 1836) (excerpt).................................................................ADD11

6 Matthew Bacon, *A New Abridgement of the Law* (7th ed. 1832) (excerpt) .......................ADD18

3 William Blackstone, *Commentaries on the Laws of England* (1768) (excerpt) ...............ADD22

which impose the penalty of 200l. for such an offence: and he being now brought up by habeas corpus, it was moved by Mr. Ketelby, on the behalf of one Dennet, a creditor of the defendant, that the defendant might be turned over to the Marshalsea, he being pardoned by the statute of 9 G. 2, c. 35.

On the other side it was argued by Attorney General Ryder, and Solicitor General Murray, that the defendant being in custody at the suit of the Crown, he ought not to be turned over to another prison, at the instance of a private person, for debt: and so it was determined in *Boyse's case*. Besides, this is not the regular way for the defendant to take advantage of the Act, supposing he is pardoned thereby, (which, they said, he was not) but (on the contrary) it is directed to be by pleading.

And the whole Court were clearly of opinion, that this is not a proper method of taking advantage of the Act; but it ought to be by suggestion on the record, that the Crown may be at liberty to traverse it; and therefore they denied the motion.

Lee C.J. also said, that he was not satisfied that a person in custody for the Crown can be turned over to another prison; and there is a case, where it is held he cannot.

N.B. This matter was first moved last term, and the Court then refused, for the same reasons as were now given, to grant any rule.

[275]   COLE *against* HAWKINS.   Merely serving process upon a party attending his cause in Court is a contempt.

S. C. 2 Stra. 1094.

Motion by Sir Thomas Abney, for an attachment against one Whitten, an attorney, for serving the copy of a bill of Middlesex upon the defendant, in an action of assault and battery at the suit of one Lawes, whilst Lee C.J. was hearing causes at Nisi Prius in Westminster-Hall, and the defendant was upon the steps leading to the Court, attending his cause, which was then just going to be called on. And Sir Thomas said, that he remembered a case, where the service of a justice's summons upon a person attending the Court whilst it was sitting, was held to be a contempt.

On the other side it was argued by Solicitor General Strange and others, that the protection which the law gives to persons in these cases, extends to them only eundo & redeundo; and it does not include the serving of a process, as this is no restraint upon the person. Besides, supposing the service to be irregular, yet it is no contempt, especially as it did not hinder, or tend to hinder, the trial from going on; and the defendant's presence was not necessary. But (by Lee C.J.) the protection which the law gives in these cases, as well to the parties to causes as their counsel and attornies, extends to them eundo, redeundo & morando; and if the serving of process upon persons attending Courts were to be allowed, it would produce much terror and great distraction in business.

And the whole Court (except Page Just. who hesitated) were clearly of opinion, that the service of a process in the sight of the Court is a great contempt, and punishable by attachment. And they said, that persons have been frequently laid by the heels for making arrests in those cases, where they have refused to discharge the party arrested. And Lee C.J. said, that where this hath been agreed to, yet in the first instance the Court hath laid hold on the officer for the contempt. But, he said, it is [276] another consideration, whether such execution of a writ be void, so that the party shall be discharged.

However, in this case the attorney, (who was in Court) declaring that he served the writ through mere inadvertence, and submitting to pay the costs, and waive the proceedings, the rule granted to shew cause, &c. was discharged.

WELLIS *against* NICHOLSON.   The plaintiff's testator's bill of costs is not subject to taxation under 2 Geo. 2, c. 23, nor need the bill be signed in such case.

Per Curiam: In the case of an executor of an attorney, the testator's bills are not subject to taxation upon the statute of 2 G. 2, c. 23, the words thereof not extending to an executor. And the Court said, that in a late case, on the motion of Serjeant Parker, it was held, that in such case the bill need not be signed.

See *Lee* v. *Knight*, Barnes, 119.   *Chapple* v. *Chapman*, Barnes, 122.

THE KING *against* THE INHABITANTS OF MARTON.   Indictment against a township
for not paving a cartway ; judgment on it, reversed.

Error of a judgment upon an indictment against the inhabitants of a township,
for not paving a cartway : and it was assigned for error by Mr. Willbraham, (1) That
in the presentment the jury have not said, that the way is out of repair.   (2) It is
said only, that the inhabitants, &c. ought to repair the same : whereas this being in
the case of a township, which by custom only is obliged to repair, it ought to have
been averred, that they have from time out of mind repaired, &c. for of common right
parishes are bound to repair.   1 Vent. 183, 189.

And none appearing on the other side, the judgment was reversed, without any
opinion being given by the Court, upon the above exceptions.

Mr. Justice Page also objected, that the indictment is, for not paving ; whereas
certainly the township is not obliged to pave, but only to repair.

[277]   MICHAELMAS TERM, 12 GEO. II. 1738.

Sir William Lee, Chief Justice.   Sir Francis Page, Sir Edmund Probyn,
Sir William Chapple, Justices.

BROOKS *against* CROWSE.   To assumpsit for a farrier's bill, the defendant pleads
infancy.   The plaintiff ought to reply that the physic, &c. was necessary for the
defendant ; or, for the horses of the defendant kept for his necessary use.

S. C. 2 Stra. 1101, *Clowes* v. *Brooke.*

In assumpsit by a farrier for providing physick and other things for the defendant's
horses, the defendant pleads infancy ; and the plaintiff replies, that the physick and
materials so provided, &c. were necessary for the horses of the defendant : to which
the defendant demurs.

And it was argued by Mr. Denison for the defendant, that an infant is under the
protection of the law, and is not thereby suffered to contract for any thing but mere
necessaries for himself, as apparel, meat and learning : and even a contract by one for
being an apprentice is not binding, unless it be by the custom of London.   He cannot
so much as contract for the maintenance of his own family, or the reparation of his
own house.   In all actions therefore against an infant, it must be alledged, that the
work or things for which the suit is brought was necessary, or else they must appear
to be so in the nature of the [278] thing.   Now here it doth not appear either that
the physick and materials, or even the horses, were necessary for the infant ; for he
might have twenty horses more than there was a necessity for.   And upon this
replication a proper issue could not possibly be joined : for the issue here could only
have been, whether the physick, &c. was necessary for the horses, and not whether
the horses were necessary for the infant : which is the matter that ought to have been
put in issue.   Cro. 583.   Cro. Jac. 494, 560.   Cart. 215, in point.

On the other side it was argued by Serjeant Bellfield, that this application is good,
because it appears that the defendant had the horses, which perhaps might be by will
or donation ; and it is admitted by the demurrer, that the physick, &c. was necessary
for the horses.   It is not necessary, and it would make the pleading too prolix, to
shew specially in these cases how the things are necessary ; but the common way is,
and hath been for many years, appears by many precedents, to reply generally, that
they are necessaries : and under such general issue every circumstance, and particularly
the rank and station of the infant, will come properly before the jury.

It was replied (amongst other things) that the plaintiff should have shewn how
the defendant came by the horses, whether by donation or will, or in what other
manner : but nothing of this nature appears.   But to this Mr. Justice Probyn
answered, that this is not incumbent on the plaintiff, because he is a stranger to
the defendant's title.

And the whole Court were clearly of opinion, that this replication is ill.   For
the only matter inquirable under it is, not whether the physick, &c. was necessary
for the infant, but whether it was necessary for the horses ; whereas it should have
been replied, that the physick, &c. was necessary for the use of the defendant, or

474                     FRISBY *v.* YOUNG.

FIRST DEPARTMENT, JULY TERM, 1877.

Pleas, MS. opin., VAN HOESEN, J.)   The intent of the plaintiffs
was one step in the defense, and when the attempt to prove it was
rejected, the defendant secured the advantage of an exception.   In
*Cassard* v. *Hinman* (6 Bosw., 14) the question asked was, " at the
time of the making the writings between you and Cassan, was any
thing said by Nathan (the broker) as to the performance by receipt
and delivery of pork, or the settlement by payment and receipt of
differences, and if so, what ? "   The question was excluded, and it
was held to have been erroneously ruled upon.   The inquiry was
held relevant to the defense, which was substantially that the con-
tract was a wager.   The ruling considered demands, therefore, that
a new trial be granted.

