**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | |
| v. | 19 Civ. 8876 (JSR) |
| UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Defendants. | |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................................. ii

INTRODUCTION .......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 2

      I.      Federal courts are not powerless to review Defendants' policy and practice of
targeting state courthouses for civil immigration enforcement. ............................ 2

            A.  Plaintiffs are within the relevant zone of interests. ........................................... 2

            B.  The Courthouse Civil Arrest Directive is reviewable. ....................................... 5

            C.  Defendants' courthouse arrest policy is final agency action. .......................... 6

      II.     The complaint states a claim that the Courthouse Civil Arrest Directive exceeds
ICE's statutory authority and violates the Tenth Amendment. .............................. 9

            A.  Congress did not displace the common-law privilege against civil arrests. ..... 9

            B.  The complaint states a Tenth Amendment claim. ........................................... 13

      III.    Fugitive Slave Act case law and legislation support Plaintiffs' position. ............. 14

CONCLUSION ............................................................................................................................ 15

## TABLE OF AUTHORITIES

**Cases**                                                             **Page(s)**

*Aquavella v. Richardson,*
   437 F.2d 397 (2d Cir. 1971)..................................................................................7

*Arizona v. United States,*
   567 U.S. 387 (2012)............................................................................................10

*Baumgartner v. Baumgartner,*
   273 A.D. 411 (1st Dep't 1948) ...........................................................................12

*Bennett v. Spear,*
   520 U.S. 154 (1997)..........................................................................................4, 6

*Bond v. United States,*
   572 U.S. 844 (2014)............................................................................................13

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio,*
   364 F. Supp. 3d 253 (S.D.N.Y. 2019)..................................................................1

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971)..............................................................................................6

*City of Milwaukee v. Illinois,*
   451 U.S. 304 (1981)..............................................................................................9

*Clarke v. Sec. Indus. Ass'n,*
   479 U.S. 388 (1987)......................................................................................2, 4, 5

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019)......................................................................................5, 6

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991)............................................................................................10

*L.V.M. v. Lloyd,*
   318 F. Supp. 3d 601 (S.D.N.Y. 2018)..................................................................8

*Morrissette v. United States,*
   342 U.S. 246 (1952)..............................................................................................9

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983)................................................................................................6

*Murphy Bros. v. Michetti Pipe Stringing, Inc.,*
   526 U.S. 344 (1999)............................................................................................12

**Cases**                                                                                     **Page(s)**

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    138 S. Ct. 1461 (2018)..................................................................................14

*National Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014)......................................................................8

*Netograph Manufacturing Co. v. Scrugham*,
    197 N.Y. 377 (1910).................................................................................12

*NRDC v. Nat'l Highway Traffic Safety Admin.*,
    894 F.3d 95 (2d Cir. 2018)...........................................................................5

*Pierson v. Ray*,
    386 U.S. 547 (1967)....................................................................................9

*Prigg v. Pennsylvania*,
    41 U.S. (16 Pet.) 539 (1842).......................................................................15

*R.F.M. v. Nielsen*,
    365 F. Supp. 3d 350 (S.D.N.Y. 2019)..........................................................3

*Ryan v. U.S. Immigration & Customs Enf't*,
    382 F. Supp. 3d 142 (D. Mass. 2019)......................................................4, 9

*Weinberger v. Salfi*,
    422 U.S. 749 (1975)..................................................................................11

**Constitutions**

U.S. Const. art. IV.......................................................................................15

**Federal Statutes**

Fugitive Slave Act of 1793, 1 Stat. 302.........................................................15

8 U.S.C.
    § 1101.....................................................................................................3
    § 1229...................................................................................................10
    § 1357.....................................................................................................3

**Miscellaneous Authorities**                                                      **Page(s)**

Andrew Delbanco, *The War Before the War: Fugitive Slaves and the Struggle for*
*America's Soul from the Revolution to the Civil War* (2019)..................................................15

Dep't of Homeland Sec., *U Visa Law Enforcement Resource Guide* (2019),
https://tinyurl.com/u7ghfje.........................................................................................................3

