```
                                          USDC SDNY
                                          DOCUMENT
                                          ELECTRONICALLY FILED
UNITED STATES DISTRICT COURT              DOC #:
SOUTHERN DISTRICT OF NEW YORK             DATE FILED: 12/19/19
--------------------------------x
THE STATE OF NEW YORK and ERIC    :
GONZALEZ                          :
                                  :
      Plaintiffs,                 :
                                  :       19-cv-8876(JSR)
          -v-                     :
                                  :       OPINION AND ORDER
U.S. IMMIGRATION AND CUSTOMS      :
ENFORCEMENT, et al.               :
                                  :
      Defendants.                 :
--------------------------------x
```

JED S. RAKOFF, U.S.D.J.

Courts cannot be expected to function properly if third parties (not least the executive branch of the government) feel free to disrupt the proceedings and intimidate the parties and witnesses by staging arrests for unrelated civil violations in the courthouse, on court property, or while the witnesses or parties are in transit to or from their court proceedings. Accordingly, more than 500 years ago, the English courts developed a common law privilege against civil arrests on courthouse premises and against arrests of parties and other persons necessarily traveling to or from court. This ancient privilege, incorporated into American law in the early years of our republic by virtually all state and federal courts, has remained largely intact over the centuries. But now, according to the State of New York, the federal Immigration and Customs Enforcement agency ("ICE"), in implementation of an Executive

1

Order issued by the Trump Administration in January 2017 and a Directive to ICE agents promulgated in January 2018, has increased its civil arrests in or around New York state courthouses by a remarkable 1700 percent and more. By this lawsuit, plaintiff The State of New York, joined by co-plaintiff Eric Gonzalez (the District Attorney of Kings County), demand that these intrusions be halted.

In response, ICE now moves to dismiss the complaint, arguing, first, that it is none of this Court's business and second, that even if it is, the common law privilege against courthouse arrests doesn't apply to ICE. Finding these and ICE's other arguments without merit, the Court denies the motion to dismiss, for the reasons set forth below.

## THE ALLEGATIONS

Plaintiffs The State of New York and the Kings County District Attorney commenced this suit on September 25, 2019, seeking both declaratory and injunctive relief. Specifically, the plaintiffs seek a declaration that ICE Directive No. 11072.1, Ex. A to Onozawa Decl. (Oct. 23, 2019), ECF No. 27 (the "Directive") is invalid, Compl., Prayer for Relief ¶¶ 2-4. They further ask that ICE be enjoined from "civilly arresting parties, witnesses, and any other individual coming to, attending, or returning from courthouses or court-related proceedings" in New York State. Id. ¶ 5.

2

According to the complaint, the Directive, which ICE promulgated on January 10, 2018, Compl. ¶ 42, served to formalize aspects of Executive Order No. 13,768, 82 Fed. Reg. 8799, promulgated on January 25, 2017 (immediately after President Trump took office), which directed ICE to vigorously enforce the immigration laws against so-called "sanctuary jurisdictions." According to the complaint, the impact of the Executive Order on arrests on or near the premises of New York state courthouses was immediate: They rose from 11 in 2016 to 172 in 2017. Compl. ¶ 58 n.9 (referencing Immigrant Defense Project, The Courthouse Trap 6 (Jan. 2019)). This shift was then formalized by ICE when it issued the Directive in early January 2018, after which such arrests rose still further, to 202 in 2018. Id.

The Directive provides that ICE agents may target for civil arrest on courthouse premises "aliens with criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed from the United States but have failed to depart, and aliens who have re-entered the country illegally after being removed," Directive § 2. In addition, the Directive provides that ICE may similarly arrest aliens outside these specified categories, "such as family members or friends accompanying the target alien to court appearances or serving as a witness in a proceeding," in "special circumstances, such as

3

where the individual poses a threat to public safety or interferes with ICE's enforcement actions." Id.[1]

In response to the Executive Order and the Directive, civil arrests by ICE officers in and around New York state courthouses have, as noted, dramatically increased. Although the Directive purports only to offer guidance on how ICE officers should exercise their enforcement discretion on a "case-by-case basis," Directive § 2 n.1, plaintiffs infer from the more than 1700 percent increase in such arrests that the Directive actually embodies a conscious decision to conduct widespread immigration arrests in or around state courthouses, a reversal of ICE's pre-2017 policy to largely abstain from such arrests. Compl. ¶¶ 30-37, 58.

These arrests, according to the Complaint, have seriously prejudiced New York's sovereign interest in maintaining a functioning court system. And this is not just because the arrests are, by their very nature, disruptive. In addition, aliens who are parties to lawsuits have declined to attend

---

[1] The Directive does place some limits on the authority of ICE agents to conduct immigration arrests inside state courthouses. For example, the Directive states that "ICE officers and agents should generally avoid enforcement actions in courthouses, or areas within courthouses that are dedicated to non-criminal (e.g., family court, small claims court) proceedings." Id. The Directive also tells officers to cooperate with court security staff and to utilize non-public entrances and exits to the extent practicable. Id.

