**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK, et al.,

              Plaintiffs,

      v.

UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT,
et al.,

              Defendants.

19 Civ. 8876 (JSR)

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES. ................................................................................................ ii

PRELIMINARY STATEMENT. ..........................................................................................1

STATEMENT OF THE CASE.............................................................................................2

     A.    Prior to 2017, ICE Severely Limits Civil Immigration Arrests in or Near State Courthouses.................................................................................................2

     B.    In 2017, ICE Begins an Unprecedented Campaign of Civil Immigration Arrests In and Around New York State Courthouses. ...........................................4

     C.    ICE Confirms Its New Courthouse Civil Arrest Policy and Claims Sweeping Power to Operate In and Around State Courts.......................................6

     D.    OCA Attempts to Protect the Integrity of New York Courts...................................9

     E.    ICE's Campaign of Arrests Disrupts the Functioning of New York's Court System and Deters People from Accessing the Courts.........................................10

STANDARD OF REVIEW. ...............................................................................................12

ARGUMENT  ....................................................................................................................13

I.     ICE's Courthouse Civil Arrest Policy Exceeds The Agency's Statutory Authority. ........13

II.    ICE's Courthouse Civil Arrest Policy Is Arbitrary and Capricious....................................15

III.   ICE's Courthouse Civil Arrest Policy Violates the Tenth Amendment. ...........................20

     A.    The Tenth Amendment Prohibits Improper Interference with State Sovereignty. .......................................................................................................20

     B.    ICE Is Violating the Tenth Amendment. ..............................................................22

          1.    ICE is interfering with New York's sovereign right to maintain an independent judiciary..................................................................................22

          2.    ICE is improperly leveraging New York's sovereign actions to serve federal purposes. .....................................................................................24

CONCLUSION....................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Alden v. Maine,*
  527 U.S. 706 (1999)..........................................................................................21, 23

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
  458 U.S. 592 (1982)..................................................................................................24

*American Wild Horse Pres. Campaign v. Perdue,*
  873 F.3d 914 (D.C. Cir. 2017)..................................................................................17

*AT&T Info. Sys., Inc. v. General Servs. Admin.,*
  810 F.2d 1233 (D.C. Cir. 1987)................................................................................20

*Atlantic Coast Line R.R. v. Brotherhood of Locomotive Eng'rs,*
  398 U.S. 281 (1970)..........................................................................................21, 24

*Burlington Truck Lines v. United States,*
  371 U.S. 156 (1962)..........................................................................................15, 19

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)..................................................................................................12

*Chick Kam Choo v. Exxon Corp.,*
  486 U.S. 140 (1988)..................................................................................................21

*City of Milwaukee v. Illinois and Michigan,*
  451 U.S. 304 (1981)..................................................................................................13

*City of New York v. United States,*
  179 F.3d 29 (2d Cir. 1999)........................................................................................22

*Coyle v. Smith,*
  221 U.S. 559 (1911)..................................................................................................21

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009)..................................................................................................15

*Gregory v. Ashcroft,*
  501 U.S. 452 (1991)..........................................................................................13, 21

*Heath v. Alabama,*
  474 U.S. 82 (1985)............................................................................................21, 23

*Kaufman v. Kaye,*
  466 F.3d 83 (2d Cir. 2006)........................................................................................21

ii

**Cases**                                                                                           **Page(s)**

*Massachusetts v. Department of Health & Human Servs.*,
   682 F.3d 1 (1st Cir. 2012) ........................................................................................21

*Michigan v. EPA*,
   135 S. Ct. 2699 (2015) ...........................................................................................19

*Mingo Logan Coal Co. v. EPA*,
   829 F.3d 710 (D.C. Cir. 2016) ..............................................................................17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..........................................................................15, 17, 18, 20

*Murphy Bros. v. Michetti Pipe Stringing, Inc.*,
   526 U.S. 344 (1999) ...............................................................................................13

*Murphy v. NCAA*,
   138 S. Ct. 1461 (2018) .....................................................................................21, 23

*National Ass'n of Regulatory Utility Comm'rs v. Interstate Commerce Comm'n*,
   41 F.3d 721 (D.C. Cir. 1994) ................................................................................19

*New York v. Dep't of Health & Human Servs.*,
   414 F. Supp. 3d 475 (S.D.N.Y. 2019) ..................................................................12

*New York v. Department of Justice*,
   No. 19-267, 2020 WL 911417 (2d Cir. Feb. 26, 2020) ........................................22

*New York v. United States*,
   505 U.S. 144 (1992) .....................................................................................20, 22, 24

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ...............................................................................................21

*Orchard's Case*,
   38 Eng. Rep. 987 (1828) ........................................................................................14

*Parker v. Marco*,
   136 N.Y. 585 (1893) ..............................................................................................13

*Person v. Grier*,
   66 N.Y. 124 (1876) ..........................................................................................13, 14

*Printz v. United States*,
   521 U.S. 898 (1997) ...............................................................................................21

*United States v. Texas*,
   507 U.S. 529 (1993) ...............................................................................................13

**Cases**                                                                   **Page(s)**

*Walpole v. Alexander*,
    99 Eng. Rep 530 (1782) ............................................................................14

*Younger v. Harris*,
    401 U.S. 37 (1971) ...................................................................................21

**Constitutions**

N.Y. Const. art. VI ..........................................................................................2

U.S. Const. amend. X .....................................................................................20

**Laws and Rules**

5 U.S.C. § 706 ..........................................................................................12, 15

N.Y. Judiciary Law
    § 210.......................................................................................................23
    § 212.......................................................................................................23

8 C.F.R. § 287.5 ...............................................................................................3

Fed. R. Civ. P. 56...........................................................................................12

**Miscellaneous**

The Federalist No. 45 (Madison) ...................................................................21

## PRELIMINARY STATEMENT

As this Court previously held, the Immigration and Nationality Act (INA) incorporates the ancient "common law privilege against civil arrests on courthouse premises and against arrests of parties and other persons necessarily traveling to or from court."  Opinion and Order at 1, 31 (December 19, 2019), ECF No. 51 (MTD Op.).  The Administrative Record and the evidence produced in discovery now show conclusively that U.S. Immigration and Customs Enforcement (ICE) has been violating this privilege—and thus exceeding its statutory authority—by pursuing a policy of conducting civil immigration arrests in and around New York state courthouses.  That policy represents a sharp and unjustified departure from ICE's prior practice, leading to massive increases in courthouse arrests.  There is no material dispute that these arrests have undercut the interests served by the common-law privilege and undermined the effective functioning and sovereign dignity of New York's courts.  Plaintiffs are entitled to summary judgment on each of their claims.

