**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK, et al.,

               Plaintiffs,

      v.

UNITED STATES IMMIGRATION
AND CUSTOMS ENFORCEMENT,
et al.,

               Defendants.

19 Civ. 8876 (JSR)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

PRELIMINARY STATEMENT ............................................................. 1

ARGUMENT ................................................................................. 3

   I.  ICE's Courthouse Civil Arrest Policy Exceeds the Agency's Statutory Authority and Accordingly Violates the APA ........................................ 3

  II.  ICE's Courthouse Civil Arrest Policy Is Arbitrary and Capricious and Accordingly Violates the APA ....................................................... 8

      A.  ICE's Courthouse Civil Arrest Policy Dramatically Departs from Prior Policy ................................................................................. 9

      B.  ICE Failed to Provide a Reasoned Explanation for Its Sharp Departure from Prior Policy .................................................................... 13

CONCLUSION ............................................................................... 19

i

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Arizona v. United States*,
   567 U.S. 387 (2012)..................................................................................................4, 7

*Dopico v. Goldschmidt*,
   687 F.2d 644 (2d Cir. 1982)..........................................................................................14

*Environmental Def. Fund v. Costle*,
   657 F.2d 275 (D.C. Cir. 1981).......................................................................................12

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)............................................................................................1, 8, 13

*Herrera-Inirio v. I.N.S.*,
   208 F.3d 299 (1st Cir. 2000)............................................................................................4

*Michigan v. EPA*,
   135 S. Ct. 2699 (2015)...................................................................................................18

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)....................................................................................8, 9, 13, 18

*Murphy Bros. v. Michetti Pipe Stringing, Inc.*,
   526 U.S. 344 (1999)........................................................................................................4

*New York v. United States Dep't of Health & Human Servs.*,
   414 F. Supp. 3d 475 (S.D.N.Y. 2019)............................................................................3

*Orchard's Case* (1828), 38 Eng. Rep. 987 .........................................................................6

*Parker v. Marco*,
   136 N.Y. 585 (1893) .......................................................................................................6

*Pasquantino v. United States*,
   544 U.S. 349 (2005)........................................................................................................6

*United States v. Craft*,
   535 U.S. 274 (2002)........................................................................................................6

*United States v. Green*,
   305 F. Supp. 125 (S.D.N.Y. 1969).................................................................................5

*United States v. Lett*,
   944 F.3d 467 (2d Cir. 2019)...........................................................................................5

**Cases**                                                                    **Page(s)**

*United States v. Texas*,
   507 U.S. 529 (1993)...........................................................................................4

**Laws and Rules**

5 U.S.C. § 551 .......................................................................................................9

8 U.S.C. § 1229 .....................................................................................................7

Fed. R. Civ. P. 56 .................................................................................................3

N.Y.C. Admin. Code
   § 9-131 ...........................................................................................................18
   § 14-154 .........................................................................................................18

## PRELIMINARY STATEMENT

Defendant U.S. Immigration and Customs Enforcement (ICE) moves for summary judgment on Plaintiffs' claims under the Administrative Procedure Act (APA). (ICE does not argue that it should be granted summary judgment on Plaintiffs' Tenth Amendment claim.) This Court has already rejected ICE's main legal arguments, and ICE's core factual claims are not supported by its own Administrative Record or the summary judgment record more broadly. ICE's motion should be denied.

*First*, ICE is not entitled to summary judgment on Plaintiffs' APA claim that the courthouse civil arrest policy exceeds the agency's statutory authority. As ICE acknowledges, this Court has already held that the Immigration and Nationality Act (INA) "incorporates the [common-law] privilege" against civil arrests in or near state courthouses. Opinion and Order at 30-31 (Dec. 19, 2019), ECF No. 51 ("MTD Op."). ICE's motion simply recycles legal arguments that this Court considered and rejected in denying ICE's motion to dismiss. And ICE does not contest the extensive evidence in the summary judgment record showing that it has in fact been conducting civil arrests in and near courthouses in precisely the manner that the longstanding common-law privilege would forbid.

*Second*, ICE is not entitled to summary judgment on Plaintiffs' APA claim that the courthouse civil arrest policy is arbitrary and capricious. An agency violates the APA when it reverses itself or sharply deviates from a carefully considered prior policy, but then fails to acknowledge or adequately explain the change. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-516 (2009). That is what ICE did here. Although ICE in its summary judgment motion minimizes its new post-2017 policy of expanded arrests in and around state courthouses—going so far as to claim (at 19) that the new policy is "no different than its predecessors"—the

Administrative Record conclusively shows (and the summary judgment record confirms) that ICE's current courthouse civil arrest policy is a sharp break from pre-2017 practice. ICE cannot be said to have sufficiently explained its 180-degree shift towards a new policy of actively targeting courthouses for civil immigration enforcement if it will not even acknowledge the magnitude of its shift in the first place.

