UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STATE OF NEW YORK and ERIC GONZALEZ,

Plaintiffs,

v.

UNITED STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT; MATTHEW T. ALBENCE, in his
official capacity as Acting Director of United States
Immigration and Customs Enforcement; UNITED STATES
DEPARTMENT OF HOMELAND SECURITY; and
CHAD WOLF, in his official capacity as Acting Secretary
of Homeland Security,

Defendants.

19 Civ. 8876 (JSR)

---

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2614/2695/2721
Fax: (212) 637-2686
Email: rebecca.friedman@usdoj.gov
        jeffrey.oestericher@usdoj.gov
        tomoko.onozawa@usdoj.gov

REBECCA R. FRIEDMAN
JEFFREY S. OESTERICHER
TOMOKO ONOZAWA
Assistant United States Attorneys, *Of Counsel*

# TABLE OF CONTENTS

ARGUMENT ........................................................................................................................1

    A.    The Courthouse Directive Has a Rational Basis and Is Not Arbitrary or Capricious ...........................................................................................................1

        1.    The Directive Is the Product of Reasoned Decisionmaking .......................1

        2.    The Directive Is Not Prohibited by the Common-Law Privilege Against Civil Arrest ...........................................................................11

    B.    This Court Should Deny Summary Judgment on Plaintiffs' Tenth Amendment Claims ...................................................................................13

        1.    ICE Has Not Violated New York's Sovereign Right to Maintain an Independent Judiciary ................................................................13

        2.    ICE Is Not Violating the Anti-Commandeering Doctrine .......................21

CONCLUSION.................................................................................................................24

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Arizona v. United States*,
567 U.S. 387 (2012) ........................................................................................... 23

*Camp v. Pitts*,
411 U.S. 138 (1973) ............................................................................................. 8

*Chamber of Commerce of U.S. v. Securities and Exchange Commission*,
412 F.3d 133 (D.C. Cir. 2005) ............................................................................ 7

*Chick Kam Choo v. Exxon Corp.*,
486 U.S. 140 (1988) ........................................................................................... 21

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117, 2126 (2016) .............................................................................. 6

*Herrera-Inirio v. INS*,
208 F.3d 299 (1st Cir. 2000) ............................................................................. 11

*In re Tarble*,
80 U.S. 397 (1871) ............................................................................................. 23

*Kaufman v. Kaye*,
466 F.3d 83 (2d Cir. 2006) ............................................................................... 21

*Lamb v. Schmitt*,
285 U.S. 222 (1932) ........................................................................................... 12

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) .......................................................................... 23

*Michigan v. Environmental Protection Agency*,
135 S. Ct. 2699 (2015) ........................................................................................ 9

*Mingo Logan Coal Co. v. Environmental Protection Agency*,
829 F.3d 710 (D.C. Cir. 2016) ............................................................................ 9

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................................................... 1

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
138 S. Ct. 1461 (2018) ...................................................................................... 22

*Nat'l Ass'n of Regulatory Utility Comm'rs v. Interstate Commerce Comm'n*,
41 F.3d 721 (D.C. Cir. 1994) ............................................................................ 9

*Natural Resources Defense Council, Inc. v. Muszynski*,
268 F.3d 91 (2d Cir. 2001) ............................................................................... 8

*New York v. U.S. Dep't of Commerce*,
351 F. Supp. 3d 502 (S.D.N.Y. 2019) ............................................................ 13

*O'Shea v. Littleton*,
414 U.S. 488 (1974) ........................................................................................ 21

*Printz v. United States*,
521 U.S. 898 (1997) ........................................................................................ 22

*Riverkeeper, Inc. v. U.S. Environmental Protection Agency*,
358 F.3d 174 (2d Cir. 2004) ............................................................................. 8

*Scanner Techs. Corp. v. Icos Vision Sys. Corp.*,
253 F. Supp. 2d 624 (S.D.N.Y. 2003) ........................................................... 18

*Stillwell v. Office of Thrift Supervision*,
569 F.3d 514 (D.C. Cir. 2009) ......................................................................... 7

*Toll v. Moreno*,
458 U.S. 1 (1982) ........................................................................................... 23

*United States v. Green*,
305 F. Supp. 125 (S.D.N.Y. 1969) ................................................................. 12

*United States v. Lett*,
944 F.3d 467 (2d Cir. 2019) ........................................................................... 11

*United States v. Santana*,
427 U.S. 38 (1976) ........................................................................................... 8

*United States v. Watson*,
423 U.S. 411 (1976) ......................................................................................... 8

*Younger v. Harris*,
401 U.S. 37 (1971) ......................................................................................... 21

**Statutes**

8 U.S.C. § 1226 ................................................................................. 13, 21, 22

8 U.S.C. § 1229 ........................................................................................ *passim*

8 U.S.C. § 1326 .................................................................................................. 3

8 U.S.C. § 1357(a) ................................................................................. 13, 21, 22

8 U.S.C. § 1367 .................................................................................................. 2

**Other Authorities**

H.R. Rep. 109–233, at 120 (2005) ................................................................... 4

U.S. Const. amend. X ............................................................................. *passim*

Defendants U.S. Immigration and Customs Enforcement ("ICE"), Matthew T. Albence, in his official capacity as Acting Director of ICE, United States Department of Homeland Security ("DHS"), and Chad Wolf, in his official capacity as Acting Secretary of Homeland Security, respectfully submit this memorandum of law in opposition to Plaintiffs' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## ARGUMENT

### A. The Courthouse Directive Has a Rational Basis and Is Not Arbitrary or Capricious

#### 1. The Directive Is the Product of Reasoned Decisionmaking

The Directive meets the APA's requirements for reasoned decisionmaking. "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Deference is particularly warranted where, as here, the agency action is not one that imposes benefits or burdens upon regulated parties, but rather is a statement of ICE's discretionary policies for determining at which public location a targeted alien may be subject to a civil immigration enforcement action, and the manner in which ICE officers and agents are required to exercise that discretion.

Plaintiffs principally, and mistakenly, complain that "ICE's new courthouse civil arrest policy departs sharply from its prior practice of respecting state judicial proceedings and the distinct sovereign interests they serve," and "radically chang[ed] course" from prior policies. *See* Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment ("Pls.' Br.") at 16, 17. That argument fails for several reasons. The Administrative Record demonstrates that prior to the January 10, 2018 Directive (the "Directive"), ICE had been conducting civil immigration arrests and other enforcement activities at or near courthouses for years pursuant to established policies. As explained in Defendants' opening brief and as set forth in the

Administrative Record, the Directive evolved out of ICE's prior policies with respect to civil

immigration enforcement actions at or near courthouses, which were first issued in March 2014,

and revised in January 2015 and October 2015—none of which have been challenged.  *See*

Defendants' Memorandum of Law in Support of Partial Motion for Summary Judgment ("Defs.'

