**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., <br><br> Defendants. | 19 Civ. 8876 (JSR) |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

ARGUMENT ..............................................................................................................................1

I.    ICE'S COURTHOUSE CIVIL ARREST POLICY VIOLATES THE APA ..........................................1

    A.    ICE's courthouse civil arrest policy exceeds its authority under the INA. ..............1

    B.    ICE's courthouse civil arrest policy is arbitrary and capricious. .............................1

II.    SUMMARY JUDGMENT SHOULD BE GRANTED ON THE TENTH AMENDMENT CLAIM .............5

    A.    The record shows that ICE has targeted New York courthouses, drastically expanded civil arrests at courthouses, and disrupted New York's courts. ...............5

        1.    ICE's major expansion of courthouse civil arrests is undisputed. ...............5

        2.    The burden New York suffers from ICE's practice of targeting New York courts is undisputed. .....................................................................6

    B.    The undisputed facts establish a Tenth Amendment violation. ...............................9

CONCLUSION .........................................................................................................................11

# **TABLE OF AUTHORITIES**

**Cases** **Page(s)**

*American Wild Horse Pres. Campaign v. Perdue*,
   873 F.3d 914 (D.C. Cir. 2017) ............................................................................................. 2

*AT&T Info. Sys., Inc. v. GSA*,
   810 F.2d 1233 (D.C. Cir. 1987) ........................................................................................... 3

*CBS Corp. v. Northrup Grumman Corp.*,
   53 F. Supp. 2d 629 (S.D.N.Y. 1999) .................................................................................... 6

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) ......................................................................................................... 3

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ............................................................................................................. 2

*Gordon v. Kaleida Health*,
   299 F.R.D. 380 (W.D.N.Y. 2014) ........................................................................................ 6

*Kaufman v. Kaye*,
   466 F.3d 83 (2d Cir. 2006) ................................................................................................... 9

*Murphy v. NCAA*,
   138 S. Ct. 1461 .................................................................................................................... 9

*New York v. DOJ*,
   951 F.3d 84 (2d Cir. 2020) ................................................................................................. 10

*New York v. United States*,
   505 U.S. 144 (1992) ........................................................................................................... 10

*Physicians for Soc. Responsibility v. Wheeler*,
   No. 19-5104, 2020 WL 1921539 (D.C. Cir. Apr. 21, 2020) ................................................ 2

*SEC v. Yorkville Advisors, LLC*,
   305 F. Supp. 3d 486 (S.D.N.Y. 2018) .................................................................................. 9

*Tarble's Case*, 80 U.S. 397 (1871) ............................................................................................ 10

*United States v. Gotti*,
   457 F. Supp. 2d 395 (S.D.N.Y. 2006) .................................................................................. 7

*United States v. Harris*,
   733 F.2d 994 (2d Cir. 1984) ................................................................................................. 7

| **Cases** | **Page(s)** |
|---|---|
| *United States v. Prevezon Holdings, Ltd.*, 319 F.R.D. 459 (S.D.N.Y. 2017) | 7 |
| *United States v. Texas*, 507 U.S. 529 (1993) | 1 |
| *Younger v. Harris*, 401 U.S. 37 (1971) | 9 |

**Rules**

| | |
|---|---|
| Fed. R. Civ. P. 56 | 6 |
| Fed. R. Evid. | |
| 703 | 8 |
| 801 | 6, 7 |
| 803 | 7 |
| 807 | 7 |

**ARGUMENT**

**I.     ICE'S COURTHOUSE CIVIL ARREST POLICY VIOLATES THE APA**

    **A.     ICE's courthouse civil arrest policy exceeds its authority under the INA.**

ICE's courthouse arrest policy violates the APA because it exceeds ICE's statutory authority. The INA, ICE's proffered basis for arrest authority, incorporates the ancient "common law privilege against civil arrests on courthouse premises and against arrests of parties and other persons necessarily traveling to or from court." Opinion & Order at 1, ECF No. 51 ("MTD Op."). And ICE concedes (at 11 n.3, ECF No. 98) it is doing what the privilege would forbid.

