UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
THE STATE OF NEW YORK and ERIC      :
GONZALEZ                            :
                                    :
      Plaintiffs,                   :
                                    :        19-cv-8876(JSR)
          -v-                       :
                                    :        OPINION AND ORDER
U.S. IMMIGRATION AND CUSTOMS        :
ENFORCEMENT, et al.                 :
                                    :
      Defendants.                   :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

     Recent events confirm the need for freely and fully

functioning state courts, not least in the State of New York.

But it is one thing for the state courts to try to deal with the

impediments brought on by a pandemic, and quite another for them

to have to grapple with disruptions and intimidations

artificially imposed by an agency of the federal government in

violation of long-standing privileges and fundamental principles

of federalism and of separation of powers.

     Here, plaintiffs the State of New York and the Kings County

District Attorney seek to end what they allege are the

disruptions of New York courts and the intimidation of parties

and witnesses caused by the decision of the United States

Immigration and Customs Enforcement agency ("ICE") to greatly

increase civil immigration arrests in and around New York State

courthouses. According to plaintiffs, not only do these

1

immigration arrests make certain parties and witnesses fear coming to court, but the temporary chaos they create disrupts court proceedings and makes it impossible for judges to do their jobs effectively.

Accordingly, plaintiffs here seek injunctive and declaratory relief against ICE's current courthouse arrest policy as set forth in an ICE Directive issued in January 2018. In their first cause of action, plaintiffs argue that the policy exceeds ICE's authority under the Immigration and Nationality Act ("INA"), and is thus invalid under section 706(2)(C) of the Administrative Procedure Act ("APA"). In their second cause of action, plaintiffs argue that the agency adopted this policy in an arbitrary and capricious manner, thereby violating section 706(2)(A) of the APA.

Following discovery and motion practice, the contending parties now cross-move for summary judgment on both of these claims. For the following reasons, the Court rules in plaintiffs' favor on both claims and grants the requested relief.

**BACKGROUND**

In their complaint filed on September 25, 2019, plaintiffs the State of New York and the Kings County District Attorney sought injunctive and declaratory relief from ICE's policy of conducting civil immigration arrests of aliens at New York state

courthouses. Compl., Prayer for Relief ¶¶ 2-5, ECF No. 1 (Sept. 25, 2019).[1] Prior to 2017, ICE required its officers to avoid courthouse arrests except in very limited circumstances involving high-priority removal targets. In furtherance thereof, ICE, on March 19, 2014, issued its 2014 courthouse arrest guidance, declaring that "[e]nforcement actions at or near courthouses will only be undertaken against Priority 1 aliens," Ex. 46,[2] AR 76,[3] a term narrowly defined in an earlier memorandum issued by ICE's parent, the Department of Homeland Security ("DHS"), as "[a]liens who pose a danger to national security or a risk to public safety," Ex. 48 at 1.[4] Additionally, the 2014 courthouse arrest guidance did not permit courthouse arrests of

---

[1] The complaint also named as defendants ICE's parent agency — the United States Department of Homeland Security — as well as the heads of both agencies. Compl. ¶¶ 20-22.

[2] Numbered exhibits refer to the exhibits to the Declaration of Matthew Colangelo in Support of Plaintiffs' Motion for Summary Judgment, ECF No. 91 (Mar. 13, 2020).

[3] AR citations refer to the administrative record filed at ECF Nos. 55 (Jan. 3, 2020) and 75 (Feb. 14, 2020).

[4] The Priority 1 category was further specified to include "aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security"; "aliens convicted of crimes, with a particular emphasis on violent criminals, felons, and repeat offenders"; "aliens not younger than 16 years of age who participated in organized criminal gangs"; "aliens subject to outstanding criminal warrants"; and "aliens who otherwise pose a serious risk to public safety." Id. at 1-2.

"individuals who may be 'collaterally' present, such as family members or friends who may accompany the target alien to court appearances or functions." AR 76.[5] In January 2015, ICE promulgated its 2015 courthouse arrest guidance, slightly revising but not materially expanding the categories of aliens subject to courthouse arrest. AR 171.[6]

All of this significantly changed after the new federal administration took office in 2017. To begin with, President Trump, only five days after taking office, issued Executive Order No. 13,768 (the "Executive Order"), Enhancing Public Safety in the Interior of the United States, 82 Fed. Reg. 8799 (Jan. 25, 2017), AR 71-75. The Executive Order, though not

---

[5] Whether even the very limited and circumscribed arrest policy embodied in ICE's 2014 guidance violated the law is a question this Court need not address. As a practical matter, it was unlikely to raise a threat of the disruptions and interruptions that the present policy presents.