Ordered accordingly, with costs to abide the event.

DAVIS, P. J., and DANIELS, J., concurred.

Judgment reversed, new trial ordered, costs to abide event.

————————

LOUIS FRISBIE, RESPONDENT, *v.* JAMES R. YOUNG,
APPELLANT.

*Resident witness — exempt — from arrest on process — not from service of summons.*

A resident witness is, while attending examination, exempt from arrest, but not
from the service of process.   A different rule applies to non-resident witnesses.

APPEAL from an order denying a motion to set aside the service
of a summons, on the ground that the same was served while the
defendant was attending examination as a witness.

*Brodhead & Wight,* for the appellant.

*W. S. Cowles,* for the respondent.

BRADY, J. :

The defendant was served with a summons while under examina-
tion as a witness *de bene esse.*   He came from another State here,
and after his arrival was advised that his testimony was desired.
He consented to appear, and his examination was arranged by stipu-
lation.   It is shown that, if he had not consented, compulsory

**ADD3**

process would have been issued. It further appears, however, that he was a resident of this State at the time of the examination, according to his own statement then made, and his absence was, therefore, connected with business. He states, indeed, in the affidavit on which this motion rests, that he was not engaged in business in the city of Chicago, Illinois. As a resident witness, he was exempt *only from arrest* while attending for examination, and not from the service of process. Non-resident witnesses were discharged absolutely. (Graham's Pr. [2d ed.], 130, and cases cited.) The privilege does not extend to non-bailable process, or process on which no bail is demanded. The cases of *Lamkin* v. *Starkey* (14 N. Y. S. C. R., 479) and *Brett* v. *Brown* (13 Abb. [N. S.], 295) do not conflict with this view. They were cases of non-resident or foreign witnesses, to whom, as we have seen, a different rule applies. The Revised Statutes exonerated witnesses *from* arrest, and subjected the persons arresting them to action and a penalty. (2 R. S., old paging, 402; 3 R. S. [6th ed.], 665.) The defendant being a resident of this State, it follows that he could be served with a summons which did not interfere with his liberty. It was a non-bailable process.

The order made at Special Term was correct, therefore, and must be affirmed, with ten dollars costs and the disbursements of this appeal.

Davis, P. J., and Daniels, J., concurred.

Order affirmed, with ten dollars costs, besides disbursements.

---

SARAH H. BOSTWICK, Respondent, *v.* ADOLPH FRANK-FIELD, Appellant.

*Contract of sale of land by landlord to tenant — effect of.*

In 1870 the defendant leased to one Thrall certain lots for three years, and verbally agreed to sell them to him at any time during the term for their fair market value. Thrall entered into possession and erected a church with defendant's knowledge, by means of gifts and loans made to him. April 28, 1871, a contract was made, by which defendant agreed to sell the lots to Thrall

**ADD4**

party whether the sheriff take one or more security, that being in his discretion; some he must take, for otherwise it is directly in opposition to the statute; neither is it material to the party whether they are such as are sufficient, for if they are not, and the defendant is thereupon discharged, this will not amount to an escape; because nothing is done but what is pursuant to the statute, and therefore he is no otherwise chargeable than by amerciaments. The statute was made and intended for the benefit of the debtor, not of the creditor; and there might be some colour for the action if the sheriff might return that he let him to bail, for then it might have been necessary to have alledged the sufficiency of them, which might have been traversed; but now he must pursue the substance of the statute so far as to take bail; he is the proper judge of the sufficiency, and when the bail is taken he must return a *cepi corpus;* so that he is only to be amerced till he bring in the body, but an escape will not lie against him (a).

### CASE 108.  LONG'S CASE.

It is a contempt to make an arrest in Palace Yard *sedente·Curiâ.*—S. C. 1 Lev. 166.

One Long was arrested in the Palace Yard, not far distant from the hall gate, the Court being then sitting; and being an attorney of this Court, he, together with the officer, was brought into Court, and the officer was committed to the Fleet, that he might learn to know his distance.

And because the plaintiff was an attorney of the Court of King's Bench, who informed this Court, that his cause of action was for two hundred pounds; therefore the Court ordered that another of the sheriff's bailiffs should take charge of the prisoner, and that Mr. Robinson, the Chief Prothonotary, should go along with him to the Court of King's Bench; which was done, and that Court, being informed how the case was, discharged the defendant upon filing of common bail.

[182] The writ upon which this Long was arrested was an *attachment of privilege,* which the Court supposed to be made on purpose to oust him of his privilege; for there was another writ against him at the sheriff's office at the suit of another person.

### CASE 109.  THE COUNTESS OF NORTHUMBERLAND'S CASE.

Knights must be of the jury where a peer is concerned.—S. C. 1 Mod. 226.

Adjudged, that where *a peer* is party, either plaintiff or defendant, two or more *knights* must be returned of the jury (a).

It was said, that in Cumberland there was but one freeholder who was a knight, besides Sir Richard Stote, a serjeant at law.—And the Court were of opinion, that rather than there should be a failure of justice a serjeant of law ought to be returned a juryman, for his privilege would not extend to a case of necessity.

---

(a) In the case of *Sir William Rouse* v. *Patterson,* Hilary term, 13 Geo. 2, in B. R. it was held, that an action lies against a sheriff for taking insufficient pledges in *replevin. Note to the Fourth Edition.*—See *Rex* v. *Lewis,* 2 Term Rep. 617, that the Court will not grant an *attachment* against a sheriff for neglecting to take a *replevin-bond.*

(a) But now by the 24 Geo. 2, c. 18, challenge to the panel for want of a knight where a peer is party is taken away.

## HILARY TERM.

The Twenty-Eighth and Twenty-Ninth of Charles the Second.   In the King's Bench.

Sir Richard Rainsford, Knt., Chief Justice.   Sir Thomas Twisden, Knt., Sir William Wylde, Knt., Sir Thomas Jones, Knt., Justices.   Sir William Jones, Knt., Attorney General.   Sir Francis Winnington, Knt., Solicitor General.

### CASE 110.   BELL *against* KNIGHT.

A statute imposing a duty on "every *fire-hearth* and stove in any house," extends to *smiths forges*, although there is a proviso exempting "any *blowing-house*, stamp, furnace, or kiln," from the payment of such duty.—*Post*, 186.

In an action of trover, upon not guilty pleaded the jury found a special verdict, in which the point was upon the construction of the statute of 14 Car. 2, c. 10, for the establishing of an additional revenue upon the King, his heirs, and successors, for the better support of his and their Crown and dignity ; by which it is enacted, "that for every fire-hearth and stove in every house the yearly sum of two shillings shall be paid to the King, other than such as in the said Act are exempted :" then comes a proviso, which saith, "that this Act shall not extend to charge any blowing-house, stamp, furnace, or kiln, &c."

The question now was, whether *a smith's forge* shall be charged with this duty ?

Winnington, Solicitor General, conceived, that all fire-hearths are liable within the body of the Act ; that there is nothing to exempt them but what is in the exception ; and then *a smith's forge* cannot be called *a blowing-house* within the intent of the Act, notwithstanding the jury have found that smiths use bellows to blow their forges ; for by *blowing-houses* such houses are meant as are in Staffordshire and Suffolk for the making of iron.   These were the blowing-houses intended by the Parliament to be excepted, and no other ; for if smiths forges had been meant thereby, those would have been inserted in the proviso as well as the other things therein-mentioned. [183] Words are to be taken in a common understanding ; and if a traveller should enquire for *a blowing-house*, nobody would send him to *a smith's forge*.

By the opinion of the whole Court it was adjudged upon the first argument, that smiths forges are liable to this duty.

And the solicitor said, it had been lately adjudged so in this Court by the opinion of Twisden, Wylde, and Rainsford, Justices ; and that Hale, Chief Justice, was of the same opinion.