Letter from Attorney General Barr & Acting Secretary Wolf to Chief Justices
Walters and Fairhurst (Nov. 21, 2019),
https://www.justice.gov/ag/page/file/1219556/download ....................................................1, 7

## INTRODUCTION

Defendants' statements at oral argument confirm what has been apparent all along: U.S. Immigration and Customs Enforcement (ICE) has a policy of conducting civil immigration arrests in and around state courthouses; States like New York concededly suffer injury from the arrests conducted pursuant to this policy; and yet Defendants assert that ICE officers have untrammeled authority to make these purely civil arrests, without any regard whatsoever for the States' important sovereign interests in maintaining the integrity of state judicial proceedings and pursuing criminal prosecutions.  If there were any doubts on these points, recent statements by the federal government have dispelled them.  The day after oral argument in this case, the U.S. Attorney General and Acting Secretary of Homeland Security wrote to the Chief Justices of Oregon and Washington, objecting to state policies that would prevent ICE "from making administrative arrests in and around courthouses" and asserting that the Supremacy Clause forbids States from protecting their judicial proceedings—including criminal prosecutions—from disruptive civil immigration arrests.[1]

The startling breadth of Defendants' position provides further reason for this Court to deny their motion to dismiss.  At no point in this litigation, including at oral argument, have Defendants ever identified a clear statement that Congress intended to disregard the well-established common-law privilege against civil arrests in or near courthouses.  And Defendants' insistence that federal immigration law automatically overrides core state sovereign interests is inconsistent with basic Tenth Amendment principles.  Plaintiffs' complaint alleges that, as a result of Defendants' policies, many people fear attending court and cooperating with

---

[1] Letter from Attorney General Barr & Acting Secretary Wolf to Chief Justices Walters and Fairhurst at 1-2 (Nov. 21, 2019), https://www.justice.gov/ag/page/file/1219556/download.  The Court may take judicial notice of this letter.  *See, e.g.*, *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 262 (S.D.N.Y. 2019).

prosecutors, impairing New York's ability to dispense justice not only to its 4.4 million immigrants, but also to people throughout the State who count on New York's courts and prosecutors to function effectively.  The motion to dismiss should be denied.

## ARGUMENT

### I. Federal courts are not powerless to review Defendants' policy and practice of targeting state courthouses for civil immigration enforcement.

#### A. Plaintiffs are within the relevant zone of interests.

Plaintiffs meet the lenient test for showing that their interests arguably fall within the interests the Immigration and Nationality Act (INA) protects, particularly given Congress's "evident intent to make agency action presumptively reviewable" under the Administrative Procedure Act (APA), *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).  At oral argument, Defendants conceded (Tr. 14) that Plaintiffs have adequately alleged injury caused by Defendants' courthouse civil arrest policy—specifically, meaningful interference with Plaintiffs' ability to ensure the unhindered operation of the state judicial system, protect public safety, secure the participation of victims and witnesses in investigations and court proceedings, and promote effective law enforcement and criminal prosecution.  Compl. ¶ 1.  These conceded injuries are among the harms that Congress sought to address in the INA, confirming that Plaintiffs fall within the zone of interests of that statute.

*1.*  Numerous INA provisions reflect Congress's intent to encourage noncitizen participation in criminal investigations and prosecution, and thereby to protect public safety more broadly.  For example, the U-visa program authorizes immigration relief for noncitizen crime victims who have cooperated with law enforcement, and often requires noncitizens to

appear in state court as a prerequisite to immigration relief.[2]  8 U.S.C. § 1101(a)(15)(U); *see* Compl. ¶ 48.  Similarly, the T-Visa program authorizes immigration relief for victims of human trafficking who have cooperated with state and local law enforcement investigations or prosecution of human trafficking crimes.  8 U.S.C. § 1101(a)(15)(T).