4

scheduled hearings, fearing arrest. This not only forces courts to adjourn proceedings, thereby wasting judicial resources, see, e.g., Compl. ¶¶ 68, 70, 75; see also Br. of Former Judges as Amici Curiae in Supp. of Pls.' Oppo. to Defs.' Mot. to Dismiss (Nov. 5, 2019), ECF No. 34, at 10-14 (hereinafter "Br. of Former Judges"), but also undermines New York's interest in allowing plaintiffs to pursue meritorious civil claims, Compl. ¶¶ 83-84; see generally Br. of Amici Curiae Immigrant Defense Project and 40 Legal Services Organizations, Public Defender Organizations, and Non-Profit Organizations in Supp. of Pls. (Nov. 5, 2019), ECF No. 30 (hereinafter "Br. of Immigrant Defense Project et al."); Br. of Former Judges 10-11. Further still, these arrests have interfered with New York's ability to prosecute crimes, both because witnesses who are undocumented aliens are afraid to come forward and also because even those defendants who are guilty of New York crimes are sometimes taken into ICE custody before they can be tried and convicted. Compl. ¶¶ 88-105. Finally, the Directive has also chilled crime reporting, with calls to the Brooklyn DA's Immigrant Affairs Unit declining by 67 percent from 2016 to 2018. Compl. ¶ 101; see also Br. of Former Judges 7-10.

Citing these harms, plaintiffs challenge the Directive on three separate grounds. Count One, Compl. ¶¶ 135-42, argues that ICE's courthouse arrest policy violates the ancient common law

5

privilege against civil arrest when one is present at a courthouse or necessarily traveling to or from court proceedings. This privilege, plaintiffs further argue, is presumptively incorporated into the Immigration and Nationality Act ("INA"), rendering the Directive "in excess of statutory jurisdiction, authority, or limitations" and therefore invalid under section 706(2)(C) of the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2)(C); Compl. ¶¶ 121-29. Count Two argues that ICE's adoption of the Directive was arbitrary and capricious, in violation of section 706(2)(A) of the APA, because ICE did not adequately consider the harms that this policy would impose.[2] 5 U.S.C. § 706(2)(A); Compl. ¶¶ 130-34; see also Compl. ¶¶ 62-105; Br. of Former Judges 7-14; Br. of Immigrant Defense Project et al. Finally, citing these same harms, Count Three argues that the Directive violates the Tenth

---

[2] The Directive lists three purported justifications for this policy. First, "[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband. Accordingly, civil immigration enforcement actions taken inside courthouses can reduce safety risks to the public, targeted alien(s), and ICE officers and agents." Directive § 1. Second, "many individuals appearing in courthouses for one matter are wanted for unrelated criminal or civil violations." Id. And third, "courthouse arrests are often necessitated by the unwillingness of jurisdictions to cooperate with ICE in the transfer of custody of aliens from their prisons and jails." Id. None of these justifications addresses any of the harms that plaintiffs allege are inherent in implementation of the Directive.

6

Amendment to the U.S. Constitution because it impermissibly
burdens the State of New York's operation of its judicial
system. Compl. ¶¶ 135-42.

## THE MOTION TO DISMISS

Defendants present six grounds for dismissal, the first
three of which are jurisdictional in nature and are therefore
brought under Fed. R. Civ. P. 12(b)(1), and the latter three of
which are substantive in nature and therefore brought under Fed.
R. Civ. P. 12(b)(6).

The first jurisdictional ground is that the interests
plaintiffs ask this Court to protect are not within the "zone of
interests" protected by the INA, 8 U.S.C. §§ 1101 et seq. The
second is that ICE's immigration enforcement authority is
"committed to agency discretion by law" under 5 U.S.C. §
701(a)(2) and therefore unreviewable. The third is that the
Directive is not a final agency action and therefore
unreviewable under 5 U.S.C. § 704.

The first substantive ground is defendants' contention that
there is no applicable common law privilege against courthouse
civil arrests still extant. The second is that, even if there is
such a privilege, it is preempted by the INA. The third is that
plaintiffs do not, in any case, state a Tenth Amendment claim.

## STANDARDS OF REVIEW

The Court considers each of these arguments in turn. As to the three grounds for dismissal under Rule 12(b)(1), the plaintiff bears the burden of demonstrating the existence of subject matter jurisdiction. Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994). But where, as here, the Court "relies solely on the pleadings and supporting affidavits, the plaintiff need only make a prima facie showing of jurisdiction." Id. "In determining whether a plaintiff has met this burden," the Court must "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations." Id.

As to the three arguments under Rule 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). After discarding allegations that amount to nothing more than legal conclusions, see Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), the Court should "accept as true" what remains and "draw all reasonable inferences in plaintiff's favor." Beazley Ins. Co., Inc. v. Ace Am. Ins. Co., 150 F. Supp. 3d 345, 354 (S.D.N.Y. 2015) (citing In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007)).

**REVIEWABILITY**

8

Defendants' three jurisdictional arguments are all premised
on the notion that the Directive and ICE's actions pursuant to
the Directive are simply not reviewable by a federal district
court. Defendants ask the Court to hold that ICE has unfettered
and unchallengeable discretion to adopt a policy of conducting
immigration arrests in a setting where it previously did so only
rarely, thereby expanding the agency's own authority and
significantly altering its relationship with state governments.
This result would be a most unusual one under our constitutional
system, let alone in any nation that prides itself on adhering
to the rule of law. The Court therefore approaches defendants'
arguments on reviewability with some skepticism.

First, defendants argue that plaintiffs do not have a cause
of action under the APA because the interests they seek to
protect are not "within the zone of interests to be protected or
regulated by" the INA. Match-E-Be-Nash-She-Wish Band of
Pottawatomi Indians v. Patchack, 567 U.S. 209, 224 (2012),
(quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397
F.3d 150, 153 (1970)). Defendants note that the INA broadly
authorizes the civil arrest of aliens in the United States, see
8 U.S.C. §§ 1226(a) & 1357(a). And while the INA creates
immigration courts (that is, courts that are an arm of the
executive) that allow individual aliens to challenge their
arrest and removal, see 8 U.S.C. § 1252; 8 C.F.R. § 1003.0 et

9

seq., the statute does not explicitly provide a cause of action to the plaintiffs here, nor does it "create[] any entitlement or interest that Plaintiffs may invoke." Defs.' Mem. of Law in Supp. of Mot. to Dismiss (Oct. 23, 2019), ECF No. 26, at 8 (hereinafter "Mem.").