*First*, ICE's courthouse civil arrest policy is contrary to law under the Administrative Procedure Act (APA) because it exceeds the agency's authority under the INA.  ICE does not seriously dispute that it has deliberately targeted state courthouses as convenient locations for making civil immigration arrests, based on its asserted legal position that there is no restriction whatsoever on its ability to conduct courthouse arrests.  But this Court has already rejected that extreme interpretation of ICE's civil arrest authority and recognized that the INA effectively incorporates the common-law privilege against civil arrests in and around state courthouses.

*Second*, ICE's courthouse civil arrest policy is also arbitrary and capricious under the APA because ICE has failed to adequately justify its stark departure from the agency's prior policies,

which recognized the importance of respecting state courthouses.  Although ICE has provided conclusory rationales for its new arrest policy—including the purported "safety risks" of non-courthouse arrests—the Administrative Record lacks any evidence about the significance of those interests, and no analysis whatsoever of how these interests outweigh the harm to individuals and the serious burden on the orderly functioning of state courts caused by federal interference with state prosecutions and judicial proceedings.

*Third*, ICE's courthouse civil arrest policy violates the Tenth Amendment, which protects core aspects of New York's sovereignty from federal interference or exploitation.  New York has the sovereign prerogative to maintain an independent judicial system.  But here, the record shows that ICE's policy has directly interfered with New York's sovereign right to maintain its own courts, including by co-opting New York's sovereign actions—for example, maintaining security in state courthouses and compelling attendance by witnesses or litigants—to support the federal government's own divergent policy objectives.

## STATEMENT OF THE CASE

### A.   Prior to 2017, ICE Severely Limits Civil Immigration Arrests in or Near State Courthouses

New York operates one of the oldest and busiest court systems in the Nation.  *See* R. 56.1 Stmt. ¶ 8.[1]  New York's Constitution provides for an independent judiciary, operating statewide through a single Unified Court System (UCS) that includes courts of general jurisdiction, local courts, specialized courts like Family Court, and "problem-solving courts" like the Queens Human Trafficking Intervention Court.  *See* N.Y. Const. art. VI; R. 56.1 Stmt. ¶¶ 8-9.

---

[1] Citations herein to "R. 56.1 Stmt." are to Plaintiffs' Statement of Material Facts filed pursuant to Local Rule 56.1 along with this Memorandum of Law.  Citations to "AR" are to the Administrative Record filed on the docket at ECF Nos. 55 and 75.

"Courts cannot be expected to function properly if third parties (not least the executive branch of the government) feel free to disrupt the proceedings and intimidate the parties and witnesses by staging arrests for unrelated civil violations in the courthouse, on court property, or while the witnesses or parties are in transit to or from their court proceedings."  MTD Op. at 1.  In recognition of this fact, ICE, prior to 2017, strongly discouraged its agents from making civil immigration arrests in or around state courthouses.[2]  ICE forbade agents from initiating removal proceedings against victims or witnesses of crimes, and admonished agents to avoid any action that might undercut the "willingness and ability of victims, witnesses, and plaintiffs to call police and pursue justice."  AR 110-112 (ICE Policy No. 10076.1, *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs*, at 1 (June 17, 2011)); *accord* R. 56.1 Stmt. ¶¶ 23-24, 32-33, 35.  With respect to courthouses, ICE's formal policies regarding all arrests (civil or criminal) and all courthouses (federal or state) provided that only "Priority 1 aliens"—a narrow group of people engaged in serious criminal activity, such as terrorism or violent gang activity—could be arrested in or near courthouses.  *E.g.*, R. 56.1 Stmt. ¶¶ 16-20, 25-31, 34; *see also* AR 76 (Memorandum from Philip T. Miller, *Enforcement Actions at or Near Courthouses* (Mar. 19, 2014)); AR 171-172.

Civil immigration arrests in and around New York courthouses were accordingly rare before 2017.  *E.g.*, R. 56.1 Stmt. ¶ 61.  The Executive Director of New York's Office of Court Administration (OCA), John McConnell, testified that, in his decades of experience, ICE operations in state courthouses had never been an issue prior to 2017.  R. 56.1 Stmt. ¶ 77 (citing

---

[2] This proceeding is limited to ICE's authority to conduct civil immigration arrests.  *See* Compl. ¶ 1 (ECF No. 1).  ICE agents also conduct a much more limited number of criminal arrests—by executing arrest warrants signed by a judge, s*ee* 8 C.F.R. § 287.5(e)(4)—but that distinct arrest authority is not at issue here.

McConnell Dep. Tr. 41).  The Bureau Chief of the Brooklyn DA's Domestic Violence Bureau, who has worked for the DA's office continually since 1992, testified that she had never heard of ICE courthouse activity prior to 2017.  R. 56.1 Stmt. ¶ 61 (citing Brooklyn DA 30(b)(6) (Kaminsky Dep. Tr. 16, 53).  Another attorney who practices frequently in the state courts said that, prior to 2017, she had never seen an ICE arrest in or around a courthouse.  R. 56.1 Stmt. ¶ 61 (citing Hu Decl. ¶ 14); *see also, e.g.*, R. 56.1 Stmt. ¶ 73.

### B.      In 2017, ICE Begins an Unprecedented Campaign of Civil Immigration Arrests In and Around New York State Courthouses

In 2017, just days after taking office, President Trump issued a sweeping Executive Order designed to "take the shackles off" ICE and other federal immigration enforcers.  *See* R. 56.1 Stmt. ¶ 36; *see also* Exec. Order No. 13,768, *Enhancing Public Safety in the Interior of the United States*, 82 Fed. Reg. 8799 (Jan. 30, 2017) (included in AR 71-75).  The Executive Order directed ICE to "employ all lawful means" to enforce immigration laws "against all removable aliens," and mandated that DHS and ICE abandon their existing enforcement priorities.  *See* R. 56.1 Stmt. ¶ 37. Within days, the Executive Order had been circulated to local ICE officers and supervisors, who immediately understood that prior restrictions on courthouse arrests were no longer operative.  *See* R. 56.1 Stmt. ¶ 39 (citing ICE 30(b)(6) Day 2 Dep. Tr. 128-30; Brophy Dep. Tr. 92-93; Judge Dep. Tr. 23, 44-45; McGinnity Dep. Tr. 217; Williams Dep. Tr. 108).  The next month, the Department of Homeland Security (DHS) formally announced that it was rescinding its enforcement priorities and would "no longer . . . exempt classes or categories of removable aliens from potential enforcement."  R. 56.1 Stmt. ¶¶ 40-42 (quoting DHS Secretary Kelly, *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017) (included in AR 91-96)).  DHS encouraged ICE officers to "initiate enforcement actions against removable aliens encountered during the performance of their official duties."  R. 56.1 Stmt. ¶ 41; *see also* AR 94.