Nor can ICE show that it provided adequate reasons for its radical change sufficient to merit summary judgment. Rather, ICE's contemporaneous positions as reflected in the Administrative Record (as opposed to its litigation position now) show that the agency gave no real consideration to the serious harms that its ramp-up of courthouse civil arrests would have on the administration of justice and access to courts in the States. Instead, when state judges and others implored ICE to change its expansive new policy, ICE merely repeated its legal position that the agency possesses an unfettered right to make courthouse arrests (which it does not) and then claimed that it needed to operate in state courthouses because of the States' increasing reluctance to let ICE operate in their jails (a state of affairs that is little described in the Administrative Record and that in fact well predates the policy shift at issue here).

ICE's motion for summary judgment should accordingly be denied.

## ARGUMENT

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the APA context, "'[t]he entire case on review is a question of law'" and "[s]ummary judgment is 'generally appropriate.'" *New York v. United States Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 516 (S.D.N.Y. 2019) (collecting cases).

## I.    ICE'S COURTHOUSE CIVIL ARREST POLICY EXCEEDS THE AGENCY'S STATUTORY AUTHORITY AND ACCORDINGLY VIOLATES THE APA

ICE's lead argument for summary judgment on Plaintiffs' statutory authority claim is one that this Court has already rejected. This Court has already held that the INA incorporates the ancient "common law privilege against civil arrests on courthouse premises and against arrests of parties and other persons necessarily traveling to or from court."   MTD Op. at 1, 31. ICE acknowledges (as it must) that its policy of conducting civil arrests in and around New York courthouses is unlawful under this Court's prior interpretation of the INA. *See* Defs.' Mem. of Law in Supp. of Partial Mot. for Summ. J. at 14 n.7 (Mar. 13, 2020), ECF No. 89 ("ICE SMJ Br."). Yet ICE now asks the Court to abandon that ruling and grant summary judgment in its favor. None of ICE's arguments warrant a reversal of this Court's prior legal conclusions.

*First*, ICE suggests (at 14) that *immigration* arrests are not covered by the privilege. But there is no dispute that the privilege covers civil arrests, and this Court has already recognized that "arrests of allegedly undocumented aliens" are simply the most common of the "new forms of civil arrest" that have accompanied "the rise of the regulatory state" in the post-New Deal era. MTD Op. at 23 (citing *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984)). Moreover, the basic function of an immigration arrest is identical to that of the civil arrests that were indisputably

3

covered by the privilege: like the *capias* writs that were used in an earlier era to initiate a civil suit, civil arrests by ICE are carried out "to secure the [arrestee's] appearance" at a civil proceeding, namely, a removal proceeding. *See Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999); *see also Arizona v. United States*, 567 U.S. 387, 396 (2012) ("Removal is a civil, not criminal, matter.").

ICE cites two cases to support its point, but neither provides a reason for this Court to reverse its interpretation of the INA. Citing First Circuit authority, ICE notes the general principle that immigration "is uniquely a matter of federal, not local, concern." *Herrera-Inirio v. I.N.S.*, 208 F.3d 299, 307 (1st Cir. 2000) (cited in ICE SMJ Br. at 1, 14). But this Court's prior ruling was based on its interpretation of federal law and thus is entirely compatible with this principle. The question in this case has always been whether Congress, in enacting the INA, intended to explicitly abrogate the centuries-old common law privilege prohibiting civil arrests of those coming to and going from the courthouse. This Court previously applied the principle that federal laws should not be read to displace "long-established and familiar" state common law rules, *United States v. Texas*, 507 U.S. 529, 534 (1993) (quotation marks omitted), and properly concluded that Congress had not expressed with the requisite "'unmistakably clear'" language its intention to abrogate the common law privilege at issue here. *See* MTD Op. at 30-31 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). Interpreting the INA to incorporate the common law privilege thus respects federal objectives as Congress has defined them—rather than as ICE would prefer them to be.