Br.") at 4–7; *see also* AR 76, 171–172, 127.[1]  Moreover, Plaintiffs fail to explain why it was

unreasonable for ICE to revise its civil immigration enforcement policies in or around

courthouses to comport with changes in both local compliance with ICE detainers and DHS

enforcement priorities.  Defs.' Br. at 4–6.  Indeed, the Administrative Record demonstrates ICE's

past practice of revising its courthouse policies to reflect changing enforcement priorities.  *See*

Declaration of Matthew Colangelo [ECF No. 91] ("Colangelo Decl."), Ex. 38; *see, e.g.,* AR 171–

172.  Accordingly, it was reasonable for ICE to issue the Directive after President Trump issued

Executive Order 13768 on January 25, 2017, which expanded the categories of aliens to be

prioritized for removal and specifically directed DHS to expand its removal priorities and review

its existing policies for consistency with that order.  Defs.' Br. at 6–7.

Plaintiffs nonetheless insist that "ICE's new courthouse civil arrest policy departs sharply

from its prior practice of respecting state judicial proceedings and the distinct sovereign interests

they serve," Pls.' Br. at 2, 16, and cite pages from the Administrative Record relating to other

ICE policies prohibiting removal proceedings against individuals known to be the immediate

victim or witness to a crime, individuals known to be in non-frivolous lawsuits regarding

violations of civil rights or liberties, individuals engaging in a protected activity relating to civil

rights or other rights, and the disclosure of information protected by 8 U.S.C. §1367, *see id.*

(citing AR 39–53, 88–90, 110–112).  However, nothing in the Directive "departs sharply" from

---

[1] All references to "AR" are to the Administrative Record filed on January 3, 2020 [ECF No. 55], and the Supplemental Administrative Record filed on February 14, 2020 [ECF No. 75].

these policies.  As explained in Defendants' opening brief, the Directive differs from ICE's

March 2014 Directive in three main respects: (1) it focuses solely on civil immigration

enforcement actions "inside" courthouses (as opposed to at or near courthouses); (2) consistent

with the expanded categories of enforcement priorities in the Executive Order, Section 2 of the

Directive adds two new categories of targeted aliens: "aliens who have re-entered the country

illegally after being removed" (a federal felony under 8 U.S.C. § 1326) and "aliens who have

been ordered removed from the United States but have failed to depart"; and (3) Section 2 of the

Directive articulates "special circumstances" in which ICE may arrest non-target aliens, such as

when "the individual poses a threat to public safety or interferes with ICE's enforcement

actions."  *See* Colangelo Decl. Ex. 53, at DHS 0032.  Otherwise, the Directive is consistent with

prior ICE policies that also authorized courthouse arrests.

Plaintiffs also incorrectly claim that the Directive is arbitrary and capricious because it

"undermine[s] federal objectives that Congress sought to achieve in statutes such as the 1994

Violence Against Women Act ('VAWA'), the 2000 Victims of Trafficking and Violence

Protection Act, and with the T- and U-visa programs,"  Pls.' Br. at 16, "fail[ed] to consider its

own prior determination of congressional objectives . . . .," *id.* at 17, and allegedly failed to

consider "federal policies like those advanced by VAWA . . . ."  *Id.*  However, as explained in

Defendants' opening brief, *see* Defs.' Br. at 16, Congress was fully aware of the practice of

conducting immigration enforcement actions against aliens at courthouses in 2006.  8 U.S.C.

§ 1229(e)(1)–(2).  Furthermore, its legislative priorities in enacting § 1229 were to prevent the

government from relying solely on information provided by abusers when determining whether

to proceed with a removal proceeding, and to ensure that the government would keep

information relating to victims of abuse strictly confidential.  The House Report underlying the

enactment of section 921 of VAWA 2005 makes clear that section 1229(e) was:

> [D]esigned to ensure that abusers and criminals cannot use the immigration
> system against their victims.  Examples include abusers using DHS to obtain
> information about their victims, including the existence of a VAWA immigration
> petition, interfering with or undermining their victims' immigration cases, and
> encouraging immigration enforcement officers to pursue removal actions against
> their victims.

H.R. Rep. 109–233, at 120 (2005).

The House Report further provides that "[8 U.S.C. § 1229(e)] establishes a system to

verify that removal proceedings are not based on information prohibited by section 384 of

IIRIRA [the Illegal Immigration Reform and Immigrant Responsibility Act of 1996]," and

requires DHS to certify, *inter alia*, that:

> (1) no enforcement action was taken leading to such proceedings against an alien
> at certain places including . . . a courthouse if the alien is appearing in connection
> with a protection order or child custody case, or that
>
> (2) such an enforcement action was taken, but that there was no violation of the
> aforementioned provisions.

*Id.* at 121.  As set forth in Defendants' opening brief, *see* Defs.' Br. at 16, Congress made clear

that "[r]emoval proceedings filed in violation of section 384 of IIRIRA" must be dismissed,

H.R. Rep. 109–233, at 121, but instructs that "further proceedings *can be brought*" so long as the

government does not violate the confidentiality provisions of IIRIRA section 384.  *Id.* (emphasis

added).  Accordingly, nothing in the legislative history of 8 U.S.C. § 1229(e) shows that

Congress sought to "encourag[e] aliens' attendance at court" by barring ICE from arresting

aliens at or around federal, state, and local courthouses, nor demonstrates that the Directive was

issued in repudiation of Congressional intent.  Pls.' Br. at 14.

Moreover, contrary to Plaintiffs' assertion, *see* Pls.' Br. at 17, the plain language of the Directive demonstrates that ICE considered the impact on crime victims, VAWA-self petitioners, other categories of potentially vulnerable aliens, witnesses to criminal proceedings, and family members and friends.  Section 2 of the Directive provides that "[a]liens encountered during a civil immigration enforcement action inside a courthouse, such as family members or friends accompanying the target alien to court appearances or serving as a witness in a proceeding, will not be subject to civil immigration enforcement action, absent special circumstances" which include posing a threat to public safety or interfering with ICE's enforcement actions.  Colangelo Decl. Ex. 53, at DHS 0032.  The Directive also reminds ICE officers of additional requirements imposed by VAWA with respect to civil immigration actions at courthouses against certain victims and witnesses.  *Id.* at DHS 0034 n.2.  Section 2 of the Directive further instructs ICE officers "generally [to] avoid enforcement actions in courthouses, or areas within courthouses that are dedicated to non-criminal (*e.g.,* family court, small claims court) proceedings."  *Id.* at DHS 0033.  That language is consistent with the language that Chief Administrative Judge of the New York State Unified Court System ("UCS") proposed to ICE, which provided that, "absent exigent circumstances, agents should avoid enforcement actions in court facilities and/or during scheduled proceedings which are dedicated to non-criminal matters."  (AR 163).