ICE's latest brief just reprises arguments that Plaintiffs have already refuted elsewhere. *See* Pls.' Opp. to ICE Mot. for Summ. J. at 4-6, ECF No. 97 ("MSJ Opp."). ICE suggests (at 11 & n.4) that the Court's prior decision "disregarded the plenary power of the federal government over immigration" (citing *New York v. DOJ*, 951 F.3d 84, 113 (2d Cir. 2020)). But the APA claim here does not turn on the theoretical outer limits of the federal immigration power. Rather, the only question is whether Congress, in enacting the INA, intended to abrogate the privilege prohibiting civil arrests of those coming to and going from the courthouse. As this Court recognized, federal laws presumptively do not displace "long-established and familiar" state common law rules, *United States v. Texas*, 507 U.S. 529, 534 (1993), and here Congress has not expressed with the requisite "'unmistakably clear'" language its intention to displace the common law privilege. *See* MTD Op. at 30-31 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). That conclusion, plus ICE's admission that it is conducting arrests in and around New York's courthouses, entitles Plaintiffs to summary judgment under the APA.

    **B.     ICE's courthouse civil arrest policy is arbitrary and capricious.**

ICE's courthouse civil arrest policy is also arbitrary and capricious. ICE's assertion (at 1) that it engaged in reasoned decision-making here ignores its failure to adequately consider the

serious burdens on state courts demonstrated in the Administrative Record (and confirmed by the summary judgment record) due to ICE's sharp move away from previous agency policy, which stringently limited courthouse arrests. (*E.g.*, Administrative Record (AR) 164-166); Pls.' R. 56.1 Stmt. ¶¶ 18-49, 142-215, ECF No. 92; Pls.' Suppl. R. 56.1 Stmt. ¶¶ 392-99, ECF No. 102.

ICE incorrectly argues (at 1-3) that its current courthouse arrest policy is merely an evolution from its pre-2017 policy. As Plaintiffs have explained (MSJ Opp. at 9-13), ICE's prior policy strictly prohibited arrests "at or near" courthouses except as to specific targets who were either national security threats or convicted of the most serious crimes. Now, ICE's written policy allows the agency to operate without restriction on the courthouse steps; to arrest targets with no criminal history inside the courthouse; and, in the event of "special circumstances" that ICE can determine itself, to arrest their friends or families too. Yet ICE failed to explain the reasons for this dramatic departure from past policy, as the APA requires. *E.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009); *accord Physicians for Soc. Responsibility v. Wheeler*, No. 19-5104, 2020 WL 1921539, at *6 (D.C. Cir. Apr. 21, 2020); *American Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 927 (D.C. Cir. 2017).

Contrary to ICE's arguments (at 3-5), ICE did not sufficiently consider the ways in which ramping up its enforcement actions at courthouses against people with no serious criminal background (or none at all) would conflict with the goals Congress set forth in victim-protective statutes like the Violence Against Women Act (VAWA). It is not enough that ICE referenced a separate piece of agency guidance concerning VAWA in a footnote in its Courthouse Civil Arrest Directive. *See* Compl., Ex. 1 at 3 n.2, ECF No. 1-1. ICE previously adhered to that guidance *in addition to* its prior restrictions on courthouse civil arrests. (AR 110.) ICE cannot justify abandoning its prior arrest policy by referring to separate, preexisting VAWA guidance.

In any event, the Directive's cautionary language means little because, in practice, New York-based ICE agents were sent to make courthouse arrests *without even reading the Directive*, and ICE supervisors do not understand the meaning of some of its key terms, especially those that impose ostensible limits on the scope of agents' authority. Pls.' R. 56.1 Stmt. ¶¶ 55-58; Pls.' Suppl. R. 56.1 Stmt. ¶ 305. Moreover, ICE agents have (for example) arrested people in and around family courts and traffic courts, despite supposed limitations on such enforcement. Pls.' R. 56.1 Stmt. ¶¶ 70-72; 136-37. Although ICE suggests (at 7-8) that the Court should ignore such record evidence on arbitrary and capricious review, courts may look outside the Administrative Record where, as here, the evidence goes to an agency's failure to consider important aspects of the problem at issue. *See, e.g.*, *AT&T Info. Sys., Inc. v. GSA*, 810 F.2d 1233, 1236 (D.C. Cir. 1987).