[6] Specifically, the 2015 courthouse arrest guidance directed that immigration arrests "at or near" courthouses "only be undertaken against" Priority 1(a), 1(c), 1(d), and 1(e) aliens, categories defined as, respectively, "(a) aliens engaged in or suspected of terrorism or espionage, or who otherwise pose a danger to national security;" "(c) aliens convicted of an offense for which an element was active participation in a criminal street gang;" "(d) aliens convicted of an offense classified as a felony in the convicting jurisdiction, other than a state or local offense for which an essential element was the alien's immigration history;" and "(e) aliens convicted of an 'aggravated felon[y]' as defined in section 101(a)(43) of the Immigration and Nationality Act at the time of the conviction." Id.

specifically addressed to courthouse arrests, directed DHS to prioritize immigration enforcement against broader categories of aliens than those named in prior policies.[7] Very shortly thereafter, in February 2017, then-DHS Secretary John Kelly issued a memorandum (the "2017 Implementing Memo"), AR 91-96, that, once again in general terms, sought to implement the Executive Order by rescinding the earlier guidance on immigration enforcement priorities and providing that "the Department no longer will exempt classes or categories of removable aliens from potential enforcement." AR 92.

Although neither the Executive Order nor the Implementing Memo expressly addressed courthouse arrests, the parties here agree that ICE officers understood the Executive Order in particular, and the 2017 Implementing Memo as well, to effectively remove the earlier limitations on courthouse arrests and mandate broader enforcement in and around state courthouses.

---

[7] The Executive Order named as priorities for removal any noncitizens who "(a) [h]ave been convicted of any criminal offense"; "(b) [h]ave been charged with any criminal offense, where such charge has not been resolved"; "(c) [h]ave committed acts that constitute a chargeable criminal offense"; "(d) [h]ave engaged in fraud or willful misrepresentation in connection with any official matter or application before a governmental agency"; "(e) [h]ave abused any program related to receipt of public benefits"; "(f) [a]re subject to a final order of removal, but who have not complied with their legal obligation to depart the United States"; or "(g) [i]n the judgment of an immigration officer, otherwise pose a risk to public safety or national security." AR 72.

See, e.g., Ex. 29 at Tr. 127:15-129:14; Ex. 38 at Tr. 217:6-14; Ex. 41 Tr. at 108:3-15. The result was a great increase in courthouse arrests, including (as detailed below) in New York State.

About a year later, on January 10, 2018, ICE promulgated Directive No. 11072.1 (the "Directive"). Ex. 53. The Directive largely codified and regularized the change in courthouse arrest policy that was already being implemented by ICE agents. Specifically, the Directive expressly allowed ICE officers to arrest in and around courthouses a much broader sweep of aliens, including, inter alia, "aliens who have been ordered removed from the United States but have failed to depart, and aliens who have re-entered the country illegally after being removed." Id. ¶ 2. While the Directive further provided that "family members or friends accompanying the target alien to court appearances or serving as a witness in a proceeding" should not be arrested absent "special circumstances," it left the determination of whether such circumstances exist to the case-by-case judgment of individual ICE officers. Id.[8]

---

[8] The Directive also instructed ICE agents to generally avoid enforcement actions in family court, small claims court, and similar courts, and further directed that arrests "should, to the extent practicable, continue to take place in non-public areas of the courthouse." Id.

Even before the Directive was issued, however, the number of civil immigration arrests undertaken in and around New York State courthouses greatly increased as a result of ICE's interpretation of the 2017 Executive Order. Based on extensive arrest records produced by defendants,[9] plaintiffs calculate that, while ICE conducted 20 enforcement actions at or near New York state courthouses in 2015 and 28 in 2016, this increased to 161 in 2017, 107 in 2018, and 173 in 2019.[10] Ex. 42 ¶ 13. The striking increase from 2016 to 2017 further confirms that ICE effectively expanded its courthouse arrest policy in early 2017 in response to the Executive Order (and the 2017 Implementing Memo), and that the Directive, promulgated in 2018, simply memorialized the policy and practices that had already been put in place the preceding year.