But Twisden, Justice, said, that neither the Chief Justice nor himself gave any judgment upon the merits, but upon a point in pleading.

### HILARY TERM.

The Twenty-Eighth and Twenty-Ninth of Charles the Second.
In the Common Pleas.

Sir Francis North, Knt., Chief Justice.   Sir Hugh Wyndham, Knt., Sir Robert Atkins, Knt., Sir William Scroggs, Knt., Justices.   Sir William Jones, Knt., Attorney General.   Sir Francis Winnington, Knt., Solicitor General.

### CASE 111.   STROUD *against* THE BISHOP OF BATH AND WELLS AND SIR GEORGE HORNER.

In *quare impedit*, a declaration that A. was seised in fee of the manor to which the advowson is appendant, and presented B. and then granted the next avoidance to the plaintiff, and that by the death of B. he was intitled to present, is good, without stating that the presentation to B. was *tempore pacis*.—S. C. 1 Mod. 230.

*Quare impedit.*—The plaintiff alledges, that Sir George Horner was seised in fee of the manor of Dowling, to which the advowson was appendant ; that being so seised he presented one Harding, and then granted the next avoidance to the plaintiff ; that

*Practice of the Office of Pleas*, 496.)  The only effect, therefore, of the course which *Plaskett* has taken is, that his adversary can sustain no injury by delay, but may still have the fruit of his judgment.  The alleged misrecital in the writ could be cured by amendment under the 5 *G*. 1, *c.* 13.(1)  The amendment could be made by the House of Lords ; and the Court of Chancery ought not to take upon itself to determine, whether the higher tribunal will permit such an amendment to be made or not.

Mr. *Sugden* in reply contended, that the court, out of which the writ issued, seeing that it contained state-[158]-ments contrary to the truth, would supersede it without speculating on the chance of its being hereafter amended ; especially, where it was intended as a mere instrument of delay.  No injury would be done by superseding the writ, because the party could still have such writ of error as he was entitled to, according to the truth of his case.

The *Lord Chancellor* [Lyndhurst].  The former writ of error having been *non-prossed*, *Plaskett* had no right to sue out a writ of error, reciting that the judgment had been affirmed in the Court of Exchequer Chamber.  He has, therefore, sued out a writ which is not sustainable in its present form.  He says that he can amend it ; but I must deal with it in its present form, especially as I am satisfied that it is brought for delay.

The writ was ordered to be superseded with costs.

(1) The statute enacts, " That all writs of error, wherein there shall be any variance from the original record, or other defect, may and shall be amended and made agreeable to such record by the respective courts where such writ or writs of error shall be made returnable."

[159] ORCHARD'S Case.  *July* 19, 1828.

A person having been taken in execution upon a *ca. sa.* within the outer door of the *Vice-Chancellor's* Court in *Lincoln's Inn*, while the Court was sitting, the *Lord Chancellor* ordered the officer to attend with his prisoner forthwith, and having examined the officer, discharged the prisoner immediately.

Mr. *Wakefield*, on behalf of a solicitor of the name of *Orchard*, stated, that *Orchard* had been this morning taken in execution either in the body of the *Vice-Chancellor's* Court in *Lincoln's Inn*, or in the space between the outer and the inner doors, both doors being open, and while the *Vice-Chancellor* was sitting for the despatch of business.  The circumstance was immediately mentioned to the *Vice-Chancellor*, who was requested to order the discharge of the prisoner forthwith ; but his Honor, doubting whether he had jurisdiction, directed the matter to be brought before the *Lord Chancelor*.

It was admitted that *Orchard* was not in court for the purpose of professional attendance, or of discharging any professional duty.

Mr. *Wakefield*, after narrating these circumstances, submitted that every place, in which the Judges of the King's superior courts were sitting, was privileged, and that no arrest could be made in their presence or within the local limits of the place where they were administering justice.  To permit arrest to be made in the Court would give occasion to perpetual tumults, and was altogether inconsistent with the decorum which ought to prevail in a high tribunal.  Sir *William Waller's* case (*Cro. Car.* 373).  Lord *Coke*, in his *Third Institute* (page 141), says, " The King's palace at *Westminster* hath this liberty and privilege, viz. *nullæ citationes aut summon-itiones liceant fieri cuicunque infra* [160] *palatium Regis Westm.*  Like privilege hath *Westminster Hall*, or other place where the King's justices, &c., sit."  " No arrest," says *Blackstone*, " can be made in the king's presence, nor within the verge of his royal palace, nor in any place where the King's justices are actually sitting." (3 *Black. Com.* 289.)  *Long's* case (2 *Mod. Rep.* 181) is thus stated : " One *Long* was arrested in the palace-yard, not far distant from the hall gate, the Court being then sitting ; and being an attorney of the court, he, together with the officer, was brought into court, and the officer was committed to the *Fleet*, that he might learn to know his distance."  *Pigot* v. *Charlewood* (*Barnes*, 200), *Maule* v. *Grubb*

(Ibid.), *Willamson* v. *Jaques* (3 *T. R.* 392), *Ex parte Ledwich* (8 *Ves.* 598), *List's case* (2 *V. & B.* 373).

The *Lord Chancellor* ordered that the officer, who had made the arrest, should immediately attend with his prisoner.

The officer, being on the floor of the court, was examined by the *Lord Chancellor*. He stated, that he had a writ of *capias ad satisfaciendum* against *Orchard*; that he saw *Orchard* in *Chancery Lane*, and hastened to arrest him, but that *Orchard*, having observed him, ran with all the speed he possibly could, and got within the outer door of the *Vice-Chancellor's* court, before he could overtake him.

The *Lord Chancellor* [Lyndhurst] immediately ordered *Orchard* to be discharged from custody; and admonished the officer to beware of again acting in a similar manner.

### [161] GRETHAM v. BELL.   *July* 19, 1828.

Where it is necessary to produce a record of the Court on the trial of an issue, the party must procure the proper officer to attend with it; and an order will not be made directing the officer to deliver the record to any other person for the purpose of being produced.

An issue had been directed to be tried at *York*, in order to ascertain whether the Plaintiff was one of the next of kin of an intestate; the Defendant, it was admitted, was one of the next of kin.

Mr. *Agar* moved, on behalf of the Defendant, that the depositions of the Plaintiff's witnesses, sworn in the cause, might be delivered to the clerk of Mr. Serjeant *Jones*, in order to be produced on the trial, he undertaking to return them to the Six Clerk.

It was stated, that the production of the original depositions was necessary, in order that the Plaintiff's witnesses might be asked whether the signatures to the depositions were in their respective handwriting, and might then be cross-examined on the matters contained in the depositions; and the clerk of Mr. Serjeant *Jones* was selected, because, the Judges having left town, the depositions could not be intrusted to any of their clerks.

As no person appeared to oppose the application, the Court assented to it.

The Clerk in Court, however, refused to deliver up the depositions, until the matter should be again submitted to the Court.

Accordingly, on the following day, the motion was renewed; when Mr. *Beames*, for the Clerk in Court, stated, that no such order as was now asked had ever been [162] made; that the original records were never taken out of the custody of the Court, or its recognized officer; and that the order usually made in such cases, was, that the officer of the Court should attend with the record on having his expenses paid.

Mr. *Agar* replied, that the enormous expense of procuring the attendance of the clerk in court with the record was the cause why the present motion was made, and was a sufficient reason why it should be granted.

The *Lord Chancellor*. It appears that what the Court is now asked to do has never been done, and is contrary to the established usage. The application must be refused.

### [163] DEW v. CLARKE.   *July* 31, *August* 1, 2, 3, 4, 19, *Nov.* 1, 1828.

#### [S. C. 6 L. J. Ch. 186.]

A commission of review will not be granted, unless there is clear error in law, or a clear mistake as to fact, in the judgment of the Court below, or unless the case involves an important and doubtful question of law, which ought to be decided in the most solemn form. A will was held to be invalid, on the ground that the testator, though sane in his general conduct, laboured under an unsound delusion of mind with respect to his only child.