Other provisions of the INA likewise reflect Congress's intent to encourage participation by vulnerable noncitizens in state court proceedings, including by expressly conditioning certain forms of immigration relief on factual findings made by state courts.  For example, Congress authorized Special Immigrant Juvenile (SIJ) status, *see id.* § 1101(a)(27)(J), to provide "a path to lawful permanent residence for young immigrants who have been victims of abuse, neglect, or abandonment."  *R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 361-63 (S.D.N.Y. 2019).  To obtain SIJ status, these young immigrants must appear in state court to obtain judicial findings about their family and custodial situations.  8 U.S.C. § 1101(a)(27)(J)(i)-(ii).  Deterring noncitizens from participating in necessary state-court proceedings would undermine Congress's intent in enacting this program.  *See* Compl. ¶ 49.

*2.*  In addition, the INA reflects Congress's intent that federal immigration enforcement respect the role of state and local laws.  Section 287(g) of the INA, for instance, permits state officers to cooperate with certain federal immigration functions in limited circumstances, but only "to the extent consistent with State and local law."  8 U.S.C. § 1357(g)(1).  The INA also codifies Congress's "preference that federal immigration enforcement not impede state criminal

---

[2] Defendants have elsewhere acknowledged that Congress intended through the INA to facilitate crime victims' cooperation with state and local law enforcement.  *See* Dep't of Homeland Sec., *U Visa Law Enforcement Resource Guide* 1 (2019), https://tinyurl.com/u7ghfje ("Congress recognized that individuals without lawful immigration status may be particularly vulnerable to victimization and may be reluctant to help in the investigation or prosecution of criminal activity due to fear of removal from the United States.").

law enforcement," by forbidding aliens sentenced to state incarceration to be removed until released from state custody.  *Ryan v. U.S. Immigration & Customs Enf't*, 382 F. Supp. 3d 142, 156 (D. Mass. 2019) (citing 8 U.S.C. § 1231(a)(4)(A)), *appeal filed*, No. 19-1838 (1st Cir. Sept. 5, 2019).[3]

*3.*  Defendants argue that the INA's many references to respecting state judicial proceedings are irrelevant because the zone-of-interests test turns on "the particular provision of law upon which the plaintiff relies," and the INA's civil-arrest provisions, 8 U.S.C. §§ 1226 and 1357, do not expressly refer to state proceedings.  Reply 1 (quoting *Bennett v. Spear*, 520 U.S. 154, 175-76 (1997)); *see* Tr. 5.  But *Bennett* concerned the sufficiency—not the necessity—of the plaintiffs' reliance in that case on the specific statutory provision at issue.  *See* 520 U.S. at 175-77.  The Supreme Court has never held that the zone-of-interests test is satisfied *only* in such circumstances; to the contrary, federal courts "are not limited to considering the statute under which [the plaintiff] sued, but may consider any provision that helps us to understand Congress's overall purposes in the" statute at issue.  *Clarke*, 479 U.S. at 401.

In any event, Defendants' assertion that the INA's civil-arrest provisions make no reference to state judicial proceedings supports rather than undermines Plaintiffs' zone-of-interests argument.  Because Congress legislated against the backdrop of a long-established common-law privilege against courthouse arrests, the absence of any clear statement about state

---

[3] At oral argument, Defendants urged the Court to disregard *Ryan*'s holding because the INA's bar on removal during state incarceration does not extend to a period of parole, supervised release, or probation.  Tr. 5 (citing 8 U.S.C. § 1231(a)(4)(A)).  That the requirement of federal forbearance applies only during imprisonment and not during parole does not undermine the district court's conclusion that state and local prosecutors have interests that are "more than 'marginally related' to ICE enforcement in courthouses."  *Ryan*, 382 F. Supp. 3d at 155 (quoting *Clarke*, 479 U.S. at 399)).  And in any event, § 1231(a)(4)(A) is not the only provision in the INA that places Plaintiffs within the statute's zone of interests, as discussed above.

judicial proceedings in the civil-arrest provisions confirms that Congress did not intend to override that privilege. *See infra* at 9-11. In other words, silence here shows that Congress did intend to respect state criminal prosecutions in judicial proceedings—implicitly in the civil-arrest provisions, as it did explicitly in other provisions of the INA. Defendants have thus failed to establish that Plaintiffs' interests "are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399.