If the logic of defendants' arguments were carried to its extreme, ICE would become virtually a fourth branch of government, with unfettered discretion not subject to any meaningful review by any constitutional court. But in fact, the zone-of-interests test that must be satisfied to give the Court jurisdiction is "not especially demanding," Lexmark Intern., Inc. v. Static Control Components, Inc., 572 U.S. 118, 130 (2014) (quoting Match-E-Be-Nash-She-Wish, 567 U.S. at 225) (internal quotation marks omitted), and the Court finds that it is satisfied here. Specifically, plaintiffs offer two rationales as to why their interests are not "so marginally related to or inconsistent with the purposes implicit in the [INA] that it cannot reasonably be assumed that Congress authorized the plaintiff to sue," Id. at 130 (internal quotation marks omitted), and either one is sufficient to satisfy this lenient standard. See Pls.' Mem. of Law in Oppo. to Defs.' Mot. to Dismiss (Nov. 5, 2019), ECF No. 33, at 3-4 (hereinafter "Oppo.").

10

First, as Judge Talwani of the District of Massachusetts
recently held, the text of the INA reflects a Congressional
"preference that federal immigration enforcement not impede
state criminal law enforcement." Ryan v. U.S. Immigration and
Customs Enf't, 382 F. Supp. 3d 142, 155 (D. Mass. 2019). For
example, section 1231(a)(4)(A) of Title 8 provides that the
agency may not remove an alien who is currently serving a
sentence of imprisonment. Although an alien may be removed while
on parole or supervised release, id., this subparagraph
nonetheless demonstrates Congress's decision, at least in some
circumstances, to respect the determinations of the various
states' criminal justice institutions over those of federal
immigration authorities. Similarly, the U-visa program, see 8
U.S.C. § 1101(a)(15)(U), provides immigration status to alien
crime victims who assist law enforcement. This provision
evidences not only "Congressional intent to offer visas to
vulnerable persons," Defs.' Suppl. Mem. of Law in Further Supp.
Of Mot. to Dismiss (Dec. 3, 2019), ECF No. 42, at 2 (hereinafter
"Defs.' Suppl. Mem."), but also Congressional intent to
facilitate federal, state, and local criminal law enforcement.

Second, plaintiffs here allege the kind of "secondary
economic injuries" resulting from the waste of judicial
resources that the Second Circuit recently held sufficient to
satisfy the zone-of-interests test, "notwithstanding that the

11

statute violated was not intended to protect against the type of injury suffered by the plaintiffs." C.R.E.W. v. Trump, 939 F.3d 131, 154 (2d Cir. 2019); see Compl. ¶¶ 2, 18, 66. Defendants argue that C.R.E.W.'s holding applies only to suits by competing firms, Defs.' Suppl. Mem. 3-4, but the language of the decision is not so narrow. For example, the C.R.E.W. court cited Bank of America Corp. v. City of Miami, 137 S. Ct. 1297, 1303-05 (2017), in which the Supreme Court held that Miami's predatory-lending suit against the bank fell within the Fair Housing Act's zone of interests because of the impact of foreclosures on the municipal budget.

The Court also notes that at least one circuit court has already recognized that state plaintiffs fall within the INA's zone of interests in a different context. See Texas v. United States, 809 F.3d 134, 163 (5th Cir. 2015), aff'd by an equally divided court, 136 S. Ct. 2271 (2016) (challenging the Deferred Action for Childhood Arrivals and Deferred Action for Parents of Americans programs as violations of the INA on the ground that states are harmed as providers of public benefits).

The Court therefore finds that plaintiffs fall within the INA's zone of interests and that plaintiffs therefore have a cause of action for their APA claims under 5 U.S.C. § 702.[3]

---

[3] Defendants also cite additional cases where various non-profit organizations were found not to fall within the INA's zone of

Defendants' second ground for dismissal under Fed. R. Civ. P. 12(b)(1) is that plaintiffs' APA claims are unreviewable because immigration enforcement is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Court rejects this argument as well. While plaintiffs must "clear the hurdle of § 701(a)" before asserting an APA claim, Heckler v. Chaney, 470 U.S. 821, 828 (1985), this hurdle is not very high. An action is "committed to agency discretion by law" only where the statute is "drawn in such broad terms that in a given case there is no law to apply." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971) (emphasis supplied). In other words, agency action is unreviewable "even where Congress has not affirmatively precluded review . . . if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler, 470 U.S. at 830.

As above, defendants cite sections 1226 and 1357 of the INA to demonstrate the agency's broad discretion to enforce the immigration laws and argue that such discretion deprives the court of any meaningful standard against which to judge ICE's

---

interests. E.g., De Dandrade v. U.S. Dep't of Homeland Sec., 367 F. Supp. 3d 174, 188-90 (S.D.N.Y. 2019); INS v. Legal Assistance Project, 510 U.S. 1301 (1993) (in-chambers stay order by O'Connor, J.). But these cases are inapposite to·the instant suit brought by government plaintiffs.

decision to arrest immigrants in and around state courthouses. Mem. 9-11. But as plaintiffs persuasively respond, Oppo. 5-8, defendants' argument presupposes that plaintiffs are wrong on the merits. As discussed below, plaintiffs allege that the INA incorporates a pre-existing common law privilege against civil arrest of those present at a courthouse and those necessarily coming and going. Compl. ¶¶ 106-16. If true, this would provide an obvious standard against which to evaluate the agency's exercise of discretion.[4] See Heckler, 470 U.S. at 830. Even assuming arguendo that plaintiffs were wrong on the merits of this argument, their contention satisfies their burden at this stage of the litigation to present a prima facie case for reviewability. See Robinson, 21 F.3d at 507.