4

ICE immediately began a wave of new civil immigration enforcement targeting state courthouses.  ICE's own records show that in New York, the number of ICE arrests conducted in or around New York courthouses rose dramatically beginning in February 2017.  *See* R. 56.1 Stmt. ¶ 63.  Independent surveys also found a massive increase in the number of courthouse arrests at this time.  *See, e.g.*, R. 56.1 Stmt. ¶ 63 (citing Immigrant Def. Project, *The Courthouse Trap: How ICE Operations Impacted New York's Courts in 2018*, at 6 (Jan. 2019) (suggesting 1700% increase)).  OCA's records show that ICE has conducted law enforcement operations on at least a weekly basis since the agency implemented its new policy.  *See* R. 56.1 Stmt. ¶ 66 (citing Thorsfeldt Decl. ¶¶ 4-7 & Chart 1).  And prosecutors and public defenders have corroborated the huge increase in ICE arrests in and around New York courthouses.  *See, e.g.*, R. 56.1 Stmt. ¶ 63.  In Albany, one public defender noted a "marked increase" in ICE arrests, not just in the criminal courts but also in the local regional traffic courts, where ICE arrested people attending court on "charges related to broken taillights and driving on an expired driver's license."  R. 56.1 Stmt. ¶ 63 (quoting Milstein Decl. ¶¶ 5, 9).  In Manhattan, practitioners said they had never seen ICE courthouse arrests before 2017 but had seen dozens since then.  R. 56.1 Stmt. ¶ 63 (quoting S. Oshiro Decl. ¶ 7 and Hu Decl. ¶ 14).

ICE has conducted arrests in both criminal and non-criminal courts—"in the courtroom, in the vestibules outside of the courtrooms, in the hallways, outside the courthouse, and in the court parking lot," according to one practitioner.  R. 56.1 Stmt. ¶ 63 (quoting S. Oshiro Decl. ¶ 7).  ICE officers have arrested a victim at the Queens Human Trafficking Intervention Court; parties attending Family Court hearings, including some with no criminal record at all; and people attending local village and town courts across the State.  *See* R. 56.1 Stmt. ¶¶ 70-72 (citing Milstein Decl. ¶ 9; Gaudio Decl. ¶¶ 4, 10; Panjwani Decl. ¶ 20).  And ICE's arrests sometimes involve the

5

use of "significant physical force and violence."  R. 56.1 Stmt. ¶ 63 (citing S. Oshiro Decl. ¶ 7).

ICE officers have been observed slamming arrestees to the ground, shoving them into unmarked

cars, and in one case even breaking a courthouse door.  *See, e.g.*, R. 56.1 Stmt. ¶ 138.  One

courthouse observer described an arrest in broad daylight on the steps of the New York County

Supreme Court that involved four ICE officers slamming a man to the ground and pushing him

into an unmarked vehicle.  R. 56.1 Stmt. ¶ 138 (citing Hu Decl. ¶ 24); *see also, e.g.*, R. 56.1 Stmt.

¶ 138 (citing Epstein Decl. ¶ 14 (describing arrestee being violently brought to the ground as

"scared and bewildered" members of the public looked on)).

### C.   ICE Confirms Its New Courthouse Civil Arrest Policy and Claims Sweeping Power to Operate In and Around State Courts

Since President Trump's 2017 Executive Order, ICE has made clear that it is pursuing a

new and more aggressive policy of courthouse arrests.  When state judges across the country raised

concerns about the harms being inflicted by ICE's new enforcement campaign, ICE reiterated its

stance.  For example, in March 2017, the Chief Justice of California wrote to DHS to express

concern about ICE agents "stalking" defendants, witnesses, and others in California courthouses.

R. 56.1 Stmt. ¶ 114.  Similarly, in April 2017, Oregon's Chief Justice formally requested that ICE

stop making courthouse civil arrests and explained that "ICE's increasingly visible practice of

arresting and detaining individuals in or near courthouses" was deterring legal residents and

citizens, as well as undocumented people, "from coming to court when they should."  AR 164-

166.  Numerous other judges and court administrators raised similar concerns.  *See* R. 56.1 Stmt.

¶¶ 115, 118, 125.

Federal officials responded by confirming that ICE was targeting state courthouses for civil

immigration arrests and defended ICE's unrestricted legal right to pursue this policy.  For example,

then-DHS Secretary John Kelly and then-Attorney General Jefferson Sessions responded to

California's Chief Justice by arguing that ICE agents had the right to "arrest these aliens in public places," and justified this policy by arguing that, because "certain jurisdictions" did not facilitate ICE arrests in their local prisons and jails, ICE specifically sought to operate in state courthouses where "visitors are typically screened upon entry."  AR 134-135.  ICE's then-acting director Thomas Homan made the same arguments in a series of 2017 letters, stating that "ICE will continue conducting targeted enforcement operations at courthouses."  AR 160; AR 188-190. Homan also confirmed the policy in testimony before Congress in June 2017.  Asked by Representative Nita Lowey about the wave of ICE courthouse arrests, Homan argued that "[c]ourthouses is [sic] a place we should be arresting people" and that an undocumented person, wherever they are, "should be looking over his shoulder if he is in this country in violation of the law."  R. 56.1 Stmt. ¶ 280; *see also* R. 56.1 Stmt. ¶ 283.  And in April 2017, a DHS spokesman stated that crime victims and witnesses would also be subject to arrest at the courthouse: "Just because they're a victim in a certain case does not mean there's not something in their background that could cause them to be a removable alien."  R. 56.1 Stmt. ¶ 282.

In January 2018, ICE issued written guidance addressing courthouse civil arrests.  R. 56.1 Stmt. ¶ 48 (citing Ex. 53, *Civil Immigration Enforcement Actions Inside Courthouses*, at 1-2 (Jan. 10, 2018)) (the "Directive" or "Courthouse Civil Arrest Directive").  The Directive reiterated ICE's view that ICE officers possess broad power to make civil arrests in and around state courthouses.  The Directive explained that "many individuals appearing in courthouses for one matter are wanted for unrelated criminal or civil violations."  Courthouse Civil Arrest Directive at 1.  And the Directive reasoned that such arrests were safer for ICE officers because "[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband."  *Id.*

The Directive did suggest that agents "avoid unnecessarily alarming the public" and "minimize their impact on court proceedings," but it did not elaborate on those concerns or meaningfully limit ICE's ability to conduct courthouse arrests. For example, the Directive states that "[a]liens encountered during a civil immigration enforcement action inside a courthouse" who are not "targeted alien[s] . . . will not be subject to . . . enforcement action, absent special circumstances," but then says that ICE agents can decide when there are "special circumstances" "on a case-by-case basis." Courthouse Civil Arrest Directive at 1-2 & n.1. Similarly, the Directive says that ICE officers should "generally avoid" arrests in non-criminal courts like Family Court, but then authorizes such arrests when "operationally necessary." *Id.* at 2. ICE field office supervisors have conceded in depositions that they do not know what terms like "special circumstances" or "operationally necessary" mean and have not restrained their office's courthouse arrest activities in light of this language. R. 56.1 Stmt. ¶¶ 57-58. Indeed, one supervisor recounted that he did not even share the 2018 Directive with officers newly assigned to his team before sending them to make arrests around a state courthouse. R. 56.1 Stmt. ¶ 54 (citing McGinnity Dep. Tr. 113-114).