ICE also cites the Second Circuit's decision in *United States v. Lett*, but that case is inapposite. In *Lett*, the Second Circuit explained that ICE could lawfully arrest and detain a person for civil removal purposes even though the person had previously been released on bail pursuant to the Bail Reform Act (BRA) in a related criminal proceeding, since the INA and the BRA are

independent "bases for detention."  944 F.3d 467, 470 (2d Cir. 2019). But that reasoning has nothing to do with this case. Plaintiffs' claim here is not that the common-law privilege independently "prevent[s] an authorized immigration enforcement action."  ICE SMJ Br. at 14. Rather, what Plaintiffs have argued—and what this Court has held—is that the INA itself *incorporates* the privilege, rendering ICE's courthouse civil arrest policy unauthorized under federal law in the first place.

*Second*, ICE rehashes its old argument that the common law privilege against courthouse civil arrests actually provides immunity only from service of process, and not from civil arrests as such. Just as it did at the motion-to-dismiss stage, ICE relies on cases like *United States v. Green*, 305 F. Supp. 125 (S.D.N.Y. 1969), which discuss the application of the privilege in the context of service of process. *Compare* ICE SMJ Br. at 14-15 (citing *Green*), *with* Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 14-19 (Oct. 23, 2019), ECF No. 26 (block-quoting *Green* in support of same argument). But this Court already rejected that argument, including ICE's reliance on cases like *Green*, holding that "[w]hat these cases demonstrate is that the common law privilege against courthouse arrests had as its fundamental purpose the protection of the courts in carrying out their functions, and that this policy was so strong that, even in the brief period when civil arrests became rare, the privilege was extended to service of process. Far from being abandoned, therefore, the privilege was being expanded."  MTD Op. at 25; *see also id.* at 26 n.10 (citing *Green* and explaining that a similar case was "totally distinguishable").

ICE's reliance (at 15) on *Pasquantino v. United States* does not help its argument. *Pasquantino* recognized that federal laws should be read to preserve, rather than override, "long-established and familiar" common law rules, but found this principle inapplicable in that particular case because the basis for federal criminal liability at issue there would not have been barred by the common-law rule invoked by the defendant; there was thus no conflict between the common

law and the later-enacted federal statute. 544 U.S. 349, 359-60 (2005) (quotation marks omitted).[1]

Here, by contrast, ICE's interpretation of the INA as *allowing* courthouse civil arrests would override the common law rule *against* courthouse civil arrests, thus triggering the presumption in favor of preserving the common law. *See, e.g.*, MTD Op. at 20-29; *Parker v. Marco*, 136 N.Y. 585, 589 (1893) (the privilege "has always been held to extend to *every proceeding of a judicial nature*" (emphasis added)).   The "traditional rationales" for the ancient common law privilege, which ICE references in its brief (at 15 (quoting *Pasquantino*, 544 U.S. at 360), confirm that the privilege prohibits the precise activity that ICE argues is authorized under the INA. As this Court explained, the privilege's purposes—the need "to encourage parties 'to come forward voluntarily'" and the imperative "to enable courts to function properly"—are directly implicated by ICE's civil immigration arrests. MTD Op. at 27-29 (quoting *Walpole v. Alexander* (1782), 99 Eng. Rep. 530, 530-531).[2]

---

[1] To the same effect is *United States v. Craft*, 535 U.S. 274 (2002), which ICE also cites (at 15). *Craft* also turned on the question whether a common law rule was "so well established … that we must assume that Congress considered the impact of its enactment on the question now before us." *Pasquantino*, 544 U.S. at 359 (quotation marks omitted). In *Craft*, the state common law rule, regarding the imposition of liens on properties-by-the-entirety, was less clearly established, and in light of that "ambiguity" did not preclude the application of federal tax liens under the capacious terms of the federal tax lien statute. 535 U.S. at 287-88.

[2] ICE relies (at 15) on the observation in *Pasquantino* that none of the early cases regarding the common law revenue rule "involved a domestic sovereign acting pursuant to authority conferred by a criminal statute," 544 U.S. at 364. But that was a case-specific point, not a rule of law. Whether the revenue rule at issue in *Pasquantino* had ever been applied to a "domestic sovereign" enforcing a criminal (as opposed to tax) statute was important in that case because the revenue rule's *central function* was to bar domestic sovereigns in particular from enforcing foreign tax laws. All of that is irrelevant here. And even if it mattered, there can be no doubt that the privilege against courthouse civil arrest traditionally *did* apply against government officers and law enforcement agents, most notably the sheriffs and officers who traditionally served writs of *capias ad satisfaciendum*. *See, e.g.*, *Orchard's Case* (1828), 38 Eng. Rep. 987, 987-988.