Plaintiffs also mistakenly claim that the issuance of the Directive was arbitrary and capricious because ICE failed to consider "prior policy" and "serious reliance interests" engendered by those prior policies.  Pls.' Br. at 16.  Past ICE policies and the general longstanding presence of law enforcement agents performing lawful enforcement activities in courthouses could not have led the public to assume that ICE never conducted civil immigration activities in courthouses at any time.  As a matter of public record, ICE has issued several

courthouse arrest policies since 2014 (AR 76, 127, 171–172), and ICE has never deemed courthouses to be "sensitive locations" within the meaning of ICE Policy No. 10029.2 (AR 160, 177, 188, 190; *see also* Defs.' Br. at 9).  Plaintiffs also do not and cannot dispute that, unlike "sensitive locations" such as schools, hospitals and places of worship, federal, state and local law enforcement agencies have regularly entered courthouses to arrest targeted subjects and conduct other law enforcement activities.  As the New York State UCS acknowledged when it issued its "Policy and Protocol Governing Activities in Courthouses by Law Enforcement Agencies" on April 26, 2017, "law enforcement agencies" have regularly "act[ed] in the pursuit of their official legal duties in New York State courthouses."  (AR 173).  This is not a case where a brand-new policy completely upended serious reliance interests along the lines of what the Supreme Court recognized, for example, in *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)— *e.g.,* "decades of industry reliance" on an agency's "prior policy," where the agency's "new position could necessitate systemic, significant changes" with those who fail to comply facing "substantial . . . liability," "even if this risk of liability" could be reduced by applicable statutory exemptions or defenses.  *See New York v. U.S. Dep't of Justice*, 951 F.3d 84, 123 (2d Cir. 2020) (finding *Encino* inapposite in immigration-related APA and 10th Amendment challenge).

Plaintiffs also claim that the Directive is arbitrary and capricious because of ICE's purported failure to "more concretely explain[] the 'safety risks' that ICE agents supposedly face when conducting arrests outside of courthouse or attempt[] to describe the magnitude of such risks."  Pls.' Br. at 18.[2]  The Administrative Record shows that ICE repeatedly conveyed the indisputable observation that courthouse visitors are subjected to weapons screening in a way

---

[2] Plaintiffs incorrectly contend that ICE relied on the news article that appears on AR 156–157 to support the agency's "'safety' rationale."  Pls.' Br. at 18.  However, the news article supports ICE's understanding of, and provides just one example of, an arrest by other federal and local law enforcement officials in a courthouse.  *See* Defs.' Br. at 9.

that individuals generally in the public are not, and that the confirmed absence of weapons in courthouses reduces potential safety risks when conducting civil immigration enforcement activities there.  *See, e.g.,* AR 135 ("ICE officers and agents are required to locate and arrest these aliens in public places . . . where the risk of injury to the public, the alien, and the officer is significantly increased because the alien can more readily access a weapon, resist arrest, or flee. Because courthouse visitors are typically screened upon entry to search for weapons and other contraband, the safety risks for the arresting officers and persons being arrested are substantially decreased."); *see also* AR 188, 190.  To the extent that Plaintiffs are contending that ICE was subject to a heightened burden of explanation and had to "determine the magnitude of any risks faced by ICE agents in conducting arrests at non-courthouse locations" by some method, *see* Pls.' Br. at 19, "[t]he APA imposes no general obligation on agencies to produce empirical evidence" for its policy judgments.  *Stillwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009); *see also Chamber of Commerce of U.S. v. Securities and Exchange Commission*, 412 F.3d 133, 142 (D.C. Cir. 2005) ("we are acutely aware that an agency need not—indeed cannot—base its every action upon empirical data").

Plaintiffs also claim that there is a "severe mismatch between ICE's policy, which allows courthouse arrests of *any* person who might appear in court, and ICE's asserted interest in 'the transfer of custody of aliens' from state and local 'prisons and jails.'"  Pls.' Br. at 20 (emphasis in original).  But nothing in the Directive allows civil immigration enforcement actions against "*any* person who might appear in court," *see* Colangelo Decl. Ex. 53, at DHS 0032; instead, the Directive constrains the authority of ICE officers and agents by identifying the types of aliens that should be targeted for enforcement inside courthouses and those aliens against whom enforcement actions should not be taken, "absent special circumstances."  *Id.*  Similarly,

Plaintiffs improperly rely on disputed facts in their Rule 56.1 Statement to assert that the Directive arbitrarily and capriciously "applies to a broad swath of people who may never have been subject to any transfer request from a local prison or jail." *See generally* Defs.' Responses to R. 56.1 Stmt. ¶¶ 70–72.  A judicial determination of agency action as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" is a "narrow" one that is squarely "limited to examining the administrative record to determine 'whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Riverkeeper, Inc. v. U.S. Environmental Protection Agency*, 358 F.3d 174, 184 (2d Cir. 2004) (quoting *Natural Resources Defense Council, Inc. v. Muszynski*, 268 F.3d 91, 97 (2d Cir. 2001)). *See also Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("In applying the [§ 706(2)(A)] standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

Finally, Plaintiffs' argument that ICE patently ignored "objections raised by state courts" when it issued the Directive and failed to undertake a "consideration of costs" is unavailing. Pls.' Br. at 17.  These assertions provide no basis for a challenge under the APA.  As an initial matter, although Plaintiffs fault ICE for responding to letters from state judges with the "stark legal position that ICE has unrestricted authority to conduct civil immigration arrests in any 'public place,'" Pls.' Br. at 17 (citing AR 134), it was hardly arbitrary and capricious for ICE to rely on Supreme Court precedent acknowledging the constitutionality of warrantless arrests in public locations that are supported by probable cause.  *See United States v. Santana*, 427 U.S. 38, 42 (1976) ("In *United States v. Watson* . . . we held that the warrantless arrest of an individual in a public place upon probable cause did not violate the Fourth Amendment) (citing *United States v. Watson*, 423 U.S. 411 (1976)).