ICE next argues (at 5-6) there were no reliance interests at stake here sufficient to require an explanation of its policy shift because "[p]ast ICE policies and the general longstanding presence of law enforcement agents" indicated that ICE made courthouse civil arrests. But ICE's courthouse civil arrests were sharply limited prior to 2017. Indeed, the Administrative Record shows that key stakeholders experienced ICE's policy shift—from a focus on a narrow group to arrests of a much broader population of immigrants—as an unprecedented disruption. (*E.g.*, AR 164-166, 171.) ICE's new policy thus upset the "background understanding" of how the agency would conduct enforcement operations in a way that unsettled the expectations of courts and litigants. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). ICE needed "a more reasoned explanation for its decision to depart from its existing enforcement policy." *Id.*

ICE next says (at 6-7) that it permissibly justified its policy shift by asserting that courthouse arrests are safer due to the metal detectors in state courthouses. However, the actual examples of courthouse arrests in the Administrative Record—an instance where non-ICE criminal

3

law enforcement arrested two suspects, one at home and one at courthouse, both without incident (AR 156-157); and an instance where ICE's aggressive courthouse arrest tactics contributed to a purported "scuffle" with defense attorneys (AR 144)—offer no evidence about the specific dangers posed by non-courthouse arrests, let alone anything that would explain why these comparative dangers justify the significant harms of ICE's policy.

ICE also argues (at 5, 9-11) that it took into account the concerns of state court judges, including Chief Administrative Judge Marks. But ICE leaves out critical context. Judge Marks and other state court officials first implored ICE to end the new courthouse arrest policy altogether or to designate courthouses as "sensitive locations"; only after ICE refused those requests did Judge Marks and others propose that ICE conduct courthouse arrests "only as a last resort." (AR 162-163.) ICE cannot explain how it took into account state officials' legitimate concerns by completely rejecting their initial requests. And even as to the officials' later request, ICE took no real action: ICE's Directive contains no limit at all on arrests "near" courthouses, and its remaining limitations are not even being followed. MSJ Opp. at 14-16.

Finally, ICE suggests (at 2) that its new policy was a reasonable response to the President's January 2017 order to massively increase immigration arrests and "take the shackles off" ICE agents. But the President's Executive Order cannot substitute for the reasoned decision-making that the APA requires of the agency. The Executive Order never once mentions state courthouses; instead, it was ICE that decided to ramp up its civil arrests in and near courthouses. ICE was thus required to engage in reasoned decision-making and to adequately explain the decision that it made. Its failure to do so here entitles Plaintiffs to summary judgment.

4

## II. SUMMARY JUDGMENT SHOULD BE GRANTED ON THE TENTH AMENDMENT CLAIM

### A. The record shows that ICE has targeted New York courthouses, drastically expanded civil arrests at courthouses, and disrupted New York's courts.

ICE raises various evidentiary objections in its brief and its Rule 56.1 Response, but none obscure two essential, uncontested facts: ICE dramatically expanded its courthouse civil arrests in and around New York courts after January 2017; and ICE's decision to target New York's courthouses profoundly burdens the justice system, including courts, prosecutors, and others.

#### 1. ICE's major expansion of courthouse civil arrests is undisputed.

January 2017 marked a significant increase in ICE's rate of courthouse arrests. The record establishes that courthouse arrests were occasional and trending downward each year from 2014 to 2016, immediately spiked in 2017, and have increased every year since, such that ICE conducted courthouse arrests in 2019 at six times the rate as in 2016. Pls.' Suppl. R. 56.1 Stmt. ¶¶ 392-96; Second Thorsfeldt Decl. ¶¶ 10-19 (attached as Ex. 145 to Second Colangelo Declaration, ECF No. 101). Testimonial evidence from prosecutors, defense attorneys, and court officials alike confirms that in 2017, ICE departed dramatically from past practice and never looked back. *See* Pls.' R. 56.1 Stmt. ¶¶ 61-73, 77-81, 87, 97, 110-11, 142-71, 186-215.