---

[9] These records include I-213 arrest reports and ICE Field Operation Worksheets, as well as Unusual Occurrence Reports produced by the New York state courts. Ex. 42 ¶¶ 4, 9; see also Onozawa Decl. ¶ 27, ECF No. 100 (Apr. 20, 2020).

[10] There is no disagreement among the parties that ICE's enforcement activity in and near New York State courthouses increased greatly between 2016 (and before) and 2017 (and after). Defendants calculate somewhat different numbers — from 52 immigration arrests in 2015 and 39 in 2016 to 139 in 2017, 228 in 2018, and 247 in 2019, Onozawa Decl. ¶¶ 27-28 — owing to a different definition of the term "near" a courthouse, as well as disagreements over which documents to include in the calculation, among other discrepancies. Id. But this minor factual dispute between the parties is not relevant to any legal issue here involved.

Plaintiffs here have offered substantial evidence that ICE's decision to expand its courthouse arrest authority impacted litigants and courts in the State of New York even beyond what the numbers themselves might suggest. Evidence proffered by the plaintiffs indicates that substantial numbers of non-citizen litigants, even those who were not themselves subject to these actions, now feared any kind of participation in the legal system, including reporting domestic violence, e.g., Ex. 1 ¶¶ 6-8; Ex. 15 ¶¶ 4-11, litigating family court actions, Ex. 1 ¶ 9; Ex. 3 ¶¶ 5-7, and pursuing meritorious defenses to criminal charges, Ex. 7 ¶ 7. And in criminal cases, alien victims and witnesses expressed concern about coming forward for fear of arrest. E.g., Ex. 2 ¶ 13; Ex. 32 at Tr. 72:7-24; Ex. 43 at Tr. 48:6-25; see also, e.g., Amicus Br. of Immigrant Defense Project et al., ECF No. 82 (Mar. 13, 2020) at 6-7 (providing examples of ICE agents using force against aliens in and around courthouses).

Plaintiffs have also submitted substantial evidence indicating that these arrests, in addition to their impact on litigants, undermined the orderly functioning of New York courts themselves. Because ICE arrested aliens as they were entering court for scheduled proceedings, e.g., Ex. 28 at Tr. 55:9-15; Ex. 39 at Tr. 41:17-42:9; Ex. 59 at 84, the agency forced courts to adjourn proceedings at the last minute, wasting scarce

judicial time and resources, see e.g., Ex. 32 at Tr. 38:10-14. Similar results occurred when ICE failed to produce a criminal defendant for a scheduled conference. Ex. 43 at Tr. 77:22-80:9. Even worse were those occasions when ICE conducted an arrest in the courthouse itself, resulting in "complete chaos," id. Tr. at 73:17 (testimony of a Brooklyn assistant district attorney), as well as physical damage, Ex. 59 at 14. Finally, ICE further undermined the interests of justice by arresting and deporting criminal defendants who were appearing in court in connection with their own cases, thereby ensuring that these defendants never faced justice for their crimes. E.g., Ex. 32 at Tr. 18:16-21:25, 32:7-16, 36:3-39:25; Ex. 104. See generally Amicus Br. of States, ECF No. 86 (Mar. 13, 2020); Amicus Br. of N.Y.C. Bar Ass'n, ECF No. 87 (Mar. 13, 2020).[11]

Defendants, however, dispute many of the foregoing characterizations. See, e.g., Defs.' Counter Statement to Pls.' Rule 56.1 Statement ¶¶ 139, 146, 185, 216-79, ECF No. 99 (Apr. 20 2020). Although the Court is persuaded, upon careful review of the record, that ICE's courthouse arrest policy has generated substantially the harms that plaintiffs claim and that

---

[11] New York's Office of Court Administration has implemented policies to try to mitigate the negative impacts of ICE's activities in and around state courthouses, but these policies have not entirely succeeded. See Amicus Br. of Former Judges at 2-5, ECF No. 83 (Mar. 13, 2020).

defendants have not raised genuine disputes in these respects, nevertheless, the Court need not, and does not, reach these factual contentions. This is because the questions in the instant motion can be resolved as pure issues of law, the resolution of which does not depend on these facts. See New York v. U.S. Dep't of Health and Human Servs., 414 F. Supp. 3d 475, 516 (S.D.N.Y. 2019).