*Ely Stott* died on the 18th of *November* 1821, at the age of seventy-two years, leaving a widow and an only child, a daughter. In *February* 1821, a commission of lunacy had been issued against him, under which he was found of unsound mind from the 1st of *January* 1821. In *May* 1818 he had executed a will, by which he

530        THE KING *v.* HOLY TRINITY IN WAREHAM        3 DOUGL. 44.

plaintiff, a rule to show cause why there should not be a new trial was obtained, and the only question made was on the construction of a grant from the plaintiff to the defendant, whether it operated as a grant of the fishery, reserving to the grantor only a right of fishery; or whether it excepted the sole fishery out of the grant. By the deed, Lord Paget granted " the mill, with all waters, streams, &c. necessary for working the mill, and usually held and enjoyed therewith, except and always reserved to the said Lord Paget, his heirs, &c., the right and privilege of fishing in the waters of the said mill." At the time of this grant, Lord Paget had a sole fishery in these waters.

Dunning and Davenport showed cause.—This is not a reservation of a right of fishing, but an exception of the right of fishing, which Lord Paget possessed before, and which was a sole right. It is an exception of what the grantor had before, and did not choose to part with. By the grant, every thing necessary to the mill for driving and working it was granted, as well as for confining the water; but the words of the grant, had they stood alone, would not have carried the right of fishery. The exception, however, puts an end to all question.

Wallace, A.-G., and Law, contra.—The words of the grant are sufficient to convey the soil of the water and of the ponds, and therefore it is clear that, without the reservation, Lord Paget could have had no title. Where a grant is made, all that the granting words used include, will pass by the grant (*a*)[1]. By the reservation, nothing more than the easement of fishing in the waters is reserved. The words of the reservation are the words of the grantor, and shall be taken most strongly against him. Co. Litt. 197. Plowd. 171. 1 Saund. 137. Those words will be fully satisfied by holding that an easement is reserved.

Lord Mansfield.—If there are words in the English language which will not admit of a doubt, they are these [44] words. Lord Paget had water for a mill, and he had a sole fishery, and he grants the mill, with the water for the mill, reserving the fishery : and the question is, whether the whole right of fishing is reserved, or whether a new right is created by it? The words are, " the right and privilege of fishing."

Rule discharged.

[45] CASES ARGUED AND DETERMINED IN THE COURT OF KING'S BENCH, IN HILARY TERM, IN THE TWENTY-SECOND YEAR OF THE REIGN OF GEORGE III.

THE KING *v.* INHABITANTS OF THE HOLY TRINITY IN WAREHAM.
Saturday, 26th January, 1782.

(Reported, Caldecott, 141.)

WALPOLE *v.* ALEXANDER (*a*)[2]. Friday, 1st February 1782. A witness coming from abroad to give evidence in a cause here, without being served with a subpœna, is privileged from arrest.

The defendant obtained a rule to show cause why he should not be discharged out of custody on filing common bail. The application was made on three grounds ; 1. That he had come from France as a witness in a cause of *Simond* v. *Hankey*, to be tried at the sittings ; 2. That he had been discharged by a commission of bankrupt subsequent to the debt for which he was arrested ; and 3. That a suit was depending in France respecting the same subject matter.

The Attorney-General and Cowper showed cause. As to the privilege of the defendant as a witness, it appears that he arrived in London on the 20th of December, 1781. On the seventeenth of that month the cause in which he was [46] to be a witness was put off, in consequence of a letter received from him, stating that he could not attend until after the next term. He swears in his affidavit, that on coming to town he was served with a subpœna, by his own desire, which was on the 20th of December, the last day of the sittings. Whether the subpœna was for the sittings after the last or the next term, does not appear on the affidavit ; but as no subpœna issued after the 12th of December, it must have been for the last term. when, by consent, the cause was postponed. He was arrested on the 28th of December.

_____

(*a*)[1] *Throckmerton* v. *Tracy*, C. B., 2 & 3 P. & M., Plowden, 151.
(*a*)[2] S. C. cited Tidd's Pr. 198, 8th edit.

at which time there was no process by which he could be compelled to attend as a witness. The protection afforded to witnesses is not on their own account, but for the purposes of justice; and when the defendant found that the cause could not come on at those sittings, and that it was unsafe for him to remain, he might have returned. It is stated in the affidavit, that an application was intended to be made for permission to examine him upon interrogatories; but that allegation is insufficient, for the consent of both parties is necessary to that proceeding, and it does not appear that it could have been obtained. [The Court giving no opinion on the two latter grounds of the application, the arguments of counsel on those heads are admitted.]

Lord Mansfield (stopping Dunning, who was for the rule). This is the first case of a witness coming from abroad who has required the protection of the Court. That protection is extended to witnesses coming from abroad, as well as to those who are resident in this country. Although in England a party may have the benefit of the evidence of a witness who has been arrested, by means of a habeas corpus ad testificandum, yet, in order to encourage witnesses to come forward voluntarily, they are privileged from arrest. This privilege protects them in coming, in staying, and in returning, provided they act bonâ fide, and without delay, which is a question of reasonableness. Every reason which applies to the protection of a witness at home, holds more strongly with regard to a witness who comes from abroad. The creditor is not injured by his coming; for unless he came, there would be no opportunity of arresting him. The service of the subpœna abroad would be an useless form; he cannot be punished for not coming; if he comes at all, then it must be voluntarily. The cause depending on the [47] evidence of a witness who is out of the country, the time of trial must necessarily be uncertain. The only question then to be considered is, whether, in such case, the witness comes bonâ fide or collusively.

There never was a fairer case than the present. The parties would not consent to examine the witness upon interrogatories, or to put off the trial; an application was therefore made to me, upon affidavits and letters from the witness. I proposed, and it was so settled, that at all events the cause should go on after this term, whether the witness came or not. In the mean time he arrived, before the sittings were over; but I do not wonder that the parties did not apply to bring on the cause, for it was near Christmas. It is admitted that he was protected for some time;—why not until the next sittings? Was he to go back again to Paris, merely to return here this term, putting the parties to an enormous expense? I am of opinion, that all the rules which apply to the protection of witnesses here, hold with regard to witnesses coming from abroad, and that the defendant must be discharged.

Ashurst and Willes, Justices, of the same opinion.

Buller, Justice.—It is not true that the privilege of a witness depends upon the subpœna. I have found a case (E. 27 Car. 2) where a man was discharged who came to London to make an affidavit which might have been made in the country; but it was for the furtherance of justice, and he was therefore protected. No subpœna is necessary where the witness lives abroad.

Rule absolute.

The discharge, being on the privilege, was without the terms of filing common bail.

THE KING v. INHABITANTS OF KEEL.    Wednesday, 6th February, 1782.

(Reported, Caldecott, 144.)

THE KING v. JAMES RODD.    Wednesday, 6th February, 1782.

(Reported, Caldecott, 147.)

[48] THE KING v. MORGAN.    Saturday, 9th February, 1782.

(Reported, Caldecott, 156.)

THE KING v. INHABITANTS OF COVENT GARDEN.    Saturday, 9th February, 1782.

(Reported, Caldecott, 158.)

Case 1:19-cv-08876-JSR   Document 33   Filed 11/05/19   Page 48 of 64

David Graham, Treatise on the Practice of the Supreme Court of the
State of New-York (2d ed. 1836) (excerpt) (ADD11-ADD17)

# TREATISE

ON THE

# PRACTICE OF THE SUPREME COURT

OF THE

## STATE OF NEW-YORK.

BY DAVID GRAHAM, Jun.

COUNSELLOR AT LAW.

**SECOND EDITION.**

NEW-YORK:

PUBLISHED BY GOULD, BANKS & CO.

NO 144 NASSAU STREET;

AND WILLIAM & A. GOULD & CO.

STATE STREET, ALBANY.

1836.