**B.    The Courthouse Civil Arrest Directive is reviewable.**

The Court should reject what it correctly acknowledged (Tr. 8) as Defendants' "extraordinary" argument that Congress intended ICE to have "unfettered, unlimited, unchallengeable powers" to conduct civil arrests in and near state courthouses. "[W]hile the federal courts may be courts of limited jurisdiction, they're not totally without some power" in this area. Tr. 26. This dispute does not fall into one of the "rare circumstances" where the reviewing court has no ability to judge the agency's exercise of discretion. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019) (quotation marks omitted).

For example, as oral argument made clear, there are meaningful standards this Court can apply to determine (1) the scope of the common-law privilege against civil arrests in or near courthouses; and (2) the extent to which Congress incorporated that privilege when it enacted the INA. These questions lie at the heart of Plaintiffs' claim that ICE has exceeded its statutory authority. *See* Compl. ¶¶ 121-29. And the parties' debate over these issues at argument relied on entirely familiar judicial tools—including interpretations of cases (*e.g.*, Tr. 14-17, 31) and legislative and regulatory history (*e.g.*, Tr. 20, 32-33)—that courts routinely apply in invalidating agency action. *See, e.g., NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 108-13 (2d Cir. 2018). Plaintiffs' arbitrary-and-capricious claim (Compl. ¶¶ 130-34) likewise requires this

Court only to engage in the well-settled inquiry into whether the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

At oral argument, Defendants argued (Tr. 10) that Plaintiffs' reviewability analysis "conflate[s] the difference between Section 701 and Section 706." But this argument ignores the Supreme Court's recent admonition in *Department of Commerce* that "the general requirements of reasoned agency decisionmaking" ordinarily *will* provide an adequate basis for judicial review. 139 S. Ct. at 2567-69. What is needed to overcome that strong "presumption of judicial review," *id.* at 2568, is some "clear and convincing evidence" that Congress intended to disable the federal courts. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (quotation marks omitted). In *Department of Commerce*, the Court held that a statute that authorized the Secretary of Commerce to conduct the decennial census in "'such form and content as he may determine'" was not clear enough evidence. 139 S. Ct. at 2568 (quoting 13 U.S.C. § 141). Defendants have identified no provision in the INA that even comes close to this already inadequate language. *See* Opp. 6-7. The narrow exception to reviewability under the APA thus does not apply here.

### C. Defendants' courthouse arrest policy is final agency action.

Plaintiffs have alleged final agency action subject to APA review because Defendants' courthouse arrest policy "mark[s] the consummation of the agency's decisionmaking process" and is one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177-78 (quotation marks and citations omitted).

*1.* Defendants contend that Plaintiffs fail the first prong of the *Bennett* test as to ICE

arrests near (as distinct from inside) state courthouses, on the ground that they have no policy on such arrests.  Reply 5; Tr. 11-12.  But recent public statements foreclose this argument.  On November 21, 2019, the Acting Secretary of Homeland Security and the U.S. Attorney General wrote a letter criticizing the Chief Justices of Oregon and Washington for considering court rules that "would attempt to preclude [ICE] . . . from making administrative arrests *in and around* courthouses in your respective states."[4]  This letter alone makes clear that Defendants have adopted a final policy of conducting civil immigration arrests in and near state courthouses.

Even ignoring these statements, the Courthouse Civil Arrest Directive is not on its face limited to arrests inside courthouses.  It purports to establish ICE policy regarding "civil immigration enforcement actions," and defines that term broadly to mean "[a]ction taken by an ICE officer or agent to apprehend, arrest, interview, or search an alien in connection with enforcement of administrative immigration violations."  Directive §§ 1, 3.1 (Dkt. 1-1); *see also* Compl. ¶¶ 1, 5, 9, 42-44, 127, 139.  That broad definition would cover, for example, ICE officers who surveil parties and witnesses in courthouses and then arrest them immediately outside (before or after court proceedings)—as Plaintiffs allege here.  *See, e.g.*, Compl. ¶¶ 70-71, 73, 75.