Defendants also attempt to rely on the well-settled proposition that an agency's individual enforcement or prosecutorial determinations are generally committed to its discretion by law. See, e.g., Heckler, 470 U.S. at 831 ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to

---

[4] This argument does not, as defendants claim, conflate APA section 701(a)(2) with section 706(2). See Dep't of Commerce v. New York, 139 S. Ct. 2551, 2568 (2019); Defs.' Suppl. Mem. 4-6. Plaintiffs do not merely assert in the abstract that defendants' conduct violates the INA; they also allege that the common law privilege implicitly adopted by the INA provides a meaningful standard against which to judge the legality of the agency's actions. See 139 S. Ct. at 2568.

an agency's absolute discretion."). But this argument misunderstands the nature of the suit. Plaintiffs do not challenge ICE's decision to arrest particular aliens as opposed to others; they challenge instead what they allege to be a categorical policy to conduct immigration arrests in particular places where the statute (implicitly) and the common law (explicitly) do not permit such arrests. Such a policy would not be committed to unreviewable agency discretion.

Finally, defendants' third jurisdictional ground for dismissal under Rule 12(b)(1) is that the Directive is not final agency action and therefore unreviewable under section 704 of the APA. An agency action is final if two conditions are met: first, "the action must mark the 'consummation' of the agency's decisionmaking process;" and second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (citations omitted).

Defendants concede that the first prong of the finality test is here met, but they argue that the Directive fails the second prong. In defendants' view, the Directive is a general statement of policy that "merely explains how the agency will enforce a statute or regulation — in other words, how it will exercise its broad enforcement discretion . . . under some extant statute or rule." Nat'l Mining Ass'n v. McCarthy, 758

15

F.3d 243, 251-52 (D.C. Cir. 2014); see Mem. 11-12; Defs.' Reply Mem. of Law in Further Supp. Of Mot. to Dismiss (Nov. 13, 2019), ECF No. 38, at 4-5.

Plaintiffs respond, however, that the facts as alleged in the complaint clearly show that the Directive is effectively an interpretive rule. Oppo. 8-9. It does not simply provide guidance to ICE officers on how to exercise their discretion, but rather embodies a conscious change in policy that is based on a new interpretation of the law. Oppo. 8-10. Such an interpretive rule would have legal consequences, as it would subject aliens to civil immigration arrest in settings where they were not previously so subject, and it would therefore be a final agency action. See Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 106 (2015).

The factors distinguishing policy statements from rules include "the actual legal effect (or lack thereof)," "the agency's characterization of the guidance," and "post-guidance events." McCarthy, 758 F.3d at 252-53. While the Directive purports only to offer guidance to officers on how to exercise their enforcement discretion "on a case-by-case basis," Directive § 2 n.1, the "post-guidance events" alleged in plaintiffs' complaint show beyond cavil that the Directive actually embodies a legally-consequential change to the agency's interpretation of the INA. Thus, while courthouse arrests by ICE

16

were not totally unheard of prior to the Directive,
nevertheless, following its promulgation, according to the
Complaint, civil immigration arrests by ICE officers in and
around New York state courthouses increased by 1700 percent.
Compl. ¶ 58; see also Br. of Immigrant Defense Project et al. 3.
Moreover, these arrests have taken place within the courthouses
themselves, e.g., Compl. ¶¶ 79-80, on their thresholds, id. ¶
69, and only a short distance away, e.g., id. ¶¶ 72, 75, 77, 81.
Among the latter category are situations where ICE officers have
identified an alien within a courthouse and then followed her
outside the building to conduct the arrest. E.g., id. ¶ 71.[5]
Efforts by New York State to limit the practice, furthermore,
have been ineffective. See Id. ¶¶ 52-61. A change of this
magnitude necessarily suggests that the Directive embodies ICE's
novel interpretation of its statutory authority to conduct

---

[5] Because of these factual allegations, defendants' argument that
any agency action with respect to arrests around (rather than
within) courthouses is not final under both Bennett prongs is
unavailing. The Directive concededly says nothing on its face
about arrests near or outside of a courthouse. But this Court
has previously held that "an agency need not dress its decision
with the conventional accoutrements of finality" in order to
make it so. U.S. Gypsum Co. v. Muszynski, 161 F. Supp. 2d 289,
291 (S.D.N.Y. 2001) (internal quotation marks and alteration
omitted). Here, ICE's "own behavior belie[s]" its contention
that the Directive does not represent the "consummation of [its]
decisionmaking process" about enforcement actions on the
peripheries of courthouses. Id. (alterations omitted); Bennett,
520 U.S. at 177-78 (internal quotation marks omitted).

17

courthouse arrests, and not merely case-by-case guidance to individual officers.