The record here confirms that the 2018 Directive has not meaningfully limited ICE's actual arrest practices. Instead, ICE has continued to arrest individuals who are not "targeted aliens"; has pursued civil immigration arrests in non-criminal courts, including Family Court; and has conducted aggressive and at times violent arrests in public that have distressed onlookers and materially impeded court proceedings. *See, e.g.*, R. 56.1 Stmt. ¶ 138 (citing Hu Decl. ¶ 24 (describing violent rendition-style arrest in 2018); Gaudio Decl. ¶¶ 4, 10 (describing disruptive, intimidating ICE presence in the courtroom in March 2019 and ICE activity in Family Court); S. Oshiro Decl. ¶ 7 (describing ICE agents' refusal to announce or identify themselves)).

8

### D.        OCA Attempts to Protect the Integrity of New York Courts

In response to the wave of ICE civil arrests in and around New York courts, OCA, the administrative arm of New York's UCS, took both informal and formal action.  Informally, OCA reached out to ICE's New York Field Office and attempted to secure an understanding that ICE would limit its activities in non-criminal courts.   R. 56.1 Stmt. ¶ 84 (citing McConnell Dep. Tr. 86-87).  Formally, OCA issued its own policy regarding courthouse arrests in April 2017.  *See* R. 56.1 Stmt. ¶ 90.  The 2017 UCS Policy required that all law enforcement officers identify themselves when entering state courthouses to make an arrest, and that a judge be informed of the effort to arrest a "party or other participant in a case before [them]."  *Id.*

OCA also reached out to officials in Washington, D.C., to ask ICE to end the practice of civil arrests in state courthouses altogether, including by formally designating courthouses as "sensitive locations" where enforcement activity is prohibited.  R. 56.1 Stmt. ¶ 95 (citing McConnell Dep. Tr. 86, 91, 96-97).  ICE rejected those efforts.  R. 56.1 Stmt. ¶ 96.  Later, Chief Administrative Judge Lawrence Marks, acting on behalf of a "working group of state chief justices and chief court administrators," proposed language for a more limited ICE policy on courthouse arrests. AR 162-163.  The draft text provided that "enforcement activities in and around court facilities" should be undertaken "only as a last resort," and that ICE agents should not engage in enforcement actions in non-criminal courts or proceedings except in "exigent circumstances."  AR 162-163. Although acting ICE director Matthew Albence agreed to incorporate this proposed language (AR 167-169), ICE ultimately did not do so before issuing its 2018 Directive, and has not observed meaningful restraints in its actual enforcement practices in any case.

**E.    ICE's Campaign of Arrests Disrupts the Functioning of New York's Court System and Deters People from Accessing the Courts**

ICE's wave of courthouse civil immigration arrests across New York has served as an overwhelming deterrent to participation in the justice system for many New York residents, including crime victims, witnesses, defendants, and family members. *See, e.g.*, R. 56.1 Stmt. ¶¶ 142, 186, 200, 214-215 (citing Brooklyn 30(b)(6) (Ming) Dep. Tr. 66-67 (immigrant community members fear "having to testify or anything that involves . . . com[ing] to court" for fear of ICE arrest); Yi Decl. ¶¶ 17-20 (witnesses reluctant to testify to grand jury for fear of being arrested by ICE); Vargas Decl. ¶ 18 (defendants' family members are "too afraid to attend bond hearings or court dates in support of their loved ones" for fear of ICE arrest); S. Oshiro Decl. ¶ 10 (defendants "have foregone the opportunity to take their case to trial to contest their innocence because they fear that ICE could arrest them in court")).  One public defender estimated that 95% of her colleagues had reported absences in court due to fear of ICE since 2017.  R. 56.1 Stmt. ¶ 189 (citing Hu Decl. ¶ 9).

The evidence also shows that the prospect of civil arrest is deterring some from seeking relief in civil matters, such as guardianship proceedings, family court matters, and proceedings related to intimate partner violence. *See, e.g.*, R. 56.1 Stmt. ¶¶ 192-198 (citing Ahmad Decl. ¶¶ 8-9 (discussing client who withdrew petition for order of protection for fear of ICE arrest), Mohavedi Decl. ¶¶ 9-10 (discussing guardianship and proceedings under Violence Against Women Act), Panjwani Decl. ¶¶ 21, 23 (describing withdrawal of family court petition after seeing ICE courthouse arrest)).  And the expert report of political scientist Dr. Matthew Barreto confirms, based on a literature review and a robust survey of Latinx adults in New York, that ICE's courthouse civil arrests have had a significant "chilling effect" on voluntary participation in the legal system. R. 56.1 Stmt. ¶¶ 216-240.

ICE's campaign of civil courthouse arrests has also repeatedly disrupted ongoing judicial proceedings.  For example, ICE has made mid-prosecution arrests that have cut short active criminal cases.  *See, e.g.*, R. 56.1 Stmt. ¶¶ 142, 148-159 (citing Brooklyn 30(b)(6) (Kaminsky) Dep. Tr. 18-49 (describing how ICE's arrest of a criminal defendant prevented the Brooklyn DA's office from continuing with a felony sex crimes prosecution)); *see also* R. 56.1 Stmt. ¶¶ 162-168.  And despite asserting otherwise, ICE has also continued to arrest individuals *before* they attend court proceedings, increasing the risk of delays and complications.  *Compare* R. 56.1 Stmt. ¶ 180 (citing U.S. Immigration & Customs Enf't, *FAQ on Sensitive Locations and Courthouse Arrests*, at DHS 0030), *with* R. 56.1 Stmt. ¶¶ 152, 181-183 (citing Brooklyn DA 30(b)(6) (Kaminsky) Dep. Tr. 36; ICE 30(b)(6) Day 1 Dep. Tr. 41-42, 206-07; McGinnity Dep. Tr. 265-66; Rodriguez Dep. Tr. 55-56).  ICE has even arrested complaining witnesses in criminal cases.  *See* R. 56.1 Stmt. ¶ 62 (citing Milstein Decl. ¶ 5).