*Third*, ICE argues (at 15-17) that even if there is a common-law privilege against courthouse civil arrests that would otherwise apply here (and there is), the INA preempts it by establishing a "comprehensive system regarding immigration arrests, which includes permitting arrests specifically at courthouses" (ICE SMJ Br. at 17). Again, that argument is neither new nor meritorious.

Preemption is simply the wrong frame here because (as discussed) this Court's prior ruling was based on its interpretation of federal law itself—not on a conclusion that state law took precedence over a conflicting federal law. If, as this Court previously held, there is "no indication in the language of the [INA] that the 'clear and manifest purpose of Congress' was to abrogate the relevant state common law" privilege against civil arrests in or near courthouses (MTD Op. at 31 (citing *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 316 (1981)), then there certainly can be no argument that Congress intended to "displace state law altogether," *Arizona*, 567 U.S. at 399.

ICE's remaining arguments to the contrary merely rehash the agency's disagreement with this Court's prior determination that 8 U.S.C. § 1229(e) does not overcome the strong presumption in favor of the common law and the existing federal-state balance. Section 1229(e) need not be read as referring to civil arrests; it can "fairly be read as referring to criminal arrests, against which the state common law privilege does not protect," including criminal arrests by state and local police rather than ICE. MTD Op. at 33. Moreover, it would make little sense to interpret Section 1229(e), a provision designed to *protect* non-citizen victims who appear in court in order to seek justice, "as evidence of Congressional intent to allow ICE to undermine that very objective." *Id.* at 34. ICE offers the Court no basis to depart from its prior reasoning.

This Court should accordingly deny ICE's motion for summary judgment on Plaintiffs' APA claim that ICE's courthouse civil arrest policy exceeds its statutory authority.

## II.   ICE's COURTHOUSE CIVIL ARREST POLICY IS ARBITRARY AND CAPRICIOUS AND ACCORDINGLY VIOLATES THE APA

ICE also seeks summary judgment on Plaintiffs' "arbitrary and capricious" claim. But ICE premises all its arguments on the assertion that its current courthouse civil arrest policy merely "evolved" from prior policy as a "reasonable" response to changed circumstances. ICE SMJ Br. at 2, 4-7, 19. ICE is wrong on both the facts and the law.

On the facts, ICE's courthouse civil arrest policy is not a mere evolution of prior policy, but a sharp reversal that requires more extensive consideration and justification than ICE has ever given. As the Administrative Record and summary judgment record make clear, ICE abruptly broke with its prior policy in 2017 by launching an unprecedented campaign of civil immigration enforcement in and around New York courthouses.

On the law, ICE cannot come close to showing that it is entitled to judgment. The Administrative Record does not reflect that its abrupt ramp-up in courthouse arrests was a product of reasoned decision-making that sufficiently grappled with and accounted for the new policy's adverse impact on the State's administration of justice. *See, e.g., Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). Rather, as the Administrative Record reveals, ICE rescinded its prior policy limiting operations in or around courthouses and sharply increased those operations in New York, without offering a "reasoned explanation" for discarding the prior policy, especially in light of the serious concerns raised by state courts and other stakeholders. *See, e.g.*, *Fox Television*, 556 U.S. at 515-516.

Other than denying any serious policy change, and without sufficient evidence of reasoned decision-making in the Administrative Record, ICE can offer only litigation-driven "*post hoc*

rationalizations" to support its motion. *State Farm*, 463 U.S. at 50. The Court should reject those, too. Summary judgment should be denied.

## A.    ICE's Courthouse Civil Arrest Policy Dramatically Departs from Prior Policy.

ICE's arguments all rest on the assertion that its challenged policy "evolved" out of the agency's prior policies, instead of "making an unannounced change." ICE SMJ Br. at 2, 4-7, 19. Indeed, ICE goes so far as to assert that its current policy "is no different than its predecessors" because it simply responds to changes in enforcement priorities. *Id.* at 19. But this attempt to downplay ICE's about-face on courthouse arrests is belied by the record, which shows a dramatic, unannounced shift in the agency's policy in early 2017.[3] As reflected both in the agency's written guidance and in its on-the-ground tactics, ICE abruptly and radically departed from its pre-2017 policies without adequate—and, at times, without any—explanation.