Moreover, the Directive demonstrates that ICE undertook its best efforts to balance its statutory enforcement authority and priorities against the concerns of state judges and members of the public.  As described above, *see supra* at p. 5, the Directive instructs ICE officers and agents to generally avoid courthouses or areas within courthouses that are dedicated to non-criminal proceedings.  Colangelo Decl. Ex. 53, at DHS 0033.  The Directive is further tailored to address potential disruptions to state courthouses and judicial proceedings, by instructing that "civil immigration enforcement actions inside courthouses should, to the extent practicable":

- Continue to take place in non-public areas of the courthouse;
- Be conducted in collaboration with court security staff;
- Utilize the court building's non-public entrances and exits;
- Be conducted to avoid unnecessarily alarming the public;
- Be conducted so as to limit ICE officers' time at courthouses.

*Id*.

While Plaintiffs assert that ICE did not make an adequate factual determination to support the Directive, they rely on wholly inapposite cases, including matters where the agency failed to consider the kind of cost-benefit analysis required in formal rulemaking proceedings. *See, e.g., Michigan v. Environmental Protection Agency,* 135 S. Ct. 2699, 2705 (2015) (describing Clean Air Act provisions requiring EPA to conduct studies and consider costs when regulating emissions of hazardous air pollutants from power plants).  *See also Nat'l Ass'n of Regulatory Utility Comm'rs v. Interstate Commerce Comm'n*, 41 F.3d 721, 726 (D.C. Cir. 1994) (holding that, in APA challenge to Interstate Commerce Commission's regulations under Intermodal Surface Transportation Efficiency Act, "the inquiry at the second step of *Chevron* overlaps analytically with a court's task under the [APA]"); *Mingo Logan Coal Co. v. Environmental Protection Agency*, 829 F.3d 710, 719–724 (D.C. Cir. 2016) (holding as a

procedural matter that the regulated entity that sued EPA under the APA waived any argument that EPA failed to consider the dollar costs incurred by that entity).

The analogous case here is the Second Circuit's recent decision in *New York v. U.S. Dep't of Justice*,, 951 F.3d 84 (2d Cir. 2020), which involved APA and Tenth Amendment challenges to three conditions that the Department of Justice ("DOJ") placed on the receipt of law-enforcement grants under the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program for fiscal year 2017.  The conditions were imposed to ensure that state regulatory schemes did not impair the operation of the federal immigration laws by inhibiting information-sharing between state and federal officials about an individual's immigration status.  *Id.* at 94–95.  Plaintiffs sued, claiming that DOJ acted arbitrarily and capriciously in imposing the challenged conditions, *id.* at 122–23, and like Plaintiffs here, that the APA required DOJ to "consider[] the conditions' negative consequences, particularly in undermining relationships between immigrant communities and local law enforcement." *Id.* at 122.

The Second Circuit disagreed.  Instead, the Second Circuit held that because DOJ was statutorily authorized to impose the challenged conditions, "nothing in the statute authorized DOJ to excuse a Byrne applicant from certifying its willingness to comply with an applicable federal law on a finding that the detrimental effects of compliance outweigh the benefits."  *Id.* "Indeed, that would be particularly unwarranted here where the legislative history shows that Congress was itself aware of the very detrimental effects raised by plaintiffs when it enacted [the statute]."  *Id.*  The same reasoning applies here.  Under the INA's grant of broad arrest power to ICE generally, and by enacting 8 U.S.C. § 1229(e), Congress was fully aware that certain categories of aliens were subject to arrest in courthouses and was aware of the detrimental effects of pursuing removal proceedings against them generally.  Rather than ban courthouse arrests,

however, Congress sought to balance the law enforcement prerogatives of the Executive Branch against the rights of victims by ensuring that such arrests and proceedings were not based solely on information provided by an abuser and that the government kept sensitive victim information in strict confidence.  *See supra* at p. 3-4.

### 2.      The Directive Is Not Prohibited by the Common-Law Privilege Against Civil Arrest

Plaintiffs' next argument, that they are entitled to summary judgment because ICE has "pursued a courthouse civil arrest policy that conflicts with the common law privilege and thus exceeds ICE's authority under the INA," Pls.' Br. at 13–15,[3] is also incorrect.  As Defendants explained in their opening brief, there is no state or federal common law privilege against federal immigration enforcement arrests.  *See* Defs' Br. at 14–17.[4]

As the Second Circuit in *New York v. DOJ* explained, "in the immigration context . . . it is the federal government that holds 'broad,' . . . and 'preeminent' power," and the INA is "Congress's 'extensive and complex' codification of that power."  951 F.3d at 113 (internal quotations omitted).  Because "Congress possesses plenary authority over immigration-related matters, it may freely displace or preempt state laws in respect to such matters."  *Herrera-Inirio v. INS*, 208 F.3d 299, 307 (1st Cir. 2000).  The Second Circuit's decision in *United States v. Lett*, 944 F.3d 467 (2d Cir. 2019) is also instructive.  *Lett* explored the interplay of two federal laws, and explained that the fact that another law authorizes a different action (release on bail for criminal charges) does preclude the government from exercising its authority under the INA to

---

[3] Defendants do not dispute that they have conducted civil immigration enforcement arrests; rather, ICE has a long-standing policy of making targeted arrests of specific aliens in or around courthouses.  Defs.' Br. at 1 (citing AR 76, 127, 171).

[4] While this Court recognized a common law privilege against arrest when it denied the motion to dismiss, Defendants respectfully submit that the Court's ruling disregarded the plenary power of the federal government over immigration and that, by the time the INA was enacted, the common law privilege against "arrest" was limited to service of process.

detain individuals for removal.  *Id.* at 470–71.  If a federal law cannot prevent an authorized

immigration enforcement action, *a fortiori*, a state law cannot prevent the same enforcement

action because of the Supremacy Clause and the federal government's plenary power over

immigration.  *See* Defs.' Br. at 14.

Plaintiffs focus on the "core purposes behind the privilege"—encouraging witnesses to

come forward voluntarily, and enabling the court to function.  Pls.' Br. at 14–15.  But they fail

to address the more recent cases which hold that when an out-of-state defendant is subject to

civil process under a forum state's long-arm statute, the privilege does not apply.  *See generally*

*United States v. Green*, 305 F. Supp. 125, 128 (S.D.N.Y. 1969).  In *Green*, defendants argued

that they were immune to service of subpoenas under the privilege laid out in *Lamb v. Schmitt*,

285 U.S. 222 (1932), stating that they "might not voluntarily attend the examination armed with

the knowledge of possible liability to service of the subpoenas."  *Green*, 305 F. Supp. at 127–28.