In response to this evidence, ICE argues that Plaintiffs' count of arrests is disputed—and therefore merits a trial to find facts—because Plaintiffs did not define terms like "at or near a courthouse," "rare," and "continued at high rates." *See, e.g.*, Defs.' R. 56.1 Resp. ¶¶ 47, 61-63, 66-67, 69-70, 73, 97, ECF No. 99. But those quibbles are academic. ICE does not dispute that the very purpose of the January 2017 Executive Order was to "take the shackles off" ICE officers and other federal immigration authorities. *Id.* ¶ 36. And ICE itself now estimates that courthouse civil arrests rose from 39 in 2016, to 247 in 2019—a more than six-fold increase after the shackles were taken off. *See* Onozawa Decl. ¶ 28, ECF No. 100. One of Plaintiffs' central points—that a once-

5

uncommon occurrence has exploded into a pervasive facet of courthouse practice in New York—is thus not in genuine dispute.

### 2. The burden New York suffers from ICE's practice of targeting New York courts is undisputed.

Likewise, there is no genuine dispute that the explosion of courthouse civil arrests fundamentally burdens the administration of justice in New York. The summary judgment record shows that courthouse civil arrests have an overwhelming deterrent effect on participation in the justice system, impede courthouse functioning, and impair criminal prosecutions and public safety efforts. Pls.' R. 56.1 Stmt. ¶¶ 131-215. ICE responds to this factual presentation *not* by presenting countervailing evidence, but instead by contending that Plaintiffs' evidence is inadmissible, immaterial, or vague. Defs.' R. 56.1 Resp. ¶¶ 131-215. Those objections are unfounded. Rule 56 requires Plaintiffs to support their factual assertions with material that *could* be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c); *see Gordon v. Kaleida Health*, 299 F.R.D. 380, 393 (W.D.N.Y. 2014). Plaintiffs have done that here.

*1. Plaintiffs do not rely on inadmissible hearsay.* ICE lodges blanket hearsay objections to Plaintiffs' assertions of fact involving: (a) public statements of DHS and ICE officials, *see* Defs.' R. 56.1 Resp. ¶¶ 280-83; (b) testimony from civil legal services providers, public defenders, and the Brooklyn District Attorney's office, *id.* ¶¶ 142, 147-49, 152-53, 158-62, 166, 170-71, 174, 176, 184, 186-200, 205-09, 212-15; and (c) studies cited in Dr. Barreto's expert report, *id.* ¶¶ 218, 220-28, 240. Those objections are meritless.

Public statements by ICE and DHS officials are non-hearsay as an opposing party's statement. Fed. R. Evid. 801(d)(2); *see CBS Corp. v. Northrup Grumman Corp.*, 53 F. Supp. 2d 629, 630 n.1 (S.D.N.Y. 1999) (Rakoff, J.). The Court may therefore consider such public statements—including DHS's April 2017 announcement that crime victims and witnesses would

6

now be subject to civil immigration arrest, as well as statements by ICE leadership that noncitizens should be afraid attending court, *see* Pls.' R. 56.1 Stmt. ¶¶ 280-83.

Likewise, the testimony Plaintiffs presented from legal services providers, public defenders, and the Brooklyn District Attorney's office would be admissible at trial either as non-hearsay or under an exception to the rule against hearsay. Much of that testimony is not hearsay because it contains statements offered to prove state of mind, statements offered to prove an effect on the listener or others, or because it is not an out-of-court "statement."[1] Fed. R. Evid. 801(a), (c); *United States v. Gotti*, 457 F. Supp. 2d 395, 397 (S.D.N.Y. 2006). The remainder of the objected-to testimony would be admissible at trial under the exceptions for present sense impressions, then-existing mental condition, and business records. Fed. R. Evid. 803(1), (3), (6); *United States v. Harris*, 733 F.2d 994, 1004 (2d Cir. 1984). This testimony is also likely otherwise admissible at trial under the residual exception. Fed. R. Evid. 807 & 2019 amendments note; *United States v. Prevezon Holdings, Ltd.*, 319 F.R.D. 459, 464-68 (S.D.N.Y. 2017).