Specifically, as already noted, plaintiffs argue in their first cause of action, Compl. ¶¶ 121-29, that ICE's courthouse arrest policy as embodied in the Directive exceeds the agency's authority under the INA, because that statute incorporates a common law privilege against civil arrest of those present in courthouses, on courthouse grounds, or necessarily traveling to or from courthouses for scheduled proceedings. By conducting these arrests, plaintiffs argue, ICE therefore violates section 706(2)(C) of the APA. In their second cause of action, Compl. ¶¶ 130-134, plaintiffs argue that ICE's adoption of this policy beginning in 2017, and its codification a year later in the Directive, was arbitrary and capricious, in violation of section 706(2)(A) of the APA. The parties now cross-move for summary judgment on both of these claims.[12] It is these pure questions of law that the Court now decides.

---

[12] Plaintiffs also advance a third cause of action, arguing that ICE's policy unconstitutionally infringes on New York's state

SR Document 109   Filed 06/10/20   Page 11 of 24

## DISCUSSION

### I.  Count One

The parties first cross-move for summary judgment on plaintiffs' first cause of action. Plaintiffs here argue that the Directive exceeds ICE's statutory authority because the INA incorporates the centuries-old common law privilege against courthouse civil arrest. See 5 U.S.C. § 706(2)(C). Defendants counter that there is no such privilege still extant, and that, alternatively, even if such privilege still exists, the INA preempts it.

The Court has already addressed this dispute at great length in its December 2019 Opinion and Order denying defendants' earlier motion to dismiss (the "Motion to Dismiss Opinion"), ECF No. 51 (Dec. 19, 2019), at 20-34, and hereby re-adopts that Opinion by reference. In brief, English courts from at least the late eighteenth century repeatedly recognized a common law privilege against civil arrest for anyone present on courthouse premises and grounds or necessarily coming and going to a court proceeding. E.g., Walpole v. Alexander (1782), 99 Eng. Rep. 530, 530-31; Meekins v. Smith (1791), 126 Eng. Rep.

---

sovereignty, in violation of the Tenth Amendment. Compl. ¶¶ 135-42. Because the Court holds in plaintiffs' favor on the APA claims, and because each of those claims independently provides a basis for all of the relief plaintiffs here seek, the Court need not and does not reach the Tenth Amendment claim and treats it as having become moot.

363, 363; see also 3 William Blackstone, Commentaries on the Laws of England 289 (1768). During the nineteenth and early twentieth centuries, American courts, including those of New York State as well as the U.S. Supreme Court, confirmed that this privilege was part of our law as well. See Person v. Grier, 66 N.Y. 124, 125 (1876); Parker v. Marco, 136 N.Y. 585, 589 (1893); Stewart v. Ramsay, 242 U.S. 128, 129 (1916).

These decisions recognized two independently sufficient rationales supporting the privilege: first, to encourage parties and witnesses to attend court proceedings, e.g. Person, 66 N.Y. at 126, and, second, to enable courts to function properly, e.g. Parker, 136 N.Y. at 589.

As further detailed in the Court's Motion to Dismiss Opinion, although this privilege first arose at a time when civil arrest of the defendant was the means by which a plaintiff initiated a civil suit, by the era of Person, Parker, and Stewart, this practice had given way to more familiar forms of service of process. Yet rather than abandon the privilege, those courts found it to be so strong as to apply even to the far-less disruptive process service of the day. And now that immigration detention has arisen as a new, intrusive form of civil arrest, see I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1038 (1984), it follows that the privilege applies in this context as well. Motion to Dismiss Opinion at 22-29.

12

This Court further held in the Motion to Dismiss Opinion that the statute governing ICE's arrest authority, the INA, incorporates this privilege into federal law. Motion to Dismiss Opinion at 29-34. The Court's reasoning, fully elaborated there, drew on the fundamental principle that courts should interpret a federal statute not to abrogate contrary state law unless Congress's intention to do so is "manifest" in the statute's language. City of Milwaukee v. Ill. and Mich., 451 U.S. 304, 316 (1981) (citing Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)); see also Gregory v. Ashcroft, 501 U.S. 452, 460 (1991) (holding that courts should interpret federal statutes not to "alter the usual constitutional balance between the States and the Federal Government" unless the language of the statute is "unmistakably clear" to that effect) (internal quotation marks omitted).