**ADD11**

Entered according to the Act of Congress, in the year eighteen hundred and thirty-six, by GOULD, BANKS & Co., in the office of the Clerk of the Southern District of New-York.

ALEXANDER S. GOULD, PRINTER, 144 NASSAU STREET.

**ADD12**

TO THE

# HON. JOHN SAVAGE,

LATE

## CHIEF JUSTICE OF THE STATE OF NEW-YORK,

THIS WORK

### IS RESPECTFULLY DEDICATED,

IN TESTIMONY

OF THE SENSE WHICH THE AUTHOR ENTERTAINS,

OF THE

KINDNESS HE HAS UNIFORMLY EXPERIENCED AT HIS HANDS,

NO LESS

THAN OF THE EXALTED ESTIMATION IN WHICH

HE HOLDS

**THE TALENTS, LEARNING AND DIGNITY,**

WHICH HAVE DISTINGUISHED HIS JUDICIAL CAREER.

of the debtor liable to execution, it will not be regarded in this state; 2 Cowen, 626; it being well settled, that the *lex loci contractus* applies only so far as the nature, validity and construction of the contract is concerned, but has no application to the forms of judicial proceeding; 3 Mass. 84; 3 Cranch, 319; and our courts have uniformly denied any effect to mere personal discharges, beyond the boundaries of the state where they were granted; 1 Dall. 188; 2 Johns. Rep. 198; 7 Johns. 117; 11 Johns. 194; upon the principle, that the statutes under which they are granted, are inapplicable, as a part of the *lex loci contractus* but constitute a part of the *lex fori*, merely. 14 Johns. 346; 2 Cowen, 632. But, where the discharge goes beyond the mere imprisonment, and extends also to discharge the debt, the *lex loci* where it was granted, applies, and forms a bar, not merely to the imprisonment, but to the action itself. 12 Johns. 142; 1 Cowen, 103; 2 Cowen, 633; 9 Peters, 336; see also, 1 B. & Adol. 284.

*Parties to suits, and witnesses.*] As a general rule, every person who has any relation to a suit, whether his presence be compulsory or not, is exempt from arrest, *eundo, morando, et redeundo*. 1 T. R. 69; 4 Dall. 387; 3 Mass. 288. And, where a suitor, during a *bona fide* attendance at the sittings in which his cause was to be tried, was arrested, before the actual day of trial, in a coffee house adjacent to the court, he was ordered to be discharged. 11 East, 439. So, where a suitor attending a cause which was postponed early in the day, continued in court until five o'clock in the afternoon, and retired to a tavern, where he was arrested, during dinner, he was held entitled to his privilege *redeundo*. 2 W. Bl. 1113.

Nor is the party bound to go the nearest way home, if he do not abuse his privilege, for the purpose of going about other business of his own; 6 Taunt. 358; 4 Dall. 329; the burden of shewing which, is upon the plaintiff. 8 Bing. 166. Thus, when a party, returning from attendance in a court of justice, left the court at 5 o'clock, arrived at his office of business at twenty minutes after 5, left it at 7, and in going along the street, towards his house, went into a shop, where he was immediately arrested, it was held, that he was privileged from arrest. 3 Nev. & Man. 212. And a party coming from another place than that in which the court sits, is protected while at his lodgings, as well as when going to, or returning from court. 4 Dall. 387.

This privilege extends to a party to an action which has been referred to the decision of the court, upon a case stated, while going to, attending or returning from court: 6 Mass. 245: or while attending an

appeal from another county, to the Supreme Court, 1 Binn. 77; *et vide* 4 Serg. & Rawle, 149; or while attending or justifying bail; Barnes, 27; or before an arbitrator under a rule at *nisi prius;* 3 East, 89; 1 Caines, 116; or before inferior courts; 1 Brownl. 15; or for the purpose of opposing an insolvent's discharge; 2 Marsh. 57; 6 Taunt. 356; or under a recognizance to attend a court of general sessions; 7 Johns. 538, or before arbitrators, under the statute; 3 Cowen, 381; or before referees; 2 Wendell, 257; although in this latter case, it extends only during the hearing and a reasonable time after, to enable the party to return to his residence, and does not embrace the time, in which the party is occupied in preparing papers, to move to set aside the report. Ibid.   But the privilege of suitors does not extend to non-bailable process, or process on which no bail is demanded.   1 Wendell, 293.— "Had bail been required," says *Savage*, Ch. J. "all the relief the party would have been entitled to, would have been, to have been discharged, on filing common bail.   The indorsing of an appearance is equivalent to filing common bail.   No more was, therefore, asked of the defendant, than this court would have required, on application to them, had he been compelled to give bail, when the capias was served.   This is the uniform practice of this court, (7 Johns. 538,) and the only exception is, in favor of foreign witnesses, attending our courts, in which cases, the defendants are discharged absolutely. 2 Johns. Rep. 294; 3 Cowen, 393."—1 Wendell, 293.

In a late case in England, it has been held, that where a defendant was returning home, after being acquitted at the Old Bailey, upon a charge of stealing money, and was arrested for the same money, he was not privileged.   1 Dowl. Pr. Cas. 157; see 10 Wendell, 636.

If the party, privileged by reason of his attendance in this court, be arrested by process out of an inferior court, 2 Johns. Rep. 294, or if he be arrested by process out of this court, in violation of the privileges of other courts, in either case, this court will discharge him on common bail.   7 Johns. 538; 6 Taunt. 356.   And, if a party, coming to attend the trial of his cause, be arrested, the judge at nisi prius will discharge him, 1 Starkie, 471, and will put off the trial, without payment of costs, if any collusion can be shown to exist, between the opposite party and the creditor who arrested him; otherwise, only upon payment of costs. 1 Campb. 229.   The party may, also, move the court, out of which the process issued, to discharge him on filing common bail.   But on an application to the court for the discharge of the defendant, notice must be given to the opposite party, otherwise, only a rule to shew cause why

he should not be discharged, with a stay of proceedings in the mean time, will be granted.  1 Caines, 116.  The ancient course was to issue writs of privilege in these cases, but the practice of discharging on motion, has long been established.  It is also settled, that where a party to a cause is arrested on process issuing out of one court, while attending at *nisi prius* in another, he must apply to the judge at *nisi prius,* or to the court out of which the process issues, and not to the court in which the cause is, from which he derives his privilege.  2 Dowl. Pr. Cas. 223.

At common law, the privilege of witnesses, was placed upon the same footing, as that of suitors, while attending court, as well as *eundo et redeundo,* and was held to extend, not merely, to witnesses duly subpœnaed, but to those who attended without subpœna.  8 T. R. 536; 1 H. Bl. 636; 2 Johns. Rep. 294.  It has, however, been made the subject of express enactment by the revised statutes, which provide, that every person duly and in good faith subpœnaed as a witness to attend any court, officer, commissioner or referee, or summoned to attend any judge, officer or commissioner, in any case where the attendance of such witness may by law be enforced by attachment, or by commitment, shall be exonerated from arrest in any civil suit, while going to the place, where he shall be required, by such subpœna, to attend, while remaining at such place, and while returning therefrom. 2 R. S. 402, sec. 51.  The court or officer, before whom any person shall have been in good faith subpœnaed to attend as a witness, shall discharge such witness from any arrest, made in violation of the above provision ; and if such court shall have adjourned, before such arrest was made, or before application for such discharge be made, any judge of such court shall have the same power to discharge such witness. Ibid. sec. 52.  Every officer authorised to perform the duties of Supreme Court commissioners, and the first judges of county courts shall have the like authority, to discharge any witness arrested contrary to the foregoing provisions.  Ibid. sec. 53.  Every arrest of a witness, made contrary to the foregoing provisions, is declared by statute, absolutely void ; and is deemed a contempt of the court issuing the subpœna : and every person making such arrest, is made responsible to the witness arrested, for three times the amount of the damages which shall be found by the jury, and is also liable to an action at the suit of the party who subpœnaed such witness, for the loss, hindrance and damages sustained by him, in consequence of such arrest. Ibid. sec. 54. But no sheriff, or other officer or person, shall be so liable, unless the

person, claiming an exemption from arrest, shall, if required by such sheriff or officer, make an affidavit, stating 1, That he has been legally subpœnaed as a witness to attend before some court or officer, the place of attendance, and the cause in which he shall have been subpœnaed ; and 2, That he has not been subpœnaed by his own procurement, with intent of avoiding the service of any process ; which affidavit may be taken by such officer, and when so taken, shall exonerate such officer from all liability for not making such arrest.   Ibid. sec. 55.