Plaintiffs are entitled to challenge Defendants' policy of targeting court participants *near* courthouses even if that policy were not formally codified in the Directive.  *Id.* ¶¶ 38-41.  It is the "impact of the challenged action on the parties" that guides the pragmatic finality inquiry, not "semantic characterizations," *Aquavella v. Richardson*, 437 F.2d 397, 404-05 (2d Cir. 1971).  If the law were otherwise, agencies could evade judicial review by declining to memorialize their decisions or announce the adoption of new policies.  Opp. 10.

*2.*  Plaintiffs meet the second prong of *Bennett* as well.  Defendants' courthouse-arrest

---

[4] Letter, *supra*, at 1 (emphasis added).

practices do not constitute simply a "general statement of policy," Reply 4-5; Tr. 12, but instead have the legal effect of authorizing certain arrests that previously were not authorized, directly leading to vastly more arrests.  Compl. ¶¶ 6, 52.

In their reply (at 4-5), Defendants rely on *National Mining Association v. McCarthy*, for the proposition that "[a]n agency action that merely explains how the agency will enforce a statute or regulation" is not subject to APA review, 758 F.3d 243, 252 (D.C. Cir. 2014).  But the Directive here bears no similarity to the policy at issue in *National Mining*, which was a guidance document to EPA staff that affected parties could "ignore . . . without facing any legal consequences."  *Id.*  Here, by contrast, Plaintiffs may not simply ignore Defendants' policy.  As this Court recognized (and Defendants acknowledged), the complaint here alleges a "huge change" in the number of ICE arrests both in and near courthouses as a result of Defendants' policy (Tr. 14), and those arrests have had direct, pervasive, and extremely disruptive effects on Plaintiffs' operations in areas where state sovereign interests have long been paramount.  Compl. ¶¶ 1-2, 6-7, 69-70; *see L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 612 & n.7 (S.D.N.Y. 2018) (refusing to "permit unreviewed discretion in an area of great sensitivity").

Finally, Defendants' contention that ICE has authorized courthouse arrests since at least 2014 (Mem. 3-4; Reply 5; Tr. 11-12) is both wrong and beside the point.  The 2014 memorandum, at best, established a narrow terrorism exception to the long-extant rule *prohibiting* courthouse arrests.  Compl. ¶¶ 33-37.  At most, Defendants' argument presents a fact question about the nature and origins of Defendants' policy to be resolved at trial.[5]

---

[5] At argument, Defendants mischaracterized *Ryan* as recognizing a practice of conducting courthouse immigration arrests that predated the 2018 Directive.  *See* Tr. 11-12 (citing *Ryan*, 382 F. Supp. 3d at 159).  In the cited passage, the district court was characterizing and rejecting the federal government's arguments opposing a preliminary injunction.  The court ultimately upheld

**II.     The complaint states a claim that the Courthouse Civil Arrest Directive exceeds ICE's statutory authority and violates the Tenth Amendment.**

At oral argument, Defendants acknowledged that the arrests authorized by the Directive are purely civil in nature and involve people who "have not been convicted of or suspected of a federal crime."  Tr. 6.  And Defendants confirmed their breathtakingly broad theory that this *civil* arrest authority allows ICE officers to hobble state *criminal* prosecutions (as well as other state judicial proceedings) without any regard for countervailing state interests.  Neither the INA nor the Tenth Amendment permits such total disregard of States' core sovereign interests in their own criminal enforcement and administration of their own judiciaries.

**A.  Congress did not displace the common-law privilege against civil arrests.**

*1.*  Defendants do not seriously contest the familiar presumption that Congress incorporates well-settled principles of state common law unless it disclaims such incorporation through "clear and manifest" language.  *City of Milwaukee v. Illinois*, 451 U.S. 304, 316 (1981) (quotation marks omitted); *see, e.g.*, *Pierson v. Ray*, 386 U.S. 547, 553-54 (1967) (state-judicial immunity incorporated into federal law because "[f]ew doctrines were more solidly established at common law"); *Morrissette v. United States*, 342 U.S. 246, 262 (1952) (Congress implicitly "adopt[ed] into federal statutory law" mens rea concepts "already so well defined in common law").  This principle is not, as Defendants contend, a way to "use state common law to re-write a federal statute."  Reply 9-10 (quotation marks omitted).  Rather, it is a recognition that Congress presumptively acts in ways that preserve rather than disrupt settled common-law doctrines—particularly those that, as here, respect core state prerogatives.  *See* Opp. 15-16.