Legal consequences flow from this interpretation. Particularly instructive on this point is U.S. Army Corps of Engineers v. Hawkes Co., 136 S. Ct. 1807 (2016), which stands for the proposition that an agency's decision to deny a safe harbor to a party subject to regulation is a "legal consequence" for the purpose of a finality analysis. That case involved the U.S. Army Corps of Engineers's practice of issuing "jurisdictional determinations" upon the request of a private party, which determinations notified that party whether or not its property was subject to civil and criminal regulation under the Clean Water Act as "waters of the United States." Respondent Hawkes Co. had requested such a jurisdictional determination of its property; in response, the Army Corps of Engineers notified Hawkes that its property was waters of the United States, though it did not initiate any enforcement proceeding. Hawkes sued to challenge the jurisdictional determination, and the Government moved to dismiss on the ground that the jurisdictional determination was not a final agency action. 136 S. Ct. at 1811-13. The Supreme Court denied the motion to dismiss, holding that the jurisdictional determination was final agency action because it denied a five-year safe harbor from Clean Water Act regulation that Hawkes would otherwise have received. See also

18

Abbott Labs., 387 U.S. at 150 (noting that an agency
interpretation that "would have effect only if and when a
particular action" were brought can still be a final agency
action) (citing Frozen Food Express v. United States, 351 U.S.
40 (1956)).

Here, similarly, the novel interpretation of the INA that
plaintiffs allege to be embodied in the Directive has legal
consequences for the aliens who were not previously subject to
potential enforcement actions at state courthouses, but who now
are, as well as for the proper functioning of the state courts
themselves.[6] U.S. Army Corps of Engineers is, concededly, not
precisely on point, because a favorable jurisdictional
determination in that case would have granted respondent a
binding, five-year safe harbor, while ICE's pre-Directive policy

---

[6] ICE's pre-Directive policy, promulgated in 2014, allowed
courthouse arrests of limited categories of aliens, including
those "engaged in or suspected of terrorism or espionage, or who
otherwise pose a danger to national security," as well as those
"convicted of crimes, with a particular emphasis on violent
criminals, felons, and repeat offenders." Ex. B to Onozawa Decl.
In contrast to the Directive, this policy did not, for example,
allow "individuals who may be 'collaterally' present, such as
family members or friends" accompanying an alien in one of the
prior categories to a court proceeding to be arrested at a
courthouse. Id. Of course, the extent to which enforcement of
the Directive actually differs from enforcement of the 2014
policy is a question of fact to be answered over the course of
this litigation. But for the purposes of this motion to dismiss,
the Court accepts as true the allegation in plaintiffs'
complaint that courthouse arrests have dramatically increased in
response to the Directive. Compl. ¶ 58; Iqbal, 556 U.S. at 678.

19

is not alleged to have prohibited courthouse arrests under all circumstances. 136 S. Ct. at 1812; see Compl. ¶ 58. But under a "pragmatic" view of finality, Abbott Labs., 387 U.S. at 149, the magnitude of the change in policy is sufficient to bear legal consequences for aliens subject to potential immigration enforcement. The Directive therefore is final agency action subject to judicial review.

## **LEGAL SUFFICIENCY**

The Court now proceeds to consider defendants' three substantive arguments under Fed. R. Civ. P. 12(b)(6). The first such argument is addressed to Count One, which claims that the Directive is invalid because it violates the common law privilege against courthouse civil arrests, i.e., the privilege against arresting people in attendance on courthouse matters for unrelated civil violations either while they are on court premises or are traveling to or from court on their court-related matters. This raises two questions. Is the common law privilege still extant? And, if so, did the INA implicitly incorporate this privilege? After careful examination of the history, policy, and application of the common law privilege, as well as the text of the INA, the Court concludes that the answer to each of these questions is yes.

As a starting point, it is patently clear that English common law provided a privilege against any civil arrests in and

20

around courthouses, and also against civil arrests of witnesses and parties necessarily traveling to and from the courthouse.[7] Blackstone's famous Commentaries, on which early U.S. courts heavily relied in incorporating English common law into the laws of the several states and the United States, provides explicitly that:

> Suitors, witnesses, and other persons, necessarily attending any courts of record upon business, are not to be arrested during their actual attendance, which includes their necessary coming and returning. And no arrest can be made in the king's presence, nor within the verge of his royal palace, nor in any place where the king's justices are actually sitting.

3 William Blackstone, Commentaries on the Laws of England 289 (1768). Furthermore, although the privilege goes back to at least the fifteenth century, Lasch, supra n.7, at 423, English courts reconfirmed this privilege in several late eighteenth and early nineteenth century cases, i.e., at the very time that English common law was being incorporated into the laws of the new states of the nascent American republic. See, e.g., Meekins v. Smith (1791), 126 Eng. Rep. 363, 363 ("[A]ll persons who had relation to a suit which called for their attendance, whether they were compelled to attend by process or not, (in which

---

[7] See generally Br. of Immigration Law Scholars as Amici Curiae in Supp. of Pls. (Nov. 5, 2019), ECF No. 32 (hereinafter "Br. of Immigration Law Scholars"); Christopher N. Lasch, A Common-Law Privilege To Protect State and Local Courts During the Crimmigration Crisis, 127 Yale L.J. F. 410, 432-439 (2017).

number bail were included) were intitled [sic] to privilege from arrest eundo et redeundo [going and returning], provided they came bona fide."); Walpole v. Alexander (1782), 99 Eng. Rep. 530, 530-31 (holding that a witness from France could not be arrested in England while in the country to testify in another case); Orchard's Case (1828), 38 Eng. Rep. 987, 987-88 (holding that a lawyer who was arrested while he was at a court in a non-professional capacity was not validly arrested).