In response to ICE's continued operations in and around state courthouses, OCA further revised UCS's policy regarding law enforcement activity in state courts.  R. 56.1 Stmt. ¶¶ 108-109. The 2019 UCS Policy updated the 2017 UCS Policy by providing, among other things, that arrests inside a courthouse "may be executed . . . only pursuant to a judicial warrant," *i.e.*, with "a warrant or order issued by a federal judge or federal magistrate judge."  R. 56.1 Stmt. ¶ 108.  UCS promulgated the 2019 Policy after reaching "a critical conclusion" that "the practice of allowing administrative warrants to be the basis for arrests in the courthouse was leading to substantial adverse [e]ffects upon the court system."  R. 56.1 Stmt. ¶ 99 (citing McConnell Dep. Tr. 129-130).

Although ICE appears to have reduced its warrantless arrests *inside* courthouses after the 2019 UCS Policy, it has continued to target people who are coming to and going from New York courts, including by arresting them just outside the courthouse.  *See*, *e.g.*, R. 56.1 Stmt. ¶¶ 110-111,

152.  The summary judgment record shows that the harms caused by ICE's courthouse civil arrest policy have also continued despite the reduction of in-courthouse arrests.  The threat of ICE arrest immediately outside courthouses continues to deter individuals from accessing the courts.  *E.g.*, R. 56.1 Stmt. ¶¶ 186-279.  And ICE's arrests, especially when effected just before a scheduled court date, continue to cause delays and disruptions in judicial proceedings, including in the prosecution of criminal cases.  *E.g.*, R. 56.1 Stmt. ¶¶ 131-185.

Meanwhile, the federal government continues to assert unlimited authority to conduct civil arrests inside state courthouses, not just around them.  For example, in a November 2019 letter, Attorney General William Barr and acting DHS Secretary Chad Wolf stated that "ICE and CBP officers are not subject to state rules that purport to restrict [them] from making administrative arrests on property that is otherwise open to the public and other law enforcement officers." R. 56.1 Stmt. ¶ 129.  Similarly, ICE Field Office leaders in New York testified in depositions that ICE is not bound at all by the 2019 UCS Policy.  *E.g.*, R. 56.1 Stmt. ¶ 112 (citing Decker Dep. Tr. 67; Brophy Dep. Tr. 159-160; Judge Dep. Tr. 53-55).

## STANDARD OF REVIEW

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323 (1986).  APA claims are particularly "amenable to summary disposition" because "'[t]he entire case on review is a question of law.'"  *New York v. Department of Health & Human Servs.*, 414 F. Supp. 3d 475, 516 (S.D.N.Y. 2019), *appeal filed*, No. 20-41 (2d Cir. Jan. 3, 2020).

## ARGUMENT

**I.**  **ICE's Courthouse Civil Arrest Policy Exceeds The Agency's Statutory Authority**

Plaintiffs are entitled to summary judgment on their APA claim that ICE acted "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), because the INA does not authorize ICE's courthouse civil arrest policy.

As this Court held, the INA incorporates New York's "common law privilege . . . against arresting people in attendance on courthouse matters for unrelated civil violations either while they are on court premises or are traveling to or from court on their court-related matters."  MTD Op. at 20.  The privilege both protects those who "might be deterred" by the prospect of courthouse arrests, *Person v. Grier*, 66 N.Y. 124, 126 (1876), and safeguards the orderly operation of the courts and "the due and efficient administration of justice," *Parker v. Marco*, 136 N.Y. 585, 589 (1893).  "It thus serve[s], in either case, to enable courts to function properly."  MTD Op. at 22.

Federal statutes are presumed to preserve long-established common law principles and to respect the historic prerogatives of the States, at least in the absence of a clear statement from Congress to the contrary.  *See United States v. Texas*, 507 U.S. 529, 534 (1993); *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991); *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 316 (1981).  Here, as this Court recognized, nothing in the INA indicates "that the 'clear and manifest purpose of Congress' was to abrogate" the privilege against courthouse civil arrests in New York law.  MTD Op. at 31 (citing *City of Milwaukee*, 451 U.S. at 316).  And ICE civil arrests are like the civil arrests that traditionally triggered the common law privilege because they are carried out "to secure the [arrestee's] appearance" at a civil proceeding (i.e., removal).  *Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999); *see* MTD Op. at 23-26.

The Administrative Record conclusively demonstrates (and the evidence produced in discovery confirms) that since 2017 ICE has in fact pursued a courthouse civil arrest policy that conflicts with the common law privilege and thus exceeds ICE's authority under the INA. ICE expressly concedes that it has been conducting such civil arrests. *See, e.g.*, R. 56.1 Stmt. ¶¶ 63-66; AR 160; *see also supra* at 4-5. And the evidence and data developed in discovery thus far confirms a massive increase in those arrests since 2017. *See* R. 56.1 Stmt. ¶¶ 62, 64 (ICE and OCA data); *id.* ¶¶ 65-66 (OCA data); *see also, e.g.*, R. 56.1 Stmt. ¶ 63 (citing statements from prosecutors and defense attorneys).

The conclusion that ICE's courthouse civil arrest policy violates the longstanding privilege against courthouse civil arrests and thereby exceeds the agency's authority under the INA is further confirmed by the fact that ICE's policy implicates both of the core purposes behind the privilege. *First*, uncontradicted evidence shows that the surge in ICE civil arrests around New York courthouses has deterred witnesses, victims, defendants, and others from coming to court, undermining the privilege's purpose to encourage all with business before the court "to come forward voluntarily," *Walpole v. Alexander*, 99 Eng. Rep 530, 531 (1782); *accord Person*, 66 N.Y. at 126. Witnesses are afraid to testify in criminal cases for fear of arrest; domestic violence victims are refraining from seeking redress from their abusers for fear of arrest at the courthouse; and criminal defendants are failing to appear in court in order to avoid exposure to federal civil immigration enforcers. *See* R. 56.1 Stmt. ¶¶ 186-216.

*Second*, ICE's courthouse civil arrests also undercut the "even more fundamental purpose of the privilege . . . to enable courts to function properly." MTD Op. at 28. ICE's efforts to use state courts as a trap to ensnare parties in removal proceedings has "give[n] occasion to perpetual tumults," *Orchard's Case*, 38 Eng. Rep. 987, 987 (1828), including delays and disruptions of

14

judicial proceedings.  The summary judgment record shows the concrete disruptions that have been caused by ICE's practice of arresting complaining witnesses in pending criminal cases, *see* R. 56.1 Stmt. ¶ 62; by the agency's numerous arrests of criminal defendants that have upended or collapsed pending criminal prosecutions, *see* R. 56.1 Stmt. ¶¶ 142-185; by civil arrests and other pre-arrest activity by ICE in open court, in full view of the judge and the gallery, leading to chaos in the courthouse, *see* R. 56.1 Stmt. ¶ 139; and by violent arrests of defendants and litigants on the courthouse steps, R. 56.1 Stmt. ¶ 138.