To start, any fair comparison of ICE's past and present written policies shows that ICE substantially rescinded its prior policy. For example, for years prior to 2017, ICE prohibited administrative arrests "at or near" courthouses unless the target was a national security or serious public safety threat. (*See* AR 76, 127, 171.)[4] Specifically, ICE's prior policy only authorized

---

[3] ICE appears to assume that the agency action challenged here is solely its issuance of the January 2018 Courthouse Civil Arrest Directive. That is not the case. Rather, Plaintiffs challenge ICE's *entire* post-2017 courthouse civil arrest policy, whereby, starting in early 2017, the agency rescinded its prior rules substantially limiting its operations in and around state courthouses and massively increased those operations. *See* 5 U.S.C. § 551(4), (13); Compl. ¶¶ 38-42 (Sept. 25, 2019), ECF No. 1 (alleging policy shift in early 2017 that ICE "formalized" in the 2018 Directive); MTD Op. at 3-4 (discussing Plaintiffs' allegations of the "reversal of ICE's pre-2017 policy" in early 2017 and how "[t]his shift was then formalized by ICE when it issued the Directive in early January 2018"). The Directive, which acknowledged and purported to provide formal guidance in support of that policy, is just one aspect of the agency action challenged here.

[4] Citations to "AR" refer to the Administrative Record filed on the docket at ECF Nos. 55 and 75.

arrests "at or near" courthouses of persons who were considered "Priority 1" targets—the highest possible priority level. (*See* AR 76, 127, 171.) To be considered "Priority 1," a noncitizen had to be either a national security threat or convicted of gang-related crimes, felonies unrelated to immigration status, or "aggravated felonies," as that term is used in the INA. (AR 171.)

Following the President's January 2017 Executive Order, ICE jettisoned these strict limitations and, eventually, formalized its repeal in the Courthouse Civil Arrest Directive. As ICE acknowledges, arrests "near" courthouses are not restricted "in any way" under the Directive. ICE SMJ Br. at 11; *see also* Courthouse Civil Arrest Directive at 1-3, ECF No. 1-1. Accordingly, now, *any* noncitizen subject to civil removal may be arrested by ICE coming from or going to court, regardless of his or her criminal history. This new policy of allowing any and all civil arrests near courthouses is a radical reversal of ICE's past prohibition of such arrests except as to the highest-level targets.

By the same token, even arrests "at" or "inside" courthouses are no longer limited to the highest-level targets under ICE's new policy. The Directive states that targets for arrest inside courthouses "include" those "with criminal convictions, gang members, national security or public safety threats, aliens who have been ordered removed from the United States but have failed to depart, and aliens who have re-entered the country illegally after being removed…." Courthouse Civil Arrest Directive at 1. Standing alone, that list vastly expands the universe of people subject to arrest in courts to include misdemeanants and individuals with no criminal history whatsoever.

What's more, that expanded list is by its own terms not exhaustive. It merely "include[s]" examples without expressly limiting civil arrests to the listed targets, as ICE's prior policy did. And the Administrative Record gives good reason to doubt that there are any limits at all on ICE's operations under its current policy. The January 2017 Executive Order directed ICE to "employ

all lawful means" to enforce the immigration laws "against all removable aliens." (AR 71-75.) And in early 2017, DHS rescinded the entire priority system that had governed its prior enforcement efforts and ordered its agents to "initiate enforcement actions against removable aliens encountered during the performance of their official duties," without limitation. (AR 94; *see* AR 91-96.)[5]

The Directive also deviates sharply from ICE's prior written policy by eliminating the categorical prohibition on collateral arrests. (AR 76, 127, 171.) Whereas ICE's pre-2017 written policies permitted arrests "only" of "specific, targeted aliens, rather than individuals who may be 'collaterally' present" (AR 76, 127, 171), the Directive now expressly permits such arrests in "special circumstances, such as where the individual poses a threat to public safety or interferes with ICE's enforcement actions," Courthouse Civil Arrest Directive at 1. What else might constitute "special circumstances" is left to ICE officers and agents to decide "on a case-by-case basis." *Id*. at 1 n.1.

In sum, the change in ICE's formal, written policies regarding courthouse arrests could hardly be more stark. ICE's prior policy strictly prohibited arrests "at or near" courthouses except as to specific targets who were either national security threats or convicted of the most serious crimes. Now, ICE's written policy allows the agency to operate without restriction on the courthouse steps, to arrest targets with no criminal history at all inside the courthouse, and, in the event of "special circumstances" that ICE can determine itself, to arrest their friends or families, too. That is a dramatic departure.

---

[5] Indeed, as the summary judgment record makes clear, ICE's position is that since 2017, "everyone" is a priority for courthouse arrest. Pls.' Local Rule 56.1 Statement ¶ 46 (Mar. 13, 2020), ECF No. 92.