The court noted that "there is no jurisdiction in which petitioners could have avoided service of

process as an original matter, because their conditions of bail restricted their travel to the

continental United States."  *Id.* at 128.  Given that "defendants were not lured into jurisdictional

quicksands that imperiled their rights or privileges," the service of process was not the "type of

activity meant to be prevented in *Lamb*."  *Id.* at 129.  Like the defendants in *Green* who could be

served with process in any location, aliens are subject to enforcement of federal immigration law

in any jurisdiction, and thus the rationale behind the common law privilege does not apply.

Likewise, Plaintiffs' focus on enabling the "courts to function properly," is misplaced.

Pls.' Br. at 14–15.  The Directive is tailored to address potential disruptions to state courthouses.

*See, supra* at p. 9.  And even if there was a common law privilege against arrest, which there is

not, the comprehensive system regarding immigration arrests displaced any common law

privilege.  *See* 8 U.S.C. §§ 1226, 1357(a); 1229(e); *see* Defs' Br. at 15–16.[5]

**B.     This Court Should Deny Summary Judgment on Plaintiffs' Tenth Amendment Claims**

**1.     ICE Has Not Violated New York's Sovereign Right to Maintain an Independent Judiciary**

Contrary to Plaintiffs' argument, there is a material dispute as to whether "ICE's

courthouse civil arrests have directly interrupted and undermined ongoing proceedings" to an

extent so as to violate the Tenth Amendment.  Pls.' Br. at 22.  In particular, contrary evidence

shows that (1) the Directive contains numerous provisions designed to minimize interference

with court operations, (2) ICE has complied with the policies the New York State UCS designed

to minimize interference with court proceedings, and (3) Plaintiffs' purported evidence of

significant interference involves mostly anecdotal accounts and inadmissible hearsay.

First, it is not disputed that the Directive contains restrictions designed to minimize

interference with court operations.  Section 1 of the Directive directs that "when practicable,"

ICE officers should "conduct enforcement actions discreetly to minimize their impact on court

proceedings" and should "make every effort to limit their time at courthouses."  *See* Colangelo

Decl., Ex. 53 at DHS 0032-33.  The Directive also provides that ICE officers should generally

---

[5] Plaintiffs improperly rely on disputed facts in their Rule 56.1 Statement to assert that ICE's policy exceeds the agency's statutory authority and violates the so-called common-law privilege against courthouse civil arrests.  *See* Pls.' Br. at 14–15.  For example, Plaintiffs claim that "the evidence and data developed in discovery thus far confirms a massive increase in those arrests since 2017," which is outside of the Administrative Record and irrelevant to the legal question of whether a common law privilege exists against civil immigration enforcement actions. Accordingly, the Court should disregard those factual assertions.  *See New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 636 (S.D.N.Y. 2019) *aff'd in part, rev'd in part on other grounds*, 139 S. Ct. 2551 (2019) ("Similarly, the Court may not—and does not—consider any extra-record evidence (and materials of which the Court may take judicial notice) in evaluating Plaintiffs' arguments that [the agency's] decision was 'not in accordance with law' or 'without observance of procedure by law.' . . . .").

avoid enforcement actions in non-criminal courthouses or court parts unless "operationally necessary," should use the court building's non-public entrances and exits, and should avoid collateral arrests "absent special circumstances." *Id.* at DHS 0032, DHS 0033.

Plaintiffs acknowledge these restrictions, but argue that ICE has not "restrained their office's courthouse arrest activities in light of this language," and that the Directive has not "meaningfully limited ICE's actual arrest practices." Pls.' Br. at 8. Instead, Plaintiffs argue that ICE has pursued civil immigration arrests in non-criminal courts, pursued collateral arrests, and have used aggressive or violent means. *Id.* However, those broad statements are disputed and are not supported by the evidence.

Rather, the record shows that ICE officers in general avoid civil immigration enforcement actions in courthouses or areas within courthouses that are dedicated to non-criminal, *e.g.*, family court and small claims court proceedings, unless they are operationally necessary. *See* Defendants' Rule 56.1 Counterstatement ("Defs.' 56.1 Counterstmt.") ¶ 319. As Thomas Decker, the New York Field Office Director for ICE's Enforcement and Removal Operations ("ERO") division ("FOD Decker") explained, ICE's New York Field Office does not knowingly target aliens for civil immigration enforcement actions in human trafficking courts or other special courts unless it is a "situation that we had to go there." *Id.* at ¶ 316. Similarly, ICE does not pursue civil immigration enforcement collateral arrests at courthouses in New York State absent special circumstances. *Id.* ¶ 318. Deputy Field Office Director ("DFOD") Judge noted that the Buffalo Field Office adheres to the collateral arrest special circumstances policy, and in the New York Field Office, Supervisory Detention and Deportation Officer ("SDDO") McGinnity testified that the Directive limits collateral arrests to "special circumstances," explaining that they can only be effected when something "out of the norm" occurs. *Id.* (citing

Onozawa Decl. Ex. J (McGinnity Individual Tr.) at 96–99, 101 and Onozawa Decl. Ex. F (Judge 30(b)(6) Tr.) at 44.   Perhaps most significantly, the factual record shows that ICE considers courthouse arrests to be a location of "last resort," to be considered only after other locations have been ruled out and/or attempted.   *Id.* ¶¶ 334–37.

Plaintiffs do not address these facts, and instead claim, in conclusory fashion, that the record supports their view of no meaningful limitations.   Pls.' Br. at 8, 22-23.   The evidence they cite on collateral arrests, non-criminal court arrests, and violence[6] consist of anecdotal accounts that are limited in number and/or inadmissible due to hearsay.   *See, e.g.* Response to Plaintiffs' Rule 56.1 Statement ¶¶ 63, 70–72, 138.[7]

Second, while Plaintiffs argue that ICE's increase in courthouse arrests has "compelled" New York's Chief Administrative Judge to issue policy guidance, Pls.' Br. at 23, Plaintiffs ignore that ICE has complied with both the 2017 and 2019 UCS Policies.   *See* Defs.' 56.1 Counterstmt. ¶¶ 297, 300.   Plaintiffs' assertion that ICE "gives no weight whatsoever to the States' reserved prerogative to maintain their own judiciaries," is both unsupported and mistaken.   Pls.' Br. at 23.   To the contrary, ICE has attempted to address potential disruptions to state courthouses and proceedings through the Directive and compliance with the UCS policies. *See* Defs.' 56.1 Counterstmt. ¶¶ 297, 300, 304, 305, 338; *see supra* at p. 9.