Dr. Barreto's reliance on social science literature (including a report he coauthored regarding the impact of a Texas state law on immigrant communities) to form his expert opinions in this case is also proper. "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed"; and "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they

---

[1] *See, e.g.*, Pls.' R. 56.1 Stmt. ¶ 186 (citing, for example, Ahmad Decl. ¶ 8 (Ex. 1) ("Since 2017, I have observed that many of our clients appear scared and fearful of reporting domestic violence to the police and pursuing court relief for fear of getting arrested by ICE."); Panjwani Decl. ¶ 18 (Ex. 18) ("Since 2017, I have observed our noncitizen clients express a profound and new fear of attending court due to the possibility of an ICE arrest. Our clients frequently ask me and my staff whether ICE could arrest them if they seek a protective order or other relief in court."); Epstein Decl. ¶ 18 (Ex. 6) ("On a regular basis, clients ask 'Can ICE pick me up if I go to court?' 'What will happen to me if ICE arrests me during court?'")).

need not be admissible for the opinion to be admitted." Fed. R. Evid. 703. Dr. Barreto's literature review and Texas study may be considered here because experts in his field regularly rely on such sources. *See* Colangelo Decl., Ex. 25 ("Barreto Report") ¶¶ 8, 18-83, ECF No. 91-25.

ICE's critique (at 17) that certain of the peer-reviewed social science studies Dr. Barreto reviewed do not include the word "courthouse" completely misses the mark. Dr. Barreto's literature review confirms, consistent with social science principles, that increased immigration enforcement has a chilling effect on immigrant community participation. Pls.' R. 56.1 Stmt. ¶¶ 220-28. Defendants similarly fail to raise a genuine dispute of fact regarding the credibility of Dr. Barreto's opinions on his survey, as Defendants' own expert conceded that he lacked familiarity with basic survey methodology concepts and cited no independent authorities for his main critique that surveys lack external validity. *See* Pls.' R. 56.1 Stmt. ¶¶ 244, 253.

*2. Defendants' lack-of-foundation objections are baseless.* ICE's characterization of witness testimony as lacking foundation or being insufficiently specific is meritless. There is no basis for the Court to disregard as conclusory, for example, testimony from the Brooklyn District Attorney's Domestic Violence Bureau Chief—a nearly three-decade veteran of that office—that she was never aware of a problem with ICE courthouse arrests before 2017; that after 2017 she heard concerns from all corners with regularity; and that her office's efforts to prosecute serious sex crimes have been undermined by ICE arrests, including in a felony case where the defendant was arrested entering the courthouse. Pls.' R. 56.1 Stmt. ¶¶ 61, 63, 146-48, 158-61.

ICE discounts as "conclusory" Plaintiffs' evidence of how ICE's failure to produce individuals in its custody has disrupted state criminal prosecutions. Defs.' R. 56.1 Resp. ¶¶ 172-79. Yet ICE agrees that, since 2017, it "has failed to honor some writs and produce noncitizen defendants for court proceedings"; that "there is no central point of contact for requesting the

8

presence of a criminal defendant from ICE"; and that Plaintiffs' witnesses "discuss the efforts involved in requesting a writ." *Id.* ¶¶ 174-76, 179.

ICE also contends (at 16) that certain witnesses "conflate ICE courthouse arrests with fears of ICE enforcement generally." But the testimony ICE cites—and additional evidence in the summary judgment record—identifies ICE arrests in and near courthouses as the cause of the chilling effect on noncitizens. Pls.' Suppl. R. 56.1 Stmt. ¶¶ 346-50, 365-68; *see generally* Pls.' R. 56.1 Stmt. ¶¶ 76-215. ICE cannot manufacture a triable issue of fact by misstating the record. *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 516-17 (S.D.N.Y. 2018).