As they did in their briefing on the motion to dismiss, defendants here again raise several arguments to the effect that the INA did not incorporate, but rather preempted, this privilege. But none persuades the Court to abandon its earlier conclusion. To begin with, defendants argue that the general presumption that federal statutes do not preempt the common law should not apply where, as here, there is some ambiguity as to the scope of the common law principle at issue. See United States v. Craft, 535 U.S. 274, 288 (2002) (explaining that the

13

"common-law rule" at issue there "was not so well established .
. . that we must assume that Congress considered the impact of
[a statute's] enactment on the question now before us"); cf.
Pasquantino v. United States, 544 U.S. 349, 360 (2005) (holding
that a federal wire fraud prosecution for evading foreign taxes
did not derogate a common-law principle known as the "revenue
rule" because no revenue rule cases at the time of the enactment
of the federal statute had "held or clearly implied that the
revenue rule barred the United States from prosecuting a
fraudulent scheme to evade foreign taxes").

Concededly, no cases at the time of the 1952 enactment of
the relevant provision of the INA, 8 U.S.C. § 1226, had
expressly held that the privilege applied in the exact context
of civil immigration arrest. Rather, as outlined above, the
cases in the preceding decades applied the privilege to protect
against civil service of process on courthouse grounds and to
those traveling to and from the courthouse. But this only proves
plaintiffs' point: if courts of that era recognized this
privilege as so fundamental as to apply to the relatively small
burden of service of process, it follows that these courts would
have held that the privilege applied even more strongly to civil

immigration arrest and detention. The Congress in 1952 surely recognized as much.[13]

Next, defendants cite 8 U.S.C. § 1229(e), a provision of the INA that, in their view, demonstrates that Congress intended to abrogate the common law privilege in the context of immigration arrests. This section, read in conjunction with its cross-reference to 8 U.S.C. § 1367, essentially provides that, when "an enforcement action leading to a removal proceeding" takes place at a courthouse, and the arrested alien had been appearing in court in connection with specified types of proceedings including domestic violence and sexual assault, immigration officers may not use information provided by abusers to support an adverse determination of deportability. See 8 U.S.C. § 1229(e)(1) & (2)(B); id. § 1367; H.R. Rep. No. 190-233, at 120 (2005).

---

[13] Defendants cite United States v. Green, 305 F. Supp. 125 (S.D.N.Y. 1969) as evidence that mid-twentieth century courts did not view the common law privilege so broadly. There, the court declined to apply this privilege to defendants who were served with a grand jury subpoena while present in court for a "preliminary examination" in a criminal matter. Id. at 127. But in that case, the process served upon these defendants at the courthouse was for a criminal proceeding, i.e., the defendants' alleged destruction of their draft cards in violation of 50 App. U.S.C.A. § 462(b)(3) (now codified at 50 U.S.C. § 3811(b)(3)). Green, therefore, does not implicate the courthouse civil arrest privilege at issue here.

Defendants raised an identical argument in their earlier motion to dismiss, see Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 8, 23-24, ECF No. 26 (Oct. 23, 2019), and the Court still finds it unpersuasive, for two independent reasons. First, the legislative history that defendants cite does not establish that the enacting Congress contemplated civil immigration arrests of aliens occurring at courthouses. See H.R. Rep. 190-233 at 120-21. The legislative history explains that the statute's restrictions on immigration officers using information provided by abusers applies at all stages of a removal proceeding, not just the initial arrest. Id. at 120. The statute's language about courthouse enforcement actions, therefore, does not necessarily refer to civil immigration arrest, but more likely refers to civil removal proceedings arising out of criminal arrests by state and local law enforcement, arrests which the common law privilege at issue would not cover.

Second, as Judge Talwani of the District of Massachusetts recently wrote in an opinion on this same issue, Congress added section 1229(e) to the INA in 2006, see Pub. L. No. 109-162, 119 Stat. 2960 (Jan. 5, 2006), over fifty years after the original passage of the INA. Ryan v. U.S. Immigration and Customs Enf't, 382 F. Supp. 3d 142, 158-59 (D. Mass. 2019). This is significant. Defendants read section 1229(e) as evidence, not of

16

what Congress intended in 2006, but as evidence of what Congress
intended in 1952 when it enacted 8 U.S.C. § 1226, the provision
of the INA that grants the executive branch broad authority to
conduct immigration arrests.[14] But Congress's views in 2006 are
of little help to the Court in interpreting what Congress
intended in 1952. See Ryan, 392 F. Supp. at 158 ("When a later
statute is offered as an expression of how the Congress
interpreted a statute passed by another Congress a half century
before, such interpretation has very little, if any,
significance.") (quoting Bilski v. Kappos, 561 U.S. 593, 645
(2010) (Stevens, J., concurring)).