*Seamen and soldiers in the public service.*]   The non-commissioned officers, musicians, seamen and mariners, who are, or shall be, enlisted in the service of the United States, and the non-commissioned officers and musicians, who are, or shall be, enlisted in the army of the United States, shall be exempted, during their term of service, from all personal arrest, for any debt or contract.   Ingers. Abr. 414, sec. 5.   Armourers, gunners, &c., enlisted as common seamen, are within the meaning of the statute ; Barnes, 114 ; so is every seaman, whose name is on the ship's books, notwithstanding he may have absented himself.   Ibid. 95.   In regard to the first branch of this provision, contained in the 5th section, above alluded to, it appears by a recent official order of the secretary of the navy, addressed to the officers of the navy, of the 20th of May 1836, that " it has heretofore been decided, that midshipmen were to be considered as exempted from arrest, for any debt or contract, under the provisions of the 5th section of the act of Congress of the 11th of July, 1798, ' for establishing and organizing a marine corps,' which section is in these words :—' The non-commissioned officers, musicians, seamen, and marines, who are or shall be enlisted into the service of the United States, shall be, and they are hereby exempted, during their term of service, from all personal arrests for any debt or contract.' "   The order therefore, after reciting the fact, proceeds :— "Doubts having arisen as to the correctness of this decision, the subject has been carefully examined by the Attorney General of the United States, whose opinion is, that under that section, midshipmen cannot be considered as exempted from arrest, for debts or contracts; and as I fully concur in this opinion, it is decided by this department, that midshipmen in the navy of the United States are not to be considered, as exempted from arrest, within the meaning of the foregoing section."

The act of congress further provides, that all non-commissioned officers, artificers, privates, and musicians, who are, or who shall be en-

Case 1:19-cv-08876-JSR Document 33 Filed 11/05/19 Page 55 of 64
A New Abridgement of the
Law (7th ed. 1832) (excerpt) (ADD18-ADD21)

A

# N E W

# Abridgement of the Law.

## BY MATTHEW BACON,

OF THE MIDDLE TEMPLE, ESQ.

---

### THE SEVENTH EDITION, CORRECTED;

WITH LARGE ADDITIONS, INCLUDING THE LATEST STATUTES AND AUTHORITIES.

---

VOLUMES II. III. AND IV. (EXCEPT THE ADDENDA,)

### By SIR HENRY GWILLIM,

OF THE MIDDLE TEMPLE, KNIGHT;

LATE ONE OF THE JUDGES OF HIS MAJESTY'S SUPREME COURT
AT MADRAS.

---

VOLUMES I. V. VI. VII. AND VIII. AND THE ADDENDA TO THE
OTHER VOLUMES,

### By CHARLES EDWARD DODD,

OF THE INNER TEMPLE, ESQ. BARRISTER AT LAW.

---

IN EIGHT VOLUMES.

## VOL. VI.

---

### LONDON:

PRINTED BY A. STRAHAN,

LAW-PRINTER TO THE KING'S MOST EXCELLENT MAJESTY;

FOR J. AND W. T. CLARKE; LONGMAN, REES, ORME, BROWN, AND GREEN;
T. CADELL; J. RICHARDSON; J. M. RICHARDSON; R. SCHOLEY; C. J. G. AND F.
RIVINGTON; BALDWIN AND CRADOCK; W. WALKER; SAUNDERS AND BENNING;
A. MAXWELL; S. SWEET; H. BUTTERWORTH; STEVENS AND SONS; G. WILSON;
E. HODGSON; R. PHENEY; J. RICHARDS; E. NUNN; AND A. AND R. SPOTTISWOODE.

1832.

**ADD18**

530 ·

# PRIVILEGE.

attorney suing by original, waives his privilege. Hetherington v. Lowth, 2 Stra. 837.

he seems regardless of his privilege, and is to be considered as a person at large.

2 Ld. Raym. 1556. Fitzg. 40. S. C. Burroughs v. Willis. 2 Stra. 822. Barnard. K. B. 14.

On a motion to discharge a rule which had been obtained for changing the *venue*, it appeared, that the plaintiff was a barrister and master in chancery; and the court held, that he had a privilege, by reason of his attendance, to lay his action in *Middlesex*, and therefore discharged the rule.

1 Price, 584.n.

‖An attorney (not being one of the four attornies of the court of Exchequer) is not in that court entitled to the privilege of laying his *venue* in *Middlesex*.

7 Taunt. 146. S.C. 2 Marsh. 426.; *et vide* 2 Marsh. 152.

If the plaintiff, an attorney, by mistake lay his *venue* in another county instead of *Middlesex*, the Court of C. B. will not amend in order to change it.‖

### 2. *Of the Privilege and Protection allowed those whose Attendance is necessarily required.*

Brownl. 15. Raym. 101. 2 Mod. 181. 2 Roll. Abr. 272. Golds 55. (a) If he knew that the party was prosecuting or defending any suit;

The law not only allows privileges to the officers of the court, but also protects all those whose attendance is necessary in courts; so that if a suitor is arrested either in the face of the court, or out of the court, as he is coming to attend and follow his suit, or upon his return, it appears upon complaint made thereof, that the fact was so, the court will not only discharge the party from the arrest, but will punish the officers or bailiffs, as also the plaintiff (a) who procured the arrest, as for a contempt to the court.

because an affront to the court, as well as an injury to the party arrested.   2 Lil. Reg. 369.

Mich.26 Car.2. in C. B.

Serjeant *Scroggs*, entering his coach at the door of *Westminster-hall*, was arrested upon *latitat* out of *B. R.*, and complaint being made thereof in C. B., it was agreed, that not only serjeants at law, but all other persons whatsoever, are freed from arrests so long as they are in view of any of the courts at *Westminster*, or if near the courts, though out of the view, lest any disturbance may be occasioned to the courts or any violence used, which in such cases is very penal.   In this case the serjeant was discharged of the arrest by rule of court, and the judges said, that if the plaintiff should bring an action against the sheriff for an escape, they would commit him.   The bailiffs who made the arrest were committed to the *Fleet*, but the next day, upon their submission and acknowledgment, were discharged, paying their fees.

2 Mod. 181. Long's case.

So, where one *Long*, an attorney of C. B., was arrested in *Palace-yard*, not far from the Hall gate, sitting the court, he together with the officer was brought into court, and the officer committed to the *Fleet ;* and because the plaintiff was an attorney of *B. R.* who informed the Court of C. B. that his cause of action was 200*l.*, the court ordered that another of the sheriff's bailiffs should take charge of the prisoner, and that the prothonotary should go with him to the Court of *B. R.*, and that court, being informed how the case was, discharged the defendant on common bail.   The writ upon which he was arrested was an attachment of

(B) *Privileges in Suits of Officers of Courts, &c.* (Witnesses.)   531·

of privilege, which the court supposed to be designed to oust him of his privilege; for there was another writ against him at the sheriff's office, at the suit of another person.'