At oral argument, Defendants identified no "clear and manifest" statement in the INA

---

plaintiffs' APA claim because Congress did not "clearly state [its] intent to abrogate" the common-law privilege when enacting the INA civil-arrest provisions.  382 F. Supp. 3d at 159.

overriding the common-law privilege against civil arrests or authorizing ICE officers to disregard States' sovereign interests in protecting their judicial proceedings.  Instead, as in their briefing, Defendants continued to rely (Tr. 19-20; Reply 8) solely on the INA's generic civil-arrest provisions, 8 U.S.C. §§ 1226 and 1357(a), which say nothing about the common-law privilege or state courthouses.  As Plaintiffs have explained (Opp. 13), that silence comes nowhere close to the "clear statement" necessary for Congress to declare its intent to displace state common law, *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991).

Defendants also cannot rely solely on Congress's "'broad, undoubted power'" over federal immigration law.  Reply 8 (quoting *Arizona v. United States*, 567 U.S. 387, 394 (2012)).  Indeed, *Arizona* itself stressed that "courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress."  567 U.S. at 400 (quotation marks omitted).

Finally, Defendants overstate the relevance of 8 U.S.C. § 1229(e), which is not about arrest authority at all.  Reply 8-9.  Rather, § 1229(e) requires federal immigration officials to certify during removal proceedings that information of a person's removability was not furnished solely by an abuser, if the person was subject to "an enforcement action leading to a removal proceeding" in, among other places, a courthouse.  The purpose of this provision is to *encourage* immigrant victims of domestic violence to access certain public spaces—including courthouses—without fear that their abusers will take advantage of the situation by providing damaging information to federal immigration authorities.  *See* Opp. 14.  Congress's desire to protect immigrants from the adverse consequences of certain "enforcement action[s]" is simply not synonymous with congressional endorsement of those enforcement actions in the first place.  To the contrary, given the "prophylactic" purpose of § 1229(e), it made sense for Congress to be

"over-inclusive" in "protect[ing] against [the] abuses" it sought to curb, *see Weinberger v. Salfi*, 422 U.S. 749, 776 (1975) (quotation marks omitted), without regard to whether or not the "enforcement action[s]" it referenced were authorized.

There is also no basis for Defendants' suggestion at argument that § 1229(e) "signal[ed]" Congress's recognition "that immigration courthouse arrests were occurring by 2006," when § 1229(e) was enacted.  Tr. 12.  Congress could not have recognized that fact, because—as Defendants admit (Mem. 3; Reply 4)—immigration courthouse arrests did not occur in any meaningful numbers until 2014 at the earliest.  A more plausible reading, then, is that § 1229(e)'s reference to courthouse-based "enforcement action[s] leading to a removal proceeding" means something other than ICE civil arrests—such as criminal arrests or arrests by state or local police that produce information leading to removal.  *See* Tr. 33.

*2.*  Defendants are wrong to insist (Reply 6-8; Tr. 15-16) that there is no common-law privilege against *civil arrests* in or near courthouses, only a privilege against *service of process* in courthouses.  As Plaintiffs have explained (Opp. 18-19), courts have recognized both privileges, which originated from a common core and have somewhat different applications. Moreover, it would make no sense for the common law to be concerned only with service of process.  As this Court recognized (Tr. 17), a "purpose of the common law approach was to prevent people from being deterred from coming forward in state cases"; that deterrence would occur just as much (if not more so) because of "the fear that they would be arrested" as it would that they would be "served with process."