The purposes of this privilege were both to encourage parties and witnesses "to come forward voluntarily," Walpole, 99 Eng. Rep at 531; The King v. Holy Trinity in Wareham (1782), 99 Eng. Rep. 530, 530-31, and also to maintain order in the courthouse, Orchard's Case, 38 Eng. Rep. at 987 ("To permit arrest to be made in the Court would give occasion to perpetual tumults . . . ."). It thus served, in either case, to enable courts to function properly.[8]

There is no real dispute between the parties here that this privilege was adopted into American common law after independence. But they differ as to whether it is still operative. To be sure, these early cases all occurred at a time when civil arrest of the defendant was the means by which a plaintiff initiated a civil suit. See Br. of Immigration Law

---

[8] See generally cases cited at Oppo. 16-18; and Br. of Immigration Law Scholars 8-10, 15-16.

Scholars at 8; Ryan, 382 F. Supp. 3d at 155-56 (citing Nathan Levy, Jr., Mesne Process in Personal Actions at Common Law and the Power Doctrine, 78 Yale L.J. 52 (1968)). Service of process ultimately replaced this form of civil arrest, and as a result, civil arrests in their earlier form were largely extinct at the time of the adoption of the INA. And, while criminal arrests remained, the common law privilege was never thought to apply to criminal arrests.

However, with the rise of the regulatory state, new forms of civil arrest arose, the most common of which are arrests of allegedly undocumented aliens. See I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1039 (1984)("A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime."). The immediate question therefore is whether the common law privilege applies to such arrests.

The answer is plainly yes. The continuing availability of the common law privilege, and its breadth, is shown by the fact that even after the former kind of civil arrest had become obsolete, and before regulatory civil arrests had become common, both the highest court of New York and the U.S. Supreme Court continued to apply the privilege even when the intrusion was not an actual arrest but only a disruptive service of process. The

23

first such New York case, Person v. Grier, 66 N.Y. 124 (1876), involved a resident of Pennsylvania, William Grier, who was served with process for a New York civil action while in New York in order to serve as a witness in a separate matter. The Court of Appeals held that Grier was immune from service of process in New York under the circumstances, writing that:

> It is the policy of the law to protect suitors and witnesses from arrests upon civil process while coming to and attending the court and while returning home. Upon principle as well as upon authority their immunity from the service of process for the commencement of ·civil actions against them is absolute eundo, morando et redeundo.

Id. at 125. Similarly, in Parker v. Marco, 136 N.Y. 585 (1893), a resident of South Carolina who was the defendant in an action in federal court in that state came to New York to attend a deposition of the plaintiff. The next day, as the defendant was beginning his journey back to South Carolina, the plaintiff served him with process for a new suit in New York state court that arose out of the same cause of action as the first lawsuit. The Court of Appeals held this defendant immune from suit, noting that the privilege "has always been held to extend to every proceeding of a judicial nature" and that "[i]t is not simply a personal privilege, but it is also the privilege of the court, and is deemed necessary for the maintenance of its authority and dignity and in order to promote the due and efficient administration of justice." Id. at 589.

24

The leading U.S. Supreme Court case, Stewart v. Ramsay, 242 U.S. 128 (1916), likewise held that a Colorado resident was immune from civil service of process in Illinois while in that state to testify in a case where he was the plaintiff. The rule articulated in that case is that "suitors, as well as witnesses, coming from another state or jurisdiction, are exempt from the service of civil process while in attendance upon court, and during a reasonable time in coming and going." Id. at 129.[9]

What these cases demonstrate is that the common law privilege against courthouse arrests had as its fundamental purpose the protection of the courts in carrying out their functions, and that this policy was so strong that, even in the brief period when civil arrests became rare, the privilege was extended to service of process. Far from being abandoned, therefore, the privilege was being expanded. This is as much as stated in Person, where the highest New York court held that "[i]t is the policy of the law to protect suitors and witnesses from arrests upon civil process while coming to and attending the court and while returning home." 66 N.Y. at 125 (emphasis

---

[9] While plaintiffs' argument rests on the contention that this privilege was incorporated into the common law of the various states, specifically New York, Stewart recognized this privilege as a matter of federal common law as well, and did so in part because of its ubiquity among the common laws of the states. See 242 U.S. at 130 ("The state courts, with few exceptions, have followed this rule . . . .").

supplied). A fortiori this privilege extends to civil

immigration arrests.[10]

But, although we are ultimately concerned here with a New

York state privilege recognized by the INA, this conclusion is

also reinforced at the federal level by the limited privilege

_____

[10] At oral argument before the Court, see Transcript 11/20/19 at
16:25-17:11, defendants sought to narrow the thrust of these
cases by citing Netograph Mfg. Co. v. Scrugham, 197 N.Y. 377
(1910), which in their view demonstrates that the privilege
against courthouse civil arrest attaches only when the arrestee
travels out of her state of residence for the purpose of
attending a court proceeding. See also United States v. Green,
305 F. Supp. 125, 128 (S.D.N.Y. 1969) ("The rule of immunity was
seen as generally applicable to persons ordinarily without the
jurisdiction of a court, and, therefore, necessarily not
amenable to its service of process, who appeared within that
jurisdiction solely with respect to the cause there already
underway."). Netograph held that a citizen of Ohio who was in
New York as a defendant in a criminal trial was not immune from
being served with process in an unrelated civil case as he was
leaving the state following his acquittal. But Netograph is
totally distinguishable, because it dealt with the situation
where the defendant who appeared in court was there not
voluntarily, but because he was a defendant in a criminal case.
The court reasoned that the justification for the common law
privilege "is to encourage voluntary attendance upon courts and
to expedite the administration of justice," and that "that
reason fails when a suitor or witness is brought into the
jurisdiction of a court while under arrest or other compulsion
of law." Id. at 380. (Given the historical scope of the
privilege, the Court notes without deciding a separate issue as
to whether even such a criminal defendant could be arrested
within a courthouse, rather than during his travels to and from
the courthouse as the defendant in Netograph was. See Parker,
136 N.Y. at 589 ("It is not simply a personal privilege, but it
is also the privilege of the court, and is deemed necessary for
the maintenance of its authority and dignity and in order to
promote the due and efficient administration of justice.").)