Because ICE's courthouse arrest policy exceeds the agency's statutory authority, Plaintiffs are entitled to summary judgment.

## II.    ICE'S COURTHOUSE CIVIL ARREST POLICY IS ARBITRARY AND CAPRICIOUS

ICE's courthouse civil arrest policy also violates the APA on the independent ground that it is arbitrary and capricious.  5 U.S.C. § 706(2)(A).  An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*  Moreover, when an agency changes a prior policy, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-516 (2009).  Here, as the slim

administrative record confirms, ICE radically altered its prior policy without adequate justification and without sufficient consideration of the disruptive effects of its new policy.

ICE's new courthouse civil arrest policy departs sharply from its prior practice of respecting state judicial proceedings and the distinct sovereign interests they serve.  Longstanding ICE guidance from before 2017 identified the many ways in which ICE had previously recognized that such interests were sufficiently compelling to tailor ICE's enforcement priorities, including arrest policies. *See, e.g.*, AR 39-53.  Indeed, ICE expressly based its prior position on the finding that immigration enforcement activities could negatively affect the "willingness and ability of victims, witnesses, and plaintiffs to call police and pursue justice" in state courts.  *E.g.*, AR 110.  And ICE further acknowledged that such effects not only harm the States, but also undermine federal objectives that Congress sought to achieve in statutes such as the 1994 Violence Against Women Act (VAWA), the 2000 Victims of Trafficking and Violence Protection Act, and with the T- and U-Visa programs.  AR 39-53, 88-90, 110-112.  As this Court previously recognized, these statutes express Congress's intent for federal immigration enforcement to be sensitive to the protection of witnesses, victims of crime, and others in state judicial proceedings—including by "encourag[ing] aliens' attendance at court" without fear of arrest.  MTD Op. at 10, 34.

Nothing in the Administrative Record indicates that ICE revisited, let alone reconsidered, the findings that "underlay its prior policy," or the "serious reliance interests" that its earlier, respectful treatment of state courts engendered.  *Fox Television*, 556 U.S. at 515.  Nor would there be any basis in the Administrative Record to do so:  The evidence before the agency, including communications from multiple state courts, uniformly warned ICE that courthouse arrests serve as a massive deterrent for those who seek access to the courts, and a source of disruptions and delays that hamper state prosecutors and the operation of the courts.  *See, e.g.*, R. 56.1 Stmt.

16

¶¶ 114-120 (discussing letters from State Chief Justices and others); *accord* AR 164-166.  Likewise, the Administrative Record lacks any reasoning by ICE that might alter its prior acknowledgment that federal law itself also supports respect for state courts; indeed, there is no indication that ICE even considered federal policies like those advanced by VAWA before implementing its current courthouse arrest policy.

ICE thus failed to provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay . . . [its] prior policy" before radically changing course.  *Fox Television*, 556 U.S. at 516.  Indeed, every indication is that ICE simply ignored those "facts and circumstances" in deciding to dramatically increase courthouse civil arrests.  For example, when federal officials responded to the objections raised by state courts, they did not dispute any of the facts raised, but instead reiterated the stark legal position that ICE has unrestricted authority to conduct civil immigration arrests in any "public place," including state courthouses.  *E.g.*, AR 134.  But "consideration of costs is an essential component of reasoned decisionmaking under the Administrative Procedure Act."  *E.g.*, *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 732–733 (D.C. Cir. 2016) (Kavanaugh, J., dissenting).  ICE's failure to consider those previously acknowledged costs—to weigh, in other words, the "broader, real-world impact[s]" of its courthouse arrest policy—was arbitrary and capricious. *E.g.*, *American Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 931 (D.C. Cir. 2017).  And ICE's failure to consider its own prior determination of congressional objectives before dramatically increasing its enforcement activities in state courthouses is yet another indicator of unreasoned decision making.  *See, e.g.*, *State Farm*, 463 U.S. at 54 (agency must "bear in mind" the factors "that Congress intended" for it to consider).

This Court should reject any attempt by Defendants to supply in this litigation a more fulsome rationale for ICE's radical departure from a settled, well-supported policy.  "[C]ounsel's

*post hoc* rationalizations for agency action" cannot substitute for ICE's deficient reasoning or its failure to meaningfully engage with the underlying facts. *State Farm*, 463 U.S. at 50. And the scattered language used in the Administrative Record to justify targeting state courthouses for civil immigration arrests does not come close to meeting the standards for reasoned decision-making.

*First*, a line in the 2018 Directive claims that the "safety risks" from conducting arrests are "substantially decreased" in state courthouses because "[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband." Courthouse Civil Arrest Directive at 1; *see also* AR 160-161, 188. But there is nothing in the Directive or elsewhere in the Administrative Record that more concretely explains the "safety risks" that ICE agents supposedly face when conducting arrests outside of courthouses or attempts to describe the magnitude of such risks. Indeed, the only piece of evidence that even mentions both courthouse and non-courthouse arrests is a short news article describing criminal arrests of two men in connection with a violent homicide—one of which took place at a California courthouse, and the other at the suspect's home. AR 156-157. But ICE has never claimed that this article supports its "safety" rationale. And, in any event, these arrests do not resemble in any way the civil immigration arrests that ICE is now conducting. The immigration status of the men is not addressed in the article; it appears the arrests were made by U.S. Marshals and local police, not by ICE; and there is no indication from the article that the arrest of the one suspect at his home posed any greater risk than the arrest of the other suspect at courthouse. *Id.* ICE does not explain the relevance of a criminal arrest of an individual suspected of murder in a single, non-New York case that appears unrelated to immigration enforcement. And it is particularly doubtful that the arrest of individuals suspected of murder is probative of the risks posed by civil immigration arrests of the vastly broader population that ICE now targets, including many people who either have no

criminal history or who may have committed only traffic infractions and low-grade misdemeanors like jaywalking. *See, e.g.*, AR 92 (listing current "enforcement priorities"); *see also* R. 56.1 Stmt. ¶¶ 40-43, 67-72.

Because ICE made no attempt to determine the magnitude of any risks faced by ICE agents in conducting arrests at non-courthouse locations, it did not reasonably justify its new courthouse civil arrest policy in light of the serious and concrete harms that the policy imposes on New York's judicial system. Under the APA, it is arbitrary and capricious for an agency to trigger significant losses for minimal gains. *See Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) ("One would not say that it is even rational . . . to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits."). But here ICE "made no findings specifically directed to the choice between" its current policy and its prior respectful relationship with state courts. *Burlington*, 371 U.S. at 168. ICE's decision to pursue unspecified safety goals without any regard to the harms on New York's judicial system was thus "not so much a balance of conflicting policy goals as the acceptance of one without any real consideration of the other." *National Ass'n of Regulatory Utility Comm'rs v. Interstate Commerce Comm'n*, 41 F.3d 721, 728 (D.C. Cir. 1994).