Beyond ICE's written policies, the Administrative Record also demonstrates the agency's dramatic policy shift in other ways. Letters from state judges and reports by the news media document the startling rise in courthouse arrests in 2017. (*See, e.g.*, AR 165 (Oregon Chief Justice noting in April 2017 "ICE's increasingly visible practice of arresting or detaining individuals in or near courthouses"); *see also, e.g.*, AR 148 (November 2017 Patch.com article noting "skyrocketing" ICE courthouse arrests).) These accounts confirm that ICE abandoned its prior policies restricting courthouses arrests in 2017. Nothing in the Administrative Record either explicitly disputes or implicitly undermines such accounts of ICE's policy shift.

The summary judgment record amassed by Plaintiffs confirms that ICE effected a stark shift in policy.[6] ICE's own arrest records demonstrate the dramatic increase in courthouse arrests starting in 2017, including of low-level offenders appearing in family court, human trafficking court, domestic violence court, or traffic court. Pls.' Local Rule 56.1 Statement ¶¶ 61-72 (Mar. 13, 2020), ECF No. 92 ("R. 56.1 Stmt."). Those practices are also extensively detailed in accounts from state and local officials, professional organizations, and legal service providers. *Id*. ¶¶ 113-130. Testimony and public statements from ICE officials indicate that this expanded enforcement at courthouses was a result of the President's 2017 decision to "take the shackles off" ICE. *Id*. ¶¶ 36, 280-283 (quotation marks omitted). From any angle, the basic factual premise of ICE's argument—that it has enacted no major policy change at all—is simply unsupported by the record.

---

[6] Evidence from outside the Administrative Record can be considered, for example, for purposes of an argument that the agency failed to consider the problem adequately under the APA. *See, e.g.*, *Environmental Def. Fund v. Costle*, 657 F.2d 275, 284-285 (D.C. Cir. 1981).

**B.**   **ICE Failed to Provide a Reasoned Explanation for Its Sharp Departure from Prior Policy.**

Departures from prior policy require "reasoned explanation" for diverging from the status quo. *Fox Television*, 556 U.S. at 515-516; *accord State Farm*, 463 U.S. at 42 ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."). At a minimum, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Fox Television*, 556 U.S. at 515 (emphasis in original). Yet here, ICE has violated this basic principle. The agency disregarded its prior policy in 2017 without any formal public announcement; formalized its disregard in the 2018 Directive, a full year after reversing course; and now mischaracterizes its changed policy as essentially "no different" from what it has done previously. ICE SMJ Br. at 19. ICE's failure to acknowledge those facts alone merits denying the agency's summary judgment motion.

Nor has ICE "show[n] that there are good reasons for the new policy." *Fox Television*, 556 U.S. at 515. As an initial matter, *nothing* in the Administrative Record or elsewhere offers any explanation for why ICE no longer limits arrests "near" courthouses. ICE reversed course on that issue without a word, much less with the requisite "good reasons." *See id*.

More generally, none of the arguments raised by ICE to defend its new policy in this lawsuit find support in the Administrative Record. First, ICE argues that cautionary language in the Directive reflects reasoned decision-making that considered the policy's potentially negative effects on judicial proceedings. ICE SMJ Br. at 17-18 (quoting and discussing the Directive's

13

vague instructions to minimize impact on court proceedings "when practicable," to "generally …

avoid" noncriminal courts, and to "exercise sound judgment"). But those generic cautions do not

engage in any meaningful way with the specific concerns raised to ICE's attention by state courts

and other stakeholders, and, in any event, ICE has not actually adhered to the Directive's purported

limitations on its arrest practices. ICE cannot rely on language that it does not follow to show that

it engaged in reasoned decision-making.

As early as March 2017, state court officials were requesting that ICE ban courthouse

arrests entirely, or, alternatively, formally designate courthouses as "sensitive locations"[7] because

skyrocketing arrests were delaying cases, disrupting proceedings, and deterring the most

vulnerable from accessing justice. (*See, e.g.*, AR 164-166 (April 2017 letter from Chief Justice of

Oregon)); *see also* R. 56.1 Stmt. ¶¶ 114-120 (discussing letters from State Chief Justices and

others).[8]  ICE consistently rebuffed those efforts throughout 2017, without providing any

explanation that appears in the Administrative Record. (*See, e.g.*, AR 188-189 (reiterating that

courthouses were not "sensitive locations" in a June 2017 letter to the President of the National

Center for State Courts).)