Furthermore, Plaintiffs' assertion that "ICE's [courthouse arrest] policy has deterred" participants, litigants, witnesses, and other parties from attending court, Pls.' Br. at 23, ignores that there is a material dispute as to whether ICE's courthouse arrests—as opposed to greater ICE enforcement in general—are making non-citizens more reluctant to attend court.   As FOD

---

[6] *See, e.g.*, Pls.' Br. at 5–6, 8.

[7] For example, R. 56.1 ¶ 138, the cited support on page 8 of Plaintiffs' brief, is based on inadmissible hearsay.   *See* Response to Plaintiffs' Rule 56.1 Statement ¶ 138.

Decker explained, pursuant to the *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017) (the "2017 Implementing Memo"), immigration arrests at or near courthouses would no longer be limited to Priority 1 noncitizens, and instead "made everyone a priority."  Colangelo Decl. Ex. 35 (Decker Tr.) at 130 (discussing the 2017 Implementing Memo, available at AR 97-109).  Yet the evidence that Plaintiffs cite as support for their claim that ICE's courthouse arrest policy discourages witnesses from attending court in fact discusses ICE enforcement actions more generally.  For example, Plaintiffs cite to Myongjae M. Yi's declaration (Colangelo Decl. Ex. 22) to support their claim of a generalized fear arising from courthouse arrests; however, Yi's witnesses discussed other fears, for example that ICE would "com[e] for me now" because "my name and contact information were mentioned in Court." Defs.' Responses to R. 56.1 Stmt. ¶¶ 213–14.

There is also a genuine issue of material fact with respect to whether ICE enforcement actions in and around courthouses have had a significant negative effect on New York state court proceedings.  The record is thin as to whether ICE courthouse arrests have disrupted New York state court operations by deterring witnesses, defendants, and others from attending court as Plaintiffs' facts are often inadmissible as hearsay or opinion.  *See* Defs.' Responses to R. 56.1 Stmt. ¶¶ 186, 189–200.  Moreover, to the extent Plaintiffs rely on testimony by the Brooklyn DA's Office's 30(b)(6) witnesses that ICE courthouse arrests negatively impacted the work of that office from 2017 onwards, *see* Pls.' Br. at 10, 11, such "facts" are conclusory assertions likely supported by inadmissible hearsay, or appear to conflate fears of ICE courthouse arrests with fears of ICE enforcement generally unrelated to courthouses.  *See* Defs.' Responses to R. 56.1 Stmt. ¶¶ 201–211; Defs.' 56.1 Counterstmt. ¶¶ 346-50.  Moreover, the Brooklyn DA's Office's contention is belied by the fact that, as a matter of policy, the Office, has never tracked

or memorialized whether the immigration status of individual defendants or witnesses make them subject to ICE enforcement at courthouses under the Directive.  *See* Defs.' 56.1 Counterstmt. ¶¶ 340-45, 350.  Inasmuch as Plaintiffs' alleged in their Complaint that "calls to the Brooklyn DA's Immigrant Affairs Unit ('IAU') decreased by 67% in 2018 compared to 2016" because of the Directive, Compl. ¶ 101, the Brooklyn DA's 30(b)(6) witness conceded that the number of calls in 2016 was exceptionally high because the change in administrations in 2017 spurred fraudsters to take advantage of the immigrant community by promising expedited immigration services, Defs.' 56.1 Counterstmt. ¶ 356.  The same witness attributed the decrease in the number of calls from 2016 to 2018 to generalized fears of "ramped up enforcement" by ICE and the perception that the DA's Office was working in tandem with ICE, *id.* ¶ 353, but notably did not know the number of calls to the IAU in 2019 and 2020, and whether the number of calls for those two years have increased or decreased relative to 2018, *id.* ¶¶ 357–358.

Plaintiffs' reliance on the report and testimony of their retained expert, Dr. Matthew Barreto ("Dr. Barreto"), to establish the lack of a genuine issues of material fact is misplaced. According to Plaintiffs, Dr. Barreto "confirms, based on a literature review and a robust survey of Latinx adults in New York, that ICE's courthouse civil arrests have had a significant 'chilling effect' on voluntary participation in the system."  Pls.' Br. at 10.  But Dr. Barreto's literature review is hardly a "confirmation" of any "chilling effect" on the impact of ICE courthouse arrests in New York State.  As Dr. Barreto conceded at his deposition, the vast majority of the articles that he summarized in his "literature review" relate to the effect of ICE enforcement activities in general on undocumented immigrants across several administrations.  *See, e.g.,* Defs.' Responses to R. 56.1 Stmt. ¶¶ 218, 220–228; Defs.' 56.1 Counterstmt. ¶¶ 370–375.  And as Defendants' rebuttal expert, Dr. Alan Salzberg, Ph.D., pointed out, Dr. Barreto's survey was

far from "robust," and suffered from significant deficiencies that made "all conclusions in the Barreto Report that rely upon the survey . . . speculative, unreliable, and potentially biased." *See* Colangelo Decl. Ex. 27, at 8; *see also* Defs.' Responses to R. 56.1 Stmt. ¶¶ 230, 232, 233, 235, 236, 237, 238, 239, 240; Defs.' 56.1 Counterstmt. ¶¶ 376–391. This is enough to create a genuine issue of material fact on the credibility of Dr. Barreto's expert opinions. *Scanner Techs. Corp. v. Icos Vision Sys. Corp.*, 253 F. Supp. 2d 624, 634 (S.D.N.Y. 2003) ("The credibility of competing expert witnesses is a matter for the jury, and not a matter to be decided on summary judgment.").

Furthermore, Plaintiffs repeated claim that there was a "massive' or "dramatic" increase in courthouse arrests starting in 2017, Pls.' Br. at 1, 5, 14, 17, 23, is overblown.[8] While admittedly there was an increase in civil immigration arrests at or near courthouses from the pre-2017 time period to the post-2017 time period, *see* Onozawa Decl ¶¶ 27-28, those numbers must be viewed in context and they do not by themselves establish a Tenth Amendment violation. First, contrary to Plaintiffs' suggestion, civil immigration courthouse arrests were authorized and occurred prior to 2017. Pls.' Br. at 3. SDDO McGinnity testified that ICE officers (including himself, the officers he supervised, and other team members) in the New York Field Office conducted courthouse arrests prior to 2017, and ICE's arrest records show that in 2014, 2015, and 2016, ICE conducted an average of over 50 courthouse arrests each year. *See* Defs.' 56.1 Counterstmt. ¶¶ 331-32; Onozawa Decl. ¶¶ 27-28.