### B. The undisputed facts establish a Tenth Amendment violation.

Plaintiffs are entitled to judgment under the Tenth Amendment. *First*, ICE's courthouse civil arrest policy interferes with New York's ability to maintain an independent judiciary, including by arresting complaining witnesses and civil litigants, impeding the prosecution of criminal cases, and deterring parties, witnesses, and others from attending court on a range of matters, *see* Pls.' R. 56.1 Stmt. ¶¶ 69-73, 131-215; Pls.' Suppl. R. 56.1 Stmt. ¶¶ 397-99, 403. ICE attempts (at 20 & n.11) to distinguish cases like *Younger v. Harris*, 401 U.S. 37 (1971), and *Kaufman v. Kaye*, 466 F.3d 83, 87 (2d Cir. 2006), by arguing that those cases involved "direct challenges to the state judiciary system," whereas here ICE is not "directly intervening in state court." But this argument ignores the record evidence showing that ICE's courthouse civil enforcement actions do directly cause the type of "interruptions of . . . state proceedings" that constitute an interference with the State's judicial function. *Kaufman*, 466 F.3d at 87 (quotation marks omitted). ICE does not meaningfully contest this disruption and interference with the ability of New York's judicial system to perform its basic functions.

*Second*, ICE commandeers New York's court system by "'compelling [it] to . . . to enforce a federal regulatory program.'" *Murphy v. NCAA*, 138 S. Ct. 1461, 1477 (quoting *New York v.*

9

*United States*, 505 U.S. 144, 161 (1992)). The anti-commandeering cases teach that when the federal government offers States "no choice" but to submit to its regulatory ends, it "upset[s] the usual constitutional balance of federal and state powers" in violation of the Tenth Amendment. *New York*, 505 U.S. at 170 (quoting *Gregory*, 501 U.S. at 460). New York's legal apparatus, including its state judges and prosecutors, cannot opt out of ICE's regulatory regime by maintaining legal proceedings and prosecuting criminal cases elsewhere, free from ICE's civil arrests. Moreover, ICE specifically exploits for its own ends the sovereign actions that New York has undertaken to ensure attendance and maintain courthouse safety.

ICE's contrary legal arguments (at 21-23) rest on a single case that does not control here and does not preclude the grant of summary judgment. *New York v. DOJ* involved a challenge to federal funding conditions rather than, as here, direct interference with state sovereign functions. And the discussion of Tenth Amendment anti-commandeering principles in *New York v. DOJ* was entirely dicta because the Court expressly resolved the case on other grounds that apply only to federal funding conditions. 951 F.3d at 114-15. Nor would that dicta be applicable here in any case. The Court's anti-commandeering analysis advised only that "courts must carefully identify the powers reserved to States" that would allow States to make rules "pertaining to aliens," as well as "the effect of their exercise on federal immigration laws and policies." *Id.* at 113. Here, the power to maintain a functioning judicial system is a core aspect of sovereignty that is indisputably reserved to the States and that fulfills constitutionally protected objectives independent of federal immigration policy. ICE's conduct fundamentally interferes with that power.[2]

---

[2] In *Tarble's Case* (cited by ICE at 22-23), a state court issued a writ of habeas corpus for a person held in federal custody, and the Court held that the state court lacked the power to wrest a person from federal control. 80 U.S. 397, 404 (1871). But here, as in every commandeering-type case, it is the federal government that is reaching into the domain of the States.

10

## CONCLUSION

The motion for summary judgment should be granted.

DATED: April 27, 2020

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Matthew Colangelo*

Steven C. Wu
  *Deputy Solicitor General*
Ari Savitzky
  *Assistant Solicitor General*

*Of Counsel*

Matthew Colangelo
  *Chief Counsel for Federal Initiatives*
Matthew Eisenson, *Assistant Attorney General*
Morenike Fajana, *Special Counsel*
Fiona J. Kaye, *Assistant Attorney General*
Daniela L. Nogueira, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
matthew.colangelo@ag.ny.gov

*Attorneys for the State of New York*

ERIC GONZALEZ
*District Attorney of Kings County (Brooklyn)*

By: */s/ Jill Harris*
Jill Harris, *Chief of Policy and Strategy*
Kings County District Attorney's Office
350 Jay Street
Brooklyn, New York 11201
Phone: (718) 250-3156
harrisj1@BrooklynDA.org

*Attorney for the District Attorney of Kings County (Brooklyn)*