    Finally, defendants rely on a recent Second Circuit case
not considered by the Court at the time of its Motion to Dismiss
Opinion, United States v. Lett, 944 F.3d 467 (2d Cir. 2019). In
Lett, the Second Circuit held that ICE could lawfully detain an
alien charged with importing cocaine even after that alien had
been granted bail in his federal criminal case under the Bail
Reform Act. Id. at 469. Defendants read this case for the
proposition that Congress granted ICE arrest authority so broad

---

[14] Even if defendants were to read this section as evidence that
Congress in 2006 intended to abrogate the common law privilege,
such an argument would be unavailing. As the Court previously
explained, "it would be odd to view a provision meant to
encourage aliens' attendance at court as evidence of
Congressional intent to allow ICE to undermine that very
objective." Motion to Dismiss Opinion at 34.

as to override other laws to the contrary. This, in defendants'
view, is further evidence that the INA preempts the common law
civil arrest privilege in the context of immigration arrest. But
Lett is inapposite. There, the court held that the Bail Reform
Act and the INA "serve different purposes, govern separate
adjudicatory proceedings, and provide independent statutory
bases for detention." 944 F.3d at 470. There was, therefore, as
the Second Circuit expressly found, "no conflict" between the
statutes. Id. Here, however, there is a clear conflict — a
conflict between the broad, generally-worded arrest authority of
the INA and the narrow state common-law privilege against
courthouse civil arrest. Lett gives the Court no guidance in
resolving this conflict, leading the Court, again, to rely
instead on the well-established principle against preemption of
state common law.

Finding these and defendants' other arguments unpersuasive,
the Court accordingly finds that the INA incorporates the state
common-law privilege against civil immigration arrest for those
present in New York state courthouses, or on courthouse grounds,
or necessarily traveling to or from court proceedings, and
therefore grants plaintiffs' motion for summary judgment on
Count One.

**II.  Count Two**

Next, the parties cross-move for summary judgment on plaintiffs' second cause of action, their claim that ICE adopted its courthouse arrest policy in an arbitrary and capricious manner, in violation of section 706(2)(A) of the APA.

It is axiomatic that an agency must provide a reasoned explanation for a departure from its prior policy. Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983); FCC v. Fox Television Stations, Inc., 556 U.S. 502 (2009). As explained above, ICE initially changed its courthouse arrest policy in 2017, when it greatly increased both the number and scope of courthouse arrests, purportedly in response to the January 25 Executive Order and the February 20 Implementing Memo. While neither the January 25 Executive Order nor the February 20 Implementing Memo says anything expressly about courthouse arrests, it is here undisputed that ICE officers interpreted the Executive Order in particular, along with the 2017 Implementing Memo, not only to remove the earlier limitations on courthouse arrests, but also effectively to mandate that they occur whenever necessary to ICE enforcement. See, e.g., Ex. 29 at Tr. 127:15-129:14; Ex. 38 at Tr. 217:6-14; Ex. 41 at Tr. 108:3-15. Accordingly, beginning in February 2017, the agency's policy was effectively that ICE officers had unfettered authority to arrest aliens on state courthouse grounds.

19

This change was largely codified in the adoption of the Directive in January 2018. Ironically, in light of ICE agents' interpretation of the Executive Order and the 2017 Implementing Memo, the Directive represented a mild contraction of ICE's courthouse arrest authority, though nothing even close to a full return to the pre-2017 policy. For example, the Directive provides that ICE agents should not arrest "family members or friends accompanying the target alien to court appearances or serving in a witness in a proceeding" except in "special circumstances." Ex. 53 ¶ 2. The Directive also instructs ICE officers to avoid arrests in public areas of the courthouse and in areas dedicated to non-criminal proceedings.

But while the administrative record produced by defendants provides an explanation for this modest narrowing, it says nothing about the reasons for the broad change in post-2016 policy that the Directive largely adopts. Indeed, if anything, the documents in the record demonstrate some of the problems with ICE's unconstrained authority to conduct courthouse arrests throughout 2017. The administrative record contains, for example, several 2017 media reports about disruptive courthouse arrests conducted under the pre-Directive policy. AR 136-43; 144-45; 146-55. The administrative record also contains correspondence from 2017 between ICE and several state courts, see AR 134-35 (Chief Justice Tani Cantil-Sakauye, Supreme Court

of California); 160-61 (Chief Justice Mary Fairhurst, Supreme
Court of Washington); 162-63, 167-70 (Lawrence Marks, Chief
Administrative Judge, New York State Unified Court System); 164-
66 (Thomas Balmer, Chief Justice, Oregon Supreme Court); 188-89
(Mary McQueen, National Center for State Courts), in which
various state chief justices and other judiciary personnel
express concern about ICE courthouse arrests.