If process hath issued against a husband, and in coming to defend it he and his wife are both arrested, the wife shall have privilege as well as the husband; for they are considered as one person in law, and the wife cannot answer without her husband. *Dyer, 377. a. pl. 30. Bro. Priv. 17.; et vide Noy, 68.*

If the court give either plaintiff or defendant leave to enquire after evidence in any cause depending in that court, and he be arrested, he shall have privilege; but it is otherwise if he go without the permission of the court. So, if one on the day he has been attending his cause be arrested at ten o'clock at night, by one noway engaged in the cause, he shall not have privilege. *(a)* *2Rol.Abr.272. [(a) But quære of this, for the returning has never been very nicely scanned, so as to require a* man to go the direct road. Bro. Privilege, 4. allows that the protection is not forfeited by the plea of *extra viam*, because it may be the party went to buy a horse, victuals, or other necessaries for his journey. Neither is the law so strict in point of time as to require the party to set out immediately after the trial is over, as in the case of Hatch v. Blisset, *infrà*, and Gilb. R. 508. The defendant, an old woman, had a trial at *Winchester* assizes, which was over on *Friday* at four in the afternoon: she stayed there till after dinner on *Saturday*, and in the evening at seven was arrested going home to *Portsmouth*, which is twenty miles: and the court held, that she ought to be discharged, that her protection was not expired, and a little deviation or loitering would not alter it. And in a later case, where the defendant was attending his cause at the sittings, and though it was put off early in the day, stayed in court till five in the afternoon, and then went with his attorney and witnesses to dine at a tavern, where he was arrested during dinner; the court held, that such a necessary refreshment as this ought not to be looked upon as a deviation, so as to cancel the defendant's privilege *redeundo*. Lightfoot v. Cameron, 2 Black.R. 1113.] ‖But where a party in *London* was required to attend an arbitration at *Exeter* on a given day, and three days before set off, accompanied by his attorney, and went to *Clifton*, where his wife resided, and where were some papers necessary to be produced, and was occupied for a great part of two days in sorting and arranging them; and on the afternoon of the second day was arrested: held, that he had forfeited his privilege by the delay: *Abbott* C. J. *diss.* Randall v. Gurney, 3 Barn. & A. 252. But the majority of the Court of Exchequer held the party privileged under these circumstances. 7 Price, 699. A witness is not privileged from being arrested by his bail: the bail may take him, after he has finished his evidence, for the purpose of surrendering him. *Ex parte* Lyne, 1 Ry. & Moo. Ca. 132.‖

*A.* has a suit against *B.* in C. B., and afterwards *B.* is arrested in an inferior court, when he was not coming to or returning from the defence of his suit; he shall not have privilege. *Jenk. 173.*

A person coming to give security of the peace, it was held he was privileged; if he had come to have sworn the peace, the arrest would have been allowed. *Comb. 29. The King v. Fielding.*

So, where one came to confess an indictment, the court held he had no privilege *eundo et redeundo*, because there was no process against him. *2 Salk. 544. pl. 6.; sed vide infrà.*

The courts not only protect the parties themselves, but all witnesses are protected *eundo et redeundo;* for since they are obliged to appear by the process of the court, they will not suffer any one to be molested whilst he is paying obedience to their writ. *Vent. 11. Mod. 66.*

[And it hath lately been laid down by the court of C. P. as a general rule, that all persons who have relation to a suit which calls for their attendance, whether they are compelled to attend by process or not, are entitled to privilege from arrest *eundo et redeundo*, provided they come *bonâ fide.* And in this description bail and barristers upon the circuit are included.] *Meekins v. Smith, 1 H. Bl. 636.*

M m 2                                                    Also,

532                              PRIVILEGE.

20 H. 6. 4.
Bro. Priv. 55.
2 Rol.Abr. 273.

Also, the courts not only protect the persons of their attend-
ants, but likewise all those things that are necessary for their
journey or the defence of their suit; but not merchandizes or
goods for sale or traffic.

Kinder v. Wil-
liams, 4 Term
R. 377. But see
*Ex parte* Ker-
ney, 1 Atk. 55.
*Ex parte* Dick, and *Ex parte* Stow, 2 Black. R. 1142.

[The court of *B. R.* hath refused to discharge a person in
custody by process of the sheriff's court in a cause afterwards
removed into *B. R.*, because he was arrested whilst attending
commissioners of bankrupt to prove a debt.]

Childerston v.
Barrett,
11 East, 439.

‖A plaintiff, in expectation of his cause coming on, is privileged
from arrest while waiting in the vicinity of the court before the
day of trial.

Willingham v.
Matthews,
6 Taunt. 356.

So also is a person attending the Insolvent Debtors' Court to
oppose the discharge of a debtor.

Rimmer v.
Green, 1 Maule & S. 638.

So also bail attending to justify.

Spence v. Stew-
art, 3 East, 89.
*Sed vide* 3 Barn. & A. 252.   7 Price, 699.

So also a defendant in a cause attending an arbitrator to be
examined under a rule of court.

Arding v.
Flower,
8 Term R. 554.

So also a bankrupt attending a meeting of commissioners to
declare a dividend, although several years after his last examin-
ation.

Nixon v. Burt,
1 Moo. 413.
S. C. 7 Taunt.
682.

But a capital burgess of a borough attending an election of
co-burgesses under a summons from the mayor, issued in obe-
dience to a *mandamus* directing the corporation to proceed to
such election, is not privileged during his attendance.

Walters v.
Rees, 4 Moo.
34.

If a plaintiff is arrested while attending the execution of a writ
of enquiry at his own suit the under-sheriff cannot discharge
him, but the court will do so on motion.‖

### 3. *In what Cases this Privilege is to be allowed.*

Sand. 67.

The privilege allowed officers of the court is to be understood
as extending only to such cases where the party who sues them
has sufficient remedy in their own courts: therefore, if a writ of
entry or other real action be brought against an attorney of *B. R.*,
he cannot plead his privilege; because, if this should be allowed,
the plaintiff would have a right without remedy: for the King's
Bench hath not cognizance of real actions.

*Ibid.*

So, if an attorney of C. B. be sued in an appeal, he shall not
have his privilege; for his own court hath not cognizance of this
action.

Sid. 362.
Sand. 67.
2 Keb. 346.
Turbill's case,
*et vide* 2 Leon.
156.

So, if money be attached in an attorney's hands by foreign
attachment in the sheriff's court in *London*, he shall not have his
privilege; because in this case the plaintiff would be remediless;
for the foreign attachment is by the particular custom of *London*,
and does not lie at common law.

4 Leon. 81.
2 Rol.Abr. 274.
Lit. R. 97.

In indictments, informations, or suits, in which the king alone
is concerned, the officer shall not have privilege; for it would
be unreasoonable that the court should allw protection to those
                                                                   who

**ADD21**

Blackstone, Commentaries on the
Laws of England (1768) (excerpt) (ADD22-ADD26)

# COMMENTARIES

## ON THE

# L A W S

### O F

# E N G L A N D.

## BOOK THE THIRD.

BY

WILLIAM BLACKSTONE, Esq.

SOLICITOR GENERAL TO HER MAJESTY.

OXFORD,

PRINTED AT THE CLARENDON PRESS.

M. DCC. LXVIII.

**ADD22**

Case 1:19-cv-08876-JSR    Document 33    Filed 11/05/19    Page 60 of 64

without force : for, as the bill of Middlesex was framed only for
actions of trespass, a defendant could not be arrested and held to
bail thereupon for breaches of civil contracts. But to remedy
this inconvenience, the officers of the king's bench devised a me-
thod of adding what is called a clause of *ac etiam* to the usual
complaint of trespass; the bill of Middlesex commanding the de-
fendant to be brought in to answer the plaintiff of a plea of tres-
pass, *and also* to a bill of debt[f]: the complaint of trespass giving
cognizance to the court, and that of debt authorizing the arrest.
In return for which, lord chief justice North a few years after-
wards, in order to save the suitors of his court the trouble and ex-
pense of suing out special originals, directed that in the common
pleas, besides the usual complaint of breaking the plaintiff's close,
a clause of *ac etiam* might be also added to the writ of *capias*,
containing the true cause of action; as, " that the said Charles
" the defendant may answer to the plaintiff of a plea of trespass
" in breaking his close : and also, *ac etiam*, may answer him, ac-
" cording to the custom of the court, in a certain plea of trespass
" upon the case, upon promises, to the value of twenty pounds,
" &c[g]." The sum sworn to by the plaintiff is marked upon the
back of the writ; and the sheriff, or his officer the bailiff, is then
obliged actually to arrest or take into custody the body of the de-
fendant, and, having so done, to return the writ with a *cepi cor-
pus* endorsed thereon.