Moreover, even if the specter of civil arrests did not deter parties and witnesses from coming forward, the arrests would still create disruptions at which the common-law privilege takes aim.  *See* Opp. 21-22.  Those disruptions result either from violent arrests that prevent

courts from operating, *see* Compl. ¶ 69; from adjournments and dismissals because parties and witnesses have been arrested, *see, e.g.*, *id.* ¶¶ 70, 74, 77-78, 80, 83, 86; and from the profound chilling effect of these arrests, which has prevented immigrant victims and witnesses from participating in court proceedings necessary protect their rights or public safety, *see, e.g.*, *id.* ¶¶ 88-105. The common-law privilege protected against precisely these types of disruptions. *See Baumgartner v. Baumgartner*, 273 A.D. 411, 412-13 (1st Dep't 1948). Defendants' only response (Reply 7) is that this point "proves too much" because "courts have allowed" disruptive "criminal arrests" and service of criminal process in courthouses. But the common law has long recognized that criminal enforcement raises unique public interests that render the privilege inapplicable. *See* Opp. 22. The arrests at issue here, by contrast, are not criminal arrests (Tr. 6), but civil arrests carried out "to secure the [arrestee's] appearance" at a civil (removal) proceeding—precisely the type of arrest to which the common-law privilege has long applied, *Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999).

Defendants also err in contending (Tr. 16) that the New York Court of Appeals has "disclaimed reliance on th[e] broader English privilege" and cabined the privilege to nonresidents. Defendants rely (Tr. 16-17; Reply 6) solely on *Netograph Manufacturing Co. v. Scrugham*, 197 N.Y. 377, 382 (1910). But *Netograph* decided only whether a criminal defendant attending a court appearance in his criminal case while released on bail could personally claim the privilege against service of a summons in court. *Id.* at 379-81. On that "very narrow" question, the Court declined to follow "some" unidentified English decisions, *id.* at 382, and held that witnesses who are involuntarily haled into court (including from other jurisdictions) cannot personally claim the privilege, *id.* at 380. Nowhere did the Court more broadly disclaim reliance on English common law or radically alter the scope of the common-law privilege at issue here.

*3.* At oral argument, Defendants also sought to rebut the common-law privilege by asserting (Tr. 16, 18) that ICE has authority to conduct civil arrests "in any location," whether "in a courthouse" or "at a Burger King," and that there is accordingly no rational basis for immigrants to "fear" ICE arrests at courthouses in particular because they "can be subject to an enforcement action anywhere." That argument only underscores the degree to which Defendants have persistently refused to acknowledge that States have uniquely strong sovereign interests in defending their courthouses. A state courthouse is not "a Burger King," and interference with judicial proceedings and state criminal prosecutions causes serious harms, far graver than disruptions at privately owned fast-food chains. For example, Plaintiffs allege that ICE courthouse arrests have deterred immigrants from attending court and cooperating with law enforcement, thereby disrupting New York's justice system and undermining public safety. *See, e.g.*, Compl. ¶¶ 62-63, 88-100, 104-05, 140. Defendants' casual equivalence between state courthouses and privately owned restaurants thus disregards the unique sovereign interests that the common-law privilege protects and that lie at the heart of Plaintiffs' claims.

### B. The complaint states a Tenth Amendment claim.

After contending (Mem. 24-25) that the Tenth Amendment allows claims only for commandeering, Defendants now allow (Reply 10) that the Tenth Amendment also encompasses claims for "direct" interference with a State's judiciary. The malleability of Defendants' position underscores that the Tenth Amendment is not as rigid as they contend. Indeed, as Plaintiffs have noted (Opp. 23-24), the Tenth Amendment extends beyond commandeering, such as when Congress seeks to criminalize entirely local conduct, *see, e.g.*, *Bond v. United States*, 572 U.S. 844, 854 (2014). And it covers the conduct Plaintiffs allege: undue interference with state judicial and prosecutorial functions. Defendants have no answer to this point.