from arrest that the U.S. Constitution grants to legislators, which also suggests that the courthouse privilege continues to cover more than just service of process. See U.S. Const. art. I, § 6, cl. 1 ("The Senators and Representatives . . . shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same . . . ."). These two doctrines are historically related. As the Supreme Court has recognized, the Framers modelled the privilege for legislators on the privilege against courthouse arrests for ordinary litigants. Williamson v. United States, 207 U.S. 425, 443 (1908) ("This privilege is conceded by law to the humblest suitor and witness in a court of justice; and it would be strange indeed if it were denied to the highest functionaries of the state in the discharge of their public duties.") (quoting Joseph Story, Commentaries on the Constitution of the United States § 859 (1833)). The scope of the privilege contained in the Speech or Debate Clause is, accordingly, evidence of the scope of the common law privilege. Indeed, it would be odd to read the latter privilege to no longer cover arrest when the former privilege, enshrined in the Constitution, undoubtedly does.

Finally, and most importantly, the policy objectives cited for hundreds of years by English and American courts to justify

the common law privilege against civil courthouse arrests apply equally to modern-day immigration arrests. The first such objective that English courts cited to justify the privilege was the desire to encourage parties "to come forward voluntarily," Walpole, 99 Eng. Rep at 531. American courts have recognized this same purpose. See, e.g., Person, 66 N.Y. at 126 ("Witnesses might be deterred, and parties prevented from attending . . . ."); Netograph, 197 N.Y. at 380 ("[T]he obvious reason of the rule is to encourage voluntary attendance upon courts and to expedite the administration of justice . . . ."); Stewart, 242 U.S. at 129 ("[T]he fear that a suit may be commenced [at a court] by summons will as effectually prevent his approach as if a capias might be served upon him."). According to the facts here alleged, ICE's Directive undermines this purpose by deterring immigrants from appearing in court, thus denying them an opportunity to seek justice in their own cases and impeding civil suits and criminal prosecutions by dissuading them from serving as witnesses. See Compl. ¶¶ 88-105; Oppo. 20-22; Br. of Former Judges 3-11; Br. of Immigrant Defense Project et al.

The second and even more fundamental purpose of the privilege is to enable courts to function properly. See, e.g., Orchard's Case, 38 Eng. Rep. at 987 ("To permit arrest to be made in the Court would give occasion to perpetual tumults . . . ."); Person, 66 N.Y. at 126 ("[D]elays might ensue or injustice

be done."); Parker, 136 N.Y. at 589 ("It is not simply a
personal privilege, but it is also the privilege of the court,
and is deemed necessary for the maintenance of its authority and
dignity and in order to promote the due and efficient
administration of justice."). The Directive undermines this
purpose as well. It has caused precisely the delays, re-
schedulings, waste, and disruptions that so many earlier courts
feared. See Compl. ¶¶ 68, 70, 75; Oppo. 21-22; Br. of Former
Judges 10-14. This reason, more than any other, compels the
Court to find that, as a matter of New York law, aliens are
privileged from immigration arrest while present at courthouses
and during their necessary coming and going therefrom.

Of course, the ICE agents conducting these arrests act
under authority of federal law, not New York law. The ultimate
question then is whether the federal immigration statute, which
is silent on this issue, incorporates the common law privilege,
here applicable to the courts of New York. Plaintiffs argue that
it does, while defendants, on their second substantive argument
for dismissal under Fed. R. Civ. P. 12(b)(6), argue that the INA
preempted and therefore invalidated any potential common law
privilege under the law of New York State.

There is a general presumption in favor of plaintiffs'
position. The Supreme Court has held in numerous contexts that
"statutes which invade the common law are to be read with a

29

presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." United States v. Texas, 507 U.S. 529, 534 (1993) (internal quotation marks and alterations omitted). Similarly, to the extent that the question implicates issues of federalism, the Supreme Court has also explained that courts should interpret federal statutes not to "alter the usual constitutional balance between the States and the Federal Government" unless Congress's "intention to do so" is "unmistakably clear in the language of the statute." Gregory v. Ashcroft, 501 U.S. 452, 460 (1991) (quoting Will v. Mich. Dep't of State Police, 491 U.S. 58, 65 (1989))(internal quotation marks omitted). The standard for finding that federal law has preempted state law is that such a result must have been "the clear and manifest purpose of Congress." City of Milwaukee v. Illinois and Michigan, 451 U.S. 304, 316 (1981) (citing Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)).

Gregory v. Ashcroft is particularly relevant. In that case, Missouri state judges challenged a provision of the state constitution that imposed a mandatory retirement age of seventy, arguing that the state law violated the Equal Protection Clause of the Fourteenth Amendment and was preempted by the federal Age Discrimination in Employment Act of 1967. The Governor of Missouri, as respondent, argued that the statute did not violate

30

Equal Protection and that the state judges fell within the federal statute's exemption for "appointees . . . 'on a policymaking level.'" 501 U.S. at 455-56. On the preemption argument, the Supreme Court construed the statute not to prohibit a mandatory retirement age for state judges. Noting the important federalism interests in allowing "the people of Missouri [to] establish a qualification for those who sit as their judges," Id. at 460, the Court applied a plain statement rule and held that the statute was not sufficiently clear that Congress intended to displace state law in this area. Id. at 464.