*Second*, another line in the 2018 Directive suggested that "courthouse arrests are often necessitated by the unwillingness of jurisdictions to cooperate with ICE in the transfer of custody of aliens from their prisons and jails." Courthouse Civil Arrest Directive at 1; *see also* AR 160-161, 188. But again, there is nothing in the Administrative Record—not even a newspaper article—that explains how or to what degree ICE has been harmed by this purported failure to cooperate, and no attempt to balance that supposed harm to federal objectives against the concrete harms to sovereign state interests inflicted by ICE's courthouse arrest policy.

More fundamentally, there is a severe mismatch between ICE's policy, which allows

courthouse arrests of *any* person who might appear in court, and ICE's asserted interest in "the transfer of custody of aliens" from state and local "prisons and jails."  ICE's courthouse arrest policy applies to a broad swath of people who may never have been subject to any transfer request from a local prison or jail.  As the summary judgment record confirms, ICE is making civil arrests in traffic courts, in local courts, and even in family court and courts set up to aid human-trafficking victims.  *See* R. 56.1 Stmt. ¶¶ 70-72.[3]  There is simply no "rational connection" between the asserted problem of non-cooperation in transferring custody of criminal defendants and ICE's vast expansion of its courthouse arrest policy to cover individuals who are not (and may never be) in "prisons and jails" at all.  *E.g.*, *State Farm*, 463 U.S. at 43 (quotation marks omitted).

**III.    ICE'S COURTHOUSE CIVIL ARREST POLICY VIOLATES THE TENTH AMENDMENT**

As this Court previously recognized, the Tenth Amendment protects New York's sovereign prerogative to maintain "the functioning of the state judiciary."  MTD Op. at 35.  ICE's courthouse civil arrest policy interferes with this prerogative, including by improperly leveraging New York's sovereign actions—such as compelling attendance at proceedings and imposing courthouse security measures—in order to serve ICE's federal immigration objectives.  Plaintiffs are entitled to summary judgment for their Tenth Amendment claim.

**A.    The Tenth Amendment Prohibits Improper Interference with State Sovereignty**

The Tenth Amendment "confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York v. United States*, 505 U.S. 144, 157 (1992); *see* U.S. Const. amend. X.  Indeed, "even as to matters within the competence

---

[3] Evidence from outside the Administrative Record can be considered for purposes of an argument that the agency failed to consider the problem adequately under the APA.  *See State Farm*, 463 U.S. at 43; *AT&T Info. Sys., Inc. v. General Servs. Admin.*, 810 F.2d 1233, 1236 (D.C. Cir. 1987).

of the National Government," the Constitution prohibits the federal government from "act[ing] upon and through the States." *Alden v. Maine*, 527 U.S. 706, 715 (1999) (quotation marks omitted).

The federalism principles embodied by the Tenth Amendment limit federal power in several ways. *First*, States are protected from federal interference with the internal ordering and maintenance of their governmental systems. *See, e.g.*, *Coyle v. Smith*, 221 U.S. 559, 565 (1911); *Massachusetts v. Department of Health & Human Servs.*, 682 F.3d 1, 12 (1st Cir. 2012); *see also* The Federalist No. 45 (Madison). That protection applies to the States' sovereign right to maintain their own "fully capable" judiciaries and court systems, which are "essential to [a State's] separate and independent existence," *Gregory*, 501 U.S. at 457, 472 (quotation marks omitted); *see also Heath v. Alabama*, 474 U.S. 82, 93 (1985) ("Foremost among the prerogatives of sovereignty is the power to create and enforce a criminal code."); *Atlantic Coast Line R.R. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 285 (1970) ("the maintenance of state judicial systems for the decision of legal controversies" is reserved to the States). The federal government thus may not interfere with state judiciaries—whether by enjoining state-court proceedings, *Younger v. Harris*, 401 U.S. 37, 53-54 (1971); by second-guessing States' procedures for administering cases, *see Kaufman v. Kaye*, 466 F.3d 83, 87 (2d Cir. 2006); or by conducting "ongoing federal audit[s] of state criminal proceedings," *O'Shea v. Littleton*, 414 U.S. 488, 500 (1974). A State's interest in controlling "the internal workings" of its own courts, *Kaufman*, 466 F.3d at 86, stems directly from the "the fundamental constitutional independence of the States," *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 146 (1988).

*Second*, the Tenth Amendment also proscribes federal action that effectively commandeers or coerces state action in support of federal objectives. Thus, the federal government is prohibited from directly compelling state officials to serve a federal regulatory program. *See Printz v. United*

*States*, 521 U.S. 898, 935 (1997).   And it is similarly prohibited from leveraging state governmental processes or structures for federal policy purposes—particularly when doing so would undercut the State's own objectives for those processes or structures.   *See, e.g.*, *New York*, 505 U.S. at 176 (invalidating federal statute requiring State to take legal title to nuclear waste); *Murphy v. NCAA*, 138 S. Ct. 1461, 1475-1478 (2018) (invalidating federal prohibition on state legalization of sports betting).[4]   Such exertions of control over the incidents of state government are "fundamentally incompatible with our constitutional system of dual sovereignty."  *Printz*, 521 U.S. at 935.[5]

### B.   ICE Is Violating the Tenth Amendment

#### 1.   ICE is interfering with New York's sovereign right to maintain an independent judiciary

ICE's courthouse civil arrest policy violates the Tenth Amendment because it substantially interferes with New York's ability to maintain an independent judiciary.   There is no material dispute that ICE's courthouse civil arrests have directly interrupted and undermined ongoing proceedings—such as by arresting complaining witnesses and burdening pending criminal cases, *see* R. 56.1 Stmt. ¶¶ 62, 18-49, 142-185—thus undercutting New York's sovereign "power to

---

[4] Contrary to the position taken by ICE earlier in this case, anti-commandeering is just one "example" of the Tenth Amendment's broader protection of state sovereignty.  *City of New York v. United States*, 179 F.3d 29, 33 (2d Cir. 1999), *abrogated on other grounds by Murphy*, 138 S. Ct. 1461; *see also Murphy*, 138 S. Ct. at 1475 ("The anticommandeering doctrine . . . is simply the expression of a fundamental structural decision incorporated into the Constitution.").