---

[7] Under ICE Policy No. 10029.2, *Enforcement Actions at or Focused on Sensitive Locations*, ICE generally may not conduct arrests, interviews, searches, or surveillance at or near certain "sensitive locations."  These locations include schools, hospitals, houses of worship, funerals, weddings, or public demonstrations.

[8] Despite having the opportunity to complete the Administrative Record over a month after it was due, *see* Notice of Filing of Suppl. Administrative R. (Feb. 14, 2020), ECF No. 75, Defendants have included in the Administrative Record multiple responses to letters raising concerns about ICE's policy but often not the underlying letters themselves. (*See, e.g.*, AR 134-135 (including a response to the Chief Justice of California, but not the Chief Justice's original letter).) Plaintiffs direct the Court to their Rule 56.1 Statement here in order to fill out the record that was before the agency. *See Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982) ("[D]efendants' assurances that they have submitted the full record will not substitute for the Court's independent consideration of that issue after some opportunity for discovery.").

State court officials then attempted to find a less ideal, but still workable solution to address their concerns about the interference and disruptions caused by ICE's courthouse civil arrests. In September 2017, the Chief Administrative Judge of New York proposed policy language from "a working group of state chief justices and chief court administrators" that would have permitted ICE "enforcement activities in and around court facilities *only as a last resort*." (AR 162-163 (emphasis added).) When such "last resort" arrests "in and around" courts absolutely had to take place, the proposal would still have generally prohibited such arrests in non-criminal courts or in public areas.

ICE rejected state court officials' key proposals, again without engaging with the harms that officials were raising. The Directive does not ban the challenged arrests, designate courthouses as "sensitive locations," or permit courthouse arrests "only as a last resort." The only surviving scraps of the officials' repeated attempts to reach a solution are bits of the cautionary language that were part of the September 2017 proposal. But that proposed language was intended to further restrict "last resort" arrests; it was not intended to apply to all courthouse civil arrests, as the Directive does. Moreover, this cautionary language does not even apply to arrests "near" courthouses at all, rendering ICE officers' ability to make arrests that disrupt criminal and noncriminal proceedings alike completely unchecked. Nothing in the Administrative Record provides any explanation, let alone justification, for why ICE effectively rejected the core features of the state court officials' proposals. To the contrary, ICE now claims, incorrectly, that its Directive "directly addresses those concerns." ICE SMJ Br. at 17 & n.9.

Moreover, the facts on the ground show that the Directive's cautionary language is not actually being followed and thus does not accurately reflect ICE's true policy in any case. As ICE officials themselves confirmed, ICE routinely makes arrests at or near both criminal and noncriminal

courts in ways that disrupt proceedings for victims, witnesses, plaintiffs, prosecutors, and defenders.[9] R. 56.1 Stmt. ¶¶ 131-215. Those disruptive practices have been part and parcel of ICE's civil courthouse arrest policy since 2017 and did not stop after the release of the Directive. (*See, e.g.*, AR 165.) ICE cannot claim to have reasonably addressed the concerns raised by States if its policy permits officers to routinely disregard those concerns.

Second, in just one short paragraph, ICE offers three justifications for its new policy: (a) "reduc[ing] safety risks to the public, the targeted alien, ICE officers and agents"; (b) following a purported trend whereby "other federal, state and local law enforcement officials routinely engage in enforcement activities in courthouses nationwide"; and (c) responding to "jurisdictions [that] have been unwilling to work with ICE in transferring custody of aliens from prison."  ICE SMJ Br. at 19. None of these justifications are consistent with reasoned decision-making, let alone explain the agency's policy shift.

With respect to the first point, the Administrative Record contains no actual evidence of safety risks, only the same repeated claim that such risks must exist. ICE SMJ Br. at 8-9. The only article in the Administrative Record that mentions both courthouse and non-courthouse arrests is apparently about *criminal* arrests by *non-ICE agents*, not the type of civil immigration arrests at issue here. (AR 156-157); *see also* Pls.' Mem. of Law in Supp. of Mot. for Summ. J. at 18 (Mar.

---

[9] With respect to crime victims, ICE asserts that "[t]he Directive does not alter" ICE Directive 10076.1 (ICE SMJ Br. at 2), which had previously imposed substantial restrictions on arresting victims of crimes (AR 110-112). However, the summary judgment record demonstrates otherwise. *See* R. 56.1 Stmt. ¶ 282 (citing Ex. 138, Devlin Barrett, *DHS: Immigration Agents May Arrest Crime Victims, Witnesses at Courthouses*, Wash. Post (Apr. 4, 2017), at NY_00002837 ("Immigration agents may arrest crime victims and witnesses at courthouses, a homeland security official said Tuesday, highlighting a growing dispute between the Trump administration and some state court officials who fear the practice will hinder law enforcement work in their jurisdictions.")).