What Plaintiffs really appear to be complaining about is the increase in the number of arrests due to a change in both ICE priorities and local cooperation. As ICE officers explained, in January 2017, the categories of aliens that were a priority for arrest was expanded pursuant to

---

[8] Many of Plaintiffs' "facts" supporting the massive increase, such as the citation to *The Courthouse Trap*, are inadmissible hearsay. *See* Defs.' Responses to R. 56.1 Stmt. ¶ 63.

the President's Executive Order. *See* Defs.' Responses to R. 56.1 Stmt. ¶¶ 42–46.

Consequently, the priorities for courthouse arrests was changed as well. *Id.* ¶ 45. Despite this

change, the evidence shows ICE still conducted civil immigration enforcement actions at or near

a courthouse as a "last resort." *See, e.g.*, Defs.' 56.1 Counterstmt. ¶¶ 334-36 (citing Onozawa

Decl. Ex. K (Rodriguez Tr.) at 34; Onozawa Decl. Ex. I (McGinnity 30(b)(6) Tr.) at 83–87, 146–

48, 190–93, 197; Onozawa Decl. Ex.  M (Williams Tr.) at 34–35; Onozawa Decl. Ex. F (Judge

30(b)(6) Tr.) at 96–97, 130; Onozawa Decl. Ex. G (Judge Individual Tr.) at 42–43). In addition,

courthouse arrests were often necessitated by a refusal of New York City and other local

jurisdictions to cooperate with ICE. *See* Defs.' 56.1 Counterstmt. ¶ 313. As an example, ICE

used to be able to lodge detainers on individuals arrested by the New York City Police

Department (or others), and "in previous years, those individuals would be held on a detainer and

transferred over to [ICE] from the jails, central booking, Rikers Island, into our custody without

being released to the street," but that is "no longer the case" in New York City. *See id.* (citing

McGinnity Individual Tr. at 88-89); *see also* Colangelo Decl. Ex. 53 at DHS 0032.

In addition, as Plaintiffs acknowledge, ICE "appears to have reduced its warrantless

arrests inside courthouses after the 2019 UCS Policy." Pls.' Br. at 11; *see also* Defs.' 56.1

Counterstmt. ¶ 306. For example, FOD Decker testified that the number of arrests done without

a judicial warrant inside a courthouse decreased after the 2019 UCS Policy. *Id.* Likewise,

spreadsheets maintained by ICE's Fugitive Operations Unit in New York City which tracked

civil immigration enforcement actions show that, after the Directive was issued, the Fugitive

Operations Unit conducted significantly fewer civil immigration arrests inside courthouses. *See*

Onozawa Decl. Exs. V, W; Defs.' 56.1 Counterstmt. ¶¶ 326–28.[9]  There were 97 courthouse arrests in calendar year 2017, 13 courthouse arrests in calendar year 2018, and 0 courthouse arrests in calendar year 2019 and 2020.  *See* Onozawa Decl. Exs. V, W.[10]

Finally, Plaintiffs' broad contention that the federal government "may not interfere with state judiciaries" is unavailing as it relies on inapposite cases involving direct challenges to the state judiciary system.  *See* Pls.' Br. at 21.[11]  Here, by contrast, the federal government is not directly intervening in state court, nor is it purporting to regulate states or their judicial systems; rather, it is exercising its discretion, as authorized by the INA, to undertake civil enforcement actions in or near courthouses.  Congress spoke directly to immigration arrests in the INA, 8 U.S.C. §§ 1226, 1357(a).  Given that the statutes provide for broad authority to search for an alien in the United States, subject to limitations at a specific location such as a person's dwelling,

---

[9] The way New York City Fugitive Operations counted arrests changed after the Directive.  As SDDO McGinnity testified, prior to the Directive, the internal spreadsheet marked arrests at or near courthouses as courthouse arrests.  After the Directive, the internal spreadsheet only marked an arrest as a courthouse arrest if it were made inside a courthouse.  *See* Defs.' 56.1 Counterstmt. ¶ 327.

[10] There are also limitations to how courthouse arrests were recorded.  The OCA did not track courthouse arrests prior to 2017, and though ICE New York's ERO Fugitive Operations Unit and its satellite office in Newburgh, New York, maintained informal spreadsheets that included information on civil immigration enforcement actions in courthouses, neither office maintained such spreadsheets prior to fiscal year 2017.  *See* Defs.' 56.1 Counterstmt. ¶¶ 286, 325, 329-30.  Other parts of ICE in New York State such as the Buffalo Field Office, which covers the Batavia sub-office, the Albany sub-office, and the Buffalo office, never tracked civil immigration courthouse arrests.  *Id.* ¶¶ 303, 322-23.  In addition, prior to the Directive, ICE officers were not required to note that a target address for a civil immigration enforcement action was a courthouse on either a FOW or on another location.  Defs.' 56.1 Counterstmt. ¶ 333.

[11] *See Younger v. Harris*, 401 U.S. 37, 41 (1971) (challenge to district court's judgment enjoining state prosecution); *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 142 (1988) (considering whether injunction prohibiting litigation of matter in state court was permissible); *O'Shea v. Littleton*, 414 U.S. 488, 500 (1974) (request for injunction controlling future state criminal proceedings, which would functionally serve as "ongoing federal audit" of state proceedings); *Kaufman v. Kaye*, 466 F.3d 83, 84 (2d Cir. 2006) (challenging procedure of assigning appeals among panel of judges in state court).

*see* 8 U.S.C. § 1357(a)(3), the clear implication is that ICE's search (and arrest) power is not limited at other locations, such as courthouses.  In addition, Congress amended the INA in 2006 to add 8 U.S.C. § 1229(e), which expressly addresses immigration enforcement actions against aliens at courthouses.

### 2.   ICE Is Not Violating the Anti-Commandeering Doctrine

Plaintiffs' argument that the federal government here is "prohibited from directly compelling state officials to serve a federal regulatory program" and is "similarly prohibited from leveraging state governmental processes or structures for federal policy purposes," Pls.' Br. at 21–22, is incorrect as a matter of law. [12]  Under the Tenth Amendment, the "Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997); *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018) (Tenth Amendment embodies an "anticommandeering doctrine" which "withhold[s] from Congress the power to issue orders directly to the States.").  However, as the Second Circuit held in *New York v. DOJ*, a "commandeering challenge to a federal statute depends on there being pertinent authority 'reserved to the States'" and that "conclusion is not so obvious in the immigration context" where the INA is Congress's "extensive and complex" codification of the federal government's "broad . . . and preeminent power." *New York v. DOJ,* 951 F.3d at 113 (internal citations and quotation marks omitted).