In short, no reasons for the 2017 change in policy and
practice nor for its codification in the 2018 Directive are set
forth anywhere in the administrative record of this case. This
is because, as defendants essentially conceded at oral argument
on the instant motions, see Tr. at 14:12-16:24, ECF No. 107 (May
4, 2020), the reason for this policy change was ICE's silent
interpretation of the January 2017 Executive Order and the 2017
Implementing Memo as effectively mandating this change. That is,
in 2017, ICE greatly increased the frequency and scope of its
courthouse arrests because it believed the Executive Order, in
particular, required it to do so.

In actuality, however, the Executive Order did no such
thing (nor for that matter did the 2017 Implementing Memo). As
the Court observed at oral argument, Tr. at 12:12-18, the
Executive Order (as well as the 2017 Implementing Memo) is
silent on the topic of courthouse arrests. See AR 71-75. It
merely directs, in general terms, that ICE must "employ all

lawful means to ensure the faithful execution of the immigration laws of the United States against all removable aliens," AR 72 (emphasis supplied), and it instructs the Secretary of Homeland Security to "review agency regulations, policies, and procedures for consistency with this order," AR 74.

However, for all the reasons previously explained, courthouse civil arrests are not lawful, because they contravene the common-law privilege, which the INA is best read to incorporate, that protects courts and litigants against these intimidating and disrupting intrusions. Regardless of what ICE may have believed, then, the Executive Order in fact did not compel the agency to undertake its vast broadening of the scope of courthouse arrests.[15] To the contrary, by its use of the term "lawful," it effectively forbade such unlawful intrusions.

"[I]t is black letter law that where an agency purports to act solely on the basis that a certain result is legally required, and that legal premise turns out to be incorrect, the action must be set aside, regardless of whether the action could have been justified as an exercise of discretion." Regents of

---

[15] The fact that ICE's leadership may have held its interpretation in good faith is irrelevant. Although courts often defer to an agency's reasonable interpretation of the language of an executive order, see Udall v. Tallman, 380 U.S. 1, 4 (1965), the case for deference is at its weakest where the word in question is "lawful."

the Univ. of Cal. v. U.S. Dep't of Homeland Sec., 908 F.3d 476,
505 (9th Cir. 2018) (citing SEC v. Chenery Corp. (Chenery I),
318 U.S. 80, 94 (1943) ("[I]f the [agency] action is based upon
a determination of law as to which the reviewing authority of
the courts does come into play, an order may not stand if the
agency has misconceived the law.")).

ICE has committed precisely this error. It has effectively
offered no rationale other than its misguided reliance on the
Executive Order for its consequential decision to expand its
agents' authority to conduct courthouse arrests. Although the
Directive itself makes conclusory references to the "reduce[d]
safety risks" of conducting arrests in a place where people are
screened for firearms, and the "unwillingness of jurisdictions
to cooperate with ICE in the transfer of custody of aliens from
their prisons and jails," Ex. 53 ¶ 1, the record contains no
explanation of how the agency balanced any such benefits against
the harms of the policy discussed above. Accordingly, the
adoption of the Directive by ICE, as well as less formal shift
in practice and policy in 2017, were arbitrary and capricious,
in violation of § 706(2)(A) of the APA.

**CONCLUSION**

For the foregoing reasons, the Court grants plaintiffs'
motion for summary judgment with respect to Counts One and Two,
and, as a direct result, is obliged to also grant plaintiffs'

requested injunctive and declaratory relief. Specifically, the Court declares ICE's policy of courthouse arrests, as now embodied in the Directive, to be illegal, and hereby enjoins ICE from conducting any civil arrests on the premises or grounds of New York State courthouses, as well as such arrests of anyone required to travel to a New York State courthouse as a party or witness to a lawsuit.

Clerk to enter judgment.

SO ORDERED.

Dated:    New York, NY
          June 10, 2020

United States District Judge