An *arrest* must be by corporal seising or touching the defend-
ant's body; after which the bailiff may justify breaking open
the house in which he is, to take him : otherwise he has no such
power; but must watch his opportunity to arrest him. For every
man's house is looked upon by the law to be his castle of defence
and asylum, wherein he should suffer no violence. Which prin-
ciple is carried so far in the civil law, that for the most part not
so much as a common citation or summons, much less an arrest,
can be executed upon a man within his own walls[h]. Peers of

f Append. N°. III. §. 3.  
g Lill. pract. Reg. t. ac etiam.  North's  
life of lord Guilford. 99.  
h Ff. 2. 4. 18—21.

the

the realm, members of parliament, and corporations, are privi-
leged from arrefts ; and of courfe from outlawries[i]. And againft
them the procefs to inforce an appearance muft be by fummons
and diftrefs infinite, inftead of a *capias*. Alfo clerks, attorneys,
and all other perfons attending the courts of juftice (for attor-
neys, being officers of the court, are always fuppofed to be there
attending) are not liable to be arrefted by the ordinary procefs of
the court, but muft be fued by *bill* (called ufually a *bill of privi-
lege*) as being perfonally prefent in court[k]. Clergymen perform-
ing divine fervice, and not merely ftaying in the church with a
fraudulent defign, are for the time privileged from arrefts, by
ftatute 50 Edw. III. c. 5. and 1 Ric. II. c. 16. as likewife mem-
bers of convocation actually attending thereon, by ftatute 8 Hen. VI.
c. 1. Suitors, witneffes, and other perfons, neceffarily attend-
ing *any* courts of record upon bufinefs, are not to be arrefted
during their actual attendance, which includes their neceffary
coming and returning. And no arreft can be made in the king's
prefence, nor within the verge of his royal palace, nor in any
place where the king's juftices are actually fitting. The king
hath moreover a fpecial prerogative, (which indeed is very fel-
dom exerted[l]) that he may by his *writ of protection* privilege a
defendant from all perfonal, and many real, fuits for one year at
a time, and no longer; in refpect of his being engaged in his
fervice out of the realm[m]. And the king alfo by the common
law might take his creditor into his protection, fo that no one
might fue or arreft him till the king's debt were paid[n]: but by the
ftatute 25 Edw. III. ft. 5. c. 19. notwithftanding fuch protection,
another creditor may proceed to judgment againft him, with a

---

[i] Whitelock of parl. 206, 207.

[k] Bro. *Abr. t. bille.* 29. 12 Mod. 163.

[l] Sir Edward Coke informs us, (1 Inft.
131.) that herein " he could fay nothing of
" his own experience; for albeit queen Eli-
" zabeth maintained many wars, yet fhe
" granted few or no protections : and her
" reafon was, that he was no fit fubject to
" be employed in her fervice, that was fub-

" ject to other mens actions; left fhe might
" be thought to delay juftice." But king
William, in 1692, granted one to lord Cutts,
to protect him from being outlawed by his
taylor: (3 Lev. 332.) which is the laft that
appears upon our books.

[m] Finch. L. 454. 3 Lev. 332.

[n] F. N. B. 28. Co. Litt. 131.

ſtay of execution, till the king's debt be paid ; unleſs ſuch cre-
ditor will undertake for the king's debt, and then he ſhall have
execution for both. And, laſtly, by ſtatute 29 Car. II. c. 7. no
arreſt can be made, nor proceſs ſerved upon a ſunday, except for
treaſon, felony, or breach of the peace.

WHEN the defendant is regularly arreſted, he muſt either go
to priſon, for ſafe cuſtody ; or put in *ſpecial bail* to the ſheriff.
For, the intent of the arreſt being only to compel an appearance
in court at the return of the writ, that purpoſe is equally an-
ſwered, whether the ſheriff detains his perſon, or takes ſufficient
ſecurity for his appearance, called *bail* (from the French word,
*bailler*, to deliver) becauſe the defendant is bailed, or delivered,
to his ſureties, upon their giving ſecurity for his appearance ; and
is ſuppoſed to continue in their friendly cuſtody inſtead of going
to gaol. The method of putting in bail to the ſheriff is by en-
tering into a bond or obligation, with one or more ſureties (not
fictitious perſons, as in the former caſe of common bail, but real,
ſubſtantial, reſponſible bondſmen) to inſure the defendant's ap-
pearance at the return of the writ ; which obligation is called
the *bail bond*°. The ſheriff, if he pleaſes, *may* let· the defend-
ant go without any ſureties ; but that is at his own peril : for,
after once taking him, the ſheriff is bound to keep him ſafely,
ſo as to be forthcoming in court ; otherwiſe an action lies againſt
him for an eſcape. But, on the other hand, he is obliged, by
ſtatute 23 Hen.VI. c. 10. to take (if it be tendered) a ſufficient
bailbond : and, by ſtatute 12 Geo. I. c. 29. the ſheriff ſhall take
bail for no other ſum than ſuch as is ſworn to by the plaintiff,
and endorſed on the back of the writ.

UPON the return of the writ, or within four days after,
the defendant muſt *appear* according to the exigency of the writ.
This *appearance* is effected by putting in and juſtifying bail *to
the action* ; which is commonly called putting in bail *above*. If
this be not done, and the bail that were taken by the ſheriff

° Append. Nº. III. §. 5.

*below*

**ADD25**

*below* are refponfible perfons, the plaintiff may take an affign-
ment from the fheriff of the bail-bond (under the ftatute 4 &
5 Ann. c. 16.) and bring an action thereupon againft the fheriff's
bail.  But if the bail, fo accepted by the fheriff, be infolvent
perfons, the plaintiff may proceed againft the fheriff himfelf,
by calling upon him, firft, to return the writ (if not already
done) and afterwards to bring in the body of the defendant.
And, if the fheriff does not then caufe fufficient bail to be put
in *above*, he will himfelf be refponfible to the plaintiff.

THE bail *above*, or bail *to the action*, muft be put in either
in open court, or before one of the judges thereof; or elfe, in
the country, before a commiffioner appointed for that purpofe by
virtue of the ftatute 4 W. & M. c. 4. which muft be tranf-
mitted to the court.  Thefe bail, who muft at leaft be two in
number, muft enter into a recognizance P in court or before the
judge or commiffioner, whereby they do jointly and feverally
undertake, that if the defendant be condemned in the action
he fhall pay the cofts and condemnation, or render himfelf a
prifoner, or that they will pay it for him : which recognizance
is tranfmitted to the court in a flip of parchment intitled a *bail
piece* q.  And, if required, the bail muft *juftify* themfelves in
court, or before the commiffioner in the country, by fwearing
themfelves houfe-keepers, and each of them to be worth double
the fum for which they are bail, after payment of all their debts.
This anfwers in fome meafure to the *ftipulatio* or *fatifdatio* of
the Roman laws r, which is mutually given by each litigant party
to the other : by the plaintiff, that he will profecute his fuit,
and pay the cofts if he lofes his caufe; in like manner as our
law ftill requires nominal pledges of profecution from the plain-
tiff : by the defendant, that he fhall continue in court, and
abide the fentence of the judge, much like our fpecial bail ;
but with this difference, that the *fidejuffores* were there abfo-
lutely bound *judicatum folvere*, to fee the cofts and condemna-

P Append. Nº. III. §. 5.          r *Inft. l. 4. t. 11.  Ff. l. 2. t. 8.*
q *Ibid.*

### CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the accompanying Memorandum of Law by using the CM/ECF system on November 5, 2019.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: November 5, 2019
New York, NY

_/s/ Matthew Colangelo_