At oral argument, this Court observed (Tr. 30) that state officials would be commandeered if, because of Defendants' policy, they are required to "tak[e] inaction in a situation where they normally would take action"—for example, if a state court security officer would normally intervene to prevent a litigant from being seized but is barred from doing so because ICE officers are conducting the arrest.  This Court is correct that the anti-commandeering doctrine forbids the federal government from compelling state officials not to act, *see Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1478 (2018), and the forthcoming trial will give the Court and the parties the opportunity to determine if the actual implementation of the Directive triggers this prohibition.  Consistent with this observation, Defendants' policy may also commandeer Plaintiff the Brooklyn District Attorney by preventing it from protecting victims and witnesses as it ordinarily would, or by requiring it to develop internal policies to cope with ICE's interference in its work.  At this early stage, however, Plaintiffs need not prove any particular fact pattern in order for their Tenth Amendment claim to proceed.  It is enough that the complaint's allegations identify meaningful interference with state criminal prosecutions and judicial proceedings.  By pleading many examples of how ICE arrests in or near courthouses have caused such interference, the complaint states a claim on that theory.

## III.   Fugitive Slave Act case law and legislation support Plaintiffs' position.

This Court suggested (Tr. 4) that cases concerning slave recapture during the pre-Civil War era might have parallels to the current dispute.  While those cases do not specifically discuss the common-law privilege or federal immigration law, they recognize important limitations on federal encroachment of core state functions that may be pertinent here.

The legal disputes referenced by this Court concerned the free States' efforts to resist the capture of fugitive slaves under federal law.  At that time, the Constitution's Fugitive Slave Clause required that all slaves "be delivered up on Claim of the Party to whom such Service or

Labour may be due." U.S. Const. art. IV, § 2, cl. 3.  The Fugitive Slave Act of 1793 thus allowed slaveholders and their agents to "seize or arrest" any "fugitive" slave and "take him or her before" a judge or magistrate to establish that the arrestee belonged to the slaveholder, at which point the judge or magistrate had to issue a certificate allowing the captor to remove the slave from the State. 1 Stat. 302, 302-05.  Free States opposed to this odious federal regime responded by passing "personal liberty laws," "making it more difficult to extradite an accused runaway to a slave state."  Andrew Delbanco, *The War Before the War: Fugitive Slaves and the Struggle for America's Soul from the Revolution to the Civil War* 169-70 (2019) (quotation marks omitted).

The U.S. Supreme Court eventually invalidated such personal liberty laws in *Prigg v. Pennsylvania*, holding that States could not directly "interfere" with Congress's "constitutional power to regulate" the recapture of fugitive slaves by "prescrib[ing] additional regulations" on seizures made pursuant to federal authority.  41 U.S. (16 Pet.) 539, 617-18 (1842).  But the Court recognized important limitations on this federal power: the Court held that state magistrates need not participate in the recapture process by entertaining applications for certificates to remove slaves from the State, and thus recognized that it would be permissible for such coopting of state judiciaries to be "prohibited by state legislation."  *Id.* at 622.  Free States responded by passing a "second wave" of personal liberty laws, "forbidding state officials to cooperate in the rendition of fugitives" and from "using any state facility for that purpose."  Delbanco, *supra*, at 180, 183.  Thus, even when a particular power was authorized by both the Constitution and federal law, courts nonetheless recognized the States' inviolable sovereignty to protect their judiciaries.

## CONCLUSION

Defendants claim that federal courts have no role to play in judging the lawfulness of a practice targeting noncitizens who attend state judicial proceedings and participate in state investigations and prosecutions.  The Court should reject this extraordinary position.

DATED:  December 3, 2019

Steven C. Wu
   *Deputy Solicitor General*
Scott A. Eisman
   *Assistant Solicitor General*

*Of Counsel*

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Matthew Colangelo*
Matthew Colangelo
   *Chief Counsel for Federal Initiatives*
Anjana Malhotra, *Assistant Attorney General*
Morenike Fajana, *Special Counsel*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
Matthew.Colangelo@ag.ny.gov

*Attorneys for the State of New York*

ERIC GONZALEZ
*District Attorney of Kings County (Brooklyn)*

By: */s/ Jill Harris*
Jill Harris, *Chief of Policy and Strategy*
Kings County District Attorney's Office
350 Jay Street
Brooklyn, New York 11201
Phone: (718) 250-3156
harrisj1@BrooklynDA.org

*Attorney for the District Attorney of Kings County (Brooklyn)*