In the instant case, this Court similarly finds no indication in the language of the statute that the "clear and manifest purpose of Congress" was to abrogate the relevant state common law, City of Milwaukee, 451 U.S. at 316, and consequently holds that the statute incorporates the privilege.

As evidence for the requisite Congressional intent, defendants again cite the agency's broad arrest authority under sections 1226 and 1357 of Title 8 and argue that these provisions demonstrate that federal immigration regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." Rice, 331 U.S. at 230; Mem. 19-24. But this language from Rice is inapposite. The state common law at issue does not "supplement" the federal

31

regulatory scheme at all, but rather creates a very narrow limitation on federal enforcement authority that is tailored to protect states' interests in managing their own judicial systems and one that, indeed, has been recognized as a matter of federal common law as well. See Stewart, 242 U.S. 128; Lamb v. Schmidt, 285 U.S. 222 (1932). Defendants' reading of the statute would effectively bar states' sovereign interests from imposing any limitations on ICE's enforcement discretion, which is a reading that is not "clear and manifest" from the language of the statute. City of Milwaukee, 451 U.S. at 316.

Second, and relatedly, defendants argue that "the federal government has exclusive authority over immigration," Mem. 21, and that state law cannot undermine federal power in this area. See Rice, 331 U.S. at 230 (holding that the clear statement rule may be satisfied where "the Act of Congress . . . touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."); Arizona v. United States, 567 U.S. 387, 394 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."). This argument is also unpersuasive. The issue is not whether Congress could displace state common law in this area, but whether the general language of the INA in fact did. Insofar as defendants are arguing that any state law touching

upon immigration is presumptively invalid, the language of the INA does not compel such a result. While the statute preempts state laws that criminalize federal immigration violations, see Arizona, 567 U.S. at 410, it does not necessarily preempt state laws that narrowly limit federal enforcement authority.

Third, in what is probably their strongest argument, defendants point to section 1229(e) of the INA, which is the only place where the statute mentions courthouse arrests. Section 1229(e), read in conjunction with its cross-reference to section 1367, provides that, when "an enforcement action leading to a removal proceeding" takes place at a courthouse, and the alien arrested is appearing in connection with a protection order, child custody, domestic violence, sexual assault, trafficking, or stalking case, immigration officers may not use certain types of information from the proceeding in making an adverse determination of deportability. See 8 U.S.C. §§ 1229(e)(1)-(2)(B) & 1367. This section suggests that Congress did anticipate at least some arrests occurring at courthouses. But as plaintiffs convincingly respond, Oppo. 14-15, the section could fairly be read as referring to criminal arrests, against which the state common law privilege does not protect. Furthermore, this provision does not necessarily speak to ICE's arrest authority at all; rather, it may be anticipating criminal arrests by state and local police forces, which lead to eventual

33

ICE removal proceedings. Furthermore, the provision is plausibly viewed as a prophylactic against ICE actions that target aliens based on their participation in judicial proceedings; as plaintiffs argue, id., it would be odd to view a provision meant to encourage aliens' attendance at court as evidence of Congressional intent to allow ICE to undermine that very objective. For these reasons, section 1229(e) of the INA does not demonstrate that Congress unambiguously intended to displace the state common law privilege against courthouse civil arrests.

As their final argument under Fed. R. Civ. P. 12(b)(6), defendants argue that Count Three fails to state a Tenth Amendment claim. The crux of plaintiffs' Tenth Amendment argument is that the Directive undermines New York's sovereign interests by "interfering with state court operations and impeding criminal prosecutions." Compl. ¶ 139. The defendants respond that this is not the kind of interference that involves "commandeering" of state agents that in their view is necessary to a Tenth Amendment claim. Mem. 24-25; see Murphy v. Nat'l Collegiate Athletic Ass'n, 138 S. Ct. 1461, 1475 (2018). Here, however, the Complaint unmistakably alleges a type of commandeering similar to those that the Supreme Court has found to lie at the heart of a Tenth Amendment cause of action. See Murphy, 138 S. Ct. 1461, Printz v. United States, 521 U.S. 898 (1997); New York v. United States, 505 U.S. 144 (1992). The

34

clear implication of the facts alleged in plaintiffs' complaint is that ICE's policy has commandeered state and local judges and court officials not to take action in response to ICE's arrests, even when the federal agency causes great disruption to the functioning of the state judiciary and the state agents would therefore normally intervene. See, e.g., Compl. ¶¶ 69, 74, 75, 77, 78. Plaintiffs accordingly state a Tenth Amendment claim. See Murphy, 138 S. Ct. at 1475-78.

## CONCLUSION

For the aforementioned reasons, the motion to dismiss is hereby denied with respect to all of plaintiffs' claims for relief. The stay granted from the bench at oral argument is lifted, and the case management plan adopted on October 8, 2019 is amended as follows:

The administrative record is to be filed by no later than January 3, 2020; all discovery is to be completed by February 28, 2020; moving papers for any post-discovery summary judgment motions are to be filed no later than March 13, 2020, with answering papers by no later than March 27, 2020 and reply papers by no later than April 3, 2020; and a final pre-trial conference, as well as oral argument on any summary judgment motions, will be held on April 14, 2020 at 11:00 AM.

SO ORDERED.

Dated:    New York, NY

          December 19, 2019

          JED S. RAKOFF, U.S.D.J.