[5] The Second Circuit's discussion of anti-commandeering principles in *New York v. Department of Justice*, No. 19-267 (Feb. 26, 2020), is inapposite here.  There, the court's dispositive analysis focused on whether the challenged federal statute, 8 U.S.C. § 1373, could be applied as a funding condition—a question not raised here.  *New York v. Department of Justice*, No. 19-267, 2020 WL 911417, at *18-*22 (2d Cir. Feb. 26, 2020).  Moreover, while the court in that case questioned whether the power to regulate immigration was "reserved to the States" at all under the Tenth Amendment, *id.* at *19-*20, this case does not involve state regulation of immigration.  Rather, it involves state regulation of state courthouses and their maintenance of functioning judicial systems— powers that are indisputably reserved to the States under the Tenth Amendment.  See *supra* at 20-21.

create and enforce a criminal code," *Heath*, 474 U.S. at 93.  ICE's policy has also hindered ongoing state prosecutions by deterring witnesses, defendants, and others from attending court, *see* R. 56.1 Stmt. ¶¶ 186-215.  And more broadly, ICE's policy has deterred not just participants in criminal cases, but also litigants, witnesses, and parties in a range of other matters from attending court— including New York residents who would seek to gain custody of children, *see* R. 56.1 Stmt. ¶ 199, or seek an end to domestic violence in their home through a restraining order, *see* R. 56.1 Stmt. ¶ 196.  ICE's courthouse civil arrests undermine the ability of New York's judicial system to perform its basic functions—to order relief, to resolve disputes, to compel attendance, to administer public justice—sapping New York of "the dignity . . . of sovereignty" to which it is entitled.  *Alden*, 527 U.S. at 715.  And the practical effect of ICE's massive increase in courthouse arrests has been so severe that New York's Chief Administrative Judge has twice felt compelled to issue policy guidance covering courthouse arrests to try to restore order to the system.  *See* R. 56.1 Stmt. ¶¶ 88-92, 98-99; *see also* N.Y. Judiciary Law §§ 210, 212(1)(i).

ICE's legal position here gives no weight whatsoever to the States' reserved prerogative to maintain their own judiciaries.  As the record makes clear, federal officials at the highest levels have publicly insisted that ICE has *unlimited* authority to conduct civil immigration arrests in and around state courthouses.  *See* R. 56.1 Stmt. ¶¶ 112, 129.  Indeed, this Court previously recognized that ICE's position would mean that federal law "bar[s] states' sovereign interests from imposing *any* limitations on ICE's enforcement discretion."  MTD Op. at 32.  ICE's position— that its agents may operate at will in and around New York courts regardless of any interference with courthouse operations or decorum—is starkly incompatible with the Tenth Amendment.  Indeed, a "more direct affront to state sovereignty is not easy to imagine."  *Murphy*, 138 S. Ct. at

1478 (Tenth Amendment violation if "federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting").

### 2.   ICE is improperly leveraging New York's sovereign actions to serve federal purposes

ICE's courthouse civil arrest policy also violates the Tenth Amendment because it exploits sovereign actions that are essential to maintaining New York's court system and leverages those state actions for federal policy purposes instead.  The anti-commandeering doctrine prohibits the federal government from improperly "us[ing] the States as implements of regulation."  *New York*, 505 U.S. at 161.  No matter how strong its interests, the federal government "may not conscript state governments as its agents."  *Id.* at 178.   Here, however, ICE is specifically targeting and leveraging New York's court system, using the unique governmental features of the courthouse as the crucial implement for a program of federal civil immigration enforcement.

A courthouse is not merely a "public place," as the former DHS Secretary and the former Attorney General suggested in their correspondence with the Chief Justice of California.  *E.g.*, AR 134; *see also* AR 190.  Courthouses are state-controlled, state-secured facilities—at which the State can compel individuals to attend on penalty of imprisonment, and in which the State provides civil remedies, myriad forms of relief, and public justice in its exclusive capacity as a sovereign, *see, e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982); *Atlantic Coast Line R.R.*, 398 U.S. at 285.  As ICE's 2018 Directive makes plain, ICE's policy exploits those exact features to achieve ICE's federal immigration objectives.  It is precisely *because* the State exercises power over its citizens and compels attendance at its courthouses that "individuals appear[] in courthouses for one matter" even though they may be "wanted for unrelated criminal or civil violations."  Courthouse Civil Arrest Directive at 1.  And it is precisely *because* the State controls security at courthouses to enable the orderly conduct of judicial

24

proceedings, including criminal prosecutions, that "[i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband."   Courthouse Civil Arrest Directive at 1; *see also* AR 160-161, 188.

ICE's courthouse civil arrest policy thus exploits the very actions that New York has taken to convene and protect state judicial proceedings—actions that are sovereign both in their character and purpose—and leverages them to promote the federal government's own purposes.   And in an even greater affront to state sovereignty, ICE's repurposing of New York's sovereign actions undercuts the very interests that New York seeks to promote.   New York law mandates the appearance of individuals at court proceedings to ensure that criminal prosecutions can proceed and that individuals can obtain justice in their own lawsuits; but ICE's policy intercepts individuals who appear at New York courts and prevents and deters them from heeding the State's exercise of sovereign authority.   New York maintains security at courthouses to ensure that judicial proceedings can go forward without disruption and that witnesses, parties, and other individuals feel secure enough to attend.   But ICE's policy adds disruption—as the violent, courthouse-step arrests and tearful courtroom standoffs described above demonstrate, *e.g.*, R. 56.1 Stmt. ¶¶ 142-179 —and eliminates, for many, the very security that was meant to facilitate their access to the New York courts.   The Tenth Amendment prohibits ICE's deliberate exploitation, for federal policy purposes, of the actions that New York has taken to protect its sovereign right to hold judicial proceedings and conduct criminal prosecutions.

## CONCLUSION

Plaintiffs' motion for summary judgment should be granted and judgment should be entered in Plaintiffs' favor.

DATED:  March 13, 2020    Respectfully submitted,

           LETITIA JAMES
           *Attorney General of the State of New York*

           By: */s/ Steven C. Wu*
           Steven C. Wu
            *Deputy Solicitor General*
           Matthew Colangelo
            *Chief Counsel for Federal Initiatives*
           Matthew Eisenson, *Assistant Attorney General*
           Morenike Fajana, *Special Counsel*
           Fiona Kaye, *Assistant Attorney General*
           Anjana Malhotra, *Assistant Attorney General*
           Daniela Nogueira, *Assistant Attorney General*
           Ari J. Savitzky, *Assistant Solicitor General*
           Office of the New York State Attorney General
           28 Liberty Street
           New York, NY 10005
           Phone: (212) 416-6312
           steven.wu@ag.ny.gov

           *Attorneys for the State of New York*

           ERIC GONZALEZ
           *District Attorney of Kings County (Brooklyn)*

           By: */s/ Jill Harris*
           Jill Harris, *Chief of Policy and Strategy*
           Kings County District Attorney's Office
           350 Jay Street
           Brooklyn, New York 11201
           Phone: (718) 250-3156
           harrisj1@BrooklynDA.org

           *Attorney for the District Attorney of Kings County (Brooklyn)*