13, 2020), ECF No. 93 ("Pls.' SMJ Br."). In its brief, ICE cites another article in the Administrative Record to argue that the need for the formal Directive was partially prompted by a November 2017 arrest inside a Brooklyn courthouse that resulted in a "wild scuffle." ICE SMJ Br. at 10-11 (quotation marks omitted). But the fact that a "wild scuffle" broke out in a courthouse in response to ICE's attempt to make a courthouse civil arrest *undercuts* ICE's assertion that such arrests are necessary to *decrease* safety risks to officers. And notably, nothing in the Directive would have prevented that November 2017 incident from occurring.

On the second point, the other enforcement activities that ICE references (i.e., arrests by local and state police and by federal agencies like the FBI) consist entirely of criminal enforcement. But the Administrative Record provides no reason that ICE's *civil* arrests should be on equal footing to *criminal* arrests supported by probable cause that are conducted by other law enforcement agencies. To the contrary, ICE's new policy involves quite distinct interests from ordinary criminal law enforcement because it expands arrests related to civil immigration enforcement at or near courthouses to people with no criminal record and to the lowest level offenders.

Finally, ICE argues that courthouse arrests are necessary to make up for the fact that some jurisdictions do not permit ICE to leverage the resources of state and local prisons and jails to facilitate ICE's enforcement activities, such as by complying with voluntary "detainer requests" to hold state and local detainees who might otherwise be released without any order from a judge. To the extent that the Administrative Record touches on this point at all, it is only in conclusory terms. (*See, e.g.*, AR 188.) Any mention of such jurisdictions fails to account for the fact that ICE's expansive courthouse civil arrest policy sweeps in a broad range of noncitizens who would never have been subject to transfer from prison or jail under the prior policy. *See* Pls.' SMJ Br. at 20. Moreover, New York City (where many of ICE's courthouse civil arrests take place) stopped

honoring ICE detainers in 2014—years before ICE's new policy was adopted. *See* N.Y.C. Admin. Code §§ 9-131, 14-154. The Administrative Record neither mentions nor discusses this fact, and includes no analysis, research, or discussion of jurisdictions that do not honor detainers that might explain why those jurisdictions' policies justified ICE's dramatic 2017 policy shift.

Beyond those three justifications, ICE's brief also attempts to suggest new rationales for ICE's policy. But this Court should not accept "counsel's *post hoc* rationalizations for agency action." *State Farm*, 463 U.S. at 50. "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id*. In particular, ICE's new claim that the Directive was based on input from state courts and media reports is not consistent with ICE's contemporaneous explanations of the Directive, which contains no such explanation. *See* Courthouse Civil Arrest Directive. And the Directive itself is only the formal acknowledgement of ICE's vastly expanded courthouse civil arrest policy that had already been implemented since early 2017—before any of the cited media reports or state court input occurred. The policy to permit the arrest of *any* removable noncitizen who might appear in court came first, with devastating costs to victims, witnesses, plaintiffs, and the wider community. Thus, nothing, not even ICE's post-hoc litigation position, demonstrates any attempt to actually weigh the costs and benefits of its policy shift—to compare the serious costs to the administration of justice in the States against the purported benefits of conducting federal civil immigration enforcement operations in and around state courthouses. *See Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) ("One would not say that it is even rational . . . to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits."). ICE's arguments for summary judgment on Plaintiffs' "arbitrary and capricious" claim should be rejected.

## CONCLUSION

Defendants' motion for summary judgment should be denied.

DATED:  April 20, 2020                          Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Steven C. Wu*
Steven C. Wu
  *Deputy Solicitor General*
Matthew Colangelo
  *Chief Counsel for Federal Initiatives*
Morenike Fajana, *Special Counsel*
Fiona Kaye, *Assistant Attorney General*
Daniela Nogueira, *Assistant Attorney General*
Ari J. Savitzky, *Assistant Solicitor General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6312
steven.wu@ag.ny.gov

*Attorneys for the State of New York*

ERIC GONZALEZ
*District Attorney of Kings County (Brooklyn)*

By: */s/ Jill Harris*
Jill Harris, *Chief of Policy and Strategy*
Kings County District Attorney's Office
350 Jay Street
Brooklyn, New York 11201
Phone: (718) 250-3156
harrisj1@BrooklynDA.org

*Attorney for the District Attorney of Kings County
(Brooklyn)*

19