Here, the INA specifically contemplates a broad arrest power.  8 U.S.C. §§ 1226, § 1357(a); *see also* 8 U.S.C. § 1229(e).  Given that broad power, New York cannot adopt

---

[12] Contrary to Plaintiffs' statement (Pls.' Br. at 22 n.4), in the motion to dismiss briefing, Defendants argued against Plaintiffs' Tenth Amendment claim on the grounds that included anti-commandeering and New York's ability to regulate its court system.  *See* MTD at 24–25; Reply in Support of MTD at 10.

policies contrary to federal immigration law.  Likewise, the fact that ICE allegedly "leverage[es] New York's sovereign actions – such as compelling attendance at proceedings and imposing courthouse security measures – in order to serve ICE's federal immigration objectives," Pls.' Br. at 20, does not demonstrate a violation of the Tenth Amendment.  *See New York v. DOJ,* 951 F.3d at 116 (rejecting claim that federal law which imposed immigration-related conditions for states to obtain federal grant money violated the anti-commandeering doctrine of the Tenth Amendment).[13]

Plaintiffs' attempt to distinguish *New York v. DOJ* on the ground that the case "does not involve state regulation of immigration," and instead involves state regulation of courthouses, Pls.' Br. at 22 n.5, is unavailing.  The requested relief at issue here would prevent Defendants from conducting civil immigration enforcement actions at or near courthouses.  Complaint; Prayer for Relief.  And given the plenary federal power over immigration, the state cannot bar the federal government from arresting aliens in public places.  *See, e.g.*, *In re Tarble*, 80 U.S.

---

[13] The Second Circuit's observations in *New York v. DOJ*, 951 F.3d at 90, concerning the power of the federal government to regulate immigration are especially pertinent here :

> Nor can we agree with the district court that the challenged [immigration-related] conditions impermissibly intrude on pwers reserved to the states.  *See* U.S. Const. Amend. X.  As the Supreme Court has repeatedly observed, in the realm of immigration policy, it is the federal government that maintains 'broad,' *Arizona v. United States*, 567 U.S. 387, 394, 132 S. Ct. 2492, 183 L.Ed.2d 351 (2012), and 'preeminent,' power, *Toll v. Moreno*, 458 U.S. 1, 10, 102 S. Ct. 2977, 73 L.Ed.2d 563 (1982), which is codified in an 'extensive and complex' statutory scheme, *Arizona v. United States*, 567 U.S. at 395, 132 S. Ct. 2492.  Thus, at the same time that the Supreme Court has acknowledged States' 'understandable frustrations with the problems caused by illegal immigration,' it has made clear that a 'State may not pursue policies that undermine federal law.'  *Id.* at 416, 132 S. Ct. 2492. As Chief Justice John Marshall wrote over 200 years ago, 'the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government.'  *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436, 4 L.Ed. 579 (1819).  This fundamental principle, a bedrock of our federalism, is no less applicable today.

397, 404 (1871) (state court lacks jurisdiction "to interfere with the authority of the United States, whether that authority be exercised by a Federal officer or be exercised by a Federal tribunal").

There is also no evidence that the federal government is "conscripting state governments as its agents." Pls.' Br. at 24–25. ICE is not "specifically targeting and leveraging New York's court system," including its security, as "the crucial implement for a program of federal civil immigration enforcement." *Id.* While Defendants acknowledge that they have conducted and continue to conduct civil immigration enforcement actions at or near courthouses, ICE officers are not "specifically" or "deliberately" targeting courthouses as convenient locations.[14] Instead, the record shows that: (1) ICE has had a longstanding courthouse arrest policy, Defs.' Br. at 1 (citing AR 76, 127, 171); Defs.' 56.1 Counterstmt. ¶¶ 331-32 (ICE conducted civil immigration enforcement actions at or near courthouse prior to 2017); *Id.* ¶ 284 (when McConnell became Chief Counsel of OCA in December 2009, he was aware that ICE agents were conducting arrests of undocumented aliens in and around state courthouses); (2) courthouse arrests are done as a "last resort" after other locations have been considered and/or attempted, Defs.' 56.1 Counterstmt. ¶¶ 334-36; and (3) the use of courthouse arrests is necessitated in part by the unwillingness of New York City and other local jurisdictions to cooperate with ICE, Defs.' 56.1 Counterstmt. ¶ 313.

There has also been no "deliberate exploitation" of New York's courthouses. Pls.' Br. at 25. Instead, the evidence shows that ICE agents work with the State, and are complying with the 2017 and 2019 UCS Policies. Defs.' 56.1 Counterstmt. ¶¶ 297, 300. For example, in

---

[14] Defendants note that ICE has acknowledged that a rationale of civil immigration enforcement actions around courthouses is safety concerns of officers and the public. *See* Defs.' Br. at 8–9; AR 135; AR 160–161, 188–189, 190.

compliance with the 2019 UCS Policy, ICE officers to identify themselves upon entry to a courthouse.  Colangelo Decl. Ex. 56; Defs.' 56.1 Counterstmt. ¶ 308.  ICE officers also often speak to court officers in courtrooms prior to or in connection with making an arrest.  *Id.* ¶ 308.  ICE agents typically follow instructions from court officers.  *Id.* ¶ 309.  Judges are alerted about immigration enforcement actions. *id.* ¶ 311.  Officer Rodriguez further testified that he does not use force to complete arrests at a courthouse.  Onozawa Decl. Ex. K (Rodriguez Tr.) at 56, 82.  Arrests are typically completed without incident.  Defs.' 56.1 Counterstmt. ¶ 312.

In response, Plaintiffs offer conclusory statements that "New York maintains security at courthouses to ensure that judicial proceedings can go forward without disruption and that witnesses, parties, and other individuals feel secure enough to attend," but ICE's policy "adds disruption" and eliminates the "very security that was meant to facilitate their access to New York state courts." Pls.' Br. at 25.  But as discussed above, genuine issues of material fact exist as to whether ICE's courthouse arrest policy has significantly interfered with the functioning of state courts in New York and whether the Directive—as opposed to greater ICE enforcement in general—is preventing and deterring parties from attending court.  *Supra*, p. 15-18.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for partial summary judgment and dismiss Plaintiffs' APA claims in their entirety, and deny Plaintiffs' cross-motion for summary judgment.

Dated: April 20, 2020
　　　　New York, New York

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By:　　　/s/ Tomoko Onozawa
REBECCA R. FRIEDMAN
JEFFREY S. OESTERICHER
TOMOKO ONOZAWA
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:　　(212) 637-2614/2695/2721
Fax:　　(212) 637-2686
Email: rebecca.friedman@usdoj.gov
　　　　jeffrey.oestericher@usdoj.gov
　　　　tomoko.onozawa@